# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| In the Matter of the Arbitration Between:<br><br>**PT SUMOHADIWIDJOJO**,<br><br>    Applicant<br>    (Respondent below)<br><br>and<br><br>**BSB RESIDUAL ASSETS TRUST**,<br>**BSB TRUST COMPANY, LTD.**, Trustee,<br><br>    Respondent<br>    (Claimant below).<br><br>and<br><br>**CITIZENS BANK**, Trustee. | **CIVIL ACTION NO. 04 12646 NG**<br><br>**APPLICANT PTSW'S OPPOSITION TO RESPONDENT'S MOTION TO VACATE OR REDUCE *EX PARTE* ATTACHMENT** |

## I. INTRODUCTION & BACKGROUND

### A. The Nature of the Proceeding

This proceeding involves an Application by PT Sumohadiwidjojo ("PTSW"), an Indonesian limited liability company, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), as implemented at 9 U.S.C. §§ 1 *et seq.*, the Federal Arbitration Act ("FAA").[1] PTSW seeks to

---

[1] A copy of the New York Convention, adopted by the United Nations in 1958 and to which the United States acceded in 1970, is attached to PTSW's Application as <u>Exhibit A</u>. Chapter 2 of the FAA, at §§ 201-207, deal explicitly with Convention enforcement actions, while § 208 provides that the provisions of Chapter 1 govern to the extent not inconsistent with Chapter 2 or the Convention.

  Section 207 of the FAA provides, in pertinent part:

    Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to a court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.

confirm and have entered as a Judgment of this Court a Final Award of the Singapore International Arbitration Centre ("SIAC") dated December 15, 2004 ("SIAC Final Award" or "Final Award"),[2] made against the Respondent, BSB Residual Assets Trust ("BSBRAT"), which is purportedly organized in the British Virgin Islands, with BSB Trust Company, Ltd., as Trustee (BSBRAT and its Trustee are collectively referred to hereinafter as "the Trust").  The amount of the SIAC Final Award (exclusive of interest), as set forth in a Certificate of the SIAC Registrar dated March 11, 2005, is approximately $287,000.00.[3]

It is important to recognize that PTSW's Application in this matter did not initiate a full-blown civil lawsuit.  To the contrary, "confirmation of an arbitration award is intended to be summary in nature." *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990).  Toward this end, the Federal Rules of Civil Procedure expressly provide that in proceedings brought under the FAA, the Rules apply "only to the extent that matters of procedure are not provided for" in the FAA.  Fed.R.Civ.P. 81(a)(3).  In turn, the FAA provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided for the making and hearing of motions, except as otherwise herein expressly provided."  9 U.S.C. § 6.

The Trust's Memorandum in Support of its Motion to Vacate or Reduce *Ex Parte* Attachment includes a lengthy recitation of the alleged "background facts" to the dispute between the parties that preceded the SIAC Arbitration.  This appears to be an unfortunate effort to obfuscate and complicate the routine matter of enforcing the SIAC Final Award as required by

---

[2] An original certified copy of the SIAC Final Award has been filed with the Court, and a copy is also attached for the Court's convenience at <u>Exhibit B</u> to PTSW's Application, as well as <u>Exhibit 1</u> to the Affidavit of Richard S. Nicholson, Esq. ("Nicholson Affidavit") filed contemporaneously herewith.

[3] An original certified copy of the SIAC Registrar's Certificate has been filed with the Court, and a copy is also attached for the Court's convenience at <u>Exhibit 1</u> to the Nicholson Affidavit.  Certain items of the Final Award are in Singapore dollars. The figure used herein results from the conversion of those items into United States dollars at the mid-range of current conversion rates.  *See* www.xe.com.  In addition, the SIAC Final Award bears interest at the annual rate of 6%, which would amount to more than $17,000.00 per year in this matter.

the New York Convention and the FAA. Therefore, although PTSW disagrees entirely with the Trust's characterizations and arguments concerning the substantive merits of the underlying dispute, PTSW is not required to, and thus will not, debate the merits in this Convention enforcement proceeding.

