# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of the Arbitration Between: | **CIVIL ACTION NO.  04 12646 NG** |
| **PT SUMOHADIWIDJOJO,** | |
| Applicant | **AFFIDAVIT OF** |
| (Respondent below) | **RICHARD S. NICHOLSON, ESQ.** |
| **BSB RESIDUAL ASSETS TRUST,** | |
| **BSB TRUST COMPANY, LTD**., Trustee, | |
| Respondent | |
| (Claimant below). | |
| and | |
| **CITIZENS BANK**, Trustee. | |

I, Richard S. Nicholson, upon oath do hereby state as follows:

1.      I am an attorney in good standing and a licensed member of the Bar of the Commonwealth of Massachusetts and this Court.

2.      I represent the Applicant, PT Sumohadiwidjojo ("PTSW") in this matter, which involves an Application by PTSW, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as implemented by 9 U.S.C. §1 *et seq.*, the Federal Arbitration Act, to enforce a Final Award made by the Singapore International Arbitration Centre ("SIAC") against the Respondent, BSB Residual Assets Trust, BSB Trust Company, Ltd., Trustee ("the Trust").

3.      Attached hereto as exhibits to this Affidavit are materials referenced in PTSW's Opposition to Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment, which Opposition is filed contemporaneously herewith.

4.      Attached at <u>Exhibit 1</u> are true and accurate copies of certified copies of the SIAC Final Award and the SIAC Registrar's Certificate (the original copies of which have previously been filed with the Court).

5.      Attached at <u>Exhibit 2</u> is a true and accurate copy of PTSW's Response to the Claimant's Application for Withdrawal of Claim, filed in the underlying SIAC Arbitration.

6.      Attached at <u>Exhibit 3</u> is a true and accurate copy of the Trust's Reply to Response to the Claimant's Application for Withdrawal of Claim, filed in the underlying SIAC Arbitration.

7.      Attached at <u>Exhibit 4</u> is a true and accurate copy of the SIAC Rules, 2nd Ed. 22 October 1997.

Signed under the pains and penalties of perjury this 17th day of March, 2005.


/s/ Richard S. Nicholson
Richard S. Nicholson (BBO # 542182)
COOKE, CLANCY & GRUENTHAL, LLP
150 Federal Street
Boston, MA 02110
(617) 428-6800

# **<u>EXHIBIT 1</u>**

## SINGAPORE INTERNATIONAL ARBITRATION CENTRE

{ARB NO. 002 OF 2004}

In the Matter of an Arbitration

Between

**BSB RESIDUAL ASSETS TRUST**

... (Claimants)

And

**PT SUMOHADIWIDJOJO**

... (Respondents)

## CERTIFICATION

This is to certify that the attached document is a true copy of the **Final Award** in the above Cause made on **15th December 2004**.

Dated this 15th day of December 2004



*(signature)*

**Ganesh Chandru**
**Assistant Registrar**

## AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

{ARB NO. 002 OF 2004}

In the Matter of an Arbitration

Between

**BSB RESIDUAL ASSETS TRUST**

... (Claimants)

And

**PT SUMOHADIWIDJOJO**

... (Respondents)

---

**FINAL AWARD**

---

Dated this 15th day of December 2004



Certified true copy of the original

for Registrar

# SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## SIAC ARB NO. 002/2004

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

## BSB RESIDUAL ASSETS TRUST

... Claimant

## AND

## PT SUMOHADIWIDJOJO

... Respondent

==========================================

## F I N A L   A W A R D

==========================================

**Claimant Represented By:-**

**Messrs Soemadipradja & Taher**
Wisma GKBI, Level 9
Jl Jenderal Sudirman No 28
Jakarta 10210
Indonesia

(Ref : 9565.001/HT/RAD/RR-rm)

**Respondent Represented By:-**

**Messrs Hadiputranto, Hadinoto & Partners**
The Jakarta Stock Exchange Building
Tower II, 21st Floor
Sudirman Central Business District
Jl Jenderal Sudirman Kav 52-53
Jakarta 12190, Indonesia

(Ref: TBD/rm/0341TBD04 02)

**Dated this 15th day of December 2004**

# SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## SIAC ARB NO. 002/2004

## IN THE MATTER OF AN ARBITRATION

### BETWEEN

### BSB RESIDUAL ASSETS TRUST

Claimant

### AND

### PT SUMOHADIWIDJOJO

Respondent

## F I N A L   A W A R D

Arbitrators:    Mr L P Thean, Mr Michael Hwang, S C and Mr Felix O Soebagjo

Soemadipradja & Taher representing the Claimant

Hadiputranto, Hadinoto & Partners representing the Respondent

**PARTIES**

1.    In this arbitration, the Claimant is BSB Residual Assets Trust with its registered office at Trident Chambers, Wickhams Cay, P O Box 146, Road Town, Tortola, British Virgin Islands. The Respondent is P T Sumohadiwidjojo with its principal place of business at S Widjojo Centre, 2nd Floor, Jalan Jenderal Sudirman 71, Jakarta, Indonesia.

**MATERIAL FACTS**

2.    By an instrument or document headed "TRANSFER OF RIGHT AND
INTEREST" entered into on 17 February 1998 (hereinafter called the "Transfer of
Right and Interest Agreement"), the Claimant transferred, assigned and conveyed
to the Respondent, and the Respondent accepted, all of the Claimant's rights and
interest over the entire mezzanine floor, being part of the S Widjojo Centre more
particularly described therein at a price of US$2,915,040 and subject to the terms
and conditions more particularly provided therein.

**DISPUTE**

3.    Subsequently, a dispute arose between the parties with respect to the Transfer of
Right and Interest Agreement.    Article 7 of the said agreement provided as
follows:

1.    Any dispute between the Parties hereof relating to this
Agreement shall be first settled amicably.

2.    If an amicable settlement cannot be reached within 30 (thirty)
days after the occurrence of dispute, such dispute shall be
arbitrated by three arbitrators in Singapore under the rules of the
Singapore International Arbitration Centre.    The Arbitration
award issued thereunder shall be final and binding upon the
Parties hereof.

3.    The Parties hereto agree and declare that Articles 620, 641 and
650 paragraph (2) of the Reglement op de Rechtsvordering and

Article 15 and 108 of Law Number 1 of 1950 (one thousand nine hundred and fifty) and any other provisions of Indonesian Law giving any party the right to appeal any award made by the arbitral tribunal, shall not have any application whatsoever to any arbitration commenced hereunder.

4.     The Parties hereto state that Article 631 of the Reglement op de Rechtsvordering shall apply, and thus the arbitrators shall be bound by strict rules of law in making their decision and shall not be entitled to render a decision ex aequo et bono.

4.     The parties were not able to settle the dispute amicably, and accordingly, under Article 7(2) of the Transfer of Right and Interest Agreement, the dispute was required to be arbitrated by three arbitrators in Singapore under the rules of the Singapore International Arbitration Centre (the "SIAC"), the rules being hereinafter referred to as the "SIAC Rules".

### ARBITRATION

5.     On 15 January 2004, the Claimant pursuant to Rule 3.1 of the SIAC Rules filed with the SIAC and served on the Respondent the Notice of Arbitration and thereby initiated this arbitration under the SIAC Rules.

6.     In the Notice of Arbitration, the Claimant claimed that the Respondent breached Article 3 of the Transfer of Right and Interest Agreement by:

4

(a)    denying its indebtedness to the Claimant under the Loan Agreement (referred to in Article 3 of the Transfer of Right and Interest Agreement) which was entered into between the Claimant as the lender and the Respondent as the borrower on 17 February 1998 in the amount of US$2,915,040, being part of the total loan amount under the Loan Agreement of US$3,060,000, and

(b)    improperly seeking and obtaining the release and discharge of the Deed of Granting Security Right Over Land (also referred to in Article 3 of the Transfer of Right and Interest Agreement) without notice to, or the consent or approval of, the Claimant.

The Claimant further claimed that the Respondent also breached its obligations of good faith under Article 1338 of the Indonesian Civil Code, as more particularly described in paragraph 6(b) of the Notice of Arbitration.

7.    On 29 January 2004, the Respondent, pursuant to Rule 4.1 of the SIAC Rules, served a Response to the Notice of Arbitration on the SIAC and the Claimant. In the Response the Respondent objected to the jurisdiction of arbitral tribunal under the SIAC Rules, contending that an arbitral tribunal has no jurisdiction over the matter in dispute between the Claimant and the Respondent and invoking the power of the SIAC to disallow the Claimant's claim at the outset and dismiss it with costs to the Respondent.

8.    On 20 February 2004, the SIAC held that any dispute on the jurisdiction ought to be decided by the arbitral tribunal and requested the parties to move the matter forward by taking steps to appoint the arbitrators.

**TRIBUNAL**

9.    Thereafter, the Claimant appointed Mr Michael Hwang, S C and the Respondent appointed Mr Felix O Soebagjo as the arbitrators, and both Mr Michael Hwang, S C and Mr Felix O Soebagjo appointed Mr L P Thean as the third arbitrator and the chairman of the tribunal.    The arbitral tribunal was thus constituted (the "Tribunal").

10.    On 24 May 2004, the Tribunal directed the parties to file and serve their respective submissions on the objection to the jurisdiction raised by the Respondent.  The parties duly filed and served their respective submissions within the time allowed by the Tribunal.

11.    On 6 September 2004, the Tribunal having considered the submissions made the following directions:

11.1    The Tribunal reserves its decision on the Respondent's objection to its jurisdiction until the hearing of the arbitration, when relevant evidence on Indonesian law pertaining to the issue and on factual issues may be adduced.

11.2    The Tribunal gives leave to the Claimant to amend the Statement of Case : (i) by stating (both in the title to the proceedings and in the body of the Statement of the Case) that the Claimant is the Trustee of BSB Residual Assets Trust (setting out the name of the Trustee); and (ii) by including a claim for rectification of the Transfer Agreement and the Loan Agreement to the extent as stated in paragraphs 13.3 and 13.5 of the Claimant's submission.

11.3    In granting leave to amend the Statement of Case as aforesaid, the Tribunal is not to be taken as having decided that the claim for rectification will be allowed. This issue is to be decided on the merits at the hearing of the arbitration.

11.4    The amendments to the Statement of Case are to be made by the Claimant within 14 days from the date hereof.

11.5    Notwithstanding the amendments all proceedings to date shall stand.

11.6    The Respondent shall file and serve the Statement of Defence and, if any, Counterclaim within 21 days from the date of filing and service of the Amended Statement of Case.

11.7    The Claimant shall file and serve the Statement of Reply and, if a Counterclaim is filed, the Defence to the Counterclaim, within 21 days from the filing and service of the Statement of Defence and, if any, the Counterclaim.

11.8    The Claimant shall pay the Respondent's costs relating to the amendments, but all other costs are to be reserved until the conclusion of the hearing of the arbitration.

11.9    After the close of the pleadings, a meeting will be held with a view to considering and issuing directions for the further conduct of this arbitration.

## APPLICATION FOR WITHDRAWAL OF CLAIM

12.    On 21 September 2004, the Claimant filed and served on the Tribunal and the Respondent an application for withdrawal of claim on the ground that the claim made in this arbitration has been made moot by certain events in Indonesia which were described in some detail in the application, and which the Tribunal finds it unnecessary to set out herein in any detail.  In response, the Respondent filed and served a very detailed submission on the Claimant's application for withdrawal of the claim.  The Claimant also filed a detailed submission in reply.

**AWARD**

13.   It is unnecessary to rehearse here the respective submissions of the Claimant and the Respondent. Suffice it to say that their submissions have been considered at length by the Tribunal. Most of the submissions made by them relate to the merits of the claim, and for the purpose of the application they are not of great relevance and assistance. In the opinion of the Tribunal, the Claimant is at liberty to withdraw the claim, and the only question is on what terms should it be allowed to do so. Having regard to all the relevant circumstances of the case, the Tribunal now AWARDS AND DIRECTS as follows:

(a)   that the Claimant be and is hereby allowed to withdraw its claim;

(b)   that the Claimant pay the costs of the arbitration referred to and defined in Rule 30.1 of the SIAC Rules;

(c)   that the cost of the arbitration referred to above be paid in the first instance out of the deposits paid by the Claimant and the Respondent to the SIAC and that both the Claimant and the Respondent be jointly and severally liable for the full payment of the costs of the arbitration;

(d)   that the Claimant reimburse the Respondent in full for such part of the costs of the arbitration paid for by the Respondent and/or out of the deposits made by the Respondent;

(e)   that the Claimant pay the Respondent the latter's legal costs, expenses and disbursements of this arbitration referred to in Rule 30.3 of the SIAC

Rules to be agreed between the parties and failing agreement to be taxed by the Registrar of SIAC; and

(f)    that no further arbitration be commenced by the Claimant in relation to the subject matter of its Notice of Arbitration (or any part thereof), unless and until the Respondent's costs stated above are paid in full.

14.    For the purpose of Rule 30.2 of the SIAC Rules the costs of the arbitration are specified as follows:

(a)    the costs and expenses of the Arbitrators as follows:

|      |                                                |   |             |
|------|------------------------------------------------|---|-------------|
| (i)  | the costs and expenses of Mr L P Thean         | : | $13,550.00  |
| (ii) | the costs and expenses of Mr Michael Hwang,S C | : | $8,300.00   |
| (iii)| the costs and expenses of Mr Felix O Soebagjo  | : | $12,075.00  |

(b)    the expenses of the SIAC referred to in Rule 30.1(e) of the SIAC Rules:

|                                                    |   |             |
|----------------------------------------------------|---|-------------|
| the expenses of the SIAC referred to in Rule 30.1(e) of the SIAC Rules: | : | $6,089.18   |
| Total                                              | : | $40,014.18  |

Dated this 15th day of December 2004

_____        _____        _____
L P Thean                   Michael Hwang, S C           Felix O Soebagjo

**S I A C**

## SINGAPORE INTERNATIONAL ARBITRATION CENTRE

{ARB NO. 002 OF 2004}
Bill of Costs No. 01 of 2005

In the Matter of an Arbitration

Between

**BSB RESIDUAL ASSETS TRUST**

... (Claimants)

And

**PT SUMOHADIWIDJOJO**

... (Respondents)

## CERTIFICATION

This is to certify that the attached document is a true copy of the **Registrar's Certificate** in the above Cause issued on **11th March 2005 at Singapore**.

Dated this 11th day of March 2005

**Ganesh Chandru**
**Assistant Registrar**

SIAC

## IN THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

ARB 002 of 2004
Bill of Costs No. 01 of 2005

### IN THE MATTER OF AN ARBITRATION

Between

**BSB RESIDUAL ASSETS TRUST**

… Claimants

And

**PT SUMOHADIWIDJOJO**

… Respondents

### REGISTRAR'S CERTIFICATE

In the Award dated 15 December 2004 it was ordered that:

> "the Claimants pay the Respondents the latter's legal costs, expenses and disbursements of this arbitration referred to in Rule 30.3 of the SIAC Rules to be agreed between the parties and failing agreement to be taxed by the Registrar of SIAC."

