UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of an Arbitration Between:<br><br>PT SUMOHADIWIDJOJO,<br><br>          Applicant<br>          (Respondent below)<br><br>and<br><br>BSB RESIDUAL ASSETS TRUST,<br>BSB TRUST COMPANY, LTD., Trustee,<br><br>          Respondent<br>          (Claimant below).<br><br>CITIZENS BANK<br><br>          Trustee | CIVIL ACTION NO. 04 12646 NG<br><br>REPLY MEMORANDUM IN SUPPORT OF RESPONDENTS' MOTION TO VACATE OR REDUCE *EX PARTE* ATTACHMENT |

## **INTRODUCTION**

The *ex parte* attachment issued in this matter is the latest in a series of litigation maneuvers by Applicant PT Sumohadiwidjojo ("PTSW") to avoid its contractual obligations to Respondents BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee, (together, "BSB"). By attaching BSB's assets and opposing adjudication of the merits of the parties' dispute, PTSW has effectively precluded BSB from defending itself in this proceeding. PTSW's purported justification is that BSB has no need to defend itself because this Court is "prohibited" from considering BSB's intended counterclaim based on the parties' contracts. PTSW contends that this Court's jurisdiction is limited to enforcement of the recent award of costs issued by the Singapore International Arbitration Centre ("SIAC"), even though BSB's closely related contract claim against PTSW remains unresolved. Nothing in the Convention on the Recognition and

US1DOCS 5030780v4

Enforcement of Foreign Arbitral Awards ("New York Convention") requires this Court to forgo consideration of BSB's counterclaim.  Rather, as the First Circuit has held, federal courts faced with arbitral awards that do not adjudicate the full disputes between the parties have the authority to take measures supporting the fair resolution of the parties' overall claims.

PTSW concedes that the SIAC award does not adjudicate PTSW's breach of its contractual obligation to make payments to BSB under the Loan Agreement.[1]  PTSW now seeks to preclude this Court from resolving that dispute, as well as to tie BSB's hands by depriving PTSW of the use of sufficient assets to defend this litigation.  If BSB cannot go forward on its counterclaim, PTSW stands to reap an unjustified and unfair windfall exceeding four million dollars.  BSB urges this Court to vacate the attachment and permit BSB to file a contract-based counterclaim to avert this unfair outcome.

## BACKGROUND FACTS

BSB incorporates the statement of facts included in its Memorandum in Support of Respondents' Motion to Vacate or Reduce *Ex Parte* Attachment ("Opening Memorandum").

On December 17, 2004, PTSW sought and obtained an *ex parte* attachment in the amount of $388,000 against BSB's account at Citizens Bank.  On March 11, 2005, nearly three months after PTSW filed its *ex parte* motion for attachment, the SIAC Registrar issued a certificate ("Registrar's Certificate") taxing costs in an agreed amount of approximately $287,000—essentially $100,000 less than the amount of PTSW's attachment.[2]

---

[1] The Loan Agreement was previously submitted as Exhibit 3 to the Affidavit of Alison Aubry, Esq. in Further Support of Respondents' Motion to Vacate or Reduce *Ex Parte* Attachment ("Aubry Aff.").

[2] The $287,000 figure is approximate because the Registrar's Certificate expressed two items in Singapore dollars.  *See* Applicant PTSW's Opposition to Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment ("Opposition") at 2 & n.3.  The Registrar's Certificate was previously submitted by PTSW as Exhibit 1 to the Affidavit of Richard S. Nicholson, Esq. ("Nicholson Aff.").

-3-

**ARGUMENT**

I. **THE SIAC REGISTRAR'S CERTIFICATE SHOWS THAT PTSW'S ATTACHMENT WAS PREMATURE AND EXCESSIVE.**

PTSW's *ex parte* motion for attachment, filed on December 17, 2004, was premature because the SIAC award had not fixed an amount for BSB to pay PTSW. PTSW nonetheless sought and received an attachment in the amount of $388,000. BSB argued in its Opening Memorandum that this amount was excessive. Opening Memorandum at 7-8.

Although PTSW's motion is no longer premature following the issuance of the Registrar's Certificate, it is now clear that PTSW's attachment was excessive. PTSW concedes as much and consents to a reduction of the attachment to $317,000. Applicant PTSW's Opposition to Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment ("Opposition") at 6 n.10 (stating that PTSW would not object to release of "the amount attached in excess of the [award] less approximately $30,000").

PTSW's concession is insufficient, as it is premised on the erroneous assumption that PTSW should retain security for "interest under the SIAC Rules." *Id.* Contrary to PTSW's implication, the SIAC Rules do not provide for interest on awards unless ordered by the arbitral tribunal: "[t]he Tribunal *may award* simple or compound interest on any sum which is the subject of the reference at such rates as the Tribunal determines to be appropriate." Rule 28.5 of the SIAC Rules (International) (2d ed. 1997) (emphasis added).[3] In this case, neither the SIAC award nor the Registrar's Certificate awarded PTSW any interest, much less at an "annual rate of

---

[3] Nicholson Aff. Ex. 4.

6%" as PTSW contends. Opposition at 2 n.3.[4] There is no reason to provide PTSW a security for interest to which it is not entitled.

At the very least, therefore, this Court should reduce the attachment to an amount not exceeding the most that PTSW may recover under the SIAC award and Registrar's Certificate, which is $287,000.

## II. BOTH THE LOAN AGREEMENT AND APPLICABLE LAW ALLOW BSB TO ASSERT ITS COUNTERCLAIM IN THIS ENFORCEMENT PROCEEDING.

Under the parties' Loan Agreement, BSB may set off any amount recoverable by PTSW against PTSW's obligations and may bring proceedings against PTSW in any court of competent jurisdiction. Opening Memorandum at 9 (citing Sections 17 and 22 of Loan Agreement). BSB therefore seeks to bring a counterclaim here against PTSW for damages arising from PTSW's breach of the Loan Agreement. This counterclaim, which is based on PTSW's default on loan obligations to BSB, would result in a judgment far exceeding the costs taxed in the Registrar's Certificate.

PTSW's response is that this Court is categorically "prohibit[ed]" from adjudicating a counterclaim in an enforcement proceeding under the New York Convention. Opposition at 10. PTSW's authority for this proposition is a discussion in a District Court decision that was vacated by the United States Court of Appeals for the First Circuit and that, in any event, did not involve a counterclaim asserted in enforcement proceedings. *Hewlett-Packard, Inc. v. Berg*, 867 F. Supp. 1126 (D. Mass. 1994), *vacated and remanded*, 61 F.3d 101 (1st Cir. 1995).

---

[4] Moreover, the SIAC Rules permit an award of interest only on a "sum which is the subject of the reference." SIAC Rule 28.5. Consistent with standard usage, the SIAC Rules use the word "reference" to mean to the parties' act of referring their dispute to the arbitral tribunal for decision. *See* SIAC Rule 28.7 (stating that, in the event of a settlement in which no consent award is requested, "the Tribunal shall be discharged and the reference to arbitration concluded, subject to payment by the parties of any outstanding costs of the arbitration in accordance with Rule 30"). The "subject of the reference" to arbitration here was PTSW's breach of its contractual obligations and its improper procuring of an *ex parte* order in an Indonesian court. Because the arbitral tribunal decided neither issue, the award of costs is not a "sum which is the subject of the reference." The separate provision authorizing the taxing of costs does not provide for interest. *See* SIAC Rule 30.

-4-

In *Hewlett-Packard*, the applicants had obtained an arbitral award on claims against Hewlett-Packard's predecessor under a 1984 contract, but Hewlett-Packard's own claims against the applicants under a 1982 contract were still the subject of arbitral proceedings. *See Hewlett-Packard*, 61 F.3d at 103. Hewlett-Packard's predecessor filed an *original complaint* for a declaratory judgment seeking to alter the arbitral award relating to the 1984 contract by setting off the amount claimed under the 1982 contract. *See* 867 F. Supp. at 1132 ("[Hewlett-Packard's predecessor] seeks a declaration by this court that is has fulfilled its obligations under the judgment."); *see also Hewlett Packard*, 61 F.3d at 103 (stating that Hewlett-Packard's predecessor "filed the complaint in this action with the Massachusetts district court" and that the defendants "moved to dismiss the complaint, arguing that such declaratory relief is unavailable as to foreign arbitration awards"). Thus, although the *Hewlett-Packard* District Court discussed the adjudication of "a counterclaim" in confirmation proceedings, 867 F. Supp. at 1132, that discussion was dictum.

Moreover, contrary to PTSW's suggestion (Opposition at 9 n.17), the First Circuit did not even address the District Court's unnecessary discussion, let alone "agree" with it. Rather, the First Circuit held that Hewlett-Packard's unadjudicated 1982 claim could not be set off by the court because the validity of that claim was being arbitrated at the time, and "the judicial set-off requested here would circumvent the 1982 contract to arbitrate and the now-pending arbitration under that contract." *Hewlett-Packard*, 61 F.3d at 105.

Far from supporting PTSW's position, the First Circuit's decision confirms the authority of federal courts in enforcement proceedings to consider the circumstances surrounding the award, rather than simply acting as "confirmation machines" as PTSW contends. The First Circuit stated that the circumstances of the dispute gave Hewlett-Packard a "very substantial

prudential argument" against immediate confirmation of the award. *Id.* at 105. The First Circuit reasoned that, because the applicants were successors-in-interest to a bankrupt company, immediate enforcement of the award might deprive Hewlett-Packard of the opportunity to collect on its claims under the 1982 contract, a transaction that was "closely related" to the subject matter of the award. *Id.* The First Circuit also noted that Hewlett-Packard "cannot be blamed for the discrepant timing in the resolution of its claim" because it had "made a reasonable effort" to have all claims resolved "in one proceeding at the same time." *Id.* The First Circuit concluded that "the seemingly fair solution" was to confirm the uncontested portion of the award on the 1984 contract, "reserving confirmation of the balance until the 1982 contract dispute is arbitrated." *Id.*

The First Circuit's conclusion that confirmation proceedings could be stayed until Hewlett-Packard's unadjudicated claim was resolved strongly implies that Hewlett-Packard could return to the district court with its award on the 1982 contract and assert it as a counterclaim to offset the award on the 1984 contract. The possibility of a stay of enforcement proceedings pending the arbitration of the 1982 claim would have made little sense if the results of the arbitration could not have been asserted once the enforcement proceedings resumed. This premise, although not explicitly stated in the First Circuit's decision, finds support in other authorities construing the New York Convention. *See Jugometal v. Samincorp, Inc.*, 78 F.R.D. 504, 506-07 (S.D.N.Y. 1978) ("It would be inequitable to permit this plaintiff to recover a judgment here against the defendant on the concededly valid arbitral award in its favor, and at the same time to withhold enforcement of the three counterclaims . . . . The Convention does not prevent this Court from entertaining set-offs or counterclaims . . . ."); 1 Thomas H. Oehmke, *Commercial Arbitration* § 41:106 (3d ed. 2004) ("U.S. district courts enforcing foreign arbitral

-6-

awards can entertain setoffs or counterclaims, even though these same claims may not have been considered by the arbitrator when issuing the award" (citing *Jugometal*)).[5]

The First Circuit's recognition in *Hewlett-Packard* that a district court may take account of the status of unresolved claims that are "closely related" to an arbitral award forecloses PTSW's contention that BSB's unresolved claim under the Loan Agreement is irrelevant to this confirmation proceeding. Like the respondent in *Hewlett-Packard*, BSB has consistently sought a fair and prompt decision on its claim that PTSW has defaulted on the Loan Agreement, despite PTSW's efforts to prevent any decision maker from reaching the merits in any *inter partes* proceeding. Like Hewlett-Packard, BSB sought to have its claims resolved "in one proceeding at the same time": once the High Court of Jakarta and the South Jakarta land office restored the legal rights that BSB sought to vindicate at arbitration, BSB informed the SIAC tribunal that BSB intended to have its claims decided in a single action (foreclosure in Indonesia) rather than the two steps (arbitration and enforcement) that the SIAC arbitration would have required.[6] Termination of the arbitration also put an end to PTSW's objections to the jurisdiction of the arbitral tribunal, which delayed adjudication of the merits of the dispute. However, BSB's planned resolution of its claims in Indonesia was preempted by the issuance of the attachment on December 17, 2004, which froze all of BSB's assets a mere two days after the issuance of the arbitration award on December 15. Since BSB has consistently sought the efficient and effective resolution of its claims, the equities in this case, as in *Hewlett-Packard*, favor permitting

---

[5] The court in *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1 (S.D.N.Y. 1973) also considered "an answer asserting many defenses and with a counterclaim for money damages" under the New York Convention, *id.* at 3. Although the court dismissed the counterclaim, it did so not because it found counterclaims to be inadmissible in enforcement proceedings, but because the counterclaim had been decided by the arbitrators and accounted for in the award to be enforced, *see id.* at 14, which PTSW concedes is not the case here.

[6] *See* Application for Withdrawal of Claim ¶ 1.5, Aubry Aff. Ex. 9.

-7-

resolution of the merits of BSB's counterclaim prior to the enforcement of the SIAC award of costs.

Moreover, as BSB's unresolved claim is not subject to a pending arbitration, the First Circuit's concern that a judicial determination of its validity would interfere with the "pro-arbitration policies" of the New York Convention does not arise. *See Hewlett-Packard*, 61 F.3d at 105. The enumeration of grounds for "refus[ing]" an award in Article V of the New York Convention is likewise irrelevant where, as here, the respondent does not seek "refusal" of the award, but rather a mere deferral of its enforcement until a closely related claim has been adjudicated. *See id.* at 106 ("[A] stay is a deferral rather than refusal.").

Finally, it bears noting that even the *Hewlett-Packard* District Court's statements in dictum do not justify rejection of BSB's counterclaim in the circumstances of this case. The District Court's concern that asserting a counterclaim in confirmation proceedings might run counter to "the ostensible purpose for resort to arbitration, i.e., the avoidance of litigation," 867 F. Supp. at 1132 (quoting *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990)), might have some resonance where the arbitration award actually avoided litigation by resolving a claim on the merits. The SIAC arbitral tribunal, by contrast, awarded costs only and did not resolve BSB's claim. No party expected such an award to avoid further litigation regarding PTSW's debt under the Loan Agreement; indeed, BSB's withdrawal of the claim was expressly premised on the opportunity to vindicate its interests in court.[7]

---

[7] The Eleventh Circuit's decision in *Booth*, which PTSW also cites (Opposition at 10), did not arise under the New York Convention and, indeed, specifically distinguished rulings under Chapter 2 of the FAA, which implements the Convention. *See Booth*, 902 F.2d at 933 n.8 (describing cases that "allow respondent in a petition under Chapter 2 of the [FAA] to bring [a] counterclaim" as not "directly on point"). Moreover, the conclusion in *Booth* that a court may not "determine the most efficient method of resolving the claims between the parties," *id.* at 931, is in tension with the First Circuit's decision in *Hewlett-Packard*, which did just that. The First Circuit's approach controls here.

There is therefore no obstacle to this Court's hearing of BSB's counterclaim under the New York Convention. Such a proceeding is the "fair solution" given the equities of this case. *Hewlett-Packard*, 61 F.3d at 105.[8]

## III. PTSW SHOULD NOT BENEFIT FROM ITS STRATEGY OF DEPLETING BSB'S ASSETS TO AVOID ADJUDICATION OF ITS CONTRACTUAL DUTIES.

PTSW essentially argues that it is BSB's own fault that it does not have enough money at this particular time both to make immediate payment on the SIAC award and to defend itself by way of counterclaim in this proceeding. Yet it is not BSB's fault that PTSW stopped performing under the Loan Agreement after making initial payments over several years, thereby cutting off BSB's only source of income; or that PTSW sought and obtained an *ex parte* order from the District Court of South Jakarta purporting to invalidate the Loan Agreement and Mortgage, forcing BSB to undertake litigation in Indonesian courts and arbitration in Singapore; or that PTSW's jurisdictional challenges in the arbitral tribunal rendered that proceeding unnecessarily slow and expensive, thus nullifying the benefits of arbitration. Nor is it BSB's fault that, once PTSW stopped paying BSB under the Loan Agreement, it had sufficient liquid assets to implement an obvious strategy of litigation attrition in an effort to force BSB to surrender. PTSW now enjoys the benefits of ownership of the Mezzanine Floor of the S. Widjojo Centre

---

PTSW misleadingly states that a New York district court cited *Booth* "with apparent approval (in *dicta*)." Opposition at 10 n.18. That court merely pointed out that *Booth* supported an argument made by the applicant, which the court declined to reach; there was no statement, even in dicta, "approving" that argument. *McAllister Towing & Transp. Co. v. Offshore Express, Inc.*, No. 03 Civ. 6168 (RJH), 2004 WL 1488192, at *1 n.1 (S.D.N.Y. July 1, 2004).

[8] PTSW's contention (Opposition at 10-11) that this Court is ill-equipped to decide a claim involving foreign parties, laws or evidence cannot be taken seriously, particularly where it is PTSW that has chosen this forum. Likewise, the suggestion (Opposition at 11) that this Court may lack jurisdiction over BSB's counterclaim is a misdirection. PTSW has already invoked this court's original jurisdiction on the basis of 9 U.S.C. § 203; this Court therefore has supplemental jurisdiction under over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Nothing in the New York Convention repeals supplemental jurisdiction in enforcement proceedings. *See Jugometal*, 78 F.R.D. at 506 ("Once having acquired subject matter jurisdiction of the original complaint, the Court in its discretion could exercise under [Fed. R. Civ. P. 13] ancillary jurisdiction over the subject matter of the counterclaims.").

US1DOCS 5030780v4

without making required payments under the Loan Agreement.  PTSW's attempt to cast itself as a victim subjected to "tremendous and unnecessary expense," Opposition at 5, is simply astounding given that PTSW deprived BSB of millions of dollars in value in violation of PTSW's contractual undertakings, engaged in obstructionist tactics in the SIAC arbitration, and has repeatedly sought to avoid adjudication of the merits.

The unfairness of PTSW's conduct throughout this dispute is sufficient grounds to vacate the attachment entirely.  If PTSW truly wishes to "have the dispute between PTSW and [BSB] finally resolved," as it now claims (Opposition at 4), it should accept adjudication of BSB's counterclaim in this Court, which is PTSW's chosen forum.[9]  The fact that PTSW is pressing this Court both to freeze BSB's assets and to disregard the merits of this dispute, even though the Court has clear authority and capability to hear BSB's counterclaim, shows that PTSW is not interested in a fair adjudication of the dispute, but rather wants to get away with complete impunity.[10]

BSB's counterclaim is a clear and straightforward contract claim to which PTSW has no valid defense and which will exceed the amount PTSW is due under the SIAC award at least tenfold.  PTSW will therefore not recover any monetary judgment against BSB that cannot be fully offset by BSB's counterclaim.  As stated in BSB's opening memorandum, attachment of BSB's assets in any amount is unjustified under such circumstances.  However, if the Court declines to vacate the attachment in its entirety, the attachment should be limited to $120,000 so

---

[9] PTSW falsely asserts (Opposition at 15) that the SIAC award "expressly forbid[s]" BSB from "recommencing its monetary claims" against PTSW prior to making payment on the SIAC award.  The award states only that "no further *arbitration* be commenced" regarding BSB's claims until PTSW's costs are paid.  SIAC Award ¶ 13(f) (emphasis added), Aubry Aff. Ex. 10.

[10] PTSW's likening of its desire to escape its bargained-for obligations to the federal government's interest in seizing the proceeds of criminal activity is bewildering.  Opposition at 14.  The fact that the Sixth Amendment does not allow a criminal defendant to pay a lawyer with assets subject to civil forfeiture does not bear on the question whether BSB should be allowed to raise a claim that PTSW has systematically sought to evade.

-10-

that BSB will have the remaining funds available to defend this enforcement action by pursuing its counterclaim.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate the *ex parte* trustee process attachment that it issued on December 17, 2004.

In the alternative, the Court should reduce the attachment to an amount no greater than $120,000.

Respectfully submitted,

/s/ Richard A. Johnston
Richard A. Johnston (BBO # 253420)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
richard.johnston@wilmerhale.com

Attorney for Respondent
BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee

Dated: March 28, 2005

US1DOCS 5030780v4