UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of an Arbitration Between:<br><br>PT SUMOHADIWIDJOJO,<br><br>        Applicant and<br>        Counterclaim Defendant<br>        (Respondent below)<br><br>and<br><br>BSB RESIDUAL ASSETS TRUST,<br>BSB TRUST COMPANY, LTD., Trustee,<br><br>        Respondent and<br>        Counterclaim Plaintiff<br>        (Claimant below).<br><br>CITIZENS BANK<br><br>        Trustee | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 04 12646 NG<br><br>ANSWER AND COUNTERCLAIM OF BSB<br>RESIDUAL ASSETS TRUST AND BSB<br>TRUST COMPANY LTD., TRUSTEE |

## ANSWER

### First Defense

Pursuant to Rules 8, 12, and 13 of the Federal Rules of Civil Procedure, Respondent and Counterclaim Plaintiff BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee (together "BSB") hereby answers the allegations in the individual paragraphs of the Application to Confirm and Enforce Arbitral Award ("Application") of Applicant PT Sumohadiwidjojo ("PTSW"), dated December 16, 2004:

1.      BSB admits that PTSW purports to submit its Application pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York

1

Convention"), as adopted by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.*

BSB admits that a copy of the New York Convention is attached as Exhibit A to the Application.

2.      BSB admits that PTSW purports to seek to confirm the arbitration award of the

Singapore International Arbitration Centre ("SIAC") dated December 15, 2004, a copy of which

is attached as Exhibit B to the Application ("SIAC Award").  To the extent that paragraph 2 of

the Application purports to characterize the SIAC Award, BSB responds that the award speaks

for itself.  BSB further responds that, on March 11, 2005, the SIAC Registrar issued a certificate

taxing costs in the amount of approximately US$287,000 ("SIAC Registrar's Certificate"),

which PTSW has submitted to the Court.

3.      BSB admits that PTSW filed an *ex parte* motion with the Court seeking to freeze

funds in BSB's bank account.  As was more fully set out in BSB's filings in support of its motion

to vacate or reduce PTSW's attachment, PTSW's *ex parte* motion was excessive and

inappropriate for various reasons, including that PTSW owes BSB millions of dollars as a result

of PTSW's continuing breach of the parties' Loan Agreement dated February 17, 1998 ("Loan

Agreement").  This Court granted BSB's motion in part and reduced the attachment of BSB's

funds to $287,000, without prejudice to renewal of BSB's motion to vacate or reduce the

attachment.  *See* Order on Respondents' Motion to Vacate or Reduce Ex Parte Attachment, at 11

(Apr. 12, 2005) (Dein, U.S.M.J.) ("Order").[1]

4.      Paragraph 4 of the Application purports to set forth arguments of law, to which no

response is necessary.  BSB denies, however, that this Court should enter or enforce a judgment

on the SIAC Award at this time.  Rather, as more fully set out in BSB's counterclaim below and

---

[1] The parties have stipulated that BSB's account shall remain attached in the amount of $302,000 until May 2, 2005.  In the event that PTSW objects to the Order on or before May 2, 2005, the account shall remain attached in the amount of $302,000 until the Court rules on PTSW's objection.  In the event that PTSW does not object to the Order on or before May 2, 2005, PTSW consents to the release of all funds in the account in excess of $287,000. *See* Stipulation, at 1-2 (Apr. 15, 2005).

US1DOCS 5076629v7

in BSB's Motion to Stay Confirmation and Enforcement of the SIAC Award filed herewith, this Court should stay enforcement of the SIAC Award pending adjudication of BSB's related counterclaim against PTSW. BSB's counterclaim establishes that PTSW owes BSB amounts far exceeding PTSW's claim based on the SIAC Award and that BSB is entitled to set off any amounts due to PTSW pursuant to the SIAC Award against the amounts that PTSW owes BSB pursuant to its contractual undertakings. This Court should defer enforcement of the SIAC Award pending adjudication of the merits of the parties' dispute.

5.      BSB admits that this Court has jurisdiction over this matter and that venue is proper in this district.

6.      Paragraph 6 of the Application purports to excerpt the text of 9 U.S.C. § 203, to which no response is required.

7.      Paragraph 7 of the Application purports to excerpt the text of 9 U.S.C. § 207, to which no response is required.

8.      BSB admits that the SIAC Award falls under the New York Convention. BSB also admits that it maintains an account at Citizens Bank in Massachusetts and that such account was used in connection with the commercial relationship between BSB and PTSW pursuant to their contractual agreements.

9.      BSB admits that PTSW is a company with its principal place of business at S Widjojo Centre, 2nd Floor, Jalan Jenderal Sudirman 71, Jakarta, Indonesia. BSB is without sufficient information to admit or deny the remaining allegations in paragraph 9 of the Application.

10.      BSB admits that BSB Residual Assets Trust is a trust established in the British Virgin Islands by Declaration of Trust dated 26 July 1993, as amended. BSB further admits that

3

BSB Trust Company, Ltd. is a company established under the laws of the British Virgin Islands, with its registered office at Trident Chambers, Wickhams Cay, P.O. Box 146, Road Town, Tortola, British Virgin Islands, and that BSB Trust Company, Ltd. is the trustee of BSB Residual Assets Trust.

11.    BSB admits that SIAC rendered the SIAC Award on December 15, 2004.  To the extent that paragraph 11 of the Application purports to characterize the SIAC Award, BSB responds that the award speaks for itself.  BSB further responds that PTSW submitted a copy of the SIAC Award to the Court during the briefing of BSB's motion to vacate or reduce the *ex parte* attachment in this matter.

12.    BSB denies the allegations of paragraph 12 of the Application, which purport to characterize the SIAC Award.  BSB responds that the SIAC Award speaks for itself.  BSB further responds that the SIAC Registrar's Certificate taxed costs in the total amount of approximately $287,000.

13.    BSB admits the allegations of paragraph 13 of the Application.

14.    Paragraph 14 of the Application purports to set forth arguments of law, to which no response is necessary.

15.    Paragraph 15 of the Application purports to quote Article V of the New York Convention, to which no response is necessary.

16.    Paragraph 16 of the Application purports to quote Article VI of the New York Convention, to which no response is necessary.

17.    Paragraph 17 of the Application sets forth arguments of law, to which no response is necessary.

US1DOCS 5076629v7

18.     BSB denies any and all allegations in the Application to the extent not expressly admitted herein.

## Second Defense (Setoff)

19.     The Loan Agreement, pursuant to which BSB loaned PTSW $3,060,000 and PTSW agreed to make principal and interest payments to BSB, is a valid and enforceable contract that obligates PTSW to pay $3,060,000 plus interest under its provisions to BSB.

20.     BSB has performed all of its obligations under the Loan Agreement.

21.     PTSW's liability to BSB under the Loan Agreement exceeds any liability of BSB to PTSW under the SIAC Award.

22.     Clause 17 of the Loan Agreement provides that BSB "may at any time set off any claims of [PTSW] against [BSB] in whatever currency and whether or not contingent and whether or not due and payable in or towards satisfaction of any sum whether or not contingent and whether or not due and payable to [BSB] under or in connection with this Loan Agreement."

23.     Pursuant to the Loan Agreement, BSB is contractually entitled to set off PTSW's claim under the SIAC Award against PTSW's debt to BSB under the Loan Agreement.

24.     BSB asserts this defense of setoff without prejudice to its counterclaim as set forth below.

US1DOCS 5076629v7

## COUNTERCLAIM

Counterclaim Plaintiff BSB Residual Assets Trust and BSB Trust Company, Ltd.,

Trustee (together "BSB") for its counterclaim against PT Sumohadiwidjojo ("PTSW") alleges as

follows:

## PARTIES

1.      BSB Residual Assets Trust is a trust established in the British Virgin Islands by

Declaration of Trust dated 26 July 1993, as amended.  BSB Trust Company, Ltd. is a company

established under the laws of the British Virgin Islands, with its registered office at Trident

Chambers, Wickhams Cay, P.O. Box 146, Road Town, Tortola, British Virgin Islands.  BSB

Trust Company, Ltd. is the trustee of BSB Residual Assets Trust.

2.      PTSW is a company with its principal place of business at S Widjojo Centre, 2nd

Floor, Jalan Jenderal Sudirman 71, Jakarta, Indonesia.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this counterclaim pursuant to 28

U.S.C. § 1367(a).

4.      PTSW is subject to personal jurisdiction in this District.  PTSW has voluntarily

sought the benefit of this Court's jurisdiction by filing its Application to Confirm and Enforce

Arbitral Award dated December 16, 2004 ("Application") and by filing an *ex parte* motion to

attach the assets of BSB through trustee process on or about the same date.

5.      PTSW has solicited investments from persons residing in the United States

including, on information and belief, in Massachusetts.  At least one of PTSW's directors is a

resident of the United States.  On information and belief, PTSW has obtained funds from

investors residing in the United States, including Massachusetts.

6

6.      A major part of the negotiation of the transaction between PTSW and BSB, including of the Loan Agreement that is the subject of this counterclaim, took place in the United States.  Numerous beneficiaries of BSB Residual Assets Trust reside in the United States, including in Massachusetts.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d).


## FACTS

8.      BSB seeks to enforce PTSW's obligations under the parties' Loan Agreement, pursuant to which BSB loaned money to PTSW to purchase certain economic rights and interests in the Mezzanine Floor of the S. Widjojo Centre, a commercial office building located in Jakarta, Indonesia (the "Mezzanine Floor") and certain other assets.  PTSW has defaulted on the loan and has refused to make further payments thereon, despite having previously made such payments and repeatedly acknowledged its debt to BSB over several years.

9.      On July 26, 1993, BSB acquired certain rights in the Mezzanine Floor, including the right to all of the income generated by the rental or eventual sale of that property.  PTSW collected the rent payments as agent for BSB and remitted them to BSB after deducting a management fee, taxes and other items.

10.     On October 20, 1995, BSB and PTSW entered into a formal agency agreement, pursuant to which PTSW collected the rents on behalf of BSB in return for payment of 2.5% of the rents collected.  The term of the agency agreement was from January 1, 1995, to December 31, 1997.

US1DOCS 5076629v7

11.     Between 1991 and 1995, PTSW repeatedly offered to purchase the property rights in the Mezzanine Floor from BSB's predecessors in interest and, after BSB acquired the rights, from BSB itself.

12.     After lengthy negotiations, BSB and PTSW entered into a Purchase and Sale Agreement on August 11, 1997, pursuant to which BSB agreed to sell, and PTSW agreed to purchase, BSB's rights in the Mezzanine Floor and certain other assets for the total purchase price of US$3,060,000 to be paid by cash or promissory note. A copy of the Purchase and Sale Agreement is attached as Exhibit A hereto.

13.     In February 1998, BSB and PTSW implemented their Purchase and Sale Agreement through a series of integrated agreements. Pursuant to a Transfer Agreement, BSB and PTSW agreed to a transfer of the rights to the Mezzanine Floor in exchange for a purchase price of $2,915,040. Under a separate Loan Agreement, BSB agreed to lend PTSW $3,060,000, including the $2,915,040 purchase price for the rights to the Mezzanine Floor and the $144,960 purchase price of 144,960 shares in Kalimantan Investment Corporation (the "KIC Shares"), and PTSW agreed to make principal and interest payments to BSB. The loan was secured by a Deed of Security Rights over Land, the equivalent of a mortgage under Indonesian law (the "Mortgage"). Copies of the Transfer Agreement, Loan Agreement, and an unofficial English translation of the Mortgage are attached as Exhibits B, C, and D hereto respectively.

14.     Upon closing of these agreements on February 17, 1998, BSB transferred to PTSW its principal assets, the rights to the Mezzanine Floor and the KIC Shares. Since that date, PTSW has received the rental income from the Mezzanine Floor and has acted as the owner of the rights to the Mezzanine Floor and the KIC Shares.

15.     Clause 5.1 of the Loan Agreement provides that PTSW will repay the entire principal as well as interest thereon on or before December 15, 2002.

16.     Clause 7.1 of the Loan Agreement provides that interest on the loan would be an amount equal to 84.6% of the rental income (as defined in the Loan Agreement) received by PTSW on the Mezzanine Floor.  In 2000, the parties agreed to reduce the amount of interest to approximately 60% of rental income.  Clause 7.4 of the Loan Agreement provides that interest accruing during the first three years would not be payable immediately, but rather would be deferred and added to the loan principal annually, accruing interest at an agreed rate equal to the percentage resulting from dividing the current year's interest by the outstanding principal amount of the loan.  All deferred interest (and interest accrued thereon) became due and payable on December 15, 2002.

17.     In clause 11.1(c) of the Loan Agreement, PTSW represented, warranted, and covenanted that the Loan Agreement "shall constitute valid and legally binding obligations of [PTSW] enforceable in accordance with the terms and conditions hereunder."

18.     Clause 14.1 of the Loan Agreement provides for the accrual of default interest in the event that "any amount due and payable by [PTSW] under or in connection with this Loan Agreement is not paid when due."   In addition to the standard interest rate due under clause 7, amounts in default accrued (and continue to accrue) additional interest at the rate of 1.5% per month.

19.     Clause 14.2 of the Loan Agreement provides that PTSW "undertakes to indemnify [BSB] at its first written request against any losses and any costs (including legal fees and litigation costs) which [BSB] may sustain or incur as a consequence of any default by [PTSW] in the performance of any of the obligations under or in connection with this Loan

Agreement, including but not limited to the obligation to make any payment." Clause 15 provides that PTSW "shall pay all costs, of whatever nature, related to the entering into, performance and enforcement of this Loan Agreement or in respect of any security provided and/or to be provided in connection with this Loan Agreement, including legal fees and litigation costs."

20.    Clause 17 of the Loan Agreement provides that BSB "may at any time set off any claims of [PTSW] against [BSB] in whatever currency and whether or not contingent and whether or not due and payable in or towards satisfaction of any sum whether or not contingent and whether or not due and payable to [BSB] under or in connection with this Loan Agreement."

21.    Clause 22 of the Loan Agreement provides that the agreement is governed by the law of Indonesia. This clause further states: "All disputes arising out of this Loan Agreement shall be submitted to the District Court of South Jakarta. Nothing in the preceding sentence shall limit the right of [BSB] to bring proceedings against [PTSW] in any other court of competent jurisdiction."

22.    PTSW has repeatedly acknowledged its debt to BSB in communications with BSB and with third parties. For example, in its 1997 annual report (issued in 1998), PTSW acknowledged its contractual obligations to BSB as follows:

> "On August 11, 1997 the Company [PTSW] entered into a Memorandum of Understanding with [BSB] for the purchase of the mezzanine floor of the S Widjojo Centre and 144,960 shares in Kalimantan Investment Corporation for US$ 3,060,000.
>
> On February 17, 1998 the Company [PTSW] signed a sale and purchase agreement with [BSB] and signed an acknowledgment of indebtedness for US$3,060,000 secured by a second mortgage over the S Widjojo Centre and land … .
>
> Under the terms of the loan agreement interest is payable on December 15, 2002 and the principal amount of the loan is repayable on December 15, 2002."

10

23.    Following the transfer of its interest in the Mezzanine Floor and the KIC Shares to PTSW, BSB's principal asset was its right to payments from PTSW under the Loan Agreement. PTSW made payments to BSB under the Loan Agreement between June 2000 and September 2002, at which point PTSW unilaterally ceased its payments. PTSW did not repay the principal and interest due and payable under the Loan Agreement on December 15, 2002.

24.    On September 30, 2003, PTSW sent a letter to BSB purporting to repudiate the Loan Agreement. PTSW paid BSB $168,809.42 with its letter of September 30, 2003 in an attempt to extinguish its obligations. BSB applied the amount received against accrued interest then owing by PTSW.

25.    On October 22, 2003, BSB sent a letter to PTSW that rejected PTSW's attempted repudiation of the Loan Agreement and demanded immediate payment of all amounts due thereunder.

26.    In October 2003, PTSW, without any notice whatsoever to BSB, improperly obtained an *ex parte* ruling of the District Court of South Jakarta in Indonesia, which purported to conclude that PTSW had fully repaid its debts under the Loan Agreement and ruled that the Mortgage must be released. BSB learned of the South Jakarta court proceeding only after the issuance of the *ex parte* order. A copy of an informal English translation of the *ex parte* order of the South Jakarta court is attached as Exhibit E hereto.

27.    On December 22, 2003, BSB sent PTSW another letter demanding payment of all amounts due under the Loan Agreement.

28.    Upon learning of the *ex parte* order and receiving no payment in response to its letter of December 22, 2003, BSB sought relief by commencing an arbitration in Singapore before the Singapore International Arbitration Centre (the "SIAC Arbitration"), pursuant to the

11

Transfer Agreement's provision that any dispute "relating to this agreement" would be subject to arbitration in Singapore pursuant to SIAC rules.

29.     PTSW raised numerous procedural objections in the SIAC Arbitration, including that the Tribunal lacked jurisdiction over the dispute and that the dispute should be litigated in Indonesia pursuant to clause 22 of the Loan Agreement.

30.     On May 28, 2004, before the Arbitration reached a decision on the merits, the High Court of Jakarta vacated the *ex parte* ruling of the District Court of South Jakarta that had purported to invalidate the Loan Agreement and the Mortgage.  The local land office in South Jakarta subsequently reinstated the Mortgage in favor of BSB on August 16, 2004.  Copies of informal English translations of the decision of the High Court of Jakarta and of the reinstatement of the Mortgage are attached as Exhibits F and G hereto respectively.

31.     Upon obtaining relief from the High Court of Jakarta and the South Jakarta land office, BSB sought to withdraw its arbitration claim because the actions of the High Court and the land office had already restored the legal rights that BSB sought to vindicate in the SIAC Arbitration.

32.     On December 15, 2004, in response to BSB's application to withdraw its claim, the SIAC tribunal issued its award (the "SIAC Award").  The SIAC Award allowed BSB to withdraw its claim, but required BSB to pay the costs of the SIAC Arbitration and PTSW's costs.  However, the Tribunal did not fix the amount of the costs; instead, the Tribunal said that the amount of fees should be agreed to by the parties or, failing agreement, determined by the SIAC Registrar.

33.     On December 16, 2004 -- the very day after the SIAC Award was issued -- PTSW filed its Application in this Court and obtained an *ex parte* attachment in the amount of $388,000

12

against an account held by BSB at Citizens Bank, without previously seeking an agreement with BSB as to the amount of attorneys' fees or asking the SIAC Registrar to determine the fees (as required by the SIAC Award).

34.    In seeking the *ex parte* attachment, PTSW made no mention of its own default under the Loan Agreement, its unsuccessful *ex parte* effort in Indonesia to repudiate the Loan Agreement, or its continued debt to BSB of over $4 million (*i.e.*, approximately $3 million in principal and more than $1 million in accrued but unpaid interest, plus BSB's costs of collecting its debt from PTSW).

35.    On January 19, 2005, BSB moved to vacate or reduce the *ex parte* attachment obtained by PTSW.

36.    On March 11, 2005, the SIAC Registrar issued a certificate taxing costs in the following amounts: US$272,694.18 for legal costs, US$331 and S$12,019.61 for expenses and disbursements incurred, US$1250 for costs incurred in the taxation, and S$8922.82 for taxing fees. The total amount taxed by the Registrar equals approximately US$287,000.

37.    Following briefing and oral argument, this Court granted BSB's motion in part and reduced the attachment of BSB's funds to $287,000, without prejudice to renewal of BSB's motion to vacate or reduce the attachment. *See* Order on Respondents' Motion to Vacate or Reduce Attachment, at 11 (Apr. 12, 2005) (Dein, U.S.M.J.) ("Order").[2] The Court also stated that it would have the authority to stay enforcement of the SIAC Award pending adjudication of BSB's substantive claims against PTSW and BSB's right to set off PTSW's claim under the SIAC Award against PTSW's liability to BSB. *See id.* at 10-11.

---

[2] As stated in footnote 1 above, the parties have stipulated that BSB's account shall remain attached in the amount of $302,000 until at least May 2, 2005. *See* Stipulation, at 1-2 (Apr. 15, 2005).

38.    Since learning of PTSW's improper attempt to proceed *ex parte* in the District Court of South Jakarta in 2003, BSB has sought to establish a mediation or other alternative resolution of the debt owing to it by PTSW.  PTSW has consistently rejected BSB's attempts to resolve the parties' dispute amicably.  Instead, PTSW has repeatedly sought to evade its responsibilities under the Loan Agreement and to obstruct any adjudication on the merits.

39.    BSB brings this counterclaim in order to recover all amounts owing to BSB by PTSW pursuant to the Loan Agreement.  BSB has also moved separately to stay confirmation and enforcement of the SIAC Award pending resolution of BSB's claim against PTSW.


## COUNT I – Breach of the Loan Agreement

40.    BSB incorporates the allegations of paragraphs 1 through 39 as if fully set forth herein.

41.    The Loan Agreement constitutes a valid, binding, and enforceable contract between BSB and PTSW.

42.    BSB has performed all of its obligations under the Loan Agreement.

43.    PTSW deliberately and willfully breached, and continues to breach, the Loan Agreement by failing to make full payment of all amounts due under the Loan Agreement.

44.    PTSW has deliberately and willfully breached, and continues to breach, the Loan Agreement by repudiating its obligations under the Loan Agreement.

45.    BSB has suffered significant damages as a result of PTSW's breach of the Loan Agreement, including the principal of US$3,060,000 and accumulated interest thereon; default interest pursuant to the terms of the Loan Agreement; and all costs and attorney's fees incurred by BSB in the enforcement and collection of those amounts.

14

46.     Pursuant to the Loan Agreement, BSB is contractually entitled to set off any amount due to PTSW, including amounts due under the SIAC Award, against the amounts owed by PTSW to BSB.

47.     BSB is entitled to recover all damages, including principal, interest, costs and attorney's fees due to PTSW's breach of the Loan Agreement, less any amount set off as an amount due to PTSW under the SIAC Award.

US1DOCS 5076629v7

## PRAYER FOR RELIEF

WHEREFORE, BSB prays for entry of judgment in its favor and against PTSW as follows:

A.    Adjudging PTSW to be in breach of the Loan Agreement;

B.    Ordering PTSW to pay to BSB all amounts due under the Loan Agreement, including US$3,060,000 in principal, accumulated interest and default interest thereon, and all costs and attorney's fees incurred by BSB;

C.    Staying confirmation and enforcement of the SIAC Award pending resolution of BSB's counterclaim, as further requested in BSB's Motion to Stay Confirmation and Enforcement of the SIAC Award filed herewith;

D.    Ordering that BSB may set off any payment due to PTSW under the SIAC Award against the amounts owed by PTSW to BSB under the Loan Agreement;

E.    Awarding BSB its costs in this action, including attorney's fees; and

F.    Granting BSB such other and further relief as the Court may deem just and proper.

Dated: April 28, 2005

BSB RESIDUAL ASSETS TRUST
AND BSB TRUST COMPANY, LTD.,
TRUSTEE, Respondent and Counterclaim Plaintiff

By its attorneys,

/s/ Mark C. Fleming_____
Richard A. Johnston (BBO # 253420)
Mark C. Fleming (BBO # 639358)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
richard.johnston@wilmerhale.com
mark.fleming@wilmerhale.com

US1DOCS 5076629v7

# Exhibit A

# PURCHASE and SALE AGREEMENT

This agreement is made this 11th day of August, 1997 between The BSB Residual Assets Trust of The British Virgin Islands, henceforth to be referred to as Seller, and P.T. S. Widjojo of Jakarta, Indonesia, henceforth to be referred to as Buyer.

WITNESSETH: That Seller agrees to sell and convey, and Buyer agrees to buy 1) All (144,960) shares currently held by Seller in the Kalimantan Investment Company (KIC), and 2) certain real estate located on Jalan Sudirman, Jakarta, Indonesia, such real estate being described as ownership rights and all claims to ownership rights to the S. Widjojo Centre, currently being held by Seller, to include all rights and property transferred on July 23, 1979 by Notarial Deed Number 117 from Buyer to P.T. Bank Susila Bakti.  Seller's rights of ownership are further defined by the following documents: a) An agreement called 'Binding Agreement to Sell and Purchase', Number 38, dated 4 September 1986, between P.T. Bank Susila Bakti and Perkumpulan Persaudaraan Kejiwaan Susila Budhi Dharma (PPK Subud); b) An agreement called 'Agreement with Respect to Transfer of Rights' dated 31 December 1986, between PPK Subud and the Subud Brotherhood International Foundation (SBIF); and c) An agreement called 'Deed of Transfer', dated 26 July 1993, between SBIF and Seller.  Seller declares that no restrictions or encumbrances apply to their rights of ownership, particularly that no third party holds claims or rights in relation to said property.

PURCHASE PRICE: THREE MILLION SIXTY THOUSAND DOLLARS (US$3,060,000.00).

GUARANTEE: In the event that either party (Buyer or Seller) fails to complete the purchase and sale as herein provided, the failing party agrees to pay to the other party a sum of US$100,000 as liquidated and agreed damages for the breach of this agreement, with such payment due and payable on December 16th, 1997.

PROMISSORY NOTE: Purchase price of US$3,060,000.00 to be paid by cash and/or promissory note:

- Principal:   US$3,060,000.00 less cash payment.
- Interest:   9% per annum, to be paid quarterly in arrears, with payments due by the first day of the first month of the following quarter.  Late payments shall be assessed a late fee of one and one half per cent per month (18% per annum).
- Term:   Five years, with the principal to be paid in full on or before December 15, 2002.  Principal may be reduced by cash payment at any time during the term of this note without penalty and with a subsequent reduction in interest payments.
- Security:  1) A mortgage lien on the entire Widjojo Centre property (excluding recent land acquisition to rear of the building), such lien to be subordinate to no more than one other mortgage lien; or 2) A standby letter of credit in favor of Seller in the full amount of the principal and interest of the promissory note.

Seller accepts that these two instruments (a mortgage lien and a standby letter of credit) shall continue, throughout the duration of the promissory note, to be interchangeable as security for said promissory note.  That is, should Buyer at first secure the note with a mortgage lien, and at some later date wish to replace that lien with a standby letter of credit of equivalent value, that exchange will be acceptable to Seller.

The amount of the standby letter of credit or the amount of the mortgage may be reduced as and when the amount due from Buyer is reduced by reason of interest or principal paid.

The standby letter of credit must be irrevocable, confirmed by a sound international bank with drawings to take place outside Indonesia, and it must either be for the full term of Buyer's obligation to Seller or subject to drawdown by Seller if not renewed prior to its earlier expiration, or replaced by a mortgage lien of equivalent value.  The only other condition for drawing down under the standby letter of credit or foreclosure under the mortgage lien shall be that Buyer failed to pay its obligations to Seller when due.

TRANSFER OF OWNERSHIP RIGHTS, KIC SHARES, AND BANK FLOOR LEASE: Ownership Rights shall be conveyed by Notarial Deed, to be furnished and paid for by Seller.  Possession to be given on date of transfer of Notarial Deed, KIC Shares, and Bank Floor Lease to tenant, such transfer to take place on or before

BSB RESIDUAL ASSETS TRUST - PT S. WIDJOJO PURCHASE and SALE AGREEMENT

December 15, 1997.  All rent accruing prior to date of Notarial Deed shall be to the benefit of Seller.  Cash proceeds from this sale will first be applied to Seller's costs of sale, including Indonesian taxes and fees, and attorneys' and consultants' fees.  The balance will be transferred to the beneficiaries within ninety days.

SHARES-FOR-UNITS OFFER: Buyer intends to solicit BSB Trust Beneficiaries, offering to exchange their claims for PTSW stock.

- Seller agrees, as a condition of sale, to provide Buyer with a list of Seller's beneficiaries and their addresses.  Otherwise, Seller takes note of Buyer's intention to solicit beneficiaries and does not object to it, but will not act in any way which might be interpreted as if Seller acted as an underwriter to this offering.
- Beneficiaries choosing to exercise such an exchange option shall be sent PT S. Widjojo shares by Buyer and the BSB Trust claims of those beneficiaries shall be assigned to PT S. Widjojo.  Furthermore, if Buyer so chooses, Seller agrees to reduce (on a pro-rata basis) the principal of the promissory note and the amount of the standby letter of credit (if applicable) in exchange for these BSB Trust claims.
- Buyer agrees to indemnify Seller against any litigation resulting from the offering of the PT S. Widjojo shares.
- Seller declares that:
  a) All rights and responsibilities of Seller towards the beneficiaries are defined in the 'Declaration of Trust Establishing The BSB Residual Assets Trust' dated 26 July 1993 and certified by the notary Jose Joaquin Mejia Ramirez in Quindio, Colombia, as subsequently amended on March 14, 1994 to permit the Trustees greater flexibility in managing the claims of small Beneficiaries and Beneficiaries who cannot be located.
  b) Seller will accept Buyer as a beneficiary on equal terms with all other beneficiaries.

This Agreement shall be governed and construed by and under the laws of Indonesia.

Upon transfer of Notarial Deed, Bank Floor Lease to tenant, and KIC Shares, both parties shall be released of any and all obligations, liens, and claims save those included in this document and the promissory note and mortgage lien or standby letter of credit.  In the meantime, it is understood and agreed to by both parties that BSB Residual Assets Trust does not give permission for Buyer or any other party to use this property as collateral for a loan of any kind.

This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

P.T. S. Widjojo            BUYER
By: Siti Rahayu Wiryohudoyo, Director

P.T. S. Widjojo            BUYER
By: Siti Hardiyati Sumohadiwidjojo, Director

BSB Residual Assets Trust       SELLER
BSB Trust Company, Ltd., Trustee
By: Michael Irwin, Director

BSB Trust Company, Ltd.         SELLER
By: Juan Andujar, Director

BSB Trust Company, Ltd.         SELLER
By: Michael Syfrig, Director

BSB Trust Company, Ltd.         SELLER
By: Elke Goebel, Director

BSB Trust Company, Ltd.         SELLER
By: Robert Coker, Director

BSB Trust Company, Ltd.         SELLER
By: Bachtiar Lorot, Director

2

# Exhibit B



# TRANSFER OF RIGHT AND INTEREST

This Transfer of Right and Interest is made and entered into as of this 17 day of February 1998, by and between :

I.   The BSB Residual Assets Trust, represented by *Ms. Retno Anggraini Dharmayani Muljosantoso*, residing in Jakarta, according to her statement in this matter acting by virtue of a Power of Attorney, dated 28 November 1997, authenticated by Indonesian Consulate in Vancouver, British, Colombia, Canada on 2 December 1997, under number 144/KONS/LEG/XII/1997, hereinafter referred to as the *"First Party"*; and

II.  PT. SUMOHADIWIDJOJO, abbreviated to PT. S. WIDJOJO, represented by its Director, *Mrs. Siti Hardiyati S.A. Sumohadiwidjojo* and *Mrs. Siti Rahayu Wiryohudojo*, hereinafter referred to as the *"Second Party"*.

## WITNESSETH

-   Whereas the First Party is the owner of a Right and Interest over the entire Mezzanine Floor as part of the S. Widjojo Building (S. Widjojo Centre) as identified in the Building Permit (*Idzin Bangunan*) as issued by Head of Supervision of City Development on August 13, 1974, Number 485/IMB/74, located in DKI Jakarta, South Jakarta, Kebayoran Baru, Senayan, locally known as Jl. Jend. Sudirman No. 57 (*Bank Floor*), such Bank Floor together with all right of a part of plot of Land as evidenced by Certificate of Hak Guna Bangunan Number 174/Senayan, covering approximately 36.8 m x 100.65 m (thirty six point eight by one hundred point sixty five meters) or approximately 3,703.92 $m^2$ (three thousand seven hundred three point ninety two square meters) which forms part of the 5,856 $m^2$ (five thousand eight hundred and fifty six square meters) pursuant to Situation Map Number 397/334/1975 dated December 15, 1975, registered in the name of PT. S. Widjojo pursuant to and as further described in the following Agreements (all of the Agreements will be referred to as the *"Bank Floor's Agreement"*).

    1.  *"Sale and Purchase of Building and Transfer of Land Rights"*, as evidenced by Deed Number 117 dated July 23, 1979, signed by PT. S. Widjojo and PT. Bank Susila Bakti, made before Musjaffak, successor to Raden Soeratman.

    2.  *"Binding Agreement to sell and Purchase"*, as evidenced by Deed Number 38, dated September 4, 1986, signed by PT. Bank Susila Bakti and Perkumpulan Persaudaraan Kejiwaan Susila Budhi Dharma (*"PPK SUBUD"*), made before Notary Siti Pertiwi Henny Shidki.

3. *"Agreement with Respect to Transfer of Rights"*, dated December 31, 1986, signed by and between PPK SUBUD and Subud Brotherhood International Foundation (*"SBIF"*), and

4. *"Deed of Transfer Agreement"*, dated July 26, 1993, signed by and between SBIF and the First Party.

(such Mezzanine Floor and part of the above plot of Land evidenced by Certificate of Hak Guna Bangunan (*HGB*) number 174/Senayan, hereinafter will be referred to as the *"Bank Floor"*).

- Whereas the First Party and the Second Party have concluded a Purchase and Sale Agreement where the First Party agreed to sell and convey and the Second Party agreed to buy (*1*) all shares currently held by the First Party in Kalimantan Investment Company (*"KIC"*) established and organized under the Laws of British Virgin Islands and (2) the Right and Interest over the Bank Floor (such Purchase and Sale Agreement hereinafter referred to as the *"Purchase and Sale Agreement"*).

- Whereas the Parties agree to waive the provision in the Purchase and Sale Agreement dated August 11, 1997 which stated that the Parties agree to convey the transfer of the ownership right by way of a notarial deed.

- Whereas as a consequence of the waiver mentioned above, the Parties agree to have this Agreement as evidence of the Transfer of Right and Interest to the Bank Floor of the First Party to the Second Party.

Now therefore, for and in consideration of the above mentioned covenants, the First Party and the Second Party agree to enter into this Transfer of Right and Interest over the Bank Floor subject to the following terms and conditions :

## Article 1
## TRANSFERRING RIGHT AND INTEREST

1. The First Party hereby transfers, assigns and conveys to the Second Party all of its Rights and Interest over the Bank Floor to the Second Party and the Second Party hereby accepts such transfer.

2. Both Parties agree and confirm that upon the execution of this Deed and the registration of the Deed of Granting of Security Right Over Land, the Right and Interest to the Bank Floor are vested in the Second Party.

## Article 2
## THE TRANSFER PRICE

For the Transfer of Right and Interest as specified herein, the Second Party agrees to pay to the First Party a transfer price amounting to US$ 2,915,040 (Two Million Nine Hundred Fifteen Thousand and Fourty United States Dollars) (such transfer price hereinafter referred to as the *"Transfer Price"*).



### Article 3
## PAYMENT OF THE TRANSFER PRICE

The Transfer Price is deemed fully paid by the Second Party upon execution of the Loan Agreement (attached hereto as Annex 1) dated February 17, 1998 and the registration of the Deed of Granting of Security Right Over Land (attached as Annex 2) which is made today before Mrs. S.P. Henny Singgih, Land Deed Official in Jakarta.

### Article 4
## THE FIRST AND SECOND PARTY'S WARRANTIES AND GUARANTEES

4.1.    The First Party warrants and guarantees to the Second Party that the First Party will hold the Second Party harmless for any claim from the Beneficiaries of First Party's Trust, relating to the Administration of the Trust and the receipt and distribution by the Trust of the Income from the Bank Floor.

4.2.    The Second Party acknowledges, warrants and guarantees to the First Party the following :

   a.    That tenant of the Bank Floor (Bank Pinaesaan) is currently in default under the lease agreement due to its liquidation.

   b.    That the Second Party has no claim against the First Party as a result of the default by Bank Pinaesaan.

### Article 5
## ANNULMENT OF BANK FLOOR'S AGREEMENT

The First Party and the Second Party agree that upon execution of this Transfer of Right and Interest to the Bank Floor, all previous arrangements between themselves in relation to the Bank Floor as mentioned in the beginning of this Agreement will be regarded as null and void.

### Article 6
## C O S T S

All costs, taxes payable and other charges for executing this Agreement (including Notary's fees and Lawyer's fees) will be borne equally by the First Party and the Second Party.

### Article 7
## SETTLEMENT OF DISPUTES

1.    Any dispute between the Parties hereof relating to this Agreement shall be first settled amicably.

2.  If an amicable settlement can not be reached within 30 (thirty) days after the occurrence of dispute, such dispute shall be arbitrated by three arbitrators in Singapore under the rules of the Singapore International Arbitration Centre. The Arbitration award issued thereunder shall be final and binding upon the Parties hereof.

3.  The Parties hereto agree and declare that Articles 620, 641 and 650 paragraph (2) of the Reglement op de Rechtsvordering and Article 15 and 108 of Law Number 1 of 1950 (one thousand nine hundred and fifty) and any other provisions of Indonesian Law giving any party the right to appeal any award made by the arbitral tribunal, shall not have any application whatsoever to any arbitration commenced hereunder.

4.  The Parties hereto state that Article 631 of the Reglement op de Rechtsvordering shall apply, and thus the arbitrators shall be bound by strict rules of law in making their decision and shall not be entitled to render a decision ex aequo et bono.

## Article 8
## GOVERNING LAW

This Agreement shall be governed in all respect by and construed in accordance with the laws of the Republic of Indonesia.

## Article 9
## NOTICES

Any notice, request and other correspondence under and in connection with this Agreement shall be deemed duly received on the third working day following the day such notice, request or correspondence was sent to the Parties at the addresses as may be advised in writing by either party :

BSB Residual Assets Trust
c/o Michael Irwin
806 A, Burne Avenue
Kelowna, BC VIY 5 P 7
Canada
Telp.     :
Fax       :   250 868-0006

PT. S. WIDJOJO
S. Widjojo Centre, 2nd Floor
Jalan Jend. Sudirman Kav. 7 i
Jakarta 12190
Indonesia
Telp. : 252-4210 ; 252-4188
Fax   : 520-5888; 520-5889

## Article 10
## CONFIDENTIALITY

1.  The Parties hereby agree that from the date of execution of this Agreement the Parties will maintain the confidentiality of this Agreement and all information that is exchanged by the Parties in relation to this Agreement (hereinafter referred to as "Confidential Information").

2.  No Party shall disclose any Confidential Information to any other unrelated Parties, without prior written approval from the other parties.

### Article 11
## AMENDMENTS

No amendments of this Agreement shall be valid unless in writing and duly executed by the Parties.

### Article 12
## ENGLISH LANGUAGE IN GOVERNING LANGUAGE

This Agreement is executed in a text using the English language which shall be governing language despite translation into any other language. In the event that a translation of this Agreement into the Indonesian language is required for any purpose, such translation shall be furnished by a sworn translator appointed by the Parties.

### Article 13
## SEVERABILITY

If one or more of the provisions contained in these Agreement become invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality or enforceability of the remaining provisions are not in any way affected or impaired.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date set forth above.

First Party,

BSB Residual Assets Trust
Name : Retno AD. Muljosantoso

Second Party,

PT. S. Widjojo
Name : Mrs. Siti Hardiyati S.A.-
       Sumohadiwidjojo
Title : Director

PT. S. Widjojo
Name : Mrs. Siti Rahayu Wirjohudojo
Title : Director

Witnesses :

1. 
BSB Residual Assets Trust
Name : Riana Kusumaningsari

2. 
PT. S. Widjojo
Name : Mr. Raymond Lee

ASH/ivy/tran-agr/priwin-17 (draft 16-1-98)

5



Number  : 75/Leg/1998/In two folds.-
For the Legalization of the Signatures of :
1. Mrs. SITI HARDIYATI SYAFRUDDIN ACHMAD SUMOHADIWIDJOJO,
   Director of PT. S. WIDJOJO, residing in Jakarta, Jl.
   Berlian No.8, Kelurahan Cilandak Barat, Kecamatan Cilandak,
   Jakarta Selatan.---------------------------------------------
   -Holding Identity Card No : 09.5306.450735.0128 ;--------
2. Mrs. SITI RAHAYU WIRYOHUDOYO, Director of PT. S. WIDJOJO,
   residing in Jakarta, Wisma Subud RT 007/003, Kelurahan
   Cilandak Barat, Kecamatan Cilandak, Jakarta Selatan.-----
   -Holding Identity Card No : 4603.17122/530329008.--------
3. RETNO A.D. MULJOSANTOSO, on behalf of BSB RESIDUAL ASSETS
   TRUST, residing in Bogor, Jl. Merauke No. 39, Blok M,
   Cinere RT 06/10, Kelurahan Cinere, Kecamatan Limo.-------
   -Holding Identity Card No : 03.27.2005/01328/4471326.----
   -temporarily staying in Jakarta.------------------------
4. RIANA KUSUMANINGSARI, Private Person, residing in Bekasi,
   Jatiwaringin Asri 1.S/31, RT 10/020, Kelurahan Jatiwaringin
   Kecamatan Pondok Gede.----------------------------------
   -Holding Identity Card No : 10.5505.550674.0006.---------
   -temporarily staying in Jakarta.------------------------
5. RAYMOND LEE, Private person, residing in Jakarta, Wisma
   Subud Jl. RS. Fatmawati, Jakarta Selatan.----------------
   -Holding SIM A No : 540612055210.------------------------
And who are knonw to Me, Notary.---------------------------

                    Jakarta, 17 February 1998
                       N O T A R Y.


        SITI PERTIWI HENNY SINGGIH SH.

# Exhibit C

## LOAN AGREEMENT

**THE UNDERSIGNED**:

1. **PT S. Widjojo**, a limited liability company duly established and organized under the laws of the Republic of Indonesia, with its principal place of business at S. Widjojo Centre, 2nd Floor, Jalan Jenderal Sudirman 71, Jakarta, Indonesia (the "Borrower");

2. **BSB Residual Assets Trust**, duly established and organized under the laws of the British Virgin Islands, with its offices at Trident Chambers, Wickhams Cay, P.O. Box 146, Road Town, Tortola, the British Virgin Islands (the "Lender");

The Borrower and/or the Lender may be referred to hereafter as a "Party" or the "Parties", as the case may be.

**WHEREAS**:

1. The Lender has sold and the Borrower has purchased 144.960 shares ("Shares") held by the Lender in Kalimantan Investment Corporation.

2. The Lender has further agreed to finance and assist the Borrower in maintaining S. Widjojo Centre at Jl. Jenderal Sudirman Kav.71, Jakarta, Indonesia (together with all plots of land on which it is constructed and surrounded hereinafter referred to as the "Property").

3. The Lender and the Borrower have agreed that the aggregate amount of the purchase price of the Shares and the amount of the financial assistance from the Lender to the Borrower for the maintenance of S. Widjojo Centre is US$3,060,000 (three million and sixty thousand United States Dollars ("Purchase Price")).

4. The parties have agreed that the Purchase Price will be paid at the option of the Borrower in cash or in installments pursuant to the terms of this Loan Agreement.

5. The Lender agrees to enter into this Loan Agreement with the Borrower subject to the terms and conditions set forth herein.

**NOW THEREFORE THE PARTIES HEREBY AGREE** as follows:

1. The Loan

   The Lender and the Borrower hereby confirm that the Borrower has borrowed from the Lender and that the Lender has lent to the Borrower the sum of US$3,060,000.00 (three million sixty thousand United States Dollars) together with any interest accrued thereon, the amount thereof outstanding at any time, hereinafter referred to as the "Loan".

2. Purpose

   The Loan will be used by the Borrower to pay the Purchase Price to the Lender and to maintain S. Widjojo Centre.

Loan Agreement

Halaman ke _____
_____ Page(s)

3.    Condition Precedent

This Loan Agreement will be effective provided that as a security for the proper performance of the Borrower's obligations under this Loan Agreement, a second ranking mortgage (Hak Tanggungan), will be established on the Property and registered in accordance with the applicable laws (hereinafter referred to as "the Mortgage").

4.    Letter of Credit

The Mortgage may be replaced by an unconditional and irrevocable standby letter of credit issued or confirmed by a financial institution acceptable to the Lender (hereinafter referred to as "the Letter of Credit"), provided that: (i) the Letter of Credit covers all obligations of the Borrower under this Loan Agreement; (ii) any drawings thereunder will take place outside Indonesia; (iii) the terms and conditions thereof are reasonably satisfactory to the Lender; (iv) it is valid for the full term of Borrower's obligations to the Lender or subject to drawdown by the Seller if not renewed prior to its earlier expiration, or replaced by a mortgage lien of equivalent value; and (v) the only (other) condition for drawing down under the Letter of Credit shall be that the Borrower has failed to perform its obligations under this Loan Agreement.

5.    Repayment/Reduction of Principal Amount.

5.1    The Borrower undertakes to repay the Loan as well as the interest due thereon in full ultimately on or before 15 December 2002.

5.2    Lender agrees to reduce (on a pro rata basis) the principal amount of the Loan with respect to units of Lender's (trust) beneficiaries acquired by Borrower. These units of the beneficiaries must have been tendered to Lender for cancellation. The amount by which the principal amount of the loan will be reduced will be calculated according to the following formula:

$$A = \frac{X}{Y} \times P \text{ (A equals X divided by Y times P)}$$

Whereby: A = Dollar amount by which the principal amount of the loan will be reduced;

X= the amount of units of Lender's (trust) beneficiaries acquired by Borrower;

Y = the total amount of units of Lender's (trust) beneficiaries at the date of the assignment, which at the date of signing of this agreement is 359,982.53 Beneficiary Units;

P = the principal amount of the loan on the day prior to the assignment, which at the date of signing of this agreement is US$3,060,000. -.

2

Loan Agreement

Halaman ke......................

Page(s)

**6.    Prepayment**

It is expressly understood by the Parties that the Borrower may at any time before the date mentioned in Article 5 repay, partially or in full, the Loan in cash without penalty.

**7.    Interest**

7.1.    The Loan shall bear interest in an amount equal to 84,6% of the Rental Income (as defined below) received by the Borrower from the rental of the mezzanine floor (the so-called "Bank Floor") at S. Widjojo Centre, commencing on the date hereof.

7.2.    For purposes of this Section 7, "Rental Income" shall mean the rental income or other amounts collected or received directly or indirectly by the Borrower from the tenant(s) of the Bank Floor, excluding: (i) reasonable and customary service charges and other operating expenses which are billed and paid separately consistent with past practice and security deposits; and (ii) value added or similar taxes paid by the tenant(s).   The Borrower shall permit the Lender to examine the books and records of the Borrower which relate to the calculation of Rental Income.

7.3.    The Borrower shall not make, amend or terminate any material arrangement relating to the occupancy or alteration of the Bank Floor without the prior written approval of the Lender.

7.4.    The interest as calculated above shall not be currently payable during the first three years after the date of this Loan Agreement, but rather shall be deferred and added to the principal of the Loan annually.  Such deferred interest shall itself accrue interest at a rate per annum equal to the percentage resulting from dividing the current year's interest by the outstanding principal amount of the Loan.  All such deferred interest, and the interest thereon, shall become due and payable on [15 December 2002].

7.5.    Commencing on the date which is three years after the date of this Loan Agreement, the interest as calculated above shall be currently payable in arrears on a quarterly basis on the first day of each quarter.

7.6.    The interest as calculated above shall be reduced in the same proportion and under the same conditions as the principal amount of the Loan is reduced pursuant to Section 5.2.

7.7.    The Borrower shall deliver to the Lender on the first day of each quarter, commencing on April 1, 1998, a written statement of the amount of interest on the Loan for the preceding quarter calculated in accordance with this Section 7.  Such statement shall be certified by a responsible officer of the Borrower.

**8.    Taxes/Charges**

Any and all taxes to be levied under Indonesian laws and regulations on the income of Lender made under this Loan Agreement shall be borne by Lender.

Loan Agreement

9.    Payments

9.1    Payment of all amounts due from the Borrower to the Lender hereunder or in connection herewith shall be effected by way of transfer to the Lender's account with State Street Bank and Trust Co. in Boston MA, - ABA #011000028 account number 9410-363-7.

9.2    Payments shall be made in such a way that the amounts to be paid to the Lender are credited to the Lender's account on or before the due date.

9.3    Any payment to be made on a day which is not a business day in Indonesia shall instead be due on the next business day.

9.4    Payments shall be made in US Dollars without a deduction of any kind and without any costs being incurred by the Lender.

9.5.    Payments shall be applied in settlement of the following items in the following order irrespective of any specification to the contrary by the Borrower: first, the costs and expenses and fees due under or in connection with this Loan Agreement; second, default interest and accrued interest; and third, the Loan and current interest.

9.6    The Borrower may not set off any payment due to the Lender under or in connection with this Loan Agreement against any claim of the Borrower against the Lender.

10.    Information/Annual Accounts

10.1    The Borrower undertakes that until all liabilities under this Loan Agreement have been discharged, it shall, as soon as the same become available but in any event within six (6) months after the end of each of its financial years, deliver to the Lender copies of its annual accounts, including a balance sheet, a profit and loss account and the explanatory notes thereto for such financial year, audited by a registered public accountant. The Borrower shall also notify the Lender forthwith in writing of any amendment to its Articles of Association.

10.2    Without prejudice to the provisions of the preceding paragraph of this clause, the Borrower shall, until all liabilities under this Loan Agreement have been discharged, furnish the Lender, at its first request, with all information which the Lender may from time to time reasonably require.

11.    Representations and Warranties

11.1    The Borrower hereby represents, warrants and covenants as of the date hereof that:

(a)    the Borrower has full power, authority and legal right to own its property and assets and to enter into and perform this Loan Agreement and all instruments and documents contemplated herein to be executed and performed by the Borrower;

(b)    the Borrower has entered into a loan agreement with Usaha Mulia B.V. under which the former has established a first ranking mortgage on the Property and

Loan Agreement

Halaman

5    Page(s)

registered the same with the South Jakarta Land Office;

( c)  this Loan Agreement shall constitute valid and legally binding obligations of the
      Borrower enforceable in accordance with the terms and conditions hereunder;

( d)  without limiting the generality of the foregoing, the execution, delivery and
      performance of this Loan Agreement by the Borrower will not conflict with or
      contravene any laws, regulations, permits, judgements, orders or other
      restrictions or any other agreements or obligations by which the Borrower or its
      assets may be bound, nor result in the imposition of any encumbrance of any
      nature on the Borrower's assets;

( e)  no litigation, arbitration or administrative proceeding has been commenced or is
      pending or threatened against the Borrower or any or all of its assets, the
      resolution of which could have a material adverse effect on the financial
      condition of the Borrower or its ability to perform its obligations under or in
      respect of this Loan Agreement or documents related thereto to which the
      Borrower is a party;

( f)  all necessary authorizations, reports to, registrations at, consents, licenses and
      permits required from government authorities, creditors and shareholders in
      relation to execution, delivery and performance of this Loan Agreement and for
      carrying out any acts contemplated hereunder and to carry out the business
      currently operated by the Borrower have been obtained and are and will be
      maintained by the Borrower in full force and effect, including without limitation
      reporting of the Loan to Bank Indonesia and the Team for the Management of
      Offshore Commercial Loans.

11.2   Each of the Representations set out in Clause 11.1. shall be deemed to be repeated on
       each interest payment date as defined in Clause 7, always updated with respect to the
       circumstances then subsisting.

12.    <u>Negative Pledge</u>

       The Borrower shall not create nor undertake to create or permit, any mortgage (other
       than contemplated hereunder), charge or pledge or other limited right to subsist on all or
       any of its present or future assets (including without limitation the property) than for
       normal business transactions, without the prior written consent of the Lender.  Lender
       will give its consent if interest payments have been made on the dates as mentioned in
       Clause 7 and the Borrower is not in default under one of the circumstances as mentioned
       in Clause 13.

Loan Agreement

13.    **Events of Default**

13.1    If:

a)    any amount of US$ 125,000 in respect of the Loan, interest, repayment, default interest or costs is not paid correctly and in full on the due date for payment or within thirty (30) days thereafter, or the Borrower fails to duly perform one or more of its other obligations to the Lender under this Loan Agreement or the Mortgage, or any of the Representations, Warranties or Covenants contained herein or in the Mortgage is untrue, inaccurate or misleading in any respect;

b)    if upon entering into this Loan Agreement, the Borrower gave the Lender incorrect information or failed to disclose information or mislead the Lender in any way and the Lender, if it had possessed correct and complete information, would not have entered into this Loan Agreement or would have done so on other conditions;

c)    the Borrower or its business is transferred in whole or in part, dissolved, liquidated, wound up, discontinued, or relocated abroad, or a decision by the shareholders is taken in this respect;

d)    the Borrower ceases to pursue the objects laid down in its Articles of Association;

e)    if the Borrower is acting in material violation of a statutory provision in the conduct of its business;

f)    the Borrower or any of its creditors present a petition for the Borrower's winding up, adjudication in bankruptcy or the Borrower proposes an arrangement with its creditors or presents a petition for a suspension of payments;

g)    without the prior written approval of the Lender, the Borrower's Articles of Association are amended or its management undergoes a change which amendment or change, in the Lender's opinion, is harmful to the Lender's interests and the nature of the amendment or change is such that the Lender would not reasonably have entered into this Loan Agreement, or not on the same conditions, if the amendment or change had taken place before the Lender entered into this Loan Agreement, the request of the Borrower to do so shall not be unreasonably withheld;

h)    without the prior written approval of the Lender, the Borrower merges or is taken over, the nature of the merger or take-over is such that the Lender would not reasonably have entered into this Loan Agreement, or not on the same conditions, if it had taken place before the Lender entered into this Loan Agreement, the request of the Borrower to do so shall not be unreasonably withheld;

Loan Agreement

Halaman ke_____
Page(s)

i)    a creditor of the Borrower attaches, or takes possession of, all or any part of its assets and the same is not released or discharged within thirty (30) days.

Then, the Borrower shall be in default solely by reason of the fact that one or more of the circumstances mentioned in this Clause have occurred, and the Lender may by notice to the Borrower, declare the Loan, together with interest and any other amounts due from the Borrower to the Lender under this Loan Agreement, immediately due and payable, without any further demand, notice of default or judicial intervention being necessary.

13.2    The Borrower shall inform the Lender forthwith in writing immediately after one or more circumstances have occurred which cause the Loan to become due and payable pursuant to this Clause.

14.    Default Interest and Indemnity

14.1    If any amount due and payable by the Borrower under or in connection with this Loan Agreement is not paid when due, the Borrower shall pay interest on the outstanding amount at a rate per month equal to the sum of 1,5% (one and a half percent=18 percent per year) plus the rate mentioned in Clause 7. This default interest shall accrue for the period commencing on the relevant due date and ending on the date of actual payment of the full amount in which connection parts of a month shall be treated as a whole month, shall be due and payable at all times, and shall be compounded on each of the days that interest is payable pursuant to Clause 7.1.

14.2    The Borrower undertakes to indemnify the Lender at its first written request against any losses and any costs (including legal fees and litigation costs) which the Lender may sustain or incur as a consequence of any default by the Borrower in the performance of any of the obligations under or in connection with this Loan Agreement, including but not limited to the obligation to make any payment.

15.    Costs

The Borrower shall pay all costs, of whatever nature, related to the entering into, performance and enforcement of this Loan Agreement or in respect of any security provided and/or to be provided in connection with this Loan Agreement, including legal fees and litigation costs.

16.    Evidence of debt

An extract from the accounts maintained by the Lender in accordance with its usual practice, signed by the Lender, shall be prima facie evidence of the existence and amounts of the Borrower's indebtedness. The Borrower retains the right to reclaim from the Lender any amount which it can show constitutes a payment by it or a charge to it in excess of the amount due without, however, the Lender being liable for damages in this respect.

Hale & Dorr/Loan Agreement - 17/02/98 - 10:24

7

Loan Agreement

17.    Set-Off

The Lender may at any time set off any claims of the Borrower against the Lender in whatever currency and whether or not contingent and whether or not due and payable in or towards satisfaction of any sum whether or not contingent and whether or not due and payable to the Lender under or in connection with this Loan Agreement.

18.    Additional Security

The Borrower undertakes to provide additional security to the Lender upon the Lender's first written request.

19.    Assignment/subrogation

The Lender may not assign part or all of its rights under this Loan Agreement, without the prior written consent of the Borrower, which consent shall not be unreasonably withheld. The rights of the Borrower hereunder can not be assigned.

20.    Domicile

The Borrower elects domicile at the address designated in this Loan Agreement. This election may only be amended by means of written notice to the Lender.

21.    Miscellaneous

21.1    Any notice, offer, request, payment, demand or other communication required or permitted to be given under this Loan Agreement shall be in English and in writing and shall be deemed sufficiently served if delivered in person or sent by fax or by registered airmail (return receipt requested) prepaid, addressed in the case of the Parties respectively as follows:

The Borrower:          PT S. Widjojo

                       S. Widjojo Centre, 2nd Floor

                       Jl. Jenderal Sudirman Kav. 71

                       Jakarta 12190

                       Indonesia

Attention:             Direksi

Fax number:            001-62-21-520 5888

Hale & Dorr/Loan Agreement – 17/02/98 – 10:24                                    8

Loan Agreement

```
                                              ┌─────────────────────────────┐
                                              │ Halaman ke                  │
                                              │ ─────────────────  1  Page(s)│
                                              │                             │
                                              └─────────────────────────────┘
```

The Lender:            BSB Residual Assets Trust

                       c/o Michael Irwin

                       806A Burne Avenue, Kelowna, BC VIY 5P7

                       Canada

Fax number:            001-1-250-868-0006

With a copy to:        Hale And Dorr LL.P

                       60 State Street

                       Boston, Massachusetts 02109

Attention:             William C. Benjamin, Esq.

Fax number:            001-1-617-526-5000

Notices made by mail shall be deemed to have been given or made ten (10) days after posting and in the case of fax will be deemed to be given or made on the same business day in the place of receipt following the day of transmission.

Either of the Parties may change its address from time to time by written notice to the other Party.

21.2    The failure of a Party to insist on strict performance of any provisions of this Loan Agreement or to exercise any right, power or remedy upon a breach hereof shall not constitute a waiver of any provision of this Loan Agreement or limit the Party's rights thereafter to enforce any provision or exercise any right, power or remedy.

21.3    No amendments of this Loan Agreement shall be valid unless in writing and duly executed by the Parties.

21.4    This Loan Agreement is executed in a text using the English language which shall be the governing language despite translation into any other language. In the event that a translation of this Loan Agreement into the Indonesian language is required for any purpose, such translation shall be furnished by a sworn translator appointed by the Lender, which translation shall not be contested by the Borrower save for manifest error.

21.5    This Loan Agreement contains the entire understanding of the Parties and supersedes all prior agreements and understandings (except for those agreements explicitly referred to herein) between the Parties relating to the subject matter hereof.

21.6    Each of the Parties agrees that it shall from time to time take such actions and execute such additional instruments as may be reasonably necessary to implement and carry out the intent and purposes of this Loan Agreement.

21.7    The Parties hereto waive the applicability of Section 1266 of the Indonesian Civil Code to the extent judicial intervention is required to terminate this Loan Agreement.

Hale & Dorr/Loan Agreement - 17/02/98 - 10:24

9

Loan Agreement

Halaman ke _____ 10 _____ Page(s)

22.   **Governing Law/Jurisdiction**

This Loan Agreement shall be governed by and construed in accordance with the laws of the Republic of Indonesia. All disputes arising out of this Loan Agreement shall be submitted to the District Court of South Jakarta.

Nothing in the preceding sentence shall limit the right of the Lender to bring proceedings against the Borrower in any other court of competent jurisdiction.

Signed in duplicate on 17 February 1998 in Jakarta.



**BSB RESIDUAL ASSETS TRUST**

Name: RETNO A.D. MULJOSANTOSO

Title:   ATTORNEY-AT-LAW

**PT S. WIDJOJO**

Name: SITI RAHAYU WIRYOH udoyo

Title:  Director

**PT S. WIDJOJO**

Name: SITI HARDIYATI S.A.S

Title:  DIRECTOR

Witnesses :

1.

BSB Residual Assets Trust
Name : Riana Kusumaningsari

2.

PT S. Widjojo
Name : Raymond Lee

# Exhibit D

[Unofficial English translation]

301/606/HT/1998.

HT.No.319/1998.sp.

REGISTRATION FORM 206 a

# NATIONAL LAND AGENCY

[State symbol]

### FOR THE SAKE OF JUSTICE
### BASED ON THE UNITY OF GOD

### CERTIFICATE OF
### SECURITY RIGHT

### LAND OFFICE OF SOUTH JAKARTA
### MUNICIPALITY

**DA 324136**

**09.04.—.—.6.00319**

# NATIONAL LAND AGENCY

[State Symbol]

DUPLICATE

# L A N D - B O O K

# SECURITY RIGHT OVER LAND

Number : 319/1998.

| | | |
|---|---|---|
| P R O V I N C E | : | DKI  JAKARTA |
| MUNICIPALITY | : | SOUTH JAKARTA |

**LAND OFFICE OF**
**SOUTH JAKARTA**

REGISTRATION FORM 208
No.    386/1998
REGISTRATION FORM 307
No. 49. 455 /1998

09.04.—.—.6.00319

04HM008

## FIRST REGISTRATION

| a). SECURITY RIGHT No. 319/1998. Ranking: II (second) | b). Name of Holder of this Security Right "BSB RESIDUAL ASSETS TRUST (TRUST)", domiciled in British Virgin Islands. |
|---|---|

**c). This Security Right is given to secure the repayment of debt up to the amount of:**

US $ 3,060,000.    (three million sixty thousand United States dollar)

**d).**                          OBJECT OF THIS SECURITY RIGHT

| Type and Number of Right | Other Things |
|---|---|
| -. B.174/SENAYAN. <br> -. B.176/SENAYAN. <br> -. B.331/SENAYAN. <br> -. B.386/SENAYAN. <br> -. B.447/SENAYAN. <br> -. B.451/SENAYAN. | |

e). Subject to the following requirements stated in the deed drawn up by Land Deed Official

SITI PERTIWI HENNY SINGGIH.SH.

Dated 17 -2 -1998.                          Number 28/Kebayoran Baru/1998.

Which copy constitutes as part of this Certificate of Security Right.

| f).   DATE OF ENTRY <br> JAKARTA 06 MARET 1998 <br> Head of Land Office of <br> South Jakarta Municipality <br> [signed] <br> Drs. Soengkono W. <br> NIP.010 053 521 | g).   DATE OF ISSUE OF CERTIFICATE <br> JAKARTA 06 MARCH 1998 <br> Head of Land Office of <br> South Jakarta Municipality <br> [signed] <br> Drs. Soengkono W. <br> NIP. 010 053 521 |
|---|---|
| h). <br> Certified copy <br> For the issue of Certificate | Head of Land Office of <br> South Jakarta <br> [chopped] [signed] <br> Drs. Soengkono W. <br> NIP. 010 053 521 |

04HM009

# REGISTRATION OF CHANGES

| CAUSE OF CHANGES | Date of Registration<br>No. Registration Form 208<br>No. Registration Form 307 | Remarks on Changes<br>Signature of Head Official<br>and Office Stamp |
|---|---|---|
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |
| ............................................ | ............................................ | ............................................ |

04HM008

# REGISTRATION OF CHANGES

| CAUSE OF CHANGES | Date of Registration<br>No. Registration Form 208<br>No. Registration Form 307 | Remarks on Changes<br>Signature of Head Official<br>and Office Stamp |
|---|---|---|
| | | |

04HM008

# DEED OF GRANTING OF SECURITY RIGHT

Number : 28 / Kebayoran Baru / 1998

First / Second Page

On this day, Tuesday, dated the 17th (seventeenth day) of February 1998 (one thousand nine hundred and ninety eight),

appear before me, SITI PERTIWI HENNY SINGGIH S.H., who, by virtue of the Decree of the Minister of Home Affairs dated 29 October 1984 number SK.262/DJA/1984, appointed/acted as a Land Deed Official, hereinafter referred to as PPAT as contemplated in article 19 of the Government Regulation Number: 10 of 1961 in conjunction with Article 7 paragraph 1 of the Government Regulation No.24 of 1997 on Land Registration and Law Number 4 of 1996 in conjunction with No.14 of 1997 dated 6 October 1997 on Security Rights over Land and all Things Attached Thereon (hereinafter referred to as Law on Security Rights), within the jurisdiction of Daerah Khusus Ibu Kota Jakarta,

having its office at Jalan Rajasa III/17, Kebayoran Baru, South Jakarta,

in the presence of witnesses known to me and whose names will be mentioned at the end of this deed:

-Mrs SITI RAHAYU WIRYOHUDOYO, Director of the company which will be mentioned hereunder, residing in Jakarta, at Wisma Subud, Rt.007, Rw.003, Kelurahan Cilandak Barat, District of Cilandak, South Jakarta;

-holder of KTP (Identification Card) number 4603.17122/530329008;

-Mrs SITI HARDIYATI SYAFRUDDIN ACHMAD SUMOHADIWIDJOJO, Director of the company which will be mentioned hereunder, residing in Jakarrta, at Jalan Berlian number 8, Rt.007, Rw.002, Kelurahan Cilandak Barat, District of Cilandak, South Jakarta;

-holder of KTP (Identification Card) number 09.5306.450735.0128;

-according to their statement in this matter acting jointly as representatives of the Direksi of and therefore for and on behalf of a Limited Liability Company P.T. SUMOHADIWIDJOJO, abbreviated as P.T. S.WIDJOJO, domiciled in Jakarta, which articles of association and amendments thereto have been published in the Official Gazette of the Republic of Indonesia, dated 18 June 1974 number 49, Supplement number 254, Official Gazette of the Republic of Indonesia dated 14 June 1977 number 47, Supplement number 351, Official Gazette of the Republic of Indonesia, dated 22 May 1990 number 41, Supplement number 1852, and lastly amended by Deed of Resolution of the Meeting, dated 25 January 1994 number 45 made before MARIA KRISTIANA SOEHARYO Sarjana Hukum, Notary in Jakarta;

-and to conduct legal acts stated in this deed they have obtained approval from the general meeting of shareholders of the company, as stated in the Minutes of Meeting privately drawn, dated 22 November 1997, duly stamped and attached to the first page of this deed;

-and therefore are authorized to conduct such legal acts pursuant to Article 10 of the articles of association of the company;

as the Grantor of Security Rights, hereinafter referred to as the First Party;

II. -Ms RETNO ANGGRAINI DHARMAYANI MULJOSANTOSO, Legal Consultant, residing in Bogor, Jalan Merauke number 390 Blok M, Cinere, Rt.06, Rw.10, Kelurahan Cinere, District of Limo, being the holder of KTP (Identification Card) number 03.27.2005/01328/4471326;

-temporarily residing in Jakarta;

-according to her statement in this matter acting by virtue of a Power of Attorney, dated 28 November 1997 acknowledged by PIRJO M. HOLT, Notary Public for the British Columbia Province and has been verified by the Consulate General of the Republic of Indonesia, Vancouver, British Columbia, Canada, dated 2 December 1997 No.144/Kons/Leg/XII/1997, duly stamped attached to the first page of this deed, as the attorney of Mr. MICHAEL IRWIN, the President Director of the BSB Trust Company Limited, in this matter acting as trustee of and therefore for and on behalf of BSB Residual Assets Trust (Trust), a trust duly established under the Law of the British Virgin Islands by virtue of a Declaration, dated 26 July 1993.

as the grantee of the Security Rights, who, after the registration of such Security Right at the local Land Office will act as the Holder of Security Right, hereinafter referred to as the Second Party.

The parties known/introduced to me, state as follows:

that the Second Party and the said Limited Liability Company P.T. SUMOHADIWIDJOJO abbreviated as P.T. S.WIDJOJO

as debtor have made and signed a loan agreement which is evidenced by a Loan Agreement privately made, dated today, duly stamped and legalized by me, Land Deed Official, as Notary in Jakarta, under number 74/Leg/1998/In two folds.

that to secure the repayment of the Debtor's indebtedness in the amount of US$3,060,000 (three million sixty thousand United States Dollars) in full (including its interests as well as any other amounts due and outstanding under the Loan Agreement (the "Secured Indebtedness")/which amount will be determined later by virtue of the Loan Agreement mentioned above and its supplement, amendment, extension and renewal (hereinafter referred to as the Loan Agreement) up to the amount of the Secured Value of US$3,060,000 (three million sixty thousand United States Dollars) including interests and other amounts due and outstanding which is given by the First Party by virtue of this deed to and in favor of the Second Party, who hereby acknowledges the receipt, of such Security Right which is regulated in Law on Security Right and its implementing regulations of the II (the second) ranking hereinafter referred to as "The Second Ranking Security Right over the object of Security Right", over the object(s) of:

- 6 (six) plots of rights over land/Proprietary Rights over Apartments described below:

  - HGB (Right to Build) Certificate Number 174/Senayan

  - HGB Certificate Number 176/Senayan,

  - HGB Certificate Number 331/Senayan,

  - HGB Certificate Number 386/Senayan,

  - HGB Certificate Number 451/Senayan, and

  - HGB Certificate Number 447/Senayan

04HM010                                    2

registered in the name of the Limited Liability Company P.T. SUMOHADIWIDJOJO abbreviated as P.T. S.WIDJOJO, domiciled in Jakarta.

- Proprietary Rights over Apartments, Certificates Number _____, registered in the name of _____, which location, boundaries and total area of land are described in the Measuring Letter/Situation Map/Map dated 10 December 1975, dated 16 June 1988 Number 838/1988, dated 3 March 1994 Number 1607/1974, dated 29 October 1996/No.5389/1996 and dated 25 October 1996 No.5291/1996, number 397/3394/1975, 398/3395/1975,

  -which certificates are handed over to me for the purpose of registration of the transfer of rights over land and the registration of the Security Right given by virtue of this deed;

- Ex Traditional Rights over Land over an area of approximately 5,856 M2 (five thousand eight hundred and fifty six square meters), 2,203 M2 (two thousand two hundred and three square meters), 1,660 M2 (one thousand six hundred and sixty square meters), 551 M2 (five hundred and fifty one square meters), 666 M2 (six hundred and sixty six square meters) and 58 M2 (fifty eight square meters).

| Village/Kelurahan | : | Senayan |
| District | : | Kebayoran Baru |
| Regency/Municipality | : | South Jakarta |
| Province | : | DKI Jakarta |

The granting of the Security Right mentioned above includes also:

buildings, machinery and equipments, and all things existed, constructed and growth as well as those which will exist, or will be constructed on such land which pursuant to their natures or by virtue of the prevailing laws are classified as fixed assets and including those which are constructed by virtue of a Right to Build Certificate dated 13 August 1974 number 485/IMB/'74.

Hereinafter the right over land/Proprietary Right over Apartment and other goods mentioned above are referred to as the object of Security Right which is declared by the First Party as its property.

The parties in their capacity mentioned above state that the grant of Security Right mentioned above is approved and agreed subject to the following terms:

Article 1.

The First Party warrants that all the above objects of Security Rights truly belong to the First Party, and are not involved in any dispute, free from any confiscation and free from any encumbrances,

except as stated in this deed or in the Loan Agreement.

04HM010

3

## Article 2.

The Second Security Right over the Objects of Security Right has been created by the First Party and accepted by the Second Party subject to the conditions and covenants stipulated and set forth below:

### 2.1 Right to Manage if in Breach

If a continuing Event of Default (Event of Default is an Event of Default as defined under Article 13 of the Loan Agreement) is occurring, subject to the rights of the holder of the first ranking security right over the Objects of Security Right ("the Holder of the First Security Right"), the Second Party is authorized by the First Party to manage the Objects of Security Right, in accordance with a decision of the chairman of the relevant District Court, to which the Second Party should apply in such situation in order that the Objects of Security Right be placed in its control and management.

### 2.2 Sale by Public Auction

If a continuing Event of Default occurs, the First Party, by virtue of this deed and subject to the rights of the Holder of the First Security Right, authorizes the Second Party to take any of the following actions:

(a) to sell, or cause to be sold, by public auction, all or any part of the Objects of Security Right;

(b) to provide for and to determine the time, place, manner and the conditions of that public auction;

(c) to receive, sign and give receipt for the proceeds of the public auction;

(d) to deliver to the purchaser, or purchasers, the Objects of Security Right which were sold in the public auction;

(e) to apply the proceeds of the public auction in full or partial as settlement of the Secured Indebtedness;

(f) to do or take such other action as may be required by prevailing laws and regulations or which, in the opinion of the Second Party, is necessary to realize the Objects of Security Right at auction.

### 2.3 Enhancement to First Ranking of Security Right

If the Holder of the First Security Right releases its right over the Objects of Security Right, this Second Security Right over the Objects of Security Right shall forthwith, by virtue of the prevailing law and regulations, become the first ranking security right.

### 2.4 Prohibition on Sale, Disposal or Transfer

2.4.1 Subject to the timely and prior written notice to the Second Party, the First Party will be entitled to, or will be able to allow any third party to sell, dispose of or relinquish, or transfer its rights and interests in the Objects of Security Right to any other person or party.

2.4.2 The First Party shall immediately notify the Second Party upon any attempt of the Holder of the First Security Right to sell, dispose of or relinquish, or transfer its rights and interests in the Objects of Security Right to any other person or party.

### 2.5 Action if Title is revoked or Released

If the First Party's title to the Objects of Security Right is revoked by the appropriate authorities or for any reason the rights of the First Party to the Objects of Security Right lapse or the Objects of Security Right, in whole or in part, are seized or destroyed, so that the rights of ownership of the First Party to the Objects of Security Right terminate, the Secured Indebtedness will become immediately due and payable, in full, to the Second Party and the Second Party is authorized to claim, collect or receive any payment of compensation, reimbursements or substitution due to the First Party from the State and/or any other government body or entity, and for this purpose may sign, give receipts and take any other action it deems appropriate.

### 2.6 Insurance

The First Party must have the Objects of Security Right properly insured against loss and damage, including fire, as required by the Loan Agreement and such other insurance as the Second Party may deem necessary, up to an amount deemed sufficient by and with an insurance company appointed or approved by the Second Party. The insurance policies maintained by the First Party must declare that the policies are made in the interest of the Second Party. The First Party must provide the Second Party with proof of these policies in the form of a copy of the policies. The First Party must pay any insurance premiums on time and as required. Where the First Party fails to do so the Second Party is entitled to pay such premiums which shall then be for the account of the First Party. In the event of damage by fire or other loss the Second Party is entitled to receive in whole or in part, the insurance proceeds in settlement of the Secured Indebtedness. Nothing in this Article 2.6 will limit in part or in full or in any manner the rights and obligations of the parties set out in the Loan Agreement or the agreement relating to the Deed of Assignment of Insurances entered into or to be entered into by and between the First Party and the Second Party.

### 2.7 Defending Title

The Second Party is entitled to do and perform any and all acts necessary to maintain defend and safeguard the Objects of Security Right in the name of and on behalf of the First Party and to undertake all acts necessary for the execution of or to prevent the abolishment or cancellation of the rights over the Objects of Security Right due to non-compliance with or a violation of prevailing laws and regulations, including arranging the extension or renewal of title to the Objects of Security Right.

### 2.8 Surrender of Objects of Security Right

If the Second Party exercises its power to sell the Objects of Security Right, the First Party:

(i) must first give an opportunity to any interested purchaser to inspect the Objects of Security Right at a time determined by the Second Party; and

(ii) must, subject to conditions of any lease agreement, within 30 days of receiving notice in writing of such exercise from the Second Party, vacate and surrender, or cause to be vacated and surrendered, the Objects of Security Right to the Second Party or a third party appointed by the Second Party.

### 2.9 Disposition and Encumbrance

The First Party must not perform any act of disposition or encumbrance in relation to the Objects of Security Right and is not entitled to appoint any other person or party to act as its attorney or representative to perform any of the acts mentioned above, without the prior written approval of the Second Party. Such approval will not be unreasonably withheld, if the conditions as mentioned in Article 2.4 have been met.

### 2.10 Loss Payee

In relation to the insurance mentioned in Article 2.6 above, the Second Party must be named as sole loss payee as its interests may appear for all proceeds payable in respect of any loss claimed under insurance maintained by the First Party in respect of the Objects of Security Right.

### 2.11 Rights Against Tenants or Users

If the Objects of Security Right are leased or lent for use with the approval of the Second Party, the First Party authorizes the Second Party to exercise, without any exception, all rights and powers which the First Party may have and/or could exercise against the tenant or users of the Objects of Security Right including to determine or to change the rental period and/or receive the rent in advance.

### 2.12 Other Rights Related to Sale

In exercising the right to sell under Article 2.2 above the Second Party will have the right to perform any and all things deemed necessary and beneficial by the Second Party to obtain from the proceeds of the auction as well as other expenses incurred by the Representative or proxy of the Second Party, including bailiffs costs and costs of auction.

### 2.13 Expenses

All expenses with regard to any action taken by the Second Party under Article 2.6 and other maintenance costs and taxes which are payable in connection with the Objects of Security Right are for the account of the First Party and the First Party therefore undertakes and binds itself to discharge such payment obligations promptly.

### 2.14 Failure as to Amounts Payable

If the First Party fails to carry out its undertaking in Article 2.13, the Second Party is authorized by the First Party to pay all such expenses, maintenance costs and taxes at the expense and for the account of the First Party, who waives its right to dispute the same.

### 2.15 Evidence as to Amounts Payable.

In exercising any right of sale or other disposition, it will not be necessary for the Second Party to give evidence as to the amount of the Secured Indebtedness outstanding and the Second Party is entitled for the purpose of any public auction or other disposition to determine the Secured Indebtedness then due and payable by the First Party on the basis of the Second Party's books and records, without prejudice, however, to the right of the First Party subsequently to prove that such amounts were not due, in total or in part, by the First Party, to the extent that any such amounts have been received by the Second Party out of the sale proceeds

and/or other moneys paid as compensation and referred to in this deed. The Second Party will not be liable to the First Party for any loss or damage as a result of any error.

**2.16 Evidence of Event of Default**

The Parties agree that for the purpose of enforcing this Second Security Right over the Objects of Security Right, or exercising any other rights or powers hereunder, the occurrence of a Continuing Event of Default shall be exclusively evidenced by a certificate from the Second Party to that effect.

**2.17 Maintenance**

The First Party must maintain the Objects of Security Right in good condition and carry out all repairs to the Objects of Security Right as are necessary or beneficial to maintain the value of the Objects of Security Right.

**2.18 Prohibition on Building**

The First Party may not build any structures on, to or appertaining to the Objects of Security Right, without the prior written approval of the Second Party.

**2.19 Private Sale**

2.19.1 Notwithstanding Article 2.2, if a continuing Event of Default occurs, and subject to the right of the Holder of the First Security Right, the First Party and the Second Party hereby agree that the Second Party will have the right to determine that the Objects of Security Right will be sold by means of a private sale and not by public auction, provided that the parties agree on the price. Such private sale can only take place after the lapse of one month following a notice given by the Second Party to the relevant interested party confirming that the Objects of Security Right will be sold by private sale and such notice should otherwise be given in accordance with paragraph 3 of Article 20 of the Law on HT.

2.19.2 In case of a private sale and subject to Article 2.19.3 below the Second Party shall take all necessary steps to cause the Second Security Right over the Objects of Security Right to be deleted from the Register of the relevant Land Office and to ensure that the third party purchaser need not enquire as to the amount of the debt owed to the Second Party or as to whether the Second Party has become entitled to sell.

2.19.3 In the case of a private sale pursuant to Article 2.19.1, the First Party authorizes the Second Party to take any of the following actions:

(a) to receive, sign and give receipt for the proceeds of the private sale;

(b) to deliver to the purchaser, or purchasers, the Objects of Security Right which were sold in the private sale;

(c) to apply the proceeds of the sale in full or partial settlement of the Secured Indebtedness;

(d) to do or take such other action as may be required by prevailing laws and regulations or which, in the opinion of the Second Party, is necessary to realise the sale of the Objects of Security Right.

### 2.20 Non Clearance in Case of Private Sale

The Second Party as the holder of the Second Security Right over the Objects of Security Right, reserves the right to decide whether or not a purchaser of the Objects of Security Right in a private sale, where the proceeds of the sale are not sufficient to meet the Secured Indebtedness, shall have the right to demand that the Second Security Right over the Objects of Security Right be released and cleared as a Security Right over Land pursuant to Article 19 paragraph (4) of the Law on HT.

### 2.21 Conduct of Public Auction

If the Objects of Security Right are to be sold by public auction as provided in Article 2.2, then the Second Party is entitled to suspend the public auction, and (in the case of a purchaser defaulting in the payment of the purchase price or other expenses) to decide to recommence with the public auction at the expense of the defaulting purchaser.

### 2.22 Appointment of Manager/Financial Supervisor

2.22.1 To exercise the right to manage as specified in Article 2.1 above the Second Party is entitled to take all decisions which are necessary in relation to the Objects of Security Right by themselves (on behalf of the First Party) and to preserve, maintain and/or restore the Objects of Security Right, and to recruit at the expense of the First Party, a financial supervisor and/or manager to take charge of the supervision and management of the Objects of Security Right, after any necessary Court approval.

2.22.2 A financial supervisor will have authority to supervise all financial matters relating to the Objects of Security Right and to take all steps and perform all acts it considers necessary to carry out its duties.

2.22.3 A manager recruited pursuant to the provisions above will be employed by the Second Party and will have authority to:

(a) take charge of, control and direct the sale of the Objects of Security Right;

(b) take charge of and control and direct the administrative and financial affairs of the First Party in so far as they relate to the Objects of Security Right;

(c) take all such further steps as will promote, in the opinion of that manager, the efficient management of the Objects of Security Right, protecting above all the interests of the Second Party, and other creditors if any, pending a foreclosure.

2.22.4 The Second Party is not liable to the First Party for acts carried out by any financial supervisor or manager, provided that the Second Party took reasonable care in hiring that supervisor or manager.

2.22.5 The First Party may not take and must refrain from taking any action which may be detrimental to the interests of the Second Party, and shall, at the Second Party's request, take all steps or cause such steps to be taken

so as to enable a financial supervisor or a manager to carry out its duties as provided for above.

2.22.6 The First Party must permit any financial supervisor or manager (or the Second Party if he is acting in stead of a financial supervisor or manager) and its successors, appointed pursuant to the above, to carry out the management and exploitation of the Objects of Security Right at the expense of, but without the participation of the First Party, such management to include:

(a) the termination of any lease agreements and agreements to use or to occupy the Objects of Security Right;

(b) if necessary, the making of a claim for vacation of the Objects of Security Right;

(c) claiming damages before any competent authorities including the courts;

(d) the carrying out of any necessary repairs and renovations to the Objects of Security Right, including painting, whitewashing and other ordinary maintenance;

(e) the installation of water pipelines, gas and electric power;

(f) the submission of tax returns in the name of the First Party, and meeting other tax requirements and the contesting or settling of any disputes in relation to tax assessments;

(g) the receipt of tax restitutions;

(h) the payment of all dues payable in respect of the Objects of Security Right; and

(i) such other acts of management which, though undertaken by and carried out subject to the direction and control of the Second Party, are considered to be acts of the First Party, responsibility for which remains with the First Party.

2.22.7 The Second Party will use the net proceeds of any sums collected pursuant to Article 2.22.6, which are not then used for payment of the matters listed in Article 2.22.6 or any related expenses and collection costs, to repay the Secured Indebtedness, without set-off, but with an obligation to give account of such management to the First Party.

2.23   Additional Representations and Warranties of the First Party.

The First Party further represents and warrants that:

(a) it never granted any Security Right over the Objects of Security Right other than as disclosed herein or in the Loan Agreement and it has never granted any power of attorney to create a Security Right over the Objects of Security Right to any person or party.

(b) it never undertaken to sell, to authorise, dispose of, transfer or relinquish any of its rights or interests in the Objects of Security Right or to encumber or lease the Objects of Security Right other than as disclosed herein or in the Loan Agreement;

(c) it is fully entitled to grant the Second Security Right over the Objects of Security Right in favor of the Second Party and that the security created under this Security Right over the Objects of Security Right is binding on the First Party and its successors and may be enforced according to the provisions set forth in this deed.

## 2.24 Indemnity

2.24.1 The First Party agrees, on request from the Second Party, to fully defend, indemnify and hold the Second Party or any of its representatives or attorneys innocent from and against any and all claims, causes of action, losses, liabilities and expenses which may be suffered or incurred by the Second Party as result of:

    (a) any breach of any of the obligations, representations, warranties or undertakings made or assumed by the First Party under this deed; and

    (b) the Rights conferred on the Second Party under this deed or enforcement of this deed.

2.24.2 The First Party waives any and all claims it may have against the Second Party and/or its representatives or attorneys arising out of the existence or enforcement of this deed.

## 2.25 Severability

If any one of the provisions contained in this deed is or becomes invalid, illegal or unenforceable in any respect under any applicable law, neither the validity nor enforceability of such provisions under the laws of any other jurisdiction, will in any way be affected or impaired.

## 2.26 Waivers/Remedies Cumulative

2.26.1 The Second Party will be under no obligation to enforce any right or benefit under this deed.

2.26.2 The First Party agrees that:

    (a) a failure or delay on the part of the Second Party to exercise any right, power or privilege under this deed will not operate as a waiver thereof; and

    (b) a single or partial exercise of any right, power or privilege under this deed will not preclude any further exercise of that right or of any other right, power or privilege.

2.26.3 The rights and remedies provided for in this Deed of Granting of Security Right over Land are in addition to any rights or remedies provided for in any law.

## 2.27 Additional Security

2.27.1 The security provided for in this deed is in addition to and independent of any other security which the Second Party may at any time hold for any of the Secured Indebtedness.

2.27.2 The Second Party may accept further security from the First Party or from any third party and/or release such security without consulting or notifying

the First Party and without affecting in any way the obligations and liabilities of the First Party under the Loan Agreement.

2.27.3 The Second Party is at liberty to decide, in its sole discretion, if any security conferred upon the Second Party under any other security agreements between the First Party and the Second Party will be enforced by the Second Party, as well as the sequence of the security to be so enforced.

## 2.28 Giving of Notices

2.28.1 Except if effected orally by a court server (*"jurusita"*), any notice given to a party under this deed must be in writing and must be either:

a) personally delivered against proper receipt;

b) sent by mail;

c) transmitted by telex or facsimile,

as elected by the party giving such notice.

2.28.2 Unless otherwise provided herein, the date of notice will be deemed to be:

(a) the date of receipt if delivered personally;

(b) the date 14 (fourteen) days after posting if sent by mail; or

(c) the date of transmission with confirmed answer back if transmitted by telex or facsimile.

2.28.3 If more than one method of giving notice is employed, notice shall be deemed to have been given by whichever method is first effective.

2.28.4 Except if effected orally by a court server (*"jurusita"*), all notices hereunder and all documents and/or instruments delivered by one party to another pursuant to this deed must be in the English language, except where required by any applicable law to be in the Indonesian language, in which case, if the notice is given to the Second Party, a sworn translation in English must be provided at the same time.

## 2.29 Addresses for Notices.

The address, telex or facsimile numbers of the Parties for all written notices under or in connection with this deed are as follows, or at such other address, telex or facsimile numbers as one party may notify the other in writing:

For the First Party:

PT S. Widjojo

S. Widjojo Centre, 2nd Floor

Jl. Jenderal Sudirman 71

Jakarta 12190

Indonesia

Facsimile Number: 001-62-21-520 5888

For the Second Party:

BSB Residual Assets Trust

c/o Michael Irwin

806A, Burne Avenue

Kelowna, BC V1Y 5PJ

Canada

Facsimile Number: 001 1 250 868 0006

With a copy to:

Hale and Dorr LL.P

60 State Street

Boston, Massachusetts 02109

Attention: Mr William C. Benjamin, Esq.

Facsimile Number: 001 1 617 526 5000

## 2.30    Amendments

This deed may be amended by a Land Deed Official Form signed by the Parties and registered at the Local Land Office of South Jakarta.

## 2.31    Assignment

2.31.1 This deed shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties.

2.31.2 The Second Party may at any time assign all or any part of its rights and benefits under this Security Right over the Objects of Security and any assignee will have the same rights against the First Party as it would have had if it had been the Second Party.

2.31.3 The First Party will have no rights to assign or transfer its right or obligations hereunder except with the prior written consent of the Second Party.

## 2.32    Power to Act for the First Party

2.32.1 The Second Party is hereby authorized to act in the name of or on behalf of the First Party in the course of enforcing any rights under this deed and may do and perform any and all acts necessary or incidental to the execution of those rights.

2.32.2 The First Party agrees to execute such additional authorizations and any powers of attorney which the Second Party may require for carrying out the provisions of Article 2.32.1.

2.32.3 The authority given under this deed and under this Article 2.32 is irrevocable and will not terminate by reason of any of the events mentioned in Article 1813, 1814 and 1816 of the Indonesian Civil Code (*Kitab Undang-Undang Hukum Perdata*) or for any other reason.

2.32.4 The Second Party is hereby authorized by the First Party to delegate to such person or persons (including any of the Second Party) as the Second

Party may choose the exercise of any or all of the powers conferred upon the Second Party by this deed.

### 2.33 Application of Proceeds

2.33.1 The First Party agrees that the proceeds from enforcement of the Second Security Right over the Objects of Security Right will be applied against the Secured Indebtedness payable by the First Party to the Second Party as follows:

    (i)    first, in or toward the payment of all proper costs, charges and expenses incurred or expended by the Second Party in the enforcement of this Deed of Granting of Security Right over Land, and in taking possession of, transfer and or sale of all or any part of the Objects of Security Right including court costs, stamp duties, notarial and lawyers fees;

    (ii)    secondly, to pay to the Second Party all amounts due and payable in respect of the Secured Indebtedness provided that, if the proceeds are insufficient to pay all of the Secured Indebtedness due and payable then the proceeds must be apportioned for payment, rateably and without preference or priority amongst the Secured Creditors in the proportion that the Secured Indebtedness, due and payable under the Loan Agreement at the date of such payment, bears to the total Secured Indebtedness due and payable at such date.

2.33.2 Notwithstanding the realization by the Second Party of any proceeds through the enforcement of this deed, the First Party will remain liable for the unpaid balance of all amounts payable under the Loan Agreement.

2.33.3 The remaining balance, if any, will only be paid to the First Party if the Second Party has no claims, whether or not contingent, against the First Party under the Loan Agreement. The Second Party has no obligations to pay interest on sums so paid to the First Party.

### 2.34 Continuing Security

This Second Security Right over the Objects of Security Right is continuing security for payment to the Second Party of all amounts which may, now or in the future, be owed to the Second Party by the First Party in respect of the Secured Indebtedness, and this deed will not terminate, and the security created hereunder will not be regarded as discharged or satisfied, until full and final payment by the First Party of all such amounts.

### 2.35 Separate Obligations

The First Party agrees that any obligations of the First Party to the Second Party under this deed, including the obligation to provide any information or notices, are owed to and must be performed for each of the Secured Creditors separately, as if they were the only creditor under this deed or as the Second Party may otherwise direct from time to time.

### 2.36 Suspense Account

All monies received, recovered or realized by the Second Party under this deed may at the Second Party's sole discretion be credited to any suspense or impersonal

account and may be held in such account for as long as the Second Party may think fit pending its application from time to time, in or towards the discharge of any of the Secured Indebtedness, which shall from time to time become due and the Second Party will not be liable to the First Party for any damages or interest in such event.

### Article 3

To exercise the covenants and provisions set forth in Article 2, the First Party by virtue of this deed authorizes and gives a power of attorney to the Second Party and the Second Party hereby accepts such authorization, to appear before officials of appropriate bodies to give information, to sign forms and documents, to receive all letters of credit and other documents, to pay any expenses and receive payments and to perform all actions necessary to enforce the above covenants and provisions.

### Article 4

The Parties declare (in the case of the Second Party solely for purposes of this deed) that they have chosen concerning this deed, its implementation and all its consequences general and permanent legal domicile at the Registrar's Office of the District Court of South Jakarta.

### Article 5

Any and all expenses in connection with the preparation and execution of this deed (including witness fees and other costs with respect to the enforcing of this Deed of Granting of Security Right over Land) are for the account of the First Party. All expenses and costs incurred by the Second Party in connection with the exercise of the rights and powers granted under this deed are for the account of and are payable by the First Party. Consequently the Second Party hereby irrevocably authorises the First Party to deduct such expenses and costs from the sale proceeds and/or compensation monies recovered pursuant to this deed.

Whereof this deed is executed before the Parties and:

1. Ms RIANA KUSUMANINGSARI, Sarjana Hukum, private person, and

2. Ms ANNIE SUMI AINI, Notary and PPAT employee, both residing in Jakarta,

as witnesses thereof, and after having been read as explained, so as evidence of truth of the statements by the First Party and the Second Party, this deed is signed by the First Party, the Second Party, the witnesses and I, Land Deed Official, in 2 (two) copies in the original, one of which is kept in my office and one of which is submitted to the Head of the Land Office of South Jakarta for the purpose of registration of the Security Right granted by virtue of this deed.


First Party                              Second Party


[signed]                                 [signed]


(MRS. SITI RAHAYU W)           (MISS RETNO ANGGRAINI D)

[signed]

(MRS. SITI HARDIYATI S.A.S)

Approval ............................

(...........................................)

Witness                                    Witness

[signed]                                   [signed]

(Miss RIANA KUSUMANINGSARI SH)   (MRS. ANNIE SUMI AINI)

                                           The Land Deed Official
                                           D.K.I JAKARTA,
Certified copy                             [signed]
for the issue of
Certificate
Jakarta, 6 MARCH 1998
Head of South Jakarta Land Office          (S.P. HENNY SINGGIH SH)

        [chopped] [signed]

        Drs. Soengkono W.
        NIP.010.053.521

# Exhibit E

# R U L I N G

## No.275/Pdt.P/2003/PN.Jak.Sel

**FOR THE SAKE OF JUSTICE IN THE NAME OF GOD ALMIGHTY**

The South Jakarta District Court, examining and trying the civil cases of the first instance, has, as requested by, issued its Ruling as follows:

**PT. SUMOHADIWIDJOJO or abbreviated to PT. S. WISJOJO**

Having its address at Jalan Sudirman Kav. 71, Jakarta 12190, in this matter represented by its attorney DENNY V. LIMBONG, SH, Attorney and Legal Consultant at Attorney and Legal Consultant Office DVL ASSOCIATES, having its address at S. Widjojo Centre, 10th Floor, Jalan Sudirman Kav. 71, Jakarta 12190, based on a Special Power of Attorney dated October 1, 2003, hereinafter referred to as the PETITIONER:

The relevant District Court;

Having read the documents in the files of the case;

Having heard the Petitioner's statement;

Having examined the evidences submitted by the Petitioner;

## CASE STATUS

Considering that the Petitioner with its letter of Petition dated October 4, 2003 registered with the Registrar of the South Jakarta District Court on October 4, 2002 under registration No. 275/Pdt.P/2003/PN.Jak.Sel states as follows:

1

1.  That the Petitioner and BSB Residual Assets Trust ("BSBRAT") has entered into and signed a Loan Agreement dated February 17, 1998 (Attached as Evidence P-1). That of the total Loan agreed by BSBRAT to be disbursed to the Petitioner in the amount of US$ 3,060,000.00 (three million sixty thousand United State Dollars) from BSBRAT which will be used by the Petitioner to purchase 144.960 shares in Kalimantan Investment Corporation (Attached as Evidence P-2):

2.  As per the Loan Agreement, BSBRAT shall be obliged to provide the Petitioner with a loan of US$3,060,000.00 (three million sixty thousand United State Dollars). After deducted with US$144,960 which has been received from BSBRAT and is used by the Petitioner to purchase the shares in Kalimantan Investment Corporation, the remaining portion of the Loan which shall be disbursed by BSBRAT to the Petitioner in the amount of US$2,915,040.00 (Two million nine hundred fifteen thousand forty United State dollars);

3.  That although the Petitioner still has the right to get the loan of US$2,915,040.00, BSBRAT never disburse the remaining portion of the loan and that the Petitioner never receive the sum of US$2,915,040.00 (Two million nine hundred fifteen thousand forty United State dollars) from BSBRAT. Hence the Petitioner has only the principal

2

with BSBRAT under the Loan Agreement as shown by the
Evidence P-1 in the amount of US$144,960.00 and NOT
US$3,060,000.00 (three million sixty thousand United
State Dollars);

4.  That for the Petitioner's debt with BSBRAT in the amount
of US$144,960.00, the Petitioner has, on September 30,
2003, made a full payment including interest and penalty
to BSBRAT. The amount the Petitioner has paid to BSBRAT
is as follows:

-   Principal              :   US$ 144,960.00
-   Interest and Penalty   :   US$  23,849.42
-   Total                  :   US$ 168,809.42

(Attached as Evidence P-3)

5.  As the Petitioner never receives the Remaining Portion of
the Loan of US$2,915,040.00 (Two million nine hundred
fifteen thousand forty United State dollars) from BSBRAT,
the payment of US$168,809.42 (One hundred sixty eight
thousand eight hundred nine and forty two cents United
State Dollars) to BSBRAT will serve as evidence that the
Petitioner has fully paid the WHOLE AMOUNT of the loan
with BSRAT and that the Loan Agreement hereby ends with
the full payment by the Petitioner. That the Petitioner
on September 30, 2003 notified BSBRAT to terminate the
agreement, Evidence P-1 (Attached as Evidence P-4);

3

6.  That as guarantee for the payment by the Petitioner to
    BSBRAT under Loan Agreement  Evidence P-1, the Petitioner
    has provided BSBRAT with a guarantee in the form of
    security interest on the following lots of land:

    a.  Sertifikat Hak Guna Bangunan (Building Use Right
        Certificate)  No.  174/Senayan  measuring  5856  m2,
        registered in the name of PT. S. Widjojo; (Attached
        as Evidence P-5);

    b.  Building  Use  Right  Certificate  No.  176/Senayan
        measuring 2203 m2, registered in the name of PT. S.
        Widjojo; (Attached as Evidence P-6);

    c.  Building  Use  Right  Certificate  No.  331/Senayan
        measuring 1660 m2, registered in the name of PT. S.
        Widjojo; (Attached as Evidence P-7);

    d.  Building  Use  Right  Certificate  No.  386/Senayan
        measuring 551 m2, registered in the name of PT. S.
        Widjojo; (Attached as Evidence P-8);

    e.  Building  Use  Right  Certificate  No.447/Senayan
        measuring 58 m2, registered in the name of PT. S.
        Widjojo; (Attached as Evidence P-9);

    f.  Building  Use  Right  Certificate  No.  451/Senayan
        measuring 666 m2, registered in the name of PT. S.
        Widjojo; (Attached as Evidence P-10);

    The provision of the guarantee by the Petitioner is based
    on the Certificate of Security Interest No. 319/1998 in

4

conjunction with the Deed of Provision of Security Interest No. 28/Kebayoran Baru/1998 (Attached as Evidences P-11 and P-12);

7.  That the Loan Agreement between the Petitioner and BSBRAT was cancelled through the letter dated September 30, 2003 from the Petitioner to BSBRAT. That for the termination of the loan some provision is set forth in the Article 21.7 of the Loan Agreement stating as follows;

"The parties hereby waive the applicability of Section 1266 of the Indonesian Civil Code to the extent judicial intervention is required to terminate this Loan Agreement"; Thus the cancellation of the Loan Agreement by the Petitioner is already in line with law (See Evidence P-1);

8.  That because the Loan Agreement   Evidence P-1 which constitutes the main agreement underlying the issuance of the Certificate of Security Interest in conjunction with the Deed of Provision of Security Interest Evidences P-11 and P-12 was cancelled as the Petitioner's debt with BSBRAT was fully paid, the guarantee for the Petitioner's debt with BSBRAT which constitutes an additional agreement shall become null and void. This is in line with the provision of  the Article 10 paragraph (1) and Article 18 paragraph (1) letter a of Security Interest Law which respectively state as follows:

5

Article 10 paragraph (1) of Security Interest Law:

"Provision of Security Interest preceded with a pledge to provide a Security Interest as guarantee for full payment of a debt, stated in and constitutes an inseparable part of the relevant loan agreement or other agreement incurring such a debt";

Article 18 paragraph (1)(a) of Security Interest Law:

"Security Interest shall be null and void with the following reason:

a.    clearing off of a debt guaranteed by a Security Interest;

Therefore the following 6 (six) lots of land put up as Security Interest with BSBRAT:

a.    Building Use Right Certificate No. 174/Senayan measuring 5856 m2, registered in the name of PT. S. Widjojo;

b.    Building Use Right Certificate No. 176/Senayan measuring 2203 m2, registered in the name of PT. S. Widjojo;

c.    Building Use Right Certificate No. 331/Senayan measuring 1660 m2, registered in the name of PT. S. Widjojo;

d.    Building Use Right Certificate No. 386/Senayan measuring 551 m2, registered in the name of PT. S. Widjojo;

6

  e. Building Use Right Certificate No.447/Senayan measuring 58 m2, registered in the name of PT. S. Widjojo;

  f. Building Use Right Certificate No. 451/Senayan measuring 666 m2, registered in the name of PT. S. Widjojo;

shall no longer serve as guarantee for the Petitioner's debt with BSBRAT and that the remark Security Interest of 2nd Grade in the name of BSBRAT in the said land certificates shall be deleted and that the South Jakarta Land Office shall delete the security interest of 2nd grade in the Building Use Right (HGB) certificates — evidences P-5 through P-10.

9. That the Article 22 paragraph (5) of Security Interest Law states as follows:

"If a creditor is not ready to provide statement as referred to in the paragraph (4), the relevant party may submit Petition for order to conduct such a deletion to the Head of District Court which jurisdiction covers the area at which the Security Interest is registered".

So for fear that BSBRAT as creditor may not give a statement on the Roya (deletion) of the Security Interest, the Petitioner as an interested party may submit Petition for Deletion of the Security Interest of 2nd Grade in the name of BSBRAT to the South Jakarta

District Court. The reason for the Petition a quo submitted to the South Jakarta District Court is that in the Article 4 of Security Interest Certificate No. 319/1998 and Deed of Provision of Security Interest No. 28/Kebayoran Baru/1998, the parties have chosen the jurisdiction of the South Jakarta District Court as their domicile.

Based on the above matters, we hereby request the Head of South Jakarta District Court or the Penal of Judge for the case a quo to make the following ruling:

- To approve the Petition of the Petitioner in its entirety;
- To declare the Security Interest provided under Certificate of Security Interest No. 319/1998 in conjunction with the Deed of Provision of Security Interest No. 28/Kebayoran Baru/1998 null and void and no longer applicable and that the remark "Security Interest" appearing in the land book for the lands at the South Jakarta Land Office shall be deleted;
- To declare the 6 (six) lots of land as referred to in:
    a.  Building Use Right Certificate No. 174/Senayan measuring 5856 m2, registered in the name of PT. S. Widjojo;
    b.  Building Use Right Certificate No. 176/Senayan measuring 2203 m2, registered in the name of PT. S. Widjojo;

8

c.   Building   Use   Right   Certificate   No.   331/Senayan
     measuring  1660  m2, registered  in  the  name  of  PT.  S.
     Widjojo;

d.   Building   Use   Right   Certificate   No.   386/Senayan
     measuring  551  m2, registered  in  the  name  of  PT.  S.
     Widjojo;

e.   Building   Use   Right   Certificate   No.447/Senayan
     measuring  58  m2,  registered  in  the  name  of  PT.  S.
     Widjojo;

f.   Building   Use   Right   Certificate   No.   451/Senayan
     measuring  666  m2, registered  in  the  name  of  PT.  S.
     Widjojo;

have  no  longer  serve  as  guarantee  for  the  Petitioner  (PT.
S.  Widjojo)'s  debt  with  BSBRAT  under  the  Loan  Agreement
dated  February  17,  1998  and  that  the  remark  "Security
Interest  of  2nd  Grade  in  the  name  of  BSB  Residual  Assets
Trust"  in  the  said  land  certificates  shall  be  deleted  by
the  South  Jakarta  Land  Office;

-  To  order  the  South  Jakarta  Land  Office  to  delete  the
   security  interest  of  2nd  grade  in  the  name  of  BSB  Residual
   Assets  Trust  in  the  6  (six)  land  certificates  as  follows:

   a.   Building   Use   Right   Certificate   No.   174/Senayan
        measuring  5856  m2, registered  in  the  name  of  PT.  S.
        Widjojo;

9

b.  Building   Use   Right   Certificate   No.   176/Senayan
    measuring 2203 m2, registered in the name of PT. S.
    Widjojo;

c.  Building   Use   Right   Certificate   No.   331/Senayan
    measuring 1660 m2, registered in the name of PT. S.
    Widjojo;

d.  Building   Use   Right   Certificate   No.   386/Senayan
    measuring 551 m2, registered in the name of PT. S.
    Widjojo;

e.  Building   Use   Right   Certificate   No.447/Senayan
    measuring 58 m2, registered in the name of PT. S.
    Widjojo;

f.  Building   Use   Right   Certificate   No.   451/Senayan
    measuring 666 m2, registered in the name of PT. S.
    Widjojo;

- Legal cost;

   Considering that in the fixed day of hearing, the
Petitioner's Attorney appeared, and the Petition was read out
and responding to the Judge's question, the Petitioner's
Attorney stated that he stuck to his Petition;

   Considering that to support the legal arguments of his
Petition, the Petitioner submitted evidences in the form of
duly-stamped copies and after the copies were verified with
the originals, the evidences conform to their originals as
follows:

10

1.   Evidence P-1 : Loan Agreement dated February 17, 1998;

2.   Evidence P-2 : Resolution of the Directors of Kalimantan Investment Corporation

3.   Evidence P-3 : Receipt of Payment by PT. S. Widjojo to BSB Residual Assets Trust through Citigroup;

4.   Evidence P-4 : PT. S. Widjojo's letter dated September 30, 2003;

5.   Evidence P-5 : Building Use Right Certificate No. 174/Senayan measuring 5856 m2, registered in the name of PT. S. Widjojo;

6.   Evidence P-6 : Building Use Right Certificate No. 176/Senayan measuring 2203 m2, registered in the name of PT. S. Widjojo;

7.   Evidence P-7 : Building Use Right Certificate No. 331/Senayan measuring 1660 m2, registered in the name of PT. S. Widjojo;

8.   Evidence P-8 : Building Use Right Certificate No. 386/Senayan measuring 551 m2, registered in the name of PT. S. Widjojo;

9.   Evidence P-9 : Building Use Right Certificate No. 447/Senayan measuring 58 m2, registered in the name of PT. S. Widjojo;

10.  Evidence P-10: Building Use Right Certificate No. 451/Senayan measuring 666 m2, registered in the name of PT. S. Widjojo;

11

11. Evidence P-11: Certificate of Security Interest No. 3191/1998

12. Evidence P-12: Deed of Provision of Security Interest No. 28/Kebayoran Baru/1998;

13. Translation of Evidence P-1

14. Translation of Evidence P-2

15. Translation of Evidence P-4

Considering that all the court proceedings as contained in minutes of the court proceedings concerned, the relevant minutes are appointed as to summarize the details of this ruling making all matters inclusive and considered in this Petition;

## REGARDING LEGAL CONSIDERATIONS

Considering that the purposes and the objectives of the Petition is as referred to hereinabove;

Considering that all subject matters of the case filed in this Petition *a quo*, in question, by the Petitioner is that a Loan Agreement has been agreed upon between BSBRAT, which is to provide US$ 3,060,000.00 to the Petitioner, and the Petitioner has accepted US$ 144,960.00 from BSBRAT and such amount has been spent by the Petitioner to purchase 144,960 shares at Kalimantan Investment Corporation, then the remaining portion of the BSBRAT's loan to the Petitioner is US$ 2,915,040.00, and pursuant to Evidence P-1, the loan agreement dated February 17, 1998, the Petitioner shall be

12

entitled to the remaining portion US$ 2,915,040.00 from the BSBRAT, nevertheless BSBRAT has never granted the remaining amount concerned, and therefore the Petitioner has never received the remaining portion US$ 2,915,040.00, and therefore the Petitioner shall only owe the principal amount to BSBRAT for US$ 144,960.00, the amount of which has been fully repaid by the Petitioner on September 30,2003 (Evidence P-3);

Considering that after taking into account of the Petition from the Petitioner, any matters contained therein are not contrary to the matters contained in Court's tasks and administration implementation procedures as established by the Supreme Court of the Republic of Indonesia (Book II);

Considering that pursuant to Article 14 paragraph (1) Law Number 14 of 1970 on Judicial Power or Jurisdiction Principles referring that Judge shall be prohibited to refuse to examine and try a case on the ground that there are no statutory instruments or regulations having expressly established judicial process to rule over such case;

Considering that those elaborated by the Petitioner as the legal grounds of its Petition supported and confirmed by all evidences from P-1 to P-15 provided by the Petitioner are all and inclusive by way of the correct and accurate legal arguments;

Considering that pursuant to the Loan Agreement (Evidence P-1), the Petitioner herein has provided security pledges to

13

BSBRAT in forms of security interests over land tracts provided by the Petitioner pursuant to Certificate of Security Interest No. 319/1998 in conjunction with Deed of Provision of Security Interests No. 28/Kebayoran Baru/1998 (Evidence P-11 and Evidence P-12);

Considering that in accordance with the statement of the Petitioner and in relation to the evidences filed by the Petitioner, henceforth the following legal facts have been found and confirmed;

- Whereas the Petitioner (PT. S. Widjojo) has made and signed a Loan Agreement with the agreed total loan thereof amounting US 3,060,000.00 from BSBRAT;

- Whereas in order to secure such loan, the Petitioner has pledged Certificate of Security Interest No. 319/1998 in conjunction with Deed of Provision of Security Interests No. 28/Kebayoran Baru/1998;

- Whereas out of the US$ 3,060,000.00 loan pledged by the Petitioner, the Petitioner has accepted US$ 144,960.00 from BSBRAT, nevertheless the remaining portion US$ 2,915,040.00 has never accepted or received;

- Whereas over the indebtedness US$ 144,960.00, the Petitioner has fully repaid such amount plus the interest and penalty thereof on September 30, 2003;

Considering that pursuant to Evidence P-1 Loan Agreement as the legal reference of the issuance of the Certificate

14

Security Interest and Deed of Provision of Security Interests which has been nullified as the debts of the Petitioner to the BSBRAT have been fully repaid, and therefore the pledges entrusted under BSBRAT over the loan provided to the Petitioner have been declared null and void to the law;

In consideration of all the above mentioned, the District Court concludes that:

- The Petitioner as the borrower/pledgor has repaid all its debts, and therefore the record of Security Interest at the second instance under BSBRAT over such land certificates shall be written off or nullified;

- The Petitioner as the party concerned and BSBRAT as the creditor have not declared any statements pertaining the Annulment (Roya) of Security Interests, and as such Security Interests at the second instance under BSBRAT in such land certificates shall be written off or nullified by South Jakarta's Land Agency;

Considering that pursuant to the above mentioned considerations, therefore the District Court has come into a conclusion that the Petition of the Petitioner is objective and having solid grounds and not contrary to the prevailing laws, and henceforth the Petition of the Petitioner shall be worthy of an approval;

Considering that as the consequence of the approval for the said Petition, then the fees incurred hereof shall be borne by the Petitioner;

15

Having regard to the Articles of the other concerned Laws and Regulations hereby;

## **TO RULE**

1.  To approve the Petition of the said Petitioner herein above mentioned;

2.  To declare that Security Interests provided by virtue of Certificate of Security Interest No. 319/1998 in conjunction with Deed of Provision of Security Interests No. 28/Kebayoran Baru/1998 shall be written off and declared null and void, and therefore the record of the Security Interests in the land title book at the South Jakarta's Land Agency shall be accordingly written off;

3.  To declare that 6 (six) lots of land as referred to in:

    a.  Building Use Right Certificate No. 174/Senayan measuring 5856 m2, registered in the name of PT. S. Widjojo;

    b.  Building Use Right Certificate No. 176/Senayan measuring 2203 m2, registered in the name of PT. S. Widjojo;

    c.  Building Use Right Certificate No. 331/Senayan measuring 1660 m2, registered in the name of PT. S. Widjojo;

    d.  Building Use Right Certificate No. 386/Senayan measuring 551 m2, registered in the name of PT. S. Widjojo;

16

e.  Building Use Right Certificate No.447/Senayan measuring 58 m2, registered in the name of PT. S. Widjojo;

f.  Building Use Right Certificate No. 451/Senayan measuring 666 m2, registered in the name of PT. S. Widjojo;

Shall no more serve as the pledges of the Petitioner indebtedness (PT. S. Widjojo's) to BSBRAT by virtue of the Loan Agreement dated February 17, 1998 and therefore, the record of Security Interest at the Second Instance under BSB Residual Assets Trusts in the land certificates shall be accordingly written off by the South Jakarta's Land Agency;

4.  To give an order to the South Jakarta's Land Agency to write off and nullify Security Interest at the Second Instance under BSB Residual Assets Trusts over the following 6 (six) land certificates:

a.  Building Use Right Certificate No. 174/Senayan measuring 5856 m2, registered in the name of PT. S. Widjojo;

b.  Building Use Right Certificate No. 176/Senayan measuring 2203 m2, registered in the name of PT. S. Widjojo;

c.  Building Use Right Certificate No. 331/Senayan measuring 1660 m2, registered in the name of PT. S. Widjojo;

d.  Building Use Right Certificate No. 386/Senayan measuring 551 m2, registered in the name of PT. S. Widjojo;

e.   Building Use Right Certificate No.447/Senayan measuring 58 m2, registered in the name of PT. S. Widjojo;

f.   Building Use Right Certificate No. 451/Senayan measuring 666 m2, registered in the name of PT. S. Widjojo;

5.   To give an order to the Petitioner to pay all the fees incurred in and in connection with this Petition whose amount is estimated to be Rp 119,000.- (one hundred and nineteen thousand rupiah);

In witness whereof this ruling is stipulated on this day: **THURSDAY**, on **October 16, 2003**, by us: **ROHENDI, SH.**, Judge at South Jakarta District Court, the Ruling of which is read out in an open-to-public court proceeding on the same day, assisted by **EDI SUWITNO, SH,** the Clerk in fact, as well as attended by the Proxy of the Petitioner.

THE CLERK IN FACT                    THE said JUDGE


                                     [signed on stamp duty]



**EDI SUWITNO, SH**                  **ROHENDI, SH**


Fees:

| | | |
|---|---|---|
| Administration | : Rp | 50,000.- |
| Stamp Duty | : Rp | 6,000.- |
| Editorial | : Rp | 3,000.- |
| **Summon** | **: Rp** | **60,000.-** |
| Total | : Rp | 119,000.- |

18

# Exhibit F

## RULING

### Number.PTJ.KPT.01.2004

### FOR THE SAKE OF JUSTICE BASED ON ALMIGHTY GOD

Considering, that having read:

1. A letter from Linda Widyati, SH. and Johny Taufik, S.H., LL.M of the Law Firm Soemadipradja & Taher, Number 9565.0001/LW-JT dated 6 May 2004 regarding Application for Cancellation of Ruling of the District Court:

2. The dossier of Ruling No.275/Pdt.P/2003/PN.Jak.Sel.;

3. The opinion of the High Court Supervisory Judge for the South Jakarta District Court, dated 17 May 2004;

4. The decision of the Chairman of the Jakarta High Court dated 19 May 2004 Number PTJ.11.KP.04.15.2004;

Considering, that the substance of PT. Sumohadiwidjojo's requests are as follows:

1. The applicant is a debtor of BSB Residual Assets Trusts (BSBRAT) and has received a loan in the amount of US$144,960 pursuant to the US$3,060,000 agreement; and

2. Since the applicant has repaid the loan in the amount of US$144,960 plus interest of US$23,849.42, it therefore requests to delete the security right being the security of such debt.

Considering, that in Ruling No.275/Pdt.P/2003/PN.Jak.Sel. dated 16 October 2003 the Judges of the South Jakarta District Court approved the application for the Ruling;

Considering, that the Ruling is a matter regarding the objects used as security for a debt that is *accesoir* to the principal agreement i.e. the Loan Agreement;

Considering, that if we analyse the application, such case should not be an ex parte case but should clearly be a dispute case between the parties that have mutual interests that is, creditor and debtor. Therefore the case should be submitted as a formal civil claim.

Considering that based on the above considerations, the Ruling of the South Jakarta District Court No.275/Pdt.P/2003/PN.Jak.Sel from the beginning has no legal force, therefore shall be null and void by operation of law.

In view of Law No.4 of 2004 and the prevailing laws and regulations;

### TO STIPULATE:

- Declaring null and void the Ruling of the South Jakarta District Court dated 16 October 2003 No.275/Pdt.P/2003/PN.Jak.Sel, accordingly it has no binding and executorial force;

- Ordering the Chairman of the South Jakarta District Court to revoke all official copies of the Ruling held by the related parties;

Hence stipulated in Jakarta, on FRIDAY, 28 May 2004 by us HARIFIN A. TUMPA, SH., MH. the Chairman of the Jakarta High Court.

HEAD OF THE JAKARTA HIGH COURT

[Signed and Stamp Duty

<u>HARIFIN A. TUMPA, SH. MH.</u>

# Exhibit G

(Unofficial English Translation)

[Logo]                **NATIONAL LAND AGENCY**

            **REGIONAL OFFICE FOR DKI JAKARTA**

        JALAN TAMAN JATIBARU NO.1 TELP.3851550 – 3847819 JAKARTA

---

Number:     **1028/0-9/PT/2004**                Jakarta, 16 August 2004

Enclosure:

Subject:    **Cancellation of Ruling**          To:
            **of the South Jakarta**            **The Head of South Jakarta Land Office**
            **District Court dated 16-10-2003**
            **No.275/Pdt.P/2003/PN.Jaksel.**    in
                                                **J A K A R T A**


Referring to your letter dated 21-07-2004 No. 1.711.2/1614/S-V/2004 regarding the abovementioned matter, we hereby inform you of the following matters:

**I.    Status and Location of Lands**

That the plots of land which are the objects of this matter are certificated as:

1.  Right To Build No.174/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 5,856 M2, as described in Situation Map dated 10-12-1975 No.397/3394/1975, located at Jl. Kampung Senayan, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

2.  Right to Build No.176/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 2,203 M2, as described in Situation Map dated 10-12-1975 No. 398/3395/1975, located at Jl. Kampung Senayan, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

3.  Right to Build No.331/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 1,660 M2, as described in Situation Map dated 16-06-1988 No. 838/1988, located at Jl. RT. 0013/07, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

4.  Right to Build No.386/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 551 M2, as described in Situation Map dated 03-03-1994 No. 1607/1994, located at Jl. Kampung Senayan, RT. 013/07, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

5.  Right to Build No.447/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 58 M2, as described in Situation Map dated 25-10-1996 No. 5291/1996, located at Jl. Jend. Sudirman Kav. 52-53, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

6.  Right to Build No.457/Senayan, registered in the name of PT. SUMOHADIWIDJOJO (abbreviated to PT. S. WIDJOJO) domiciled in Jakarta, having an area of 666 M2, as described in Situation Map dated 29-10-1996 No. 5389/1996, located at Jl. Jend. Sudirman Kav. 71 seb, Kelurahan Senayan, Kecamatan Kebayoran Lama, Municipality of Jakarta Selatan.

-2-

## II.    Establishment of Security Rights over Land

That those plots of land are encumbered by security rights over land, among others:

1.    On 03-02-1998, encumbered by the First Ranking Security Right over Land No. 180/1998 in the name of USAHA MULIA B.V. domiciled in Jakarta, by virtue of deed dated 23-01-1998 No. 09/Kebayoran Baru/1998, drawn up before SITI PERTIWI HENNY SINGGIH, SH, a Land Deed Official in Jakarta.

Subsequently, on 04-05-2001, the debt was transferred (cessie) to AMAL DEVELOPMENT CORPORATION LTD domiciled in British Virgin Island, by virtue of deed dated 24-05-2000 No. 45, drawn up before SITI PERTIWI HENNY SINGGIH, SH, a Land Deed Official in Jakarta.

2.    On 06-03-1998, encumbered by the Second Ranking Security Right over Land No. 319/1998 in the name of BSB RESIDUAL ASSETS TRUST domiciled in British Virgin Island, by virtue of deed dated 17-02-1998 No. 28/Kebayoran Baru/1998, drawn up before SITI PERTIWI HENNY SINGGIH, SH, a Land Deed Official in Jakarta.

3.    On 11-07-2004, encumbered by the Third Ranking Security Right over Land No. 1044/2001 in the name of AMAL DEVELOPMENT CORPORATION LTD domiciled in British Virgin Island, by virtue of deed dated 26-06-2001 No. 68/Kebayoran Baru/2001, drawn up before SITI PERTIWI HENNY SINGGIH, SH, a Land Deed Official in Jakarta.

## III.    Executorial Attachment

That on 21-02-2003 an Executorial Attachment was attached to the First and Third Rankings Security Right over Land, pursuant to the Ruling of the South Jakarta District Court dated 28-11-2002 No. 43/Eks.HT/2002/PN.Jak.Sel in conjunction with Minutes of Executorial Attachment dated 07-02-2003 No. 43/Eks.HT/2002/PN.Jak.Sel (in accordance with the Letter of the Registrar of the South Jakarta District Court dated 07-02-2003 No.W7.Dd.Ht.04.10.121.412.

## IV.    Record and Release of Security Right over Land

a.    That on the Land Register Book in respect of the relevant Right to Build was recorded the release of the Second Ranking Security Right over Land No.319/1998 in accordance with the South Jakarta District Court letter dated 28-10-2003 No.W7.Dd.Ht.04.10.70.350.3 in conjunction with the Ruling of the South Jakarta District Court dated 16-10-2003 No.275/Pdt.P/2003/PN.Jkt.Sel.

b.    That on 17-11-2003, during the release of the Security Rights over Land concerned under No.1.711.2/2036/S-V/2003, BSB RESIDUAL ASSETS TRUST (BSBRAT) should have delivered the Second Ranking Security Right over Land Certificate No.319/1998 to the South Jakarta Land Office, however until the release of the Second Ranking Security Right over Land was completed, BSBRAT had not delivered the certificate to the South Jakarta Land Office.

## V.    Blocking

That a blocking application over the plots of certificated land with the Right To Build as referred to in point I above was submitted by SOEMADIPRADJA & TAHER (in this matter acting as attorney of BSB RESIDUAL ASSETS TRUST (BSBRAT), in accordance with its letter dated 13-02-2004 No.95651/PR-1240-RK, on the grounds of a loan dispute.

## VI.    Ruling of the Courts

That the South Jakarta District Court and the Jakarta High Court issued rulings which comprised among others:

1.    Based on a petition of PT. SUMOHADIWIDJOJO (PT. S. WIDJOJO), and the Ruling of South Jakarta District Court dated 16-10-2003 No.275/Pdt.P/2003/PN.Jaksel, which decision reads as follows:

-3-

## TO STIPULATE:

-      To approve the petition of the petitioner.

-      To declare that the Security Right over Land granted under Security Right over Land Certificate No.319/1998 in conjunction with Deed of Granting of Security Right over Land No.28/Kebayoran Baru/1998 was released and no longer applicable and therefore the records of Security Right over Land concerned in the Land Register Book at the South Jakarta Land Office must be deleted.

-      To declare that the six plots of land as mentioned above shall no longer serve as security for the petitioner (PT. S. Widjojo)'s debt and accordingly the records of the Second Ranking Security Right over Land in the name of BSB Residual Assets Trust on the relevant certificates of such plots of land must be deleted by the South Jakarta Land Office.

-      To instruct the South Jakarta Land Office to delete the second ranking Security Right over Land in the name of BSB Residual Assets Trust over the above six plots of land.

-      To instruct the Registrar to serve the Ruling of the Order to Release the Security Right over Land on the Head of the South Jakarta Land Office.

-      To bear the cost incurred from this petition to the petitioner which amount is currently estimated to be Rp. 119,000,-.

2.      By virtue of a letter from LINDA WIDYATI, SH & JOHNY TAUFIK, SH, LLM, of the Law Firm SOEMADIPRADJA & TAHER (as attorney of BSB RESIDUAL ASSETS TRUSTS (BSBRAT) dated 06-05-2004 No.9565.0001/LW.JT, BSBRAT submitted an objection against the Ruling of the South Jakarta District Court to the Jakarta High Court, and the Jakarta High Court then issued a ruling on 28-05-2004 No.PTJ.KPT.01.2004 which decision reads as follows:

## TO STIPULATE:

-      To declare null and void the Ruling of the South Jakarta District Court dated 16 October 2003 No.275/Pdt.P/2003/PN.Jak.Sel. so that it does not have any binding and executorial power;

-      To instruct the Head of South Jakarta District Court to withdraw all formal copies of the relevant ruling from any relevant parties.

## VII.    Cancellation of Ruling of the Court

That on the basis of the Ruling of the Jakarta High Court dated 28-05-2004 No. PTJ.KPT.01.2004 as mentioned in number 2 (two) point VI above, the South Jakarta District Court served a letter on DANNY V. LIMBONG, SH (as attorney of PT SUMOHADIWIDJOJO (PT S.WIDJOJO)), in accordance with its letter dated 08-06-2004 No. W7.Dd.Ht.04.10.04.1618, regarding cancellation of the Ruling of the South Jakarta District Court dated 16-10-2003 No. 275/Pdt.P/2003/PN.Jak.Sel.

## VIII.    Release of Hak Tanggungan

That under the provision of Article 18 of Law No.4 of 1996 in conjunction with Article 122 of the Regulation of the State Minister of Agrarian Affairs/Head of National Land Agency No.3 of 1997 which state that:

(1)      *registration of the release of a Security Right over Land due to the writing-off of the secured debt is carried out on the basis of:*

     a.      *a creditor's statement that the debt secured by the Security Right over Land had been written-off or repaid in full, in the form of an authentic deed or a privately made letter, or*

     b.      *a receipt of the full repayment of the debt issued by the person who is authorised to receive such repayment, or*

-4-

    c.     *a quote of the minutes of auction of the object of the Security Right over Land and creditor's statement that the creditor releases the Security Right over Land for an amount exceeding the auction proceeds in the form of a privately made letter.*

(2)    *registration of the release of a Security Right over Land due to the release of the relevant Security Right over Land by its holder is carried out on the basis of a statement of the holder of the Security Right over Land that it releases the Security Right over Land over all or part of the objects of the Security Right Over Land in the form of an authentic deed or a privately made letter.*

(3)    *registration of the release of a Security Right over Land due to the clearance of the Security Right over Land pursuant to a determination of ranking by the Head of the District Court is carried out by virtue of a Head of the District Court ruling which states that Security Right over Land is released.*

(4)    *Registration of the release of a Security Right over Land due to the release of right encumbered with the Security Right over Land is carried out on the basis of:*

    a.     *a record in the Land Office that the relevant right was released due to the expiry of the right, or*

    b.     *the decision of the authorised official regarding the cancellation or revocation of the relevant right, or*

    c.     *the relinquishment of the right by the holder of the relevant right as approved by the holder of the Security Right over Land.*

(5)    *The registration of the release of the Security Right over Land referred to in paragraphs (1), (2) or (3) is carried out by virtue of an application of the holder of the Security Right over Land, the grantor of the Security Right over Land, or the holder of the relevant right by enclosing:*

    a.     *certificate of right which is the object of the Security Right over Land.*

    b.     *deed or letter which is used as a basic evidence of the release of the Security Right over Land as referred to in paragraphs (1), (2) and (3).*

(6)    *The registration of the release of a Security Right over Land referred to in paragraph (4) is carried out by the Head of the Land Office due to his position.*

## IX.   Conclusion

Based on the above matters, the solution is:

That the South Jakarta District Court Ruling dated 16-10-2003 No. 275/Pdt.P/2003/PN.Jaksel concerning the release of the Second Ranking Security Right over Land registered in the name of BSB RESIDUAL ASSETS TRUST (BSBRAT) as the registered creditor, domiciled in British Virgin Island (England), was nullified by the higher judicial institution in this matter i.e. the Jakarta High Court on 28-05-2004 under No. PTJ.KPT.01.2004, **therefore the status should be reinstated to the previous condition (the Second Ranking Security Right over Land)** as mentioned in point II, the Ruling of the Jakarta High Court to be recorded in the land registration change of data column both in the Land Register Book of the Security Right over Land and the Security Right over Land Certificate.

Please be advised accordingly.

-5-

**The Head of Regional Office of
the National Land Agency
Province of DKI Jakarta**

[signed and chopped]

**<u>Ir. ROBERT J. LUMEMPOUW, MSi</u>
NIP: 010 153 674**

Copies to:

1. Deputy of Land Information Division

2. Director of PT. BSB Residual Assets Trust (BSBRAT)

3. File