### B.     The Underlying SIAC Arbitration

The Trust commenced the underlying SIAC arbitration proceedings against PTSW on January 15, 2004, seeking a monetary award of $2,915,040.00, under certain agreements between the parties or their predecessors. The substance of these agreements, aside from the agreement to arbitrate before the SIAC,[4] are not particularly relevant to this proceeding. By late September 2004, Indonesian counsel for PTSW had raised several potentially dispositive objections to the Trust's arbitration claims, resulting in months of intensive briefing and several SIAC decisions adverse to the Trust. On September 21, 2004, the Trust abruptly decided to abandon its SIAC arbitration claims, and sought leave from the SIAC to do so.

The principle reasons proffered by the Trust for seeking to withdraw its claims against PTSW[5] were that:

> (a)     by separate proceedings which the Trust had simultaneously been pursuing in the Jakarta (Indonesia) High Court and the South Jakarta Land Office, the Trust had (so it claimed) "restored the legal rights that [it] sought to vindicate in this [SIAC Arbitration] proceeding" (¶ 1.2);
>
> (b)     accordingly, the Trust felt that it was "unnecessary . . . to proceed with its arbitration claim" (¶ 1.3);

---

[4]  A certified copy of the arbitration agreement invoked by the Trust in the SIAC Arbitration, as appearing in a document called a "Transfer of Right and Interest," has been filed with the Court pursuant to the New York Convention.

[5]  A copy of the Trust's Application to Withdraw is attached as <u>Exhibit 9</u> to the Affidavit of Alison Aubry, Esq. in Further Support of Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment. Citations (¶) are to the numbered paragraphs of the Application to Withdraw.

3

(c) the Trust (so it claimed) was "in a position to obtain the same financial results it sought in this arbitration" by "seek[ing] to foreclose on [the Trust's alleged] Security Rights in Indonesia" (¶ 5.1), and the Trust (so it claimed) could "proceed to foreclosure upon the Security Rights without the need for a prior monetary award" (¶ 5.2); and

(d) in any event, "any award granted by the [SIAC] Tribunal in favor of [the Trust] would ultimately require enforcement against [PTSW] by judicial action in Indonesia" (¶ 1.5).

The Trust noted that the ruling it had obtained from the Jakarta High Court "authorized the parties to return to the [Jakarta] District Court if further adjudication of matters related to this dispute becomes necessary" (¶ 3.3), and the Trust represented to the SIAC that it "is able and prepared to seek immediate relief . . . in Indonesia, rendering [the SIAC arbitration] process academic." (¶ 5.4).

By letter dated October 4, 2004, PTSW opposed the Trust's Application for Withdrawal of Claim, and sought to have the dispute between PTSW and the Trust finally resolved. In the alternative, PTSW requested that the Trust's withdrawal, at a minimum, be conditioned upon the payment of PTSW's costs of the arbitration, and an order barring the Trust from recommencing its arbitration claims.[6] After all, PTSW had needlessly spent hundreds of thousands of dollars over the course of nine months (as did the Trust) in defending itself before the SIAC.

In reply, the Trust reiterated that it had "obtained relief [from the Jakarta High Court] commensurate with the financial award it had requested from the [SIAC] Tribunal" (¶ 4.5) and thus could "proceed to foreclosure [in Indonesia] . . . without the need for a prior monetary

---

[6] A copy of PTSW's Response to the Claimant's Application for Withdrawal of Claim is attached as Exhibit 2 to the Nicholson Affidavit. The Response contains a summary of PTSW's position on the substantive issues involving the Trust's claims, including the reasons why the Trust has no right to any further payments from PTSW and no security interest, under principles of Indonesian law applicable to the relevant facts and circumstances. However, as discussed above, the Court need not and should not consider the merits of the parties' underlying dispute in this case

4

award in this proceeding." (¶ 4.8).[7]  The Trust also argued that an award of costs to PTSW, and a bar to further arbitration by the Trust, was unwarranted.

### B. The SIAC Final Award

The SIAC agreed that the Trust could withdraw its arbitration claim and pursue its remedies in Indonesia, but disagreed that it should do so unconditionally after having caused PTSW such tremendous and unnecessary expense.  Therefore, in granting the Trust leave to withdraw its claims, the SIAC decreed in its Final Award that *the Trust must pay PTSW its legal costs, expenses and disbursements incurred in defending the SIAC arbitration*

In addition, in order to make PTSW financially whole before the Trust could force PTSW to mount a costly defense – again – the SIAC decreed in its Final Award that "*no further arbitration [shall] be commenced by the [Trust]* in relation to the subject matter of its Notice of Arbitration (or any part thereof), *unless and until the Respondent's costs stated above are paid in full*." (Emphasis added).  As noted above, PTSW's costs have been taxed per agreement of the parties in the amount of approximately $287,000.00.[8]  In accordance with the New York Convention and the FAA, PTSW seeks to confirm this award and have it entered as a Judgment of this Court.

### C. PTSW's *Ex Parte* Motion for Attachment by Trustee Process

PTSW, at the same time it filed its Application under the Convention and the FAA, in order to secure its ability to collect upon the SIAC Final Award and resulting Judgment of this

---

[7] The Trust's Reply to Response to Claimant's Application for Withdrawal of Claim is attached as Exhibit 3 to the Nicholson Affidavit.

[8] According to the Final Award, such costs could be in an agreed amount or otherwise would be taxed by the SIAC Registrar.  The parties initially could not reach agreement and submitted materials to the SIAC Registrar. The parties subsequently reached agreement as reflected in the SIAC Registrar's Certificate. Therefore, as discussed below, the Trust's first argument in support of its present Motion to Vacate or Reduce *Ex Parte* Attachment, *i.e.,* that PTSW's Application was premature since the SIAC Award was unquantified, is now moot

Court, filed its *Ex Parte* Motion to Attach by Trustee Process pursuant to Mass.R.Civ.P. 4.2 and Mass. Gen L. c. 246, § 1 *et seq.*, as incorporated by Fed.R.Civ.P. 64(a). PTSW had reason to believe that the Trust held funds in a bank account at Citizens Bank ("Citizens") in Boston, and sought relief *ex parte* in light of the ease with which the Trust could electronically transfer, dissipate or conceal the funds if it received advance notice of PTSW's motion to attach them.

PTSW sought an attachment in the amount of $388,000, representing fees and expenses of its outside counsel and certain SIAC fees, as set forth in the Supplemental Affidavit of PTSW's President, Mr. Konrad Baerveldt. PTSW represented that it would be seeking at least this amount in the SIAC Registrar taxation proceeding.[9]

By Order dated December 17, 2004, the Court granted PTSW's *Ex Parte* Motion to Attach by Trustee Process, and issued a Trustee Summons to Citizens, which PTSW served on December 20, 2004. Citizens filed its Answer dated January 7, 2005, stating that the attached Trust accounts with Citizens held $369,717.07. The Trust's current Motion followed.[10]

## II. ARGUMENT

### A. PTSW's Application to Enforce the SIAC Final Award is Not Premature

The Trust's first argument in support of its Motion to Vacate or Reduce *Ex Parte* Attachment ("Trust's Motion") is the claim that PTSW's application was premature because, at the time of the motion, the SIAC Registrar had not finally taxed the costs awarded to PTSW

---

[9] The amount was derived from the legal bills attached in redacted format to Mr. Baerveltd's Supplemental Affidavit. PTSW intended to, and did (as the Trust notes in its current Motion), claim additional costs and expenses in its negotiations with the Trust and its submissions to the SIAC Registrar. However, in connection with the proceedings in this Court, PTSW elected not to make such additional claims since PTSW had reason to believe that the Trust's account at Citizens did not hold more than $388,000.

[10] PTSW would not object to the release of approximately $53,000.00 of the attached funds, representing the amount attached in excess of the SIAC Final Award less approximately $30,000.00, which PTSW would request be retained, over and above the amount of the Award, as security for interest under the SIAC Rules plus such costs as may be taxed by the Court in these proceedings.

under the SIAC Final Award. This argument is moot, since the Registrar has now taxed costs in the amount of approximately $287,000.00, per the agreement of the parties.

In any event, the Trust's reliance upon Article V 1(e) of the New York Convention is misplaced. The SIAC Final Award was unquestionably final and binding upon the Trust. Nothing remained for the SIAC Tribunal to do. The SIAC Rules,[11] at Rule 28, 30 and 30.5, expressly distinguish between the Tribunal's award and the subsequent taxing of costs. That is, Rule 28 provides that "[a]wards shall be final and binding on the parties from the date they are made," while Rule 30 provides that "[t]he costs of the arbitration shall be taxed by the Registrar or fixed by the Tribunal in its award," and Rule 30.5 provides that "a certificate signed by the Registrar on the amount of costs or fees taxed shall form a part of the award of the Tribunal." Accordingly, while provision for taxation by the Registrar may or may not be included in a SIAC final award, that does not render the award any less final.[12]

In analogous circumstances, the First Circuit and the Supreme Court have long held that "an unresolved issues of attorney's fees for the litigation in question does not prevent judgment on the merits from being final." *Budinich v. Becton Dickinson and Co.*, 496 U.S. 196, 202 (1988); *Crossman v. Maccoccio*, 792 F.2d 1 (1986) (*per curium*). The Rules of this Court likewise provide that "[e]ntry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees," unless the Court orders otherwise. Fed.R.Civ.P. 58(c). The

---

[11] A copy of the SIAC Rules, 2nd Ed. 22 October 1997, is attached as Exhibit 4 to the Nicholson Affidavit.

[12] Moreover, Rule 28.6 permits the SIAC Tribunal to make "separate final awards on different issues at different times." The SIAC Final Award in this case, in addition to the provision for payment by the Trust of PTSW's costs, contained several other substantive provisions – including, for example, the prohibition on the Trust's filing further arbitration claims unless and until PTSW's costs are paid, which provisions were undeniably final. The Final Award, therefore, could properly be the subject of an application under the New York Convention and the FAA, despite the prospect that additional provisions might be added.

SIAC did not order in its Final Award that it should be merely provisional or interlocutory, or that enforcement should be delayed pending the Registrar's taxation of costs.

### B. The Trust Has No "Set Off" Rights and Cannot Assert a "Counterclaim"

The Trust's second argument, *i.e.*, that it is entitled to "set off" amounts due to PTSW under the SIAC Final Award by an unadjudicated amount allegedly due to the Trust is legally infirm. This Court's decision in *Hewlett-Packard Co., Inc. v. Berg*, 867 F.Supp. 1126 (D.Mass. 1994), *vacated and remanded on other grounds*, 61 F.3d 101 (1st Cir. 1995), is directly on point.[13]

*Hewlett Packard* involved an application to enforce a foreign arbitral award under the New York Convention and the FAA. The respondent ("Apollo") defended its failure to pay the full amount awarded to Hewlett Packard ("HP") by asserting a purported right to "set off in recoupment" sums it claimed to be owed on certain unadjudicated claims against HP. Judge Tauro rejected this defense, not only because a right to "set off" or "recoup" no longer exists in Massachusetts, 867 F.Supp. at 1133,[14] but more importantly, because the New York Convention, at Articles V and VI, provide a *finite and exclusive* list of defenses which do *not* include "set off" or "recoupment" of amounts allegedly owed by the applicant. 867 F.Supp. at 1132-1133.[15]

The Trust does not even attempt to assert – nor could it – any grounds under the Convention or the FAA for challenging the validity or enforceability the SIAC Final Award. In

---

[13] The Memorandum in Support of the Trust's Motion cites the First Circuit's decision in *Hewlett Packard* but curiously ignores this Court's decision.

[14] *See Bose Corp. v. Consumers Union of United States, Inc.*, 367 Mass. 424 (1975).

[15] The Court also rejected Apollo's request that it be relieved from its obligation under an arbitral award by the entry of a "declaratory judgment" that it need not pay the full amount of the award. "Long ago the First Circuit held that a plaintiff cannot 'by a suit for a declaratory judgment reopen the questions which it referred to a neutral for a binding decision and which the neutral decided against the plaintiff.'" *Id.* at 1133, *quoting Mutual Benefit Health & Acc. Ass'n v. United Casualty Co.*, 142 F.2d 390, 393 (1st Cir. 1944).

its Application and in its *Ex Parte* Motion to Attach by Trustee Process, with supporting materials, PTSW established all of the elements necessary to support confirmation by this Court of the SIAC Final Award.[16] As a result, the Trust's assertion in its Memorandum in Support of its Motion at p. 9, that "PTSW cannot demonstrate a likelihood of succeeding in obtaining a monetary judgment in this case," is wrong.

Further, in *Hewlett Packard*, Judge Tauro refused to permit Apollo to seek a reduction in the amount it concededly owed HP under the foreign arbitral award by the assertion of "counterclaims." Recognizing that "the counterclaims asserted are contested issues of contract law which would require discovery and a full trial," he ruled squarely that "[t]he Convention only allows for specific and limited attacks on the validity of the claim [for confirmation of a foreign arbitral award], and nowhere does the Convention provide that a court sitting over a confirmation proceeding may adjudicate a counterclaim." *Id.* at 1132.[17]

The *Hewlett Packard* court considered the case of *Jugometal v. Samicorp.*, 78 F.R.D. 504 (S.D.N.Y. 1978), which was cited by the Trust in its Memorandum in Support at p. 8, and rejected its approach. The better reasoning, according to the Court, was contained in *Booth v. Hume Publishing, Inc.*, 902 F.2d 925 (11th Cir. 1990), which held that "it would be inconsistent

---

[16] As stated in PTSW's Application, Article V of the New York Convention provides that "[r]ecognition and enforcement of [a foreign arbitral] award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof [of five enumerated defenses]," or where "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country," or where "[t]he recognition or enforcement of the award would be contrary to the public policy of that country." No such defenses or circumstances are present here. *See* PTSW's Affidavit in Support of *Ex Parte* Motion for Attachment by Trustee Process, ¶ 7.

[17] The First Circuit, while reversing and remanding on other grounds, *agreed* with this conclusion. 61 F.3d at 104.

9

with the language and purpose of the [FAA] to allow counterclaims" raising issues outside of those defenses expressly enumerated in the FAA. *Id.* at 931.[18]

The *Booth* court employed a carefully reasoned analysis premised upon the fundamental notion that arbitration enforcement proceedings under the FAA are intended to be "summary in nature," with restricted inquiry into factual issues only as necessary to conduct the "narrowly limited" scope of review. *Id.* at 932.[19] The Court observed that arbitration enforcement proceedings are not commenced by the filing of a complaint, but rather, are conducted per the rules of motion practice in which a court need not even hear testimony. Therefore, the Court concluded:

> To allow a respondent to assert counterclaims that are beyond the scope of the defenses enumerated in the [FAA] would change the nature of the confirmation proceedings and would defeat the purpose of the Act.

*Id.* at 933.

This solid rationale for prohibiting counterclaims in summary, motion-like arbitration enforcement proceedings generally, is even more compelling in the case of enforcement applications under the New York Convention as implemented under the FAA. Well over 100 nations, plus dozens more of their territories and protectorates, have acceded to the New York Convention over the past 45 years.[20] Disputes giving rise to foreign arbitral awards enforceable

---

[18] The other case cited by the Trust at p. 8 of its Memorandum, *Pike v. Freeman*, 266 F.3d 78 (2nd Cir. 2001), dealt with questions of issue preclusion in arbitration. It did not address the question of whether counterclaims could be asserted in an FAA enforcement action, apparently because it was not among the several arguments raised by the applicant. A more recent case from the Second Circuit, *McAllister Towing and Transport Company, Inc v. Offshore Express, Inc.*, 2004 WL 1488192 (S.D.N.Y. 2004), cited with apparent approval (in *dicta*) *Booth*'s holding that counterclaims are not allowed in an arbitration confirmation proceeding.

[19] The *Booth* court, like Judge Tauro, considered and rejected the holding of *Jugometal*, *supra*.

[20] In addition to the United States, they include: Algeria; Antigua and Barbuda; Argentina; Australia; Austria; Bahrain; Bangladesh; Barbados; Belarus; Belgium; Bolivia; Bosnia and Herzegovina; Botswana; Brunei; Bulgaria; Burkina Faso; Cambodia; Cameroon; Canada; Central African Republic; Chile; China; Colombia; Costa Rica; Cote d'Ivoire; Croatia; Cuba; Cyprus; Czech Republic; Dahomey; Denmark; Djibouti; Dominica; Ecuador; Egypt; Estonia; Finland; France; Georgia; German Democratic Republic; Germany, Fed. Rep.; Ghana; Greece; Guatemala;

in the United States federal courts under the Convention are certain, in many instances, to involve only the citizens of foreign nations, the diverse laws and regulations of such nations (including choice of law, issue preclusion and mandatory arbitration matters), the foreign languages of such nations, and witnesses and documents found among such nations, etc. The underlying dispute between PTSW and the Trust which preceded the SIAC Final Award is a perfect example: it involves complex issues Indonesian property, agrarian and secured transactions law, the functioning of the Indonesian courts and land agencies, court and agency rulings in the Indonesian language, as well as events, persons and entities from around the world over the course of decades.

Congress could not have intended that the straightforward act of filing an application to enforce a clear, final foreign arbitral award under the New York Convention and the FAA would be sufficient to require our federal courts also to assume personal and subject matter jurisdiction over the disputes of citizens of the nations of the world, and to adjudicate such disputes to conclusion before finally enforcing the final foreign arbitral award. The federal courts are *not* courts of general jurisdiction, and Section 203 of the FAA creates only a *limited* jurisdiction in the federal courts, *i.e.*, over "[a]n action or proceeding falling under the Convention." *Cf.* 28 U.S.C. § 1332 (diversity jurisdiction between citizens of different States, or citizens of a State and citizens of a foreign state, but *not* between citizens of foreign states).

To permit a party subject to a final foreign arbitral award to defend a New York Convention confirmation action by asserting counterclaims, setting up full-blown litigation in a

---

Guinea; Haiti; Holy See; Hungary; India; Indonesia; Ireland; Israel; Italy; Japan; Jordan; Kazakstan; Kenya; Korea; Kuwait; Kyrgyzstan; Latvia; Lesotho; Lithuania; Luxembourg; Former Yugoslav Republic of Macedonia; Madagascar; Malaysia; Mali; Mauritania; Mauritius; Mexico; Monaco; Mongolia; Morocco; Netherlands; New Zealand; Niger; Nigeria; Norway; Panama; Peru; Philippines; Poland; Portugal; Romania; Russian Federation; San Marino; Saudia Arabia; Senegal; Singapore; Slovakia; Slovenia; South Africa; Spain; Sri Lanka (Ceylon); Sweden; Switzerland; Syrian Arab Rep.; Tanzania; Thailand; Trinidad and Tobago; Tunisia; Turkey; Uganda; Ukraine; United Kingdom; Uruguay; Uzbekistan; Venezuela; Vietnam; Yugoslavia; Zimbabwe.

distant forum potentially unfamiliar with the laws, language and procedures governing the underlying dispute, would severely undermine, if not vitiate, the certainty and predictability in international commercial dealings that the New York Convention was designed to create. As one commentator has recently explained:[21]

> International arbitration in business disputes has become an irreplaceable alternative to litigation. . . . It is, perhaps, the finality inherent in international arbitration awards which the parties appreciate above all else; after all, it is especially inefficient and frustrating to have to engage in global forum shopping in order to finally find a court willing to recognize and enforce an arbitral award. The New York Convention was meant to act as a shield against such uncertainty; its goal was to prevent forum shopping by ensuring that awards would be recognized and enforced in each and every member state. To fulfill this purpose, the Convention was drafted as a rigid statute, one that would not yield to flexible interpretation or invite unwanted judicial tampering. Consequently, the grounds for judicial review allowed for under the Convention are strictly limited by the exclusive list of exceptions contained in Article V. Any departure from those limitations threatens to destroy the ground on which the Convention was built and to undermine the advantages of the international arbitration of commercial disputes.

### C.  The Trust is Not Entitled to Use Attached Funds to Pursue PTSW

In the end, what the Trust really is complaining about is that, having used a substantial portion of its finite liquid funds to commence, and then abandon, arbitration against PTSW in the SIAC, while simultaneously litigating in the High Court of Jakarta and the Indonesian land agencies; having failed to convince the SIAC that it would be just to permit the Trust to walk away and pursue PTSW elsewhere on monetary claims without *first* restoring to PTSW the substantial funds that it was forced unnecessarily to incur; having represented to the SIAC that the Trust *did not need* to pursue its monetary remedies against PTSW, because it intended to seek foreclosure upon its alleged security interests in Indonesia and thus "obtain the same financial results it sought in this

---

[21] Note, "Forum Non Conveniens and Personal Jurisdiction: Procedural Limitations on The Enforcement of Foreign Arbitral Awards Under the New York Convention," 83 B.U.L.Rev. 899 (2003).

arbitration"; and having had its assets attached by lawful means in this Court, upon a showing by PTSW that the Trust owes PTSW hundreds of thousands of dollars on a final foreign arbitral award with respect to which the Trust has *no* defenses – it is now somehow "unfair" not to let the Trust use up all of its remaining funds to pursue PTSW on *alleged* claims already once abandoned, *rather than* using the funds to honor the SIAC Tribunal's Final Award. The proposition as stated collapses under its own weight. The ultimate unfairness, of course, would be to permit the Trust to deplete its assets in a losing cause, leaving PTSW with nothing but a pyrrhic victory with respect to the SIAC Final Award.

The Court should also consider the fact that the Trust claimed in its present Motion to need $120,000 to pursue its claims against PTSW. Even assuming, *arguendo*, that this is a supportable figure, since the SIAC Final Award was only $287,000.00, and since PTSW would not object to the release of $53,000.00,[22] the Trust should now a significant portion of the funds needed to pursue its claims in Indonesia. If the Trust truly has a legitimate *secured* claim against PTSW for $4 million, and if the Trust truly needs more than $53,000 to conclude the Indonesian foreclosure proceedings it promised the SIAC it intended to pursue, one would fully expect that the Trust can obtain the needed funds from among its investors or from a lender. Likewise, one might expect that any counsel who would advise the Trust that is has a strong $4 million *secured* claim against PTSW would be willing to advance a relatively small amount of legal fees and expenses, secured by the Trust's anticipated recovery.

PTSW properly employed Mass.R.Civ. P. 4.2 and Mass.Gen.L. c. 246, § 1, *et seq.*, by showing that the sums attached may be needed to satisfy the likely recovery on the SIAC Final

---

[22] *See*, *supra*, n. 10.

Award, and properly obtained an *ex parte* attachment by a showing that the funds might be withdrawn if the Trust was given advance notice.[23] To be sure, the attachment laws exempt certain property the seizure of which would cause a judgment debtor a degree of hardship which society finds intolerable. For example, creditors cannot attach "necessary wearing apparel, beds and bedding," a "heating unit used for warming the dwelling house," or sums needed to pay for "fuel, heat, water, hot water and light."[24] But the exemptions most certainly *do not* include a category called "funds, in an amount of no less than $53,000, needed to pay lawyers to assert commercial counterclaims against an prior, attaching judgment creditor."

Indeed, in matters far weightier than the Trust's commercial claim against PTSW, courts have refused to shed crocodile tears for defendants who argue that they need their liquid assets – otherwise lawfully and legitimately seized – to hire lawyers to defend themselves. *See Caplin & Drysdale, Chartered v. U.S.,* 491 U.S. 617 (1989) (criminal defendant has no constitutional right to use forfeitable property to pay counsel); *U.S. v. Undetermined Amount of U.S. Currency*, 376 F.3d 260 (4th Cir. 2004) ( "[defendants'] possible need to pay their attorneys' fees in a civil forfeiture action falls far short in degree and kind from the hardships recognized by Congress" in Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983(f)).

---

[23] The Trust's admission that PTSW seized all of its liquid assets should be sufficient to demonstrate the soundness of the conclusion that, if the Trust had received advance warning, it would have put the funds beyond PTSW's reach.

[24] *See* Mass.Gen.L. c. 234, § 35, which also exempts certain small dollar amounts of "household furniture," "bibles, school books and library," "two cows, twelve sheep, two swine and four tons of hay," trade-related "tools, implements and fixtures" or "materials and stock," "provisions necessary and procured and intended for the use of the family, or the money necessary therefor," "one pew" in "a house of public worship," "boats, fishing tackle and nets," "the uniform of an officer or soldier in the militia and the arms and accoutrements required by law to be kept by him," "rights of burial and tombs in use as repositories for the dead," "one sewing machine," "shares in co-operative associations," a "homestead . . . or, in lieu thereof, the amount of money each rental period . . . necessary to pay the rent," "cash, savings or other deposits in a banking institution, or money . . . as wages for personal labor or services, or any combination of such cash, deposits or money owing, not exceeding one hundred dollars," "public assistance," or "an automobile necessary for personal transportation or to secure or maintain employment."

14

Returning to the main point: the SIAC Tribunal *expressly forbid* the Trust from recommencing its monetary claims against PTSW "*unless and until*" PTSW's costs under the Final Award "*are paid in full.*" (Emphasis added). To permit the Trust to take back all or any significant portion of its attached funds, leaving PTSW uncertain of recovering in full under the SIAC Final Award, while the Trust re-commences its monetary claims against PTSW in this Court, would make a mockery of the SIAC and its Final Award. In the words of the First Circuit (in a different but analogous context), "[i]t would be hard to imagine a step that would be more offensive to the pro-arbitration policies reflected in Congress' endorsement of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards." *Hewlett Packard*, 61 F.3d at 104.

There are no factual, equitable or legal grounds for vacating or reducing the attachment by PTSW on the Trust's Citizens bank account to below a sum necessary to satisfy the SIAC Final Award, with interest and costs of this proceeding. Once the Trust responds to PTSW's Application, and demonstrates its inability to raise any legitimate defenses under the New York Convention or the FAA, the Court should fulfill its duty under the mandates of those laws to confirm the SIAC Final Award and enter it as a Judgment of this Court. The Trust's attached funds then can be applied to satisfy the Judgment.

## III. CONCLUSION

For all of the foregoing reasons and based upon the foregoing points and authorities, PTSW respectfully requests that the Court deny the Trust's Motion to Vacate or Reduce *Ex Parte* Attachment (except, in the Court's discretion, to the extent of $53,000.00), and grant PTSW such other and further relief as the Court deems just and proper.

        Respectfully submitted,

        **PT SUMOHADIWIDJOJO**, Applicant

        By its Attorneys,

        /s/ Richard S. Nicholson
        Marjorie Sommer Cooke (BBO # 097800)
        Richard S. Nicholson (BBO # 542182)
        COOKE, CLANCY & GRUENTHAL, LLP
        150 Federal Street
        Boston, MA 02110
        (617) 428-6800

Dated: March 17, 2005