I have on 25 February 2005 heard counsel for parties on the Respondents' Application for Taxation of Costs dated 18 January 2005.

I certify that by parties' agreement I have taxed the costs payable by the Claimants to the Respondents and allowed the same as:-

a)  US$272,694.18 for legal costs;

b)  US$331 and S$12,019.61 being expenses and disbursements incurred;

c)  US$1,250 for costs incurred in this taxation; and

d)  S$8,922.82  being taxing fees.

Dated this 11th day of March 2005.

Certified true copy of the original

Registrar

Registrar
Singapore International Arbitration Centre

# **<u>EXHIBIT 2</u>**

HADIPUTRANTO, HADINOTO & PARTNERS

The Jakarta Stock Exchange Building
Tower II, 21st Floor
Sudirman Central Business District
Jl. Jenderal Sudirman Kav. 52-53
Jakarta 12190, Indonesia

Tel: +62 (21) 515 9000, 91 920 62
Fax: +62 (21) 515 4845/46, 515 4855/56
AAA@hhp.co.id

4 October 2004                                    Ref: RAD/0109rad04 00

- **Mr. L. P. Thean**                        BY FAX NO: (65) 6534 1909
  KHATTAR WONG & PARTNERS              AND COURIER
  80 Raffles Place
  #25-01 UOB Plaza 1
  Singapore 048624

- **Mr. Michael Hwang, SC**               BY FAX NO: (65) 6557 0165
  One Marina Boulevard #25-01          AND COURIER
  Singapore 018989

- **Mr. Felix O. Soebagjo**                 BY FAX NO: (62-21) 522 9752
  SOEBAGJO, JATIM & DJAROT             AND COURIER
  Plaza DM, 17th Floor
  Jl. Jenderal Sudirman Kav. 25
  Jakarta 12920, Indonesia

- **Ms. Retno Muljosantoso / Mr. Robert Reid**
  SOEMADIPRADJA & TAHER                BY FAX NO: (62-21) 574 0068
  Wisma GKBI, Level 9                      AND COURIER
  Jl. Jenderal Sudirman No. 28
  Jakarta 10210, Indonesia

### SIAC ARBITRATION No. 002 of 2004 (ARB002/04)
### RESPONSE TO THE CLAIMANT'S APPLICATION FOR WITHDRAWAL OF CLAIM

Dear Sir and Madam,

We refer to the Claimant's application to withdraw from the present arbitration proceedings dated 21 September 2004.

The Respondent submits that the application is being made in bad faith and shows that the Claimant, having used the current arbitration proceeding for its own purposes, is now attempting to withdraw from this proceeding, as the Claimant is clearly unwilling to comply with the Tribunal's directions that the trustee of the Claimant be made a party to the proceedings.

**<u>Legal construct apparently carefully chosen to create the perception of legality where the basic underlying elements lack this legality and validity</u>**

1        It cannot be seriously disputed that the genesis of the dispute is an alleged failure by the Respondent to repay a loan. The Respondent challenged the existence of



**HADIPUTRANTO, HADINOTO & PARTNERS**

the loan in the District Court of South Jakarta on 4 October 2003 and that court ruled in the Respondent's favor on 16 October 2003. The Respondent's lawyers informed the Claimant's United States-based lawyers, Hale & Dorr LLP (now Wilmer Cutler Pickering Hale & Dorr LLP), accordingly by a letter dated 10 December 2003, [Attachment 1]. The Respondent's position on the merits is set out in this letter.

2    Prior to October 2003, the Respondent had been led to assume that the Claimant had valid interests and rights in the property, as the Claimant had strenuously continued to assert "ownership rights", including the legal existence of the Claimant, since 1993.

3    In effect, substantive elements of the complex legal construct and the reasons for this legal construct only came to light after January 2004 when the Claimant initiated arbitration proceedings. Only subsequent to the Notice of Arbitration filed by the Claimant in mid-January this year and the events of 4 October 2003, did the Respondent become aware of the Claimant's status as a non-legal entity, and that the Claimant is not on the file at the Companies Registry or incorporated under the International Business Companies Act (Cap. 291) in the British Virgin Islands. This prompted further investigations by the Respondent into the legal construct set up by the Claimant.

4    Following 3rd party investigations in March of this year, the Respondent found out about the true legal construct of the Claimant, as well as further facts which support the position that the Claimant did not in fact own (and has never owned) the property or "rights" it purportedly sold to the Respondent. These facts now include the date of incorporation of BSB Trust Company, Ltd. as being 26th of January 1995, eighteen months after the "Declaration of Trust" and "Deed of Transfer" both dated 26th of July 1993. Most significantly, verified copies of the Principal Register of Subud Brotherhood International Foundation ("SBIF") have now been obtained by the Respondent. These documents state the legally authorized signatories of SBIF, [Attachment 2].

5    The Claimant's fundamental claim is based on a transfer of the property in question, allegedly transferred to it by SBIF, pursuant to a Deed of Transfer 26 July 1993, (the "Deed of Transfer" – see Tab 5 of the Claimant's Statement of Case). The documents in Attachment 2 clearly establish the legal signatories for SBIF. These documents confirm that any two of the following were the only legally authorized signatories of SBIF over this period:

    a.    Varindra Vittachi;
    b.    Ian Arnold; and
    c.    Garrett Thomson.

6    These legal powers were exclusively held for the period from 2 March 1985 to 24 April 1995, when SBIF was officially dissolved. The signatories to the Deed of Transfer representing SBIF were Michael Irwin, Juan Andujar, Elke Goebel



HADIPUTRANTO, HADINOTO & PARTNERS

and Joel Lorot. None of these signatories were the legally authorized signatories of SBIF. The name of Garrett Thomson was included as one of the signatories signing on behalf of SBIF. However, Garrett Thomson *refused to sign* the Deed of Transfer at that time since he was aware that it will be tainted with illegality. Following enquiries made by the Respondent, Mr. Thomson confirmed this verbally, in a meeting with the Respondent's representatives on 12 June 2004. The Respondent is happy to obtain necessary affidavit to the effect, if necessary.   The same 4 persons who signed on behalf of SBIF (without legal authority to do so), also signed on behalf of the Claimant, although never having been granted by SBIF (as "trustees" of SBIF) the authority to enter into the Deed of Transfer in the first place. Significantly, Garrett Thomson was not named as a representative of the Claimant.

7    Clearly, quite apart from the merits as outlined in Attachment 1, the Deed of Transfer is invalid. In the Respondent's view, the careful legal construct was chosen to protect signatories from possible personal legal consequences arising from being signatories to the Deed of Transfer.

### Arbitration intended to prejudice the Respondent

8    The question then arises as to why the Claimant commenced these arbitration proceedings. In particular, why did the Claimant continue to engage the Respondent in substantial submissions on security for costs and objections to jurisdiction, when the Claimant was fully aware that the High Court in Jakarta had already on 28 May 2004 nullified the ruling of the District Court?

9    The Claimant is a trust. As the Tribunal has ruled, it is not a legal person. The persons taking the decisions concerning the trust have clearly sought to cause the Respondent to expend substantial resources in contesting this arbitration without the ability to recover any financial expenditure from them. The timing of the application to withdraw is not co-incidental. It comes *immediately* following the Tribunal's direction that the trustee (BSB Trust Company, Ltd.), who is a legal person against whom recovery can be sought, be made a party to the proceedings.

10    The application is an attempt by the Claimant to *evade* the consequences of the Tribunal's ruling. It is an attempt by the Claimant to prevent further arbitral proceedings and the (likely) submission, following the Tribunal's directions that it needs to consider all issues at the merits phase, which would necessarily include *issues on the legality and validity of the Deed of Transfer*.

11    Further, the view expressed by the Claimant that it "now has the ability to pursue foreclosure of its security rights" (paragraph 1.3 of the Claimant's Notice of Withdrawal) appears to be quite contrary to the direction of the Tribunal as it is only the trustee, BSB Trust Company, Ltd., that has the ability to pursue foreclosure.



0109rad04 00                                                              3

HADIPUTRANTO, HADINOTO & PARTNERS

12    As the Tribunal is already aware, the Claimant has repeatedly attempted to infer that the Loan Agreement, Security Rights, and the Transfer of Right and Interest Agreement represent a "suite of agreements" with the Transfer of Right and Interest Agreement purportedly the principal agreement. The Respondent must emphasize that this is a self serving unilateral viewpoint. Repetition of this unilateral viewpoint by the Claimant provides additional insight into the misleading nature of the Claimant's assertions since 1993.

13    Similarly, the Tribunal may regard aspects relating to the Powers of Attorney ("PoA's") now being displayed by the Claimant in light of the above. How is it possible that PoA's (authorized signatories) and documentation fundamental to the "suite of agreements" inferred by the Claimant now be excused by the Claimant as "errors of omission" and "typographical errors" when this documentation apparently had been created and approved by legal counsel for the Claimant in both the United States and Indonesia prior to the signing of the agreements?

14    Additionally, the Respondent invites the Tribunal to note that while the Jakarta Regional Land Office took cognizance of the High Court's ruling in its letter of 16 August 2004, and the South Jakarta Land Office apparently acted on the advice in that letter on 9 September 2004, the Claimant has not indicated when it became aware of these matters.

15    Further, the Claimant's reasons in paragraph 5 of its application for not proceeding with this arbitration are flawed when analyzed. Firstly, they show that the primary remedy sought is financial relief. This is a remedy under the Loan Agreement which is subject to the jurisdiction of the District Court of South Jakarta. Secondly, insofar as recourse to security rights are concerned, this Tribunal, with respect, could not have addressed the issue of the Claimant's security rights in any event. Those rights were the subject of the on-going court proceedings in Jakarta.

16    Bearing in mind that the Claimant's purpose was to seek repayment of the alleged loan and that the Loan Agreement dated 17 February 1998 provides for the District Court of South Jakarta to have jurisdiction, the proper course of action, on any sensible reading of the situation, would have been for the Claimant to address the ruling of 16 October by the District Court of South Jakarta.

17    The Claimant's own actions show that it recognized this as Claimant petitioned the High Court in Jakarta on 6 May 2004 to nullify the ruling of the District Court.

**Award sought by the Respondent**

18    The Claimant is presently in breach of the Tribunal's direction to amend its Statement of Case. The Claimant has indicated it has no intention of complying



HADIPUTRANTO, HADINOTO & PARTNERS

with the direction of the Tribunal. The Tribunal can now rule in favor of the Respondent on the ground that the Claimant, as a trust, has no legal personality to bring these proceedings.

19    Such an award is necessary to avoid a future arbitration by the trust with the consequent expenditure of time and expenditure on the part of the Respondent.

20    In any event, the Claimant should be ordered to pay the Respondent's legal costs and the arbitration costs of these proceedings. An application to withdraw is, in the ordinary case, a concession to the success of the other party: see Handbook of Arbitration Practice, published by Sweet & Maxwell in conjunction with the Chartered Institute of Arbitrators, 1998, where it is stated in paragraph 2-818 that,

> "Where a party *withdraws his claim or defence*, the usual rule is that he must pay the costs of the other party, because by his withdrawal he is conceding to the success of the other party."

21    In *The Arglios Shipping Co v Midwest Steel & Alloy Corporation, The Angeliki* [1982] 2 Lloyd's Report 594, [Attachment 3] the arbitrators made a global award on costs in favor of the owners despite the fact that one of the issues in arbitration which had been put forward by the owners had been withdrawn by them. The charterers applied to the court to remit the award to the arbitrators for further consideration with regard to the order for costs on the ground that the arbitrators were wrong to award the owners the whole of their costs when they have withdrawn one of the issues. They argued that the owners ought to have been ordered to bear their own costs of issue which they had withdrawn. In the judgment, Lloyd J said,

> "Now, of course the tribunal may order costs to follow the event though the successful party has failed on one or more issues. But here, the issues which were *withdrawn* from the consideration of the arbitrators were the central issues in the case. That in itself would be seems to be, a sufficient ground why I ought to remit the question of costs to the arbitrators."

22    Although the case dealt with a point in claim being withdrawn, as opposed to the entire claim being withdrawn, the Respondent submits that it is relevant given that in essence, this is simply a case where ALL the points in claim have been withdrawn.

23    In this case, for the reasons set out above, the application to withdraw is a further indication that the Claimant believes that the legality and validity of its case will not stand up to scrutiny in any possible merit phase.



HADIPUTRANTO, HADINOTO & PARTNERS

24    Further, the Tribunal ought to impose a condition on the Claimant's withdrawal by analogy to the practice of the Singapore courts, which analogy the Tribunal is empowered to adopt by s 12(4)(a) of the International Arbitration Act,

"The Tribunal may award any remedy or relief that could have been ordered by the High Court if the dispute had been the subject of civil proceedings in that Court."

25    The appropriate condition would be that the Claimant be barred from commencing any future arbitration on the basis of the issues raised in its Statement of Case.

26    The Respondent has at all times been respectful of the Tribunal, its rulings, and its instructions, despite its challenge to the Tribunal's jurisdiction.

For the avoidance of doubt, the Respondent maintains its preliminary objections in their entirety.

Respectfully submitted,
**For and on behalf of PT SUMOHADIWIDJOJO**

Tony Budidjaja

cc:
- SINGAPORE INTERNATIONAL ARBITRATION CENTRE          BY FAX: (65) 68830823
  City Hall 3 St. Andrew's Road                                          AND COURIER
  Singapore 178958
  Attn.: Registrar of the Singapore International Arbitration Centre

- Client (PT SUMOHADIWIDJOJO)

LAW OFFICES

# HADIPUTRANTO, HADINOTO & PARTNERS

THE JAKARTA STOCK EXCHANGE BUILDING
TOWER II, FLOOR 21
SUDIRMAN CENTRAL BUSINESS DISTRICT
JL. JEND. SUDIRMAN KAV. 52-53
JAKARTA 12190, INDONESIA
TELEPHONE : (62-21) 515 5090, 515 5091, 515 5092, 515 5093
FACSIMILE : (62-21) 515 4840, 515 4845, 515 4850, 515 4855, 515 4860, 515 4865

*Our Ref.: TAM/IPG/PK/6787TAM03 04*

10 December 2003

William C. Benjamin
Hale & Dorr LLP
60 State Street
Boston, MA 02109

Via e-mail to william.benjamin@haledorr.com

**Loan Agreement between BSB Residual Assets Trust and PT S. Widjojo dated
17 February 1998 ("Loan Agreement")**

**Dear Mr. Benjamin,**

We have been requested by PT S. Widjojo to advise them in respect to your letter to them
dated 22 October 2003 regarding the above referenced subject and to respond to that Letter.
We have reviewed the Loan Agreement and the Transfer of Right and Interest dated
17 February 1998 (the "Transfer Agreement") and the documents referred to in the
Transfer Agreement, including the Purchase and Sale Agreement entered into on
11 August 1997 in which it was stated that PT S. Widjojo had purchased from BSB
Residual Assets Trust 144,960 Shares of Kalimantan Investment Corporation (the
"Shares"), together with various correspondence, newsletters and other documents relating
to transactions referred to in the documents mentioned above.

The Loan Agreement is an interesting document. It purports to provide for a loan from
BSB Residual Assets Trust in the amount of $3,060,000 to be used "to pay the Purchase
Price and to maintain S. Widjojo Centre." Purchase Price is defined in the third
Whereas clause as the "aggregate amount of the purchase price of the Shares and the
amount of the financial assistance from the Lender to the Borrower for the maintenance of
S. Widjojo Centre", i.e., US$3,060,000. The purchase price for the Shares was
US$144,960. The remaining portion of the Purchase Price, i.e., US$2,915,040, was for
the financial assistance to be provided by BSB Residual Assets Trust to assist in the



*www.hhp.co.id*

HADIPUTRANTO, HADINOTO & PARTNERS

2

maintenance of the S. Widjojo Centre. As we understand it, this amount of the loan was never made available to PT S. Widjojo, and thus the amount of the loan that was advanced to PT S. Widjojo is limited to the amount required to purchase the Shares, i.e., US144,960.

Your 22 October 2003 letter refers to the document referred to as the "Transfer of Right and Interest ... pursuant to which BSB Residual Assets Trust transferred the Bank Floor...." The Loan Agreement makes no mention of this, and in fact refers only to the purchase of the Shares. We believe there is a very clear reason why the Loan Agreement did not refer to the "Transfer of Right and Interest" or the transfer of the Bank Floor to by BSB Residual Assets Trust. Michael Irwin, chairman of BSB Assets Trustees, in a report to the BSB investors in April 1991, although with some errors (not of his making) summed up the position fairly succinctly:

> "... When it was in Blok M, prior to moving to S Widjojo, BSB discovered that Indonesian law required it to own its own headquarters [*Note: although it appears that this view may have been a commonly held belief, in point of fact Indonesian law never required banks such as BSB to own the buildings or location where their headquarters were*]. The S Widjojo building was under construction and BSB decided to purchase the mezzanine floor. BSB and PTSW tried to establish by documentation ownership rights to the floor to BSB. However, Indonesian law does not provide for strata-titling, that is, legal ownership of individual buildings. **Consequently, the BSB investors do not have legal ownership of the floor."**

The conclusion was absolutely correct, although the reasoning was not correct. In fact Indonesian law does provide for two or more separate parties to have ownership rights in different parts of a building on the same plot or several plots of land. The Deed of Sale and Purchase of Building and Transfer of Land Rights No. 117, dated 23 July 1979 ("Deed 117/1979") between PT S. Widjojo and PT Bank Susila Bakti ("BSB") provided the basis upon which BSB could have obtained title rights to the Mezzanine Floor. However BSB never followed up to register a transfer of ownership rights to the property and the Mezzanine Floor. All the relevant title documents are and have continued to be in the name only of PT S. Widjojo. Since BSB never had any title to the Mezzanine Floor, it could not convey any title rights to any third party. In addition, however, and as was recognised in 1986 (in an Agreement with Respect to Transfer of Rights dated 31 December 1986, between PPK Subud and SBIF), PPK Subud could not own title to the property because it is not a legal entity, so that even had BSB held ownership rights, it could not have transferred such rights to PPK Subud. In addition, neither SBIF nor BSB Residual Assets Trust could own title to the property under the applicable law as they are not Indonesian citizens or Indonesian legal entities. It is clear that at no time, including on 17 February 1998, when the Transfer Agreement and the Loan Agreement were entered



www.hhp.co.id

HADIPUTRANTO HADINOTO & PARTNERS

3

into, could BSB Residual Assets Trust transfer the Mezzanine Floor to PT S. Widjojo. It is possible that there may have been some confusion about this matter at the time. However we believe that Michael Irwin had the essence of the matter very clear: **"the BSB investors do not have legal ownership of the floor."** The substantive position with respect to whether BSB Residual Assets Trust had any title to the transfer is quite clear – it did not. In addition, had it had any title rights to the Mezzanine Floor, those rights would not have been capable of being transferred other than by a deed drawn by a PPAT, and not by a private "underhand" agreement such as the Transfer of Right and Interest Agreement.

Your letter of 22 October 2003 refers to Note 10 of the audited financial statement of PT S. Widjojo for 2001 as acknowledging the amount of US3,060,000, presumably as the amount of the loan from BSB Residual Assets Trust. Auditors cannot, through audited financial statement or otherwise, create assets where none exist, nor can they create liabilities where none exist.

In order for PT S. Widjojo to have an obligation to repay any amount in excess of the purchase price for the Shares together with interest (including default interest on that amount), BSB Residual Assets would have had to have advanced those additional funds to PT S. Widjojo, in this case, as stated in the Loan Agreement, "as financial assistance from the Lender to the Borrower for the maintenance of S. Widjojo Centre." No such funds were advanced, and thus there exists no obligation to repay amounts other than as required for the purchase of the KIC Shares, together with accrued interest and penalties.

On 30 September 2003, PT S. Widjojo paid to BSB Residual Assets Trust the amount of $168,809.42, as payment in full of the amount of the loan - $144,960 – plus accrued interest and penalties in the amount of $23,849.42, thus fully discharging its obligations under the Loan Agreement.

On 4 October 2003, PT S. Widjojo filed a petition in the District Court of South Jakarta, requesting the Court to declare, inter alia, the loan under the Loan Agreement as fully paid, the land clear of the security interest as evidenced by the Hak Tanggungan Certificate No. 319/1998, and to instruct the South Jakarta Land office to release (Roya) the Hak Tanggungan from the relevant land titles. The Court's Ruling to this effect was issued on 16 October 2003. The District Court of South Jakarta, subsequently on 28 October 2003 issued a letter to the South Jakarta Land Office instructing it to release (Roya) the second rank Hak Tanggungan over the six plots of land. The second rank Hak Tanggungan over the six plots of land was annulled (Roya) by the South Jakarta Land Office on 5 December 2003. We attach copies of the Decision of the District Court and the actions taken by the South Jakarta Land Office.



HADIPUTRANTO, HADINOTO & PARTNERS

4

In our view all appropriate action has been taken and all matters relating to PT S. Widjojo's obligations under the Loan Agreement are closed. We understand that PT S. Widjojo has been considering whether the periodic payments that have been made to and received by BSB Residual Assets Trust in respect of the rental income from the Mezzanine floor were induced under false pretences. However, PT S. Widjojo is prepared to forego any actions relating to the above matter if BSB Residual Assets Trust enters into the Amicable Settlement Agreement ("ASA") referred to below and takes the other steps set forth below.

In order to close all matters relating to the Loan Agreement and any actual or alleged rights BSB Residual Assets Trust believes it may have had with respect to the Mezzanine Floor or any other property of PT S. Widjojo, PT S. Widjojo has requested that we prepare and forward to you the ASA to be entered into by PT S. Widjojo and BSB Residual Assets Trust and to be acknowledged and agreed to by George H. Helmer. A copy of the ASA is attached to this Letter. If BSB Residual Assets Trust wishes to settle this matter it is of utmost importance that it sign the ASA and obtain the signature of George Helmer promptly, without delay. For this reason PT S Widjojo has advised us that the following schedule must be observed and that it will not accept any deviation from this schedule or any change to the ASA:

1.      Within seven days from the date of this letter BSB Residual Assets Trust ("BSBRAT") must:

(a)      sign the ASA and obtain the acknowledgement and acceptance of George H. Helmer as evidenced by his signature, and

(b)      deposit with Hale and Dorr LLP the sum of US$25,000 to reimburse PT S. Widjojo for all legal and other professional or notarial services, court fees, fees for the Roya of the second ranking Hak Tanggungan and other charges incurred or to be incurred by PT S Widjojo in connection with the Loan Agreement and the ASA.

Hale and Dorr must notify Hadiputranto, Hadinoto and Partners, attention Indri Pramitaswari Guritno, by fax - (62-21) 515-4840 or 515-4845 - or e-mail, no later than 17:00 hours on 17 December 2003 (Jakarta, Indonesia time) that BSBRAT has duly signed the ASA and deposited US$25,000 with Hale and Dorr for the reimbursement of PT S. Widjojo costs as provided in this Clause. Hale and Dorr will, without dispute, promptly, but in no event more than five days following receipt from Hadiputranto Hadinoto & Partners of the statement referred to below, transfer to the Bank Account of Hadiputranto, Hadinoto and Partners amounts in the



www.hhp.co.id

HADIPUTRANTO, HADINOTO & PARTNERS

5

aggregate up to US$25,000 upon receipt of a statement from Hadiputranto, Hadinoto & Partners specifying amounts spent by PT S. Widjojo on legal and other professional fees, notarial fees, court costs and fees for the Roya of the second ranking Hak Tanggungan;

2.    The seven day period mentioned in clause 1 above will allow Hale and Dorr sufficient time to confirm with their Indonesian correspondents the validity of the Court Decree and the Roya of the second Hak Tanggungan as well as verification of any other relevant Indonesian law aspects to the loan transaction;

3.    Should Hadiputranto, Hadinoto and Partners not receive confirmation from Hale and Dorr of acceptance by the parties to the ASA within the stipulated seven day time limit, the offer to settle all matters amicably in accordance with the ASA will expire automatically and PT S Widjojo will be free to communicate directly with PT S. Widjojo and all BSBRAT Unit Holders under applicable laws, regulations, orders, judgements and agreements;

4.    Within 14 days from the date of this letter, i.e. not later than 17.00 hours on 24 December 2003 (Jakarta, Indonesia time) Hadiputranto, Hadinoto and Partners must receive at least two copies of the ASA, duly signed by BSBRAT and George H. Helmer, together with the documentation intended to be provided as part of the ASA and fully described in the ASA, for further signing and completion by PT. S Widjojo;

5.    Should PT S Widjojo become aware prior to the signing of the ASA by BSBRAT that BSBRAT or BSB Trust Co. (BVI) or George H. Helmer or any other person or party is seeking any form of judicial proceedings in connection with the matters raised in this letter or that any of the confidential information provided in or included with this letter and the ASA or provided to BSB Trust Co. (BVI), the Trustees of BSBRAT or to George H. Helmer, has been disclosed or communicated to any other person or party other than to Hale and Dorr, then it is further fully understood that PT S Widjojo will be free to immediately withdraw its offer to settle matters amicably in accordance with the ASA and to act according to the rights granted to it under the applicable laws, regulations, orders, judgements and agreements.

The above course of action is intended to (i) finally settle issues that, while being contentious, may not have been clearly understood by all the Trustees of BSB Residual Assets Trust or, *more importantly*, may not have been clearly explained or even



www.hhp.co.id

6787TAM03 04

HADIPUTRANTO HADINOTO & PARTNERS

6

communicated to all former Trustees of BSB Residual Assets Trust prior to this letter, (ii) ensure that confidential and very sensitive information is not disclosed to parties other than as stated above.


Very sincerely,



Timothy A. Manring/Indri Pramitaswari Guritno


Attachments: -  Draft of Amicable Settlement Agreement (in PDF format).
             -  The English Translation of Court Ruling No. 275/Pdt.P/2003/PN.
                Jak.Sel, dated 16 October 2003.
             -  The copies of land certificates (in PDF format).


Cc:    Konrad Baerveldt – PT S. Widjojo



www.hhp.co.id

6787TAM03 04

ATTACHMENT # 2



| Nr. | Numéro | Date | Page | | | | | Associés, gérants, administrateurs, personnes ayant qualité pour signer | Fonction, but social | Mode de signature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5405 | 16.11.1968 | 2603 | 1 | | | 3 | Edward Gordon Van Rixx, de Grande-Bretagne, à Genève | membre-président * | signature collective à 2 |
| 2 | 200 | 15.01.1969 | Pas de publication | | | | 6 | by-law Marikinn (Surrey, Grande-Bretagne) | | |
| 3 | 5635 | 2.11.1973 | 3074 | 1 | | | | Robert Edward dit Roland Siokimberger, de Bâle, à Bern (VD) | | |
| | Rectification | 6.12.1973 | 3261 | | | | | | | |
| 4 | 3432 | 4.06.1976 | 1754 | 1 | | | a3 | Philippe Lamoux dit Lionel Carré, de Genève, à Meyrin | membre * | signature collective à 2 |
| 5 | 5083 | 29.6.1984 | 2540 | 1 | | | 4 | Paul Belchord, de Grande-Bretagne, à Londres | membre * | signature collective à 2 |
| 6 | 1414 | 15.2.1985 | 421 | 3 | | | a4 | Martin Gardiner, de Grande-Bretagne, à Thames Ditton (Surrey, Grande-Bretagne) | membre président | signature collective à 2 |
| | | | | | | 3 | 5 | Philippe Ducoux dit Lionel Carré, de Genève, à Genève (Surrey, Grande-Bretagne) | membre * | signature collective à 2 |
| | | | | | | 6 | 6 | Martin Gardiner, de Grande-Bretagne, à Thames Ditton (Surrey, Grande-Bretagne) | membre * | signature collective à 2 |
| | | | | | | 4 | | Kevin Coorwood, de France, à New York | membre - président | signature collective à 2 |
| 7 | 3620 | 31.3.1995 | 2237 | | | 6 | | Pedra Vittachi, de Sri Lanka, à New York | membre * président | signature collective à 2 |
| | | | | | | 6 | | C. LaFarmild, de Grande-Bretagne, à Stanwell Village, GB | membre * vice-président | signature collective à 2 |
| | | | | | | 6 | | Barrett Thomson, de Grande-Bretagne, à Windsor, GB | membre * secrétaire | signature collective à 2 |

* du conseil ...

APOSTILLE

Convention de la Haye du 5 octobre 1961)

1. Pays: Suisse
   Le présent acte public
2. a été signé par M. ...
3. agissant en qualité de ...
4. est revêtu du sceau/timbre de ...

Attesté
5. à Genève
6. le
7.
8. sous No ... 65289

Copie certifiée conforme

1 4 JAN. 2003

La préposée
par délégation

Registre du Commerce * Canton de Genève

1 JAN. 2003

Patrick MULLER
commis administratif

Commercial Register of Geneva

[unclear numbers]

Principal Register

| Index | | | Legal Nature | | Headoffice | | Date of filing | Date of termination | | File number | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiche | | Foundation | | | | 26 November 1968 | 31 March 1995 | | 5405/1968 | | |
| Ref. | | Style or name | | Ref. | | Ref. | Address | | Ref. | Branch | Ref. | Statute date |
| 1 | | Subud Brotherhood International Foundation | | 1 | Geneva | 1 | ~~10, Avenue Soret~~ | | | | 1 | 4.11.1968 |
| | | | | | | | ~~c/o Fauste Benetti~~ | | | | 6 | 30.7.1984 |
| | | | | | | 3 | ~~16, Avenue Rocchier, c/o Philippe~~ | | | | | |
| | | | | | | | ~~Gerre~~ | | | | | |
| | | | | | | 5 | rue Muzy 7, c/o Business Advisory | | | | | |
| | | | | | | | Services SA | | | | | |

| Ref. | | Aim, observations |
|---|---|---|
| | 1 | To receive and manage one or more funds/assets, to use the profit/income and eventually the corresponding capital to encourage the well-being of humanity worldwide and to use the funds of the foundation for religious, educational and charitable purposes, including the support and development of the Subud Spiritual Brotherhood worldwide. |
| | 1 | ~~Administration: a council of 5 to 9 members~~ |
| | 6 | Administration: a council of 5 to 12 members |
| | 7 | The foundation is dissolved. As its liquidation has been brought to a close, it is therefore terminated. |

[Unofficial Translation]

| | Capital | | Shares or payment/loan of associates or resources | Properties in kind, recovery of wealth, compensation of trusts, special advantages, responsibilities, additional deposits |
|---|---|---|---|---|
| Ref. | nominal | issued | | |

| Ref. | | Public agent or legal authority |
|---|---|---|
| | 2 | Federal Department of the Interior |

Canton Revenue
Stamp Fr.2.50

| Ref. | Journal Number | Journal Date | Publication FOSC Date | Page | Insc | Mod | Ref. | First name, name, origin, residence, marital status | Function, position | Signing power |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 5405 | 26.11.1968 | 30.11.1968 | 2603 | 1 | | 3 | Edward-Gordon van Hien, of Great Britain, at Goring-by-Sea, Worthing (Sussex, Great Britain) | member-president * | any 2 collective signatures |
| 2 | 200 | 15.01.1969 | Not published | | 1 | | 6 | Robert-Edouard called Raimond-Gintzburger, of Basel, at Nyon (VD) | member * | any 2 collective signatures |
| 3 | 5605 | 2.11.1973 | 17.11.1973 | 3074 | 1 | | m3 | Philippe-Jacques called Faessel-Carre, of France, at Moyrin | member * | any 2 collective signatures |
| | | Amendment | 8.12.1973 | 3261 | | | | | | |
| 4 | 3432 | 4.06.1976 | 19.04.1976 | 1754 | 1 | | 4 | Paul Stafford, of Great Britain, at London | member * | any 2 collective signatures |
| 5 | 5083 | 29.5.1984 | 14.7.1984 | 2540 | 3 | | m4 | Sjenfin Gardiner, of Great Britain, at Thames-Ditton (Surrey, Great Britain) | member-president * | any 2 collective signatures |
| 6 | 1414 | 15.2.1985 | 2.3.1985 | 821 | 3 | 3 | 6 | Philippe-Jacques called Faessel-Carre, of France, at Geneva | member-* president | any 2 collective signatures |
| 7 | 3620 | 31.3.1995 | 24.4.1995 | 2231 | | | 6 | Sjenfin Gardiner, of Great Britain, at Thames-Ditton (Surrey, Great Britain) | member * president | any 2 collective signatures |
| | | | | | 4 | | | Xevier Guemend, of France, at New York | member * president | any 2 collective signatures |
| | | | | | 6 | | | Varadra Vittachi, of Sri Lanka, at New York | member * vice-president | any 2 collective signatures |
| | | | | | 6 | | | C. Ian Arnold, of Great Britain, at Stanwell Village, GB | member * secretary | any 2 collective signatures |
| | | | | | 6 | | | Garret Thomson, of Great Britain, at Windsor, GB | | any 2 collective signatures |

POSTSCRIPT
(Convention of the Hye 5 October 1961)

1. Country Switzerland
The present public document
2. was signed by ... [signed]
3. acting a... official in Charge
4. with the ... seal / stamp of
Commercial Register Geneva

Certified
5. at Geneva    6. this    14 JAN. 2003
7. Republic and Canton of Geneva
8. under No. 8528
9. Seal/Stamp
Seal
Canton of Geneva
Dept of Justice, Police, and Security
10. Signature
[signed]
Patrick MULLER
Administrative assistant

Certified Copy
14 JAN. 2003
Officer in charge by
proxy delegation

Seal
Canton of Geneva
Commercial Register

[Unofficial Translation]

* of the council —
——————— (rad. ref. 4)

594        **LLOYD'S LAW REPORTS**        [Q.B. (Com. Ct.)]

[1982] VOL. 2]        The "Angeliki"        PART 6

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

July 19, 1982

ARGOLIS SHIPPING CO. S.A.

v.

MIDWEST STEEL AND ALLOY CORPORATION

(THE "ANGELIKI")

Before Mr. Justice LLOYD

Arbitration — Award — Costs — Central issues withdrawn by owners and charterers — Offer of settlement by charterers — Arbitrators made award of costs in favour of owners — Whether sealed offer affected results of costs incurred — Whether award should be remitted for reconsideration of costs.

By a charter-party dated June 16, 1978, in the Gencon form, the owners let their vessel *Angeliki* to the charterers for the carriage of a cargo of steel turnings from Detroit to Pasajes in Spain.

In the course of the voyage the cargo became overheated and the vessel suffered damage, and pursuant to an agreement dated Nov. 30, 1978, the parties agreed to refer the dispute to arbitration.

In their points of claim the owners asserted that the cargo was of an injurious and/or inflammable and or dangerous nature and that the charterers were liable for damage to the vessel and the ancillary period of detention while the vessel was being repaired (Issue 1). In addition the owners claimed the balance of 10 per cent. freight (Issue 2); demurrage (Issue 3); and discharging expenses at Pasajes (Issue 4).

The charterers by their counterclaim claimed that the reason the cargo heated up was the failure on the part of the owners to carry the cargo carefully and properly (Issue 5).

The date of the hearing was fixed for Jan. 26, 1982, and on Jan. 22 the charterers made an offer in order to avoid or minimize the cost of expensive litigation. It was further agreed that Issues 1 and 5 would be withdrawn.

The offer was not accepted and the case came on for hearing before the arbitrators on Jan. 26. However, on Jan. 27, the case was settled on virtually the same terms as had been offered by the charterers on Jan. 22.

On Jan. 28, there was a hearing before the arbitrators on the question of interest and costs. In their award the arbitrators referred to Issues 2, 3, 4, and 5 and stated that the owners succeeded on Issues 2, 3 and 4 and that Issue 5 had been withdrawn. No reference was made to Issue 1 which had also been withdrawn.

The arbitrators then made a global award on costs in favour of the owners despite the fact that one of the issues in the arbitration which had been put forward by the owners had been withdrawn by them.

The charterers applied to remit the award to the arbitrators for further consideration of their order as to costs on the ground that the arbitrators were wrong to award the owners the whole of their costs when they had "lost" on the issue of damage to the vessel due to the fault of the charterers and the owners ought to have been ordered to bear their own costs of that issue which they had withdrawn as a result of the settlement between the parties. The charterers further argued that they ought to have the whole of the costs subsequent to the offer which they made on Jan. 22 and which the owners had subsequently accepted on Jan. 27.

————*Held*, by Q.B. (Com. Ct.) (LLOYD, J.), that (1) the questions of costs in relation to the sealed offer, made on Jan. 22, was entirely within the discretion of the arbitrators and it could not be held that in exercising their discretion to deal with the costs in the way they did after the sealed offer was made, they had exercised their discretion in a way which was obviously wrong since whatever view they took of the sealed letter it was plainly one within their discretion (*see* p. 597, cols. 1 and 2);

(2) on the evidence although Issues 1 and 5 involving two-thirds of all the costs of the action were withdrawn by the parties, nevertheless the arbitrators had ordered the charterers to pay the whole of the costs of those issues; the issues which were withdrawn from the consideration of the arbitrators were the central issues of the case and although that would have been sufficient ground for remitting the question of costs to the arbitrators there was a further ground that here there was a real risk that the arbitrators were under some misapprehension (*see* p. 598, col. 1);

(3) the order made by the arbitrators as to costs did not reflect the result of the arbitration including the fact that the two central issues were settled by agreement between the parties, by each side withdrawing his own claim in respect of one issue; the arbitrators ought to have attempted to reflect that fact in their award on costs and in awarding that the owners should recover the whole of the costs of the reference the arbitrators had obviously gone wrong; there was no material on which they could exercise their discretion in that way and the award would be remitted to the arbitrators for further consideration as to what order they ought to make as to costs (*see* p. 598, cols. 1 and 2).

The following case was referred to in the judgment:

*Takamine*, The, [1980] 2 Lloyd's Rep. 204;

This was an application by the charterers, Midwest Steel and Alloy Corporation that an

Case 1:04-cv-12646-NG    Document 19-3    Filed 03/17/2005    Page 19 of 22

award as to costs made by the arbitrators in favour of the owners, Argolis Shipping Co. S.A. be remitted to the arbitrators for further consideration.

Mr. Stephen Tomlinson (instructed by Messrs. Richards, Butler & Co.), for the owners; Mr. Michael Collins (instructed by Messrs. William A. Merrick & Co.) for the charterers.

The further facts are stated in the judgment of Mr. Justice Lloyd.

## JUDGMENT

Mr. Justice LLOYD: This is an application to remit an award to arbitrators for further consideration of their order as to costs. The claimants in the arbitration are Argolis Shipping Co. S.A. They were the owners of the vessel *Angeliki*. The respondents are Midwest Steel & Alloy Corporation and were the charterers.

The award is dated Feb. 1, 1982, and is a joint award of two arbitrators, Mr. Cedric Barclay and Mr. Michael Mabbs. The dispute between the parties arises out of a Gencon charter dated June 16, 1978. That charter provided for the carriage of a cargo of steel turnings from Detroit to Pasajes in Spain. In the course of the voyage the cargo became overheated and the vessel suffered damage. The charter-party does not itself contain an arbitration clause but it was agreed between the parties that the dispute should be referred to arbitration pursuant to an agreement which they made on Nov. 30, 1978.

The claimants served their points of claim on July 30, 1979. In par. 6 of their points of claim they assert that "the cargo was of an injurious and/or inflammable and/or dangerous nature" and by reason of that allegation they claimed that the respondents are liable for damage to the vessel and the ancillary period of detention while the vessel was being repaired. That sum amounts to $160,000. I will call that Issue 1. In addition, the claimants claim the balance of 10 per cent. freight; the sum there involved is $31,000. In respect of that sum the respondents claim a set off. I will call that Issue 2. Thirdly, the claimants claim demurrage in the sum of $121,640. Fourthly, they claim discharging expenses at Pasajes amounting to some 15-16 million pesetas, which is said to be the equivalent of about $230,000. Those are the four issues raised by the points of claim.

The respondents served their defence and counterclaim on Feb. 9, 1980, and by their counterclaim they claim that the reason why the cargo heated up was a failure on the part of the claimants to carry the cargo carefully and properly. I will call that Issue 5. Issues 1 and 5

were referred to at the proceedings as being the fault issues. It will be seen that they are the obverse of each other; they are two different sides of the same coin.

So much for the pleadings. The date of hearing was fixed for Jan. 26, 1982. But four days before that, on Friday, Jan. 22, there was an application to adjourn the hearing because the general average adjustment had not yet been received. That application was refused by the arbitrators. On the same day as that application, Jan. 22, at 3 40 p.m. in the afternoon, the charterers sent the owners the following telex:

The Respondents are prepared to make the following proposal to avoid or minimise the costs of expensive litigation.

1. It is agreed that neither the Claimant nor the Respondents has been in any breach of duty to the other causing the overheating of the cargo and the ship. Each party's claims in connection herewith are dropped.

Now that is Issue 1 and Issue 5.

2(A). The Respondents are willing to pay prior to the G.A. adjustment to the Claimant those sums together with interest to which they are contractually entitled under the charterparty, namely, the balance of freight [that is Issue 2] demurrage [that is Issue 3] and their lawful (i.e., in accordance with the charterparty terms or subject [unreadable] for breach of them) entitlement to discharge expenses.

Now that relates to part of Issue 4.

Since no precise figure can reasonably be placed on 2(A) before the G.A. adjustment, the Respondents are without prejudice to 2(A) hereof willing to deal with it on the principle of Order 14 under the Court Rules on which basis the Respondents are prepared to pay the claimed US $31,005.56 for freight and the claimed US $121,640.62 for demurrage, and pesetas 2,100,000 for accepted normal discharge expenses and interest.

That is Issue 2, Issue 3 and part of Issue 4.

The G.A. adjustment to be prepared urgently. Subject to the foregoing each party's rights are fully reserved in the G.A., either party being able to restore the arbitration in the event of any disputes in connection therewith (including any claim which Claimants may wish to make that items placed in G.A. should have been paid under 2(A) hereof).

4. Interest due is to be agreed between the parties or awarded in accordance with the tribunal's discretion.

5. Each party to bear their own costs or costs are to be as awarded by the tribunal in their discretion.

It is a pity that when agreeing to withdraw Issues 1 and 5, the parties did not, by agreement, deal specifically with the costs raised by those issues. If they had, this application would have been avoided.

6. Liberty to apply to the tribunal for the purpose of enforcing the terms hereof and obtaining any necessary directions in connection therewith.

The same day the charterers sent a further telex as follows:

Re our telecon this p.m. You have advised us that you consider that the normal discharge expense should be treated as US $47,353.80 rather than pesetas 2,100,000. In our 2(B) we are simply trying to adjust a suitable figure in the absence of the G.A. adjustment. We are agreeable to accepting the figure as US $47,353.80 as you suggest.

What that telex was doing was merely replacing the figure of 2,100,000 pesetas with an equivalent in U.S. dollars. But the offer was not then accepted. On Jan. 26 (that is on the Tuesday), the case came on for hearing and the hearing continued for the whole of that day. On the following day, Wednesday, Jan. 27, the case was settled virtually on the same terms as had been offered by the respondents on Jan. 22. On Jan. 28, there was a hearing before the arbitrators on the question of interest and costs. On Feb. 1, they made their award. In their award they say in par. 4:

The matters in reference related to:—

(a) Claimants claimed a balance of freight. [That is Issue 2.]

(b). Claimants claimed demurrage. [That is Issue 3.]

(c). Claimants claimed expenses in discharging the cargo at Pasajes. [That is Issue 4.]

(d). A counterclaim by Respondents relating to the condition of the cargo carried. [That is Issue 5.]

It will be noticed that in setting out the matters in reference the arbitrators make no reference to Issue 1 (that is the claimants' claim for damage to the vessel; the cost of repairs and the associated detention). Their award is in the following paragraph:

We find and hold: (a) Claimants succeed in the sum of US $31,005.56 in respect of freight.

That is the sum which had been offered in the telex on Jan. 22.

(b). Claimants succeed in the sum of US $121,640.62 in respect of demurrage.

That, again, is the sum which had been offered in the telex.

(c). Claimants succeed in the sum of US $47,353.82 in respect of expenses in discharging.

That, again, is the sum which had been offered in the telex as amplified in the owners' telex by way of reply.

(d). Respondents' counterclaim relating to the condition of the cargo, does not succeed. Respondents have withdrawn this counterclaim.

That, of course, is Issue 5, but again no reference to Issue 1 which the claimants had withdrawn; just as the respondents had withdrawn Issue 5 so had the claimants withdrawn Issue 1. When they come to deal with the question of costs they say in par. 8:

We also award and direct that Respondents do bear and pay their own and the Claimants' costs in the Reference (the latter to be taxed if not agreed) and we further award and direct that Respondents do bear and pay the costs of this our Award which we hereby tax and settle at £3,695 which sum includes our fees and those of the Umpire in attendance.

Thus, the arbitrators have made a global award on costs in favour of the claimants despite the fact that one of the issues in the arbitration, which had been put forward by the claimants, had been withdrawn by them.

Mr. Collins, who appears on behalf of the respondents on this application, makes two submissions. Firstly, he submits, that the arbitrators were wrong to award the claimants the whole of their costs when they had "lost" on the issue of damage to the vessel due to the fault of the charterers. He submits that the owners ought to have been ordered to bear their own costs of that issue which they withdrew as a result of the settlement between the parties. Secondly, and quite independently, he submits that the respondents ought to have the whole of the costs subsequent to the offer which the respondents made on Jan. 22, and which the claimants subsequently accepted on Jan. 27.

Mr. Tomlinson, who appears on behalf of the claimants, submits that it is rare for the Court to intervene on a question of costs ordered by the arbitrators. It is still more rare where the arbitrators have ordered that the costs should follow the event. Rarest of all is where both

those things have happened and in addition there has been an argument before the arbitrators on the question of costs. He submits that there is no material here on which I could order the arbitrators to reconsider the question of costs.

The principles on which the Court ought to act in these cases is common ground between the parties. Mr. Tomlinson submits that the order of the arbitrators should only be interfered with if there was no material at all on which they could make their award and exercise their discretion in the way they have. For that principle he cites, conveniently, the recent decision of Mr. Justice Robert Goff in The Takamine, [1980] 2 Lloyd's Rep. 204. Mr. Collins, on behalf of the respondents, accepts that formulation of the correct principle, but he shortens it by saying that I could only remit this award for further consideration of costs if I were of the view that the arbitrators were plainly wrong. I shall treat those two ways of putting the test as being the same.

Now, I can deal very shortly, in the light of those principles, with the second way in which Mr. Collins puts his case. He submits that once the sealed offer had been made then, if that offer was subsequently accepted, the respondents are entitled to all the costs thereafter; and he cites, by way of analogy, what happens on a payment into Court. But there is no rule that a defendant is automatically entitled to his costs after a payment-in if it is made less than 21 days before the trial. If, to take an extreme case, the payment-in is made on the day before the trial and the trial goes ahead, and if the plaintiff eventually recovers less than the amount of the payment-in, there is no automatic rule that, in those circumstances, the defendant should recover his costs of the trial. The matter is quite clearly one which is wholly and completely within the discretion of the Court; there is no rule of thumb. That appears from the note in the White Book at p. 417, written at a time when the payment-in had to be made 14 days before the date of the trial. The note reads:

Where a payment into Court was made 14 days before the hearing and the amount awarded to the plaintiff was less than the amount paid in, the Court refused to exercise its overriding discretion to award the defendant the costs after the date of payment in, since the plaintiff had prima facie 14 days (now 21 days) in which to accept the payment in.

So, here, it seems to me, that the question of costs, in relation to the sealed offer, was entirely within the discretion of the arbitrators. If they took the view that this sealed offer made, as it was, on Jan. 22, was made too late for the claimants to be able to consider it, take advice on it and decide what to do, if that was the view they took, then it was certainly well within their discretion to say that it should not affect the result of the costs incurred thereafter. They may well have taken the view that it was reasonable for the claimants to be entitled to some time to consider this sealed offer. They may well have taken the view that it was ambiguous. But whatever view they took, it seems to me, plainly, that it was one within their discretion and I could not possibly hold that in exercising their discretion to deal with the costs in the way they did after the sealed offer was made, they had exercised their discretion in a way which was obviously wrong.

The other way in which Mr. Collins puts the case seems to me to be much stronger; yet looking at the transcript of the argument which took place before the arbitrators it appears to have occupied very little time. Most of the time at the hearing as to costs was spent on the question of the sealed offer. Indeed, it may be that when the arbitrators came finally to consider their award as to costs they may have overlooked altogether this point that two of the issues, two major issues in the arbitration, had been withdrawn from their consideration altogether.

Now, the evidence on those two issues is this. Mr. Merrick, the senior partner of William A. Merrick & Co., a firm of solicitors, in his affidavit says that according to his calculations, and they could not be anything other than approximate, about two-thirds of the costs which his side incurred, were incurred in relation to what I have called the fault issues; that is to say, Issue 1 and Issue 5. So far as his own costs are concerned he says (perhaps I had better refer to his evidence) as follows:

In my opinion, the cost relating to this aspect must have involved a minimum of two thirds of all the costs of the Legal Work by the parties, and that of that two-thirds I would estimate that about two-thirds related to the Claimants' claim relating to the cargo whereas about one-third at most would have related to the Respondents' counterclaim.

That is to say, Issues 1 and Issues 5; and then in par. 12 of his affidavit he says:

On that basis, I would estimate that probably the Claimants incurred a minimum of £15,000 in pursuing their claim against the Respondents for breach of duty, which they the Claimants discontinued. As far as the Respondents are concerned these costs were wasted by the Claimants on a claim which had never been pursued, and by the same token

LLOYD'S LAW REPORTS [Q.B. (Com. Ct.)

The "Angeliki" [Lloyd, J.

costs of a similar nature have been incurred unnecessarily by the Respondents.

Those figures are not challenged or contradicted in any way by Mr. Church in his affidavit on behalf of the claimants.

Though these issues involving, on that view, two-thirds of all the costs of the action were withdrawn by the parties, nevertheless, the arbitrators have ordered that respondents pay the whole of the costs of those issues.

Now, of course, a tribunal may order costs to follow the event even though the successful party has failed on one or more issues. But here, the issues which were withdrawn from the consideration of the arbitrators were the central issues in the case. That, in itself would be, it seems to me, a sufficient ground why I ought to remit the question of costs to the arbitrators. But there is a further ground about which I am concerned, namely, that there is here a real risk, to put it no higher, that the arbitrators were under some misapprehension. This is shown by the fact, to which I have already drawn attention, that when they record the matters in the reference they record the four issues on which the claimants "won" but they do not record the fifth issue on which the respondents "won".

Mr. Tomlinson submits that the three issues on which the claimants won, namely, the balance of freight, the claim for demurrage, and that part of the expenses which are accepted as having been due anyway, are really so bound up with the fault issues that they cannot be dealt with separately on the question of costs. I cannot accept that submission for one moment. It seems to me that the issues relating to freight, demurrage and the discharging expenses, Issues 2, 3 and 4, were essentially subsidiary and ancillary to the main issues in this arbitration, which were Issues 1 and 5; and to say that the costs on Issues 1 and 5 should depend on the outcome of Issues 2, 3 and 4 seems to me to be putting the cart before the horse, or, to change the metaphor, to allow the tail to wag the dog.

In reality, the order which the arbitrators have made as to costs does not reflect the result of the arbitration including (which is the most important thing) the fact that the two central issues were settled by agreement between the parties by each side withdrawing his own claim in respect of one issue. It seems to me the arbitrators ought to have attempted to reflect that fact in the award which they made as to costs. In awarding that the claimants should recover the whole of their costs of the reference, the arbitrators have gone obviously wrong. There is no material on which they could

exercise their discretion in that way. I therefore propose to remit this award to the two arbitrators for further consideration as to what order they ought to make in relation to costs.

I should only add that it is not suggested that the respondents are entitled to costs of the issue withdrawn by the claimants, or indeed that they are entitled to any costs at all. All that is suggested, on behalf of the respondents, is that they should not have to bear the costs of those two issues incurred by the claimants.

# **EXHIBIT 3**



## Soemadipradja & Taher

Ref. No.: 9565.001/HT/RAD/RR-rm

13 October 2004

**RECEIVED**
**13 OCT 2004**

| | |
|---|---|
| **Khattar Wong & Partners**<br>80 Raffles Place<br>#25-01 UOB Plaza 1<br>Singapore 048624<br>**Attention: Mr L.P. Thean** | **By Courier & Fax**<br>**Fax No.: +65 65341909** |
| **Mr Michael Hwang, SC**<br>One Marina Boulevard #25-01<br>Singapore 018989 | **By Courier & Fax**<br>**Fax No.: +65 6557 0165** |
| **Soebagjo, Jatim & Djarot**<br>Jl. Jenderal Sudirman Kav.25<br>Jakarta 12920<br>**Attention: Mr Felix O. Soebagjo** | **By Hand & Fax**<br>**Fax No.: 522 9752** |

Dear Sirs,

**SIAC Arbitration No. 002 of 2004 (ARB002/04):**
**Claimant's Reply to the Respondent's Response**
**to the Claimant's Application for Withdrawal of Claim**

We refer to our letters of 7 October 2004 and 12 October 2004 in relation to the Respondent's Response to the Claimant's Application for Withdrawal of Claim dated 4 October 2004

As anticipated in our letter of 12 October 2004, we enclose the Claimant's Reply to the Respondent's Response to the Claimant's Application for Withdrawal of Claim for the Tribunal's consideration.

Yours faithfully,
SOEMADIPRADJA & TAHER

Hafzan Taher
Managing Partner

Robert Reid
Foreign counsel

Enclosures.

| | | |
|---|---|---|
| Cc: | The Registrar of Singapore International Arbitration Centre<br>c/o SINGAPORE INTERNATIONAL ARBITRATION CENTRE | **By Courier and Fax**<br>No.: +65 6334 2942 |
| | Mr Tony Budidjaja<br>c/o HADIPUTRANTO, HADINOTO & PARTNERS | **By Hand and Fax**<br>No.: +62 21 515 4840 |

10NRM012

Wisma GKBI, Level 9, Jl. Jenderal Sudirman No.28, Jakarta 10210, Indonesia
Phone (+6221) 574 0088 • Fax (+6221) 574 0068 • E-mail: soemath@indosat.net.id • www.soemath.com

UNDER THE

SINGAPORE INTERNATIONAL ARBITRATION CENTRE RULES

SIAC Arbitration No. 002 of 2004 (ARB002/04)

BSB RESIDUAL ASSETS TRUST
as Claimant

and

PT SUMOHADIWIDJOJO
as Respondent

REPLY TO THE RESPONSE TO CLAIMANT'S APPLICATION FOR
WITHDRAWAL OF CLAIM

Filed on behalf of the Claimant

dated 13 October 2004

Soemadipradja & Taher
Wisma GKBI, Level 9
Jl. Jenderal Sudirman No.28
Jakarta 10210, Indonesia
Ref: HT/RR/RAD

## 1    Introduction

1.1    On September 21, 2004, Claimant filed its Application for Withdrawal of Claim because the Claimant had substantially obtained the relief it sought from this Tribunal, which rendered it unnecessary for Claimant to proceed with its arbitration claim.

1.2    On 4 October 2004, Respondent filed its Response to the Claimant's Application for Withdrawal of Claim. In its Response, Respondent raised some new arguments not raised in any of Respondent's previous submissions.

1.3    As indicated in Claimant's previous submissions and as discussed below, Claimant's initiation of this arbitration and application for withdrawal of claim were both made in good faith.

## 2    Claimant's Existence and Actions Are Legally Valid

2.1    Contrary to Respondent's assertions, Claimant was organized in the form of a trust under the laws of the British Virgin Islands for the legitimate purpose of owning the so-called "residual assets" and distributing the proceeds thereof to its beneficiaries.

2.2    The Tribunal stated that identification of the Claimant as BSB Residual Assets Trust (the "Trust"), rather than as the trustee, BSB Trust Company, Ltd. (the "Trustee"), on behalf of the Trust was not fatal to the proceedings and authorized Claimant to amend its Statement of Case to recite the name of the Trustee. Claimant is prepared to do so, but considered such action to be moot in view of its Application for Withdrawal of Claim (*see paragraph 5 below*).

2.3    Contrary to Respondent's assertions (Response, ¶ 3, ¶ 4), Respondent has been fully aware of Claimant's status as a trust since 1993. All documents, including the Deed of Transfer, have recited the identity of the Trust and have been signed by the trustee(s) in the name and on behalf of the Trust. The original trustees of the Trust were the four individuals named in the Deed of Transfer. The current trustee, BSB Trust Company Ltd., was substituted for the individuals in 1995. This information has already been conveyed to the Tribunal and the Respondent under the facsimile of Soemadipradja & Taher to the Tribunal dated 20 April 2004 on Claimant's Legal Existence and Capacity.

2.4    Contrary to Respondent's assertions (Response, ¶ 5- ¶ 7), the Deed of Transfer was validly signed on behalf of SBIF by a majority of the trustees of SBIF.  (The Deed of Transfer is attached to the Statement of Case at Tab 5.)

(a)    SBIF was organized as a charitable foundation under the laws of Switzerland.    Under Article 5 of its Constitution, SBIF was managed by a Board of Trustees.  At the time of signing the Deed of Transfer, there were five trustees of SBIF.  See Letter attached as Exhibit 1.

(b)    Four out of the five trustees of SBIF signed the Deed of Transfer on behalf of SBIF, making it a binding legal instrument.  The fact that the fifth director, Garrett Thomson, did not sign the Deed of Trust is of no legal consequence, since actions of SBIF could legally be taken by a majority of its trustees.  The Board of Trustees of SBIF had the power to undertake all actions on behalf of SBIF.  It also had the power to appoint persons authorized to represent the Foundation, of which Mr. Thomson was one.  However, the authority granted to Mr. Thomson did not preempt the general authority of the Board.

(c)    SBIF conveyed the so-called "residual assets" to the Trust precisely because the status of SBIF as a charitable foundation under Swiss law did not permit it to distribute the assets to the intended beneficiaries.

2.5    In response to Respondent's question (Response ¶ 13) concerning the Powers of Attorney ("PoAs"), it is clear from the Claimant's submissions on 12 July 2004 (see paragraph 6 of "Claimant's Submissions in Response to the Respondent's Objections to Tribunal's Jurisdiction" and the Affidavit of Michael Irwin dated 29 June 2004), that a proper PoA was in existence authorising the Claimant's attorney to sign the Transfer Agreement.  (The Transfer Agreement is attached to the Statement of Case at Tab 14.)  If required, the Claimant would be able to obtain further supporting affidavits from the parties who witnessed execution/registration of the relevant PoA, including the relevant Notary Public and Indonesian Consulate General.

3      Claimant Legitimately Brought this Arbitration in Response to Respondent's Wrongful Repudiation of Its Obligations

3.1    In September 2003, after the Respondent made interest payments in accordance with the Loan and Transfer Agreements at issue for almost five years, Respondent unilaterally repudiated the transfer of the economic rights at issue and refused to pay the amounts

3

due to Claimant. (The Loan Agreement is attached to the Statement of Case at Tab 15.)

3.2   Without any notice to Claimant or participation by Claimant, Respondent sought and obtained, through presentation of misleading, deceptive and incomplete evidence and arguments, an *ex parte* ruling from the District Court of South Jakarta dated 16 October 2003, which concluded, without factual foundation, that Respondent had fully repaid its debts under the Loan Agreement and ruled that the Security Rights must be released. (The District Court of South Jakarta ruling is attached to Statement of Case at Tab 21.)

3.3   Respondent subsequently obtained cancellation of Claimant's recorded Security Rights at the South Jakarta Land Office.

3.4   Upon being advised of the *ex parte* ruling and the cancellation of the Claimant's recorded Security Rights, on 15 January 2004, Claimant filed its Notice of Arbitration, which it was entitled to do pursuant to the arbitration right provided under Article 7 of the Transfer Agreement, to obtain compensation for Respondent's breaches of the Transfer Agreement, repudiation of its debt obligation and improper recourse to an *ex parte* court proceeding in Indonesia.

---

4   **The Reinstatement of the Mortgage in September 2004 Made Continuation of the Arbitration Academic**

4.1   On 28 May 2004 the Jakarta High Court issued a ruling which declared that the ruling of the District Court of South Jakarta was null and void and had no binding and executorial powers. (The decision of the Jakarta High Court was attached to Claimant's Submissions in Respect of Respondent's Application for Security for Costs as Exhibit 1.)

4.2   Respondent contends that Claimant needlessly engaged Respondent in these arbitration proceedings after the Jakarta High Court Ruling. (Response ¶ 8-¶ 9.)

4.3   The rights of Claimant were not restored, however, until the Claimant's Security Rights were reinstated.

4.4   The South Jakarta Land Office reinstated the Security Rights in September 2004.

    (a)    In view of the ruling of the Jakarta High Court, the Jakarta Regional Land Office on 16 August 2004 directed the South Jakarta Land Office to reinstate the Security Rights. (Order of the Jakarta Regional Land Office was attached to Claimant's Application for Withdrawal of Claim as Exhibit 1.) Until the South Jakarta Land Office executed the Order, however, Claimant could not be certain that its Security Rights would be reinstated.

    (b)    The South Jakarta Land Office carried out the Order of the Jakarta Regional Land Office on 9 September 2004, and reinstated the Security Rights in the official public records, as confirmed by Statement Related to Land Registration dated 6 October 2004 (Bahasa Indonesia and unofficial English translation of Statement attached as Exhibit 2).

4.5    As a result of the reinstatement of the Security Rights, the Claimant obtained relief commensurate with the financial award it had requested from the Tribunal to compensate for the previous annulment of its economic rights.

4.6    Claimant is now in a position to obtain the same financial results it sought in this arbitration. Claimant can now seek to foreclose on the Security Rights in Indonesia to obtain the payments that Respondent owes Claimant. Claimant notes that any award granted by the Tribunal in favor of Claimant would ultimately require enforcement against Respondent by judicial action in Indonesia in any event.

4.7    Promptly after the reinstatement of the Security Rights, Claimant applied to the Tribunal for withdrawal of its claim.

4.8    Were this arbitration to continue to hearing, and were the Tribunal to grant a financial award to Claimant against Respondent, in all likelihood Claimant ultimately would end up seeking to foreclose upon the Security Rights to enforce the award. At this point, with the recent Jakarta High Court decision and the reinstatement of the Security Rights, Claimant appears able to proceed to foreclosure upon the Security Rights without the need for a prior monetary award in this proceeding.

## 5    Now That The Continuation of The Arbitration Is Academic, Claimant Has Moved To Terminate The Arbitration

5.1    The Tribunal granted Claimant leave to file an Amended Statement of Case in which BSB Trust Company, Ltd. would appear as the claimant on behalf of the BSB Residual Assets Trust. In lieu of filing that Amended Statement of Case, Claimant filed its

Application for Withdrawal of Claim, using the same identification of the claimant as in the prior submissions for ease of reference.

5.2  The Respondent contends that Claimant is presently in breach of the Tribunal's direction to amend its Statement of Case and that the Tribunal can now rule in favour of Respondent on the ground that a trust cannot act as a claimant before the Tribunal. (Response ¶ 9, ¶ 18.)

5.3  Claimant recognizes that if the Tribunal were to arbitrate the dispute, Claimant would need to amend its Statement of Case such that BSB Trust Company, Ltd. would appear as the Claimant.

5.4  To prevent both parties from incurring additional unnecessary expenses in this arbitration proceeding, Claimant has chosen not to proceed with its arbitration claim and consequently did not amend its Statement of Case.

5.5  Claimant has in no way indicated that it has "no intention of complying with the direction of the Tribunal" as stated by Respondent in Response ¶ 18. Claimant is willing to amend its Statement of Case, such that BSB Trust Company, Ltd. would appear as the Claimant, to comply with the Tribunal's directions if the Tribunal considers it necessary to consider Claimant's Application for Withdrawal. Accordingly, the Respondent's submission that the Tribunal "can now rule in favour of the Respondent on the grounds that the Claimant, as a trust, has no legal personality to bring these proceedings" is incorrect and ought to be rejected entirely by the Tribunal. Further, Respondent's allegation in Response ¶ 10, that the Claimant is trying to evade the consequences of the Tribunal's ruling, is clearly without any foundation whatsoever.

# 6   The Tribunal Should Not Award Costs or Conditions Sought by Respondent

6.1  The wrongful actions of Respondent, not the actions of Claimant in attempting to obtain relief for those wrongful actions in this proceeding, caused Respondent to incur the legal costs in this proceeding.

6.2  Claimant believes that now is an appropriate juncture to end this proceeding in order to prevent additional unnecessary expenses for both parties.

6.3      Respondent contends that an application to withdraw is a concession to the success of the other party and that the "usual rule" is that the withdrawing party must pay the costs of the other party. (Response ¶ 20–¶ 23.) Respondent has therefore submitted (Response ¶ 20) that Claimant should be ordered to pay the legal costs of the Respondent and the arbitration costs.

6.4      In contrast to the "usual rule," the Singapore International Arbitration Act and SIAC Rules contain no such presumption about the award of costs, leaving the matter entirely to the discretion of the Tribunal. (SIAC Rule 30.3: *"The Tribunal shall have the authority to order in its award that all or a part of the legal or other costs of a party (apart from the costs of the arbitration) be paid by another party."*).

6.5      Where, as in this case, a proceeding has become academic, a withdrawal is not to be viewed as a defeat or acknowledgement of likely defeat, and it is reasonable not to impose costs on the withdrawing party. (*Barretts and Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987] 1FTLR, attached as Exhibit 3.)

6.6      Respondent's submissions (Response ¶ 20 to ¶ 23) are based upon an argument that Claimant's application to withdraw amounts to a capitulation by Claimant and consequent success by Respondent. That is not the case. Claimant does not concede any of Respondent's arguments and considers that its entitlement to be paid the amount of compensation sought of US$2,915,040 plus interest for breaches by the Respondent of the Transfer Agreement, Loan Agreement and Security Rights has been clearly established. Indeed, the Claimant submits that there is sufficient evidence before the Tribunal in the Claimant's Statement of Case and other submissions by Claimant (including the Affidavit of Michael Irwin dated 29 June 2004) for such an inference to be drawn by it. The issue for Claimant however, is unfortunately that of costs. Claimant has, by reason of Respondent's breaches, been placed in a position where it cannot concurrently seek to enforce its Security Rights in Indonesia as well as conducting this arbitration. Claimant refers to the submissions dated 30 June 2004 "Claimant's Submissions in respect of Respondent's Application for Security for Costs" and the Affidavit of Michael Irwin dated 29 June 2004 in respect of Claimant's financial position.

6.7    Respondent has alleged (Response ¶ 23) that Claimant believes that its case will not stand up to scrutiny in any possible merits phase. There is absolutely no evidence available to the Tribunal upon which such a conclusion of fact may be appropriately drawn by the Tribunal. Claimant's decision to withdraw its arbitration claim in no way reflects any lack of confidence in Claimant's ability to succeed in overcoming Respondent's jurisdictional objections or to prevail on the merits of its case. Rather, the withdrawal reflects the fact that Claimant has prevailed in Indonesia in a manner that would render the relief sought in this arbitration unnecessary and academic. In order to avoid unnecessary costs and proceedings at this point in time, Claimant seeks to withdraw its arbitration claim.

6.8    Respondent asserts (Response ¶ 19) that an award in its favour is necessary to avoid future arbitration. There is absolutely no basis upon which such a submission ought to be made or accepted. The parties, by their own agreement have determined a dispute mechanism which involves arbitration. That mechanism applies to the matters in dispute between the parties in this arbitration. Those rights should not be denied in circumstances where Claimant merely seeks to withdraw its claim in an effort to reduce the costs to be incurred by the parties whilst Claimant may be seeking to enforce its Security Rights in the courts in Indonesia. Claimant wishes to preserve its rights in all regards in relation to its right to arbitrate disputes and generally under the Transfer Agreement.

6.9    Further assertions are made by Respondent (Response ¶ 24 and ¶ 25) whereby Respondent seeks a condition to be attached to the withdrawal of the arbitration that the Claimant be barred from commencing any future arbitration on the basis of the issues raised in Claimant's Statement of Case. Claimant submits that it would be unfair for this Tribunal to make such an order. In any event such an order should not preclude Claimant from seeking to enforce its rights under the contractual provisions referred to above. Claimant submits that it would be entirely inappropriate in these circumstances to limit Claimant's future rights, where the main motivating factor for Claimant seeking to withdraw is the question of costs, and the cause of Claimant's difficulties in relation to the issue of costs is Respondent's breach.

8

---

## 7    Relief Claimed

**Claimant respectfully reiterates the relief claimed pursuant to its Application for Withdrawal of Claim dated 21 September 2004.**

DATED:      13 October 2004

SIGNED FOR AND ON BEHALF OF THE CLAIMANT

BY ITS DULY APPOINTED ATTORNEY:

Hafzan Taher

Cc:    The Registrar of Singapore International Arbitration Center
       By fax Number: 65 6334 2942

**Exhibit 1**

Letter dated 20 January 1994
regarding the Board of Trustees of SBIF

10

**Exhibit 2**

Statement related to Land Registration from the South Jakarta Land Office
dated 6 October 2004
(Bahasa Indonesia and unofficial English translation)

11

**Exhibit 3**

Case of:
Barretts and Baird (Wholesale) Ltd v Institution of Professional Civil Servants [1987]
1FTLR

# **<u>EXHIBIT 4</u>**

**S I A C**

## SIAC RULES
## 2ND EDITION, 22 OCTOBER 1997

### INDEX

**Rule**

| | |
|---|---|
| 1. | Scope of Application and Interpretation |
| 2. | Notice, Calculation of Periods of Time |
| 3. | Request for or Notification of Arbitration |
| 4. | Response by Respondent |
| 5. | Centre to Provide Assistance |
| 6. | Number of Arbitrators |
| 7. | Appointment of Sole Arbitrator |
| 8. | Appointment of Three Arbitrators |
| 9. | Multi-party Appointment of Arbitrator(s) |
| 10. | Information to be Furnished to the Appointing Authority |
| 11. | Independence and Impartiality of Arbitrators |
| 12. | Challenge of Arbitrators |
| 13. | Notice of Challenge |
| 14. | Decision of Challenge |
| 15. | Replacement of an Arbitrator |
| 16. | Repetition of Hearings in the Event of the Replacement of an Arbitrator |
| 17. | Conduct of the Proceedings |
| 18. | Submission of Written Statements and Documents |
| 19. | Place of Arbitration |
| 20. | Language of Arbitration |
| 21. | Party Representatives |
| 22. | Hearings |
| 23. | Witnesses |
| 24. | Experts Appointed by the Tribunal |
| 25. | Additional Powers of the Tribunal |
| 26. | Jurisdiction of the Tribunal |
| 27. | Deposits and Security |
| 28. | The Award |
| 29. | Correction of Awards and Additional Awards |
| 30. | Costs |
| 31. | Amount of Tribunal's Fees |
| 32. | Law of the Arbitration |
| 33. | Exclusion of Liability |
| 34. | General Provisions |

# S I Ā C

Where any agreement, submission or reference provides for arbitration under the Arbitration Rules of Singapore International Arbitration Centre ("Centre"), the parties thereto shall be taken to have agreed that the arbitration shall be conducted in accordance with the following Rules, or such amended Rules as the Centre may have adopted to take effect before the commencement of the arbitration (see Rule 3.3), subject to such modifications as the parties may agree in writing.

## Rule 1 - Scope of Application and Interpretation

1.1    These Rules shall govern the arbitration save that, where any of these Rules is in conflict with a provision of the applicable law of the arbitration from which the parties cannot derogate, that provision shall prevail.

1.2    In these Rules -

"Centre" means Singapore International Arbitration Centre, a company incorporated under the Companies Act of the Republic of Singapore as a company limited by guarantee;

"Chairman" means the Chairman of the Centre and includes the Deputy Chairman;

"Registrar" means the Registrar of the Centre and includes an Assistant Registrar;

"Tribunal" includes a sole arbitrator or all the arbitrators where more than one is appointed.

## Rule 2 - Notice, Calculation of Periods of Time

2.1    For the purposes of these Rules, any notice, including a notification, communication or proposal, shall be in writing and is deemed to have been received if it is physically delivered to the addressee or if it is delivered at his habitual residence, place of business or mailing address, or, if none of these can be found after making reasonable inquiry, then at the addressee's last-known residence or place of business. The notice shall be deemed to have been received on the day it is so delivered.

2.2    For the purposes of calculating any period of time under these Rules, such period shall begin to run on the day following the day when a notice, notification, communication or proposal is received. If the last day of such

# S I A C

period is an official holiday at the residence or place of business of the addressee, the period is extended until the first business day which follows. Official holidays occurring during the running of the period of time are included in calculating the period.

2.3     Any written communication may be made by way of any form of electronic transmission effected to a business address of a party or to a facsimile number or e-mail address indicated in a party's letterhead and is deemed to have been received if it is so transmitted on the day of transmission.

2.4     The parties shall file with the Registrar a copy of any notice, including a notification, communication or proposal concerning the arbitral proceedings.

## Rule 3 - Request for or Notification of Arbitration

3.1     The party wishing to commence an arbitration under these Rules (hereinafter called the "Claimant") shall give to the other party (hereinafter called the "Respondent") a Notice of Arbitration which shall include or be accompanied by the following:

    (a)     a demand that the dispute be referred to arbitration;

    (b)     the names and addresses of the parties to the arbitration;

    (c)     a reference to the arbitration clause or the separate arbitration agreement that is invoked;

    (d)     a reference to the contract out of or in relation to which the dispute arises;

    (e)     a brief statement describing the nature and circumstances of the dispute and specifying the relief claimed; and

    (f)     a statement of any matters on which the parties have previously agreed as to the conduct of the arbitration or with respect to which the Claimant wishes to make a proposal.

3.2     The Notice of Arbitration may also include:

    (a)     the proposals for the appointment of a sole arbitrator and an appointing authority referred to in Rules 7.1 and 7.2 respectively;

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

(b)     the notification of appointment of an arbitrator referred to in Rule 8; and

(c)     the Statement of Case referred to in Rule 18.2.

3.3     The date of receipt of the Notice of Arbitration by the Registrar of the Centre shall be deemed to be the date on which the arbitration has commenced.

3.4     The Claimant shall file with the Registrar a copy of the Notice of Arbitration served on the Respondent.

3.5     If the parties have agreed on an appointing authority other than the Chairman, they shall inform the Registrar of the name of that authority.

**Rule 4 - Response by Respondent**

4.1     For the purpose of facilitating the appointment of arbitrators, within fourteen (14) days of receipt of the Notice of Arbitration, the Respondent may send to the Claimant a Response, in which case, it shall contain:

(a)     a confirmation or denial of all or part of the claims;

(b)     a brief statement of the nature and circumstances of any envisaged counterclaims; and

(c)     a comment in response to any statements contained in the Notice of Arbitration, as called for under Rule 3.1 paragraph (f), on matters relating to the conduct of the arbitration.

4.2     The Response may also include -

(a)     a comment in response to any proposal for the appointments of a sole arbitrator and for an appointing authority; and

(b)     the notification of the appointment of an arbitrator referred to in Rule 8.

4.3     The Respondent shall send a copy of any Response to the Registrar and shall confirm to the Registrar that copies have been served on the other party.

4.4     Failure to send a Response shall not preclude the Respondent from denying the claim or from setting out a counterclaim in its Statement of Defence.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I Λ C

**Rule 5 - Centre to Provide Assistance**

5.    The Registrar shall, at the request of the Tribunal or either party, make available, or arrange for, such facilities and assistance for the conduct of arbitration proceedings as may be required, including suitable accommodation for sittings of the Tribunal, secretarial assistance and interpretation facilities.

**Rule 6 - Number of Arbitrators**

6.    A sole arbitrator shall be appointed unless the parties have agreed otherwise.

**Rule 7 - Appointment of Sole Arbitrator**

7.1    If a sole arbitrator is to be appointed, either party may propose to the other, the names of one or more persons, one of whom would serve as the sole arbitrator.

7.2    If within twenty-one (21) days after receipt by a party of a proposal made in accordance with Rule 7.1 the parties have not reached agreement on the choice of a sole arbitrator, the sole arbitrator shall be appointed by the appointing authority agreed upon by the parties, and if no appointing authority has been agreed upon by the parties, or if the appointing authority agreed upon refuses to act or fails to appoint the arbitrator within twenty-one (21) days of the receipt of a party's request thereof, the Chairman shall appoint the arbitrator as soon as practicable.

7.3    If either party does not wish to propose the names of one or more persons to serve as the sole arbitrator, either party may request the Chairman to appoint the sole arbitrator. The Chairman shall as soon as practicable appoint the sole arbitrator upon the receipt of such a request.

7.4    A decision on a matter entrusted by Rule 7.2 and 7.3 to the Chairman shall not be subject to appeal.

SIAC Rules (International)
2nd Edition, 22 October 1997

# SIAC

## Rule 8 - Appointment of Three Arbitrators

8.1    If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the Tribunal.

8.2    If within twenty-one (21) days after the receipt of a party's notification of the appointment of an arbitrator, the other party has not notified the first party of the arbitrator he has appointed:

    (a)    the first party may request the appointing authority previously designated by the parties to appoint the arbitrator; or

    (b)    if no such authority has been previously designated by the parties, or if the appointing authority previously designated refuses to act or fails to appoint the arbitrator within twenty-one (21) days after receipt of a party's request thereof, the first party may request the Chairman to appoint the second arbitrator.

8.3    If within twenty-one (21) days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by an appointing authority or by the Chairman if no appointing authority has been previously designated by the parties or, if the appointing authority previously designated refuses to act within the prescribed time, in the same way as a sole arbitrator would be appointed under Rule 7.

8.4    A decision on a matter entrusted by Rule 8.2 or 8.3 to the Chairman shall not be subject to appeal.

## Rule 9 - Multi-party Appointment of Arbitrator(s)

9.1    If there are three or more parties in the arbitration, the parties shall endeavour to agree on the procedure for appointing the arbitrator(s) and if within twenty-one (21) days of the receipt of the Notice of Arbitration, the parties have not reached an agreement on the procedure for appointing the arbitrator(s), the arbitrator(s) shall be appointed by the Chairman as soon as practicable after the receipt of a party's request to the Chairman.

9.2    A decision on a matter entrusted by Rule 9.1 to the Chairman shall not be subject to appeal.

SIAC Rules (International)
2nd Edition, 22 October 1997

**S I A C**

## Rule 10 - Information to be Furnished to the Appointing Authority

10.1   When an appointing authority is requested to appoint an arbitrator pursuant to Rule 7 or 8, the party which makes the request shall send to the appointing authority a copy of the Notice of Arbitration, a copy of the contract out of or in relation to which the dispute has arisen and a copy of the arbitration agreement if it is not contained in the contract. The appointing authority may require from either party such information as it deems necessary to fulfill its function.

10.2   Where the names of one or more persons are proposed for appointment as arbitrators, their full names, addresses and nationalities shall be indicated, together with a description of their qualifications.

## Rule 11 - Independence and Impartiality of Arbitrators

11.1   In making an appointment under these Rules, the Chairman shall have due regard to any qualifications required of the arbitrator by the agreement of the parties and to such considerations as are likely to secure the appointment of an independent and impartial arbitrator and where the parties are of different nationalities, shall also take into account the advisability of appointing an arbitrator of a nationality other than those of the parties.

11.2   Any arbitrator (whether or not appointed by the parties) conducting an arbitration under these Rules shall be and remain at all times independent and impartial, and shall not act as advocate for any party.

11.3   A prospective arbitrator shall disclose to those who approach him in connection with his possible appointment, any circumstances likely to give rise to justifiable doubts as to his impartiality or independence.

11.4   An arbitrator, once appointed or chosen, shall disclose any such circumstance (referred to in Rule 11.3 above) to all parties, not already been informed by him, of these circumstances.

## Rule 12 - Challenge of Arbitrators

12.1   Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence.

12.2   A party may challenge the arbitrator appointed by him only for reasons of which he becomes aware after the appointment has been made.

SIAC Rules (International)
2nd Edition, 22 October 1997

**Rule 13 - Notice of Challenge**

13.1    A party who intends to challenge an arbitrator shall send notice of his challenge within fourteen (14) days after the appointment of the challenged arbitrator has been notified to the challenging party or within fourteen (14) days after the circumstances mentioned in Rule 12.1 or 12.2 became known to that party.

13.2    The challenge shall be notified to the other party, the arbitrator who is challenged and the other members of the Tribunal. The notification shall be in writing and shall state the reasons for the challenge. Upon receiving the notification of challenge by the Registrar, the arbitration shall be suspended until the challenge is resolved or decided upon.

13.3    When an arbitrator has been challenged by one party, the other party may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his office. In neither case does this imply acceptance of the validity of the grounds for the challenge. In both cases, the procedure provided in Rule 7, 8 or 9 shall be used in full for the appointment of the substitute arbitrator, even if during the process of appointing the challenged arbitrator, a party had failed to exercise his right to appoint or to participate in the appointment.


**Rule 14 - Decision on Challenge**

14.1    If the other party does not agree to the challenge and the challenged arbitrator does not withdraw, the decision on the challenge will be made:

   (a)    when the initial appointment was made by an appointing authority, by that authority; and

   (b)    in all other cases, by the Chairman whose decision shall be final and not be subject to appeal.

14.2    If the appointing authority or the Chairman, as the case may be, sustains the challenge, a substitute arbitrator shall be appointed or chosen pursuant to the procedure applicable to the appointment or choice of an arbitrator as provided in Rules 6 to 9 except that, when this procedure would call for the designation of an appointing authority, the appointment of the arbitrator shall be made by the appointing authority which decided on the challenge.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

## Rule 15 - Replacement of an Arbitrator

15.1   In the event of the death or resignation of an arbitrator during the course of the arbitral proceedings, a substitute arbitrator shall be appointed or chosen pursuant to the procedure provided for in Rules 7 to 11 that was applicable to the appointment or choice of the arbitrator being replaced.

15.2   In the event that an arbitrator refuses or fails to act or in the event of the de jure or de facto impossibility of his performing functions, the procedure in respect of the challenge and replacement of an arbitrator as provided in Rules 12 to 14 and 15.1 shall apply.

## Rule 16 - Repetition of Hearings in the Event of the Replacement of an Arbitrator

16.   If under Rules 13 to 15 the sole or presiding arbitrator is replaced, any hearings held previously shall be repeated unless otherwise agreed to by the parties. If any other arbitrator is replaced, such prior hearings may be repeated at the discretion of the Tribunal.

## Rule 17 - Conduct of the Proceedings

17.1   The parties may agree on the arbitral procedure, and are encouraged to do so.

17.2   In the absence of procedural rules agreed by the parties or contained herein, the Tribunal shall have the widest discretion allowed under such law as may be applicable to ensure the just, expeditious, economical, and final determination of the dispute.

17.3   In the case of a three-member Tribunal, the presiding arbitrator may, after consulting the other arbitrators, make procedural rulings alone.

## Rule 18 - Submission of Written Statements and Documents

18.1   The Tribunal may determine the periods of time within which the parties shall submit their written statements. If no specific periods of time are determined by the Tribunal the parties shall proceed as set out in this Rule 18.

18.2   Within thirty (30) days of receipt of notification from the Registrar that the Tribunal has been constituted, the Claimant shall, if it has not done so, send

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

to the Respondent a Statement of Case setting out in full detail the facts and any contention of law on which it relies, and the relief claimed.

18.3    Within thirty (30) days of receipt of the Statement of Case by the Respondent, or, where the Statement of Case was served with the Notice of Arbitration, the notification referred to in Rule 18.2, the Respondent shall send to the Claimant, a Statement of Defence stating in full detail which of the facts and contentions of law in the Statement of Case it admits or denies, on what grounds, and on what other facts and contentions of law it relies. Any counterclaims shall be submitted with the Statement of Defence in the same manner as claims are set out in the Statement of Case.

18.4    The Tribunal shall decide which further written statements, in addition to the Statement of Case and the Statement of Defence, shall be required from the parties or may be presented by them and shall fix the periods of time for communicating such statements.

18.5    The periods of time fixed by the Tribunal for the submission of written statements (including the Statement of Case and Statement of Defence) shall not exceed forty-five (45) days. However the Tribunal may extend the time-limits on such terms as it may deem appropriate.

18.6    All statements referred to in this Rule shall be accompanied by copies (or, if they are especially voluminous, lists) of all essential documents on which the party concerned relies and which have not previously been submitted by any party, and (where appropriate) by any relevant samples.

18.7    Copies of all statements referred to in this Rule shall be served on the Tribunal and the Registrar.

18.8    As soon as practicable following completion of the submission of the statements specified in this Rule, the Tribunal shall proceed in such manner as has been agreed by the parties, or pursuant to its authority under these Rules.

18.9    If the Claimant fails within the time specified under these Rules or as may be fixed by the Tribunal, to submit its Statement of Case, the Tribunal may issue an order for the termination of the arbitral proceedings or make such other directions as may be appropriate in the circumstances. If the Respondent fails to submit a Statement of Defence, or if at any point any party fails to avail itself of the opportunity to present its case in the manner directed by the Tribunal, the Tribunal may nevertheless proceed with the arbitration and make the award.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

**Rule 19 - Place of Arbitration**

19.1   The parties may choose the place of arbitration. Failing such a choice, the place of arbitration shall be Singapore, unless the Tribunal determines in view of all the circumstances of the case that another place is more appropriate.

19.2   The Tribunal may hold hearings and meetings anywhere convenient, subject to the provisions of Rule 22.2 and provided that the award shall be made at the place of arbitration.

**Rule 20 - Language of Arbitration**

20.1   Subject to any agreement by the parties, the Tribunal shall, promptly after its appointment, determine the language or languages to be used in the proceedings. This determination shall apply to the Statement of Case, the Statement of Defence, and any further written statements or other communications and, if oral hearings take place, to the language or languages to be used in such hearings.

20.2   If a document is drawn up in a language other than the language(s) of the arbitration, and no translation of such document is submitted by the party producing the document, the Tribunal, or if the Tribunal has not been established, the Registrar, may order that party to submit a translation in a form to be determined by the Tribunal or the Registrar.

**Rule 21 - Party Representatives**

21.   Any party may be represented by legal practitioners or any other representatives, subject to such proof of authority as the Tribunal may require.

**Rule 22 - Hearings**

22.1   Unless the parties have agreed on documents-only arbitration, the Tribunal shall, if either party so requests, hold a hearing for the presentation of evidence by witnesses, including expert witnesses, or for oral submissions.

22.2   The Tribunal shall fix the date, time and place of any meeting and hearing in the arbitration, and the sole or presiding arbitrator shall give the parties reasonable notice thereof.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

22.3    If any party to the proceedings fails to appear at a hearing, without showing sufficient cause for such failure, the Tribunal may proceed with the arbitration and may make the award on the evidence before it.

22.4    The Tribunal may in advance of hearings, submit to the parties, a list of questions which it wishes them to treat with special attention.

22.5    All meetings and hearings shall be in private unless the parties agree otherwise.

22.6    The Tribunal may declare the hearings closed if it is satisfied that the parties have no further proof to offer or witnesses to be heard or submissions to make. The Tribunal may on its own motion or upon application of a party but before any award is made, reopen the hearings.

22.7    All statements, documents or other information supplied to the Tribunal by one party shall be communicated to the other party. Also, any expert report or evidentiary document on which the Tribunal may rely in making its decision shall be communicated to the parties.


## Rule 23 - Witnesses

23.1    Before any hearing, the Tribunal may require any party to give notice of the identity of witnesses it wishes to call, as well as the subject matter of their testimony and its relevance to the issues.

23.2    The Tribunal has discretion to allow, refuse, or limit the appearance of witnesses, whether witnesses of fact or expert witnesses.

23.3    Any witness who gives oral evidence may be questioned by each of the parties or their representatives, under the control of the Tribunal. The Tribunal may put questions at any stage of the examination of the witnesses.

23.4    Subject to such order or direction which the Tribunal may make, the testimony of witnesses may be presented in written form, either as signed statements or by duly sworn affidavits. Subject to Rule 23.2, any party may request that such a witness should attend for oral examination at a hearing. If he fails to attend, the Tribunal may place such weight on the written testimony as it thinks fit, or exclude it altogether.

SIAC Rules (International)
2nd Edition, 22 October 1997

**S I A C**

23.5   Subject to the mandatory provisions of any applicable law, it shall be proper for any party or its representatives to interview any witness or potential witness prior to his appearance at any hearing.

## Rule 24 - Experts Appointed by the Tribunal

24.1   Unless otherwise agreed by the parties, the Tribunal:

    (a)   may appoint one or more experts to report to the Tribunal on specific issues;

    (b)   may require a party to give any such expert(s) any relevant information or to produce, or to provide access to any relevant documents, goods or property for inspection by the expert(s).

24.2   Unless otherwise agreed by the parties, if a party so requests or if the Tribunal considers it necessary, any expert shall, after delivery of his written or oral report, participate in a hearing at which the parties shall have the opportunity to question him, and to present expert witnesses in order to testify on the points at issue.

## Rule 25 - Additional Powers of the Tribunal

25.   Unless the parties at any time agree otherwise, and subject to any mandatory limitations of any applicable law, the Tribunal shall have the power, on the application of any party or of its own motion, but in either case only after giving the parties a proper opportunity to state their views, to:

    (a)   order the correction of any such contract or arbitration agreement, but only to the extent required to rectify any mistake which it determines to be common to all the parties and then only if and to the extent to which the rules of law governing or applicable to the contract permit such correction;

    (b)   allow other parties to be joined in the arbitration with their express consent, and make a single final award determining all disputes between them;

    (c)   allow any party, upon such terms (as to costs and otherwise) as it shall determine, to amend any pleading or submissions;

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

(d)    extend or abbreviate any time limits provided by these Rules or by its directions;

(e)    conduct such enquiries as may appear to the Tribunal to be necessary or expedient;

(f)    order the parties to make any property or thing available for inspection, in their presence, by the Tribunal or any expert;

(g)    order the preservation, storage, sale or other disposal of any property or thing which is the subject-matter of the dispute;

(h)    order any party to produce to the Tribunal, and to the other parties for inspection, and to supply copies of, any document or class of documents in their possession or power which the Tribunal determines to be relevant;

(i)    to make orders or give directions to any party for interrogatories;

(j)    to make orders or give directions to any party for an interim injunction or any other interim measure;

(k)    to make orders or give directions to any party for giving of evidence by affidavit;

(l)    to make orders or give directions to any party for ensuring that any award which may be made in the arbitral proceedings is not rendered ineffectual by the dissipation of assets by a party; and

(m)    to make orders or give directions to any party to stay any of the Tribunal's awards previously made.

## Rule 26 - Jurisdiction of the Tribunal

26.1    The Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, termination or validity of the arbitration agreement. For that purpose, an arbitration agreement which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the Tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration agreement.

SIAC Rules (International)
2nd Edition, 22 October 1997

# SIAC

26.2   A plea that the Tribunal does not have jurisdiction shall be raised not later than in the Statement of Defence. A plea that the Tribunal is exceeding the scope of its authority shall be raised promptly after the Tribunal has indicated its intention to decide on the matter alleged to be beyond the scope of its authority. In either case the Tribunal may nevertheless admit a late plea under this Rule if it considers the delay justified. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of an arbitrator.

26.3   In addition to the jurisdiction to exercise the powers defined elsewhere in these Rules, the Tribunal shall have jurisdiction to determine any question of law arising in the arbitration; proceed with the arbitration notwithstanding the failure or refusal of any party to comply with these Rules or with the Tribunal's orders or directions, or to attend any meeting or hearing, but only after giving that party written notice that it intends to do so; and to receive and take into account such written or oral evidence as it shall determine to be relevant, whether or not strictly admissible in law.

26.4   The Tribunal may rule on a plea referred to in Rule 26.2 above either as a preliminary question or in an award on the merits.


## Rule 27 - Deposits and Security

27.1   The Registrar or the Tribunal (at any time after it has been constituted) may direct each party to deposit an equal amount with the Centre as an advance of the costs referred to in Rule 30.

27.2   During the course of the arbitration proceedings the Registrar or the Tribunal may request supplementary deposits from the parties.

27.3   The Tribunal shall have the power to order any party to provide security for the legal or other costs of any other party by way of deposit or bank guarantee or in any other manner the Tribunal thinks fit.

27.4   Without prejudice to the right of any party to apply to a competent court for pre-award conservatory measures, the Tribunal shall also have the power to order any party to provide security for all or part of any amount in dispute in the arbitration.

27.5   In the event that orders under Rules 27.1, 27.2, 27.3 or 27.4 are not complied with, the Tribunal may refuse to hear the claims or counterclaims by the non-complying party, although it may proceed to determine claims or counterclaims by complying parties.

# SIAC

27.6    Parties are jointly and severally liable for the costs of arbitration. In the event that orders under Rules 27.1 or 27.2 are not complied with by one party, the Registrar or Tribunal may request the other party to pay the deposits that are due from the first party.

27.7    Should the parties fail to make the deposits requested for under Rules 27.1 or 27.2, either wholly or in part, the Registrar may direct the Tribunal to suspend its work until such deposits are paid.

## Rule 28 - The Award

28.1    Unless all parties agree otherwise, the Tribunal shall make its award in writing within forty-five (45) days from the date on which the hearings are closed and shall state the reasons upon which its award is based. The award shall state its date and shall be signed by the arbitrator or arbitrators.

28.2    If any arbitrator refuses or fails to comply with the mandatory provisions of any applicable law relating to the making of the award, having been given a reasonable opportunity to do so, the remaining arbitrators shall proceed in his absence.

28.3    Where there is more than one arbitrator and they fail to agree on any issue, they shall decide by a majority. Failing a majority decision on any issue, the presiding arbitrator of the Tribunal shall make the award alone as if he were a sole arbitrator. If an arbitrator refuses or fails to sign the award, the signatures of the majority shall be sufficient, provided that the reasons for the omitted signature is stated.

28.4    The sole arbitrator or presiding arbitrator shall be responsible for delivering the award to the Registrar, who shall transmit certified copies to the parties provided that the costs of the arbitration have been paid to the Centre in accordance with Rule 30.

28.5    The Tribunal may award simple or compound interest on any sum which is the subject of the reference at such rates as the Tribunal determines to be appropriate, in respect of any period which the Tribunal determines to be appropriate ending not later than the date upon which the award is complied with.

28.6    The Tribunal may make separate final awards on different issues at different times, which shall be subject to correction under the procedure specified in Rule 29. Unless otherwise stated by the Tribunal, such awards shall be individually enforceable as soon as they are made.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

28.7   In the event of a settlement, the Tribunal may render a consent award recording the settlement if any party so requests. If the parties do not require a consent award, then on confirmation in writing by the parties to the Registrar that a settlement has been reached, the Tribunal shall be discharged and the reference to arbitration concluded, subject to payment by the parties of any outstanding costs of the arbitration in accordance with Rule 30.

28.8   By agreeing to have an arbitration under these Rules, the parties undertake to carry out the award without delay. Awards shall be final and binding on the parties from the date they are made.

## Rule 29 - Correction of Awards and Additional Awards

29.1   Within thirty (30) days of receipt of the award, unless another period of time has been agreed upon by the parties, a party may by notice to the Registrar request the Tribunal to correct in the award any error in computation, any clerical or typographical error or any error of a similar nature. If the Tribunal considers the request to be justified, it shall make the correction(s) within thirty (30) days of receipt of the request. Any correction, which shall take the form of a separate memorandum, shall become part of the award.

29.2   The Tribunal may correct any error of the type referred to in Rule 29.1 on its own initiative within thirty (30) days of the date of the award.

29.3   Unless otherwise agreed by the parties, a party may, within thirty (30) days of receipt of the award, and with notice to the other party or parties, by notice to the Registrar request the Tribunal to make an additional award as to claims presented in the arbitral proceedings but not dealt with in the award. If the Tribunal considers the request to be justified, it shall make the additional award within forty-five (45) days of receipt of the request.

29.4   The provisions of Rule 28 shall apply mutatis mutandis to a correction of the award and to any additional award.

## Rule 30 - Costs

30.1   The costs of the arbitration shall be taxed by the Registrar or fixed by the Tribunal in its award. The term "costs of the arbitration" includes:

(a)    the fees of the Tribunal;

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I Ā C

(b)    the travel and other expenses incurred by the arbitrators;

(c)    the costs of expert advice and of other assistance required by the Tribunal;

(d)    any fees and expenses of the appointing authority, if applicable; and

(e)    expenses reasonably incurred by the Centre in connection with the arbitration as well as its administrative charges, but shall not include the legal or other costs incurred by the parties themselves.

30.2    The Tribunal shall specify in the award, the total amount of the costs of the arbitration. Unless the parties agree otherwise, the Tribunal shall determine the proportions in which the parties shall pay all or part of them to the Centre. If the Tribunal has determined that all or any part of the costs of the arbitration shall be paid by any party other than a party which has already paid them to the Centre, the latter shall have the right to recover the appropriate amount from the former.

30.3    The Tribunal shall have the authority to order in its award that all or a part of the legal or other costs of a party (apart from the costs of the arbitration) be paid by another party. Such costs shall, unless the award otherwise directs, be taxable by the Registrar.

30.4    If the arbitration is abandoned, suspended or concluded, by agreement or otherwise, before the final award is made, the parties shall be jointly and severally liable to pay the costs of the arbitration as determined by the Tribunal. In the event that the costs so determined are less than the deposits made, there shall be a refund in such proportions as the parties may agree, or failing agreement, in the same proportions as the deposits were made.

30.5    A certificate signed by the Registrar on the amount of costs or fees taxed shall form part of the award of the Tribunal.

## Rule 31 - Amount of Tribunal's Fees

31.1    The fees of the Tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances of the case.

31.2    If an appointing authority has been agreed upon by the parties or designated by the Chairman, and if that authority has issued a schedule of fees for arbitrators in international cases which it administers, the Tribunal in fixing its

# SIAC

fees shall take that schedule of fees into account to the extent that it considers appropriate in the circumstances of the case.

31.3    If such appointing authority has not issued a schedule of fees for arbitrators in international cases, and if the parties fail to agree, an appropriate rate shall be determined by the Registrar and communicated in writing to the parties.

31.4    In all cases when a party so requests, the Tribunal shall fix its fees only after consultation with the Registrar who may advise the Tribunal concerning the fees.

## Rule 32 - Law of the Arbitration

32.    If the place of arbitration is Singapore, the parties agree that the International Arbitration Act (Cap 143A) as amended from time to time is applicable.

## Rule 33 - Exclusion of Liability

33.1    Neither the Centre, any of its officers, employees or agents, nor any arbitrator shall be liable for:

(a)    negligence in respect of anything done or omitted to be done in the capacity of arbitrator or in connection with any arbitration conducted under these Rules; and

(b)    any mistake in law, fact or procedure made in the course of arbitral proceedings or in the making of an arbitral award.

33.2    Neither the Centre, any of its officers, employees or agents, nor any arbitrator shall be under any obligation to make any statement to any person about any matter concerning the arbitration, nor shall any party seek to make any arbitrator or any officer, member, servant or agent of the Centre, a witness in any legal proceedings arising out of the arbitration whether before, during or after the arbitration.

SIAC Rules (International)
2nd Edition, 22 October 1997

# S I A C

**Rule 34 - General Provisions**

34.1   A party who knows that any provision of, or requirement under, these Rules has not been complied with and yet proceeds with the arbitration without promptly stating its objection to such non-compliance, shall be deemed to have waived its right to object.

34.2   The provisions in these Rules shall insofar as they relate to the powers and functions of the Tribunal be interpreted by the Tribunal.

34.3   In all matters not expressly provided for in these Rules, the Chairman, the Registrar and the Tribunal shall act in the spirit of these Rules and shall make every reasonable effort to ensure that the award is legally enforceable.

34.4   Notwithstanding any provision by the parties in any contract for an appointing authority to appoint a sole arbitrator or arbitrators, such provision shall be deemed to be completely and irrevocably waived upon the appointment by the Chairman of the sole arbitrator or any arbitrator pursuant to these Rules, and thereafter all powers and functions of the appointing authority whether in such contract or in the Rules shall vest in the Chairman, in addition to and without derogation to the powers of the Chairman set out in these Rules.

34.5   Subject to Rule 34.4, in the event of conflict between these Rules and the terms of any contract entered into between the parties, the terms of the said contract shall prevail, save that where the parties have acted pursuant to or in accordance with any Rule in conflict with any term of the said contract, that Rule shall prevail, and any right vested in any party pursuant to that term in the said contract shall be deemed to be completely and irrevocably waived.

34.6   The parties and the Tribunal shall at all times treat all matters relating to the proceedings (including the existence of the proceedings) and the award as confidential. A party or any arbitrator shall not, without the prior written consent of the other party or the parties, as the case may be, disclose to a third party any such matter except:

   (a)   for the purpose of making an application to any competent court;

   (b)   for the purpose of making an application to the courts of any State to enforce the award;

   (c)   pursuant to the order of a court of competent jurisdiction;

SIAC Rules (International)
2nd Edition, 22 October 1997

**S I A C**

(d)    in compliance with the provisions of the laws of any State which is binding on the party making the disclosure; or

(e)    in compliance with the request or requirement of any regulatory body or other authority which, if not binding, nonetheless would be observed customarily by the party making the disclosure.

SIAC Rules (International)
2nd Edition, 22 October 1997