# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

In the Matter of the Arbitration Between:

**PT SUMOHADIWIDJOJO,**

        Applicant
        (Respondent below)

and

**BSB RESIDUAL ASSETS TRUST,**
**BSB TRUST COMPANY, LTD.**, Trustee,

        Respondent
        (Claimant below).

and

**CITIZENS BANK**, Trustee.

**CIVIL ACTION NO.  04 12646 NG**

## APPLICANT'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE OR DISMISS, OR TO STAY, RESPONDENTS' PURPORTED "COUNTERCLAIM"

Respectfully submitted,

**PT SUMOHADIWIDJOJO**, Applicant

By its Attorneys,

Marjorie Sommer Cooke (BBO # 097800)
Richard S. Nicholson (BBO # 542182)
COOKE CLANCY & GRUENTHAL LLP
265 Franklin Street
Boston, MA 02110
(617) 428-6800

Dated: May 19, 2005

## I. INTRODUCTION & BACKGROUND

Applicant, PT Sumohadiwidjojo ("PTSW"), by its undersigned counsel, has respectfully moved to strike or dismiss,[1] or to stay, the "counterclaim" purportedly brought by Respondent, BSB Residual Assets Trust ("BSBRAT"), BSB Trust Company, Ltd., Trustee (BSBRAT and its Trustee are collectively referred to hereinafter as "the Trust").

### A.    The Parties and the Nature of the Proceeding

PTSW is an Indonesian limited liability company, while the Trust purports to be organized in the British Virgin Islands. PTSW commenced this proceeding pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), as implemented in the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*[2] PTSW seeks to confirm and enforce a Final Award of the Singapore International Arbitration Centre ("SIAC"), made against the Trust. The amount of the SIAC Final Award (exclusive of interest) is approximately $287,000.00.

---

[1]    As explained further below, PTSW moves to strike because no "counterclaim" is permitted in this action to enforce a foreign arbitral award. However, if the Court determines that a "counterclaim" can properly be asserted, PTSW's Motion should be considered as if it was made under Fed.R.Civ.P. 12(b).

PTSW contends that the Trust's claim is invalid for numerous factual reasons, and also due to numerous principles of Indonesian contract, agrarian, property, agency and procedural law. A summary of PTSW's position on certain substantive issues involved in the Trust's purported "counterclaim" can be found in PTSW's Response to the Claimant's Application for Withdrawal of Claim, a copy of which is attached hereto as Exhibit A. There, PTSW summarizes its reasons why the Trust has no right to any further payments from PTSW and has no enforceable security interest in PTSW's property. Although it should not be necessary, PTSW is fully prepared to refute the purported factual and legal bases for the Trust's purported "counterclaim."

[2]    A copy of the New York Convention is attached to PTSW's original Application in this proceeding. Although the Convention provides certain limited defenses to enforcement of a foreign arbitral award, the Trust concedes that it has no such defenses. *See* Order on Respondent's Motion to Vacate or Reduce Ex Parte Attachment, dated April 12, 2005 (Dein, U.S.M.J.) ("Magistrate Judge's April 12th Order"), at 9 ("BSB is not seeking to vacate the award").

Section 207 of the FAA, 9 U.S.C> § 207, provides in pertinent part that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to a court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."

B.    **The Underlying SIAC Arbitration**

The Trust commenced the underlying SIAC arbitration proceedings against PTSW on January 15, 2004, seeking a monetary award of nearly $3 million.  The Trust invoked the arbitration clause of a so-called "Transfer of Right and Interest" agreement to insist that the SIAC was the proper place to resolve the dispute between the Trust and PTSW.[3]

By late September 2004, Indonesian counsel for PTSW had raised several potentially dispositive objections to the Trust's arbitration claims, resulting in months of intensive briefing and several SIAC decisions adverse to the Trust. On September 21, 2004, the Trust abruptly and unilaterally decided to abandon its SIAC arbitration claims, and sought leave from the SIAC Tribunal to do so. The principle reasons proffered by the Trust for seeking to withdraw its SIAC claims[4] were that:

(a)    by separate proceedings which the Trust had simultaneously been pursuing in the Jakarta (Indonesia) High Court and the South Jakarta Land Office, the Trust had (so it claimed) "restored the legal rights that [it] sought to vindicate in this [SIAC Arbitration] proceeding" (¶ 1.2);

(b)    accordingly, the Trust felt that it was "unnecessary . . . to proceed with its arbitration claim" (¶ 1.3);

(c)    the Trust (so it claimed) was "in a position to obtain the same financial results it sought in this arbitration" by "seek[ing] to foreclose on [the Trust's alleged] Security Rights in Indonesia" (¶ 5.1), and the Trust (so it claimed) could "proceed to foreclosure upon the Security Rights without the need for a prior monetary award" (¶ 5.2); and

---

[3] PTSW argued that the Loan Agreement, upon which the Trust now relies for its purported "counterclaim," was the principal agreement in issue (and thus that the dispute did not properly belong in the SIAC).  The Trust,  now that it suits its purpose, apparently is willing to agree with PTSW on this point.

[4]  A copy of the Trust's Application to Withdraw was attached as Exhibit 9 to the Affidavit of Alison Aubry, Esq. in Further Support of Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment.  Citations (¶) are to the numbered paragraphs of the Application to Withdraw.

(d)    in any event, "any award granted by the [SIAC] Tribunal in favor of [the Trust] would ultimately require enforcement against [PTSW] by judicial action in Indonesia" (¶ 1.5).

The Trust noted that the ruling it had obtained from the Jakarta High Court "authorized the parties to return to the [South Jakarta] District Court if further adjudication of matters related to this dispute becomes necessary" (¶ 3.3), and the Trust represented to the SIAC Tribunal that it "is able and prepared to seek immediate relief . . . in Indonesia, rendering [the SIAC arbitration] process academic."  (¶ 5.4).

PTSW opposed the Trust's Application for Withdrawal of Claim, and sought to have the dispute between PTSW and the Trust finally resolved.  In the alternative, PTSW requested that the Trust's withdrawal, at a minimum, be conditioned upon the payment of PTSW's costs of the arbitration, and an order barring the Trust from recommencing its arbitration claims. In reply, the Trust reiterated that it had "obtained relief [from the Jakarta High Court] commensurate with the financial award it had requested from the [SIAC] Tribunal" (¶ 4.5) and thus could "proceed to foreclosure [in Indonesia] . . . without the need for a prior monetary award in this proceeding." (¶ 4.8).

## C.    <u>The SIAC Final Award</u>[5]

The SIAC agreed that the Trust could withdraw its arbitration claim and pursue its remedies in Indonesia, but disagreed that it should do so unconditionally after having caused PTSW such tremendous and unnecessary expense. Therefore, in granting the Trust leave to withdraw its claims, the SIAC decreed in its Final Award that *the Trust must pay PTSW its legal costs, expenses and disbursements incurred in defending the SIAC arbitration*.

In addition, in order to make PTSW financially whole before the Trust could force PTSW to mount a costly defense – again – the SIAC decreed in its Final Award that "*no further*

---

[5]   A duly certified copy of the SIAC Final Award has been submitted to the Court.

*arbitration [shall] be commenced by the [Trust]* in relation to the subject matter of its Notice of Arbitration (or any part thereof), *unless and until the Respondent's costs stated above are paid in full.*" (Emphasis added).

### D.    PTSW's Resort to This Court

PTSW, in accordance with the New York Convention and the FAA, came to this Court to confirm and enforce the SIAC Final Award. Why this Court? The answer is elementary: First, following the SIAC Final Award, and despite the SIAC Rules requiring prompt compliance with an order of the Tribunal (discussed further below), the Trust refused to pay PTSW on the SIAC Final Award. PTSW was compelled to seek judicial assistance *somewhere*.

Second, and more to the point, PTSW had reason to believe that the Trust held funds in a bank account in Boston, and thus came to this Court to seek and obtain an *ex parte* attachment by trustee process of the Trust's account pursuant to Mass.R.Civ.P. 4.2 and Mass.Gen.L. c. 246, § 1 *et seq.*, as incorporated by Fed.R.Civ.P. 64(a). Although ultimately it was determined that the amount of the Trust's funds attached by PTSW was in excess of the actual amount of the SIAC Final Award, the the propriety of the attachment was upheld by the Magistrate Judge's April 12th Order.

## II.    THE TRUST'S "COUNTERCLAIM" SHOULD BE STRICKEN AS IT IS AN IMPERMISSIBLE RESPONSE TO AN APPLICATION UNDER THE NEW YORK CONVENTION AND THE FAA TO CONFIRM AND ENFORCE A FOREIGN ARBITRAL AWARD.

### A.    An Application to Confirm and Enforce a Foreign Arbitral Award Must Be Heard Pursuant to Motion Practice Procedure.

PTSW's Application in this matter did not initiate a full-blown civil lawsuit. Rather, "confirmation of an arbitration award is intended to be summary in nature." *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990). Toward this end, the Federal Rules of Civil

Procedure expressly provide that in proceedings brought under the FAA, the Rules apply "only to the extent that matters of procedure are not provided for" in the FAA.  Fed.R.Civ.P. 81(a)(3). In turn, the FAA provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided for the making and hearing of motions, except as otherwise herein expressly provided."  9 U.S.C. § 6.

Of course, there is no such thing as a "counterclaim" to a motion. A counterclaim under Fed.R.Civ.P. 13 is a part of a responsive "pleading" to a prior "pleading," *i.e.*, a part of the "answer" to a "complaint."  *See* Fed.R.Civ.P. 7 ("no other pleading shall be allowed" other than a complaint, answer, reply to counterclaim, answer to cross-claim, third-party complaint, and third-party answer)[6]

### B.    "Counterclaims" Are Inconsistent With the Purposes of Enforcement Actions Under the New York Convention and the FAA.

Striking or dismissing the Trust's purported "counterclaim" finds strong support in the reasoning of the decision in *Booth v. Hume Publishing, Inc.*, 902 F.2d 925 (11th Cir. 1990), which held that "it would be inconsistent with the language and purpose of the [FAA] to allow counterclaims" raising issues outside of those defenses expressly enumerated in the FAA.  *Id.* at 931.

The *Booth* court employed a carefully reasoned analysis premised upon the fundamental notion that arbitration enforcement proceedings under the FAA are intended to be "summary in

---

[6]    The Trust also argues that it is entitled to "set off" amounts due to PTSW under the SIAC Final Award by litigating the issues raised by its "counterclaims."  It is unclear whether, if the Court rules that the Trust is not legally entitled to assert a "counterclaim" in this proceeding, the Trust would nevertheless seek to pursue "setoff" rights. PTSW would oppose any such effort, for the reasons previously stated in its Opposition to the Trust's Motion to Vacate or Reduce PTSW's attachment.  In sum, this Court's decision in *Hewlett-Packard Co., Inc. v. Berg*, 867 F.Supp. 1126 (D.Mass. 1994), *vacated and remanded on other grounds*, 61 F.3d 101 (1st Cir. 1995), is directly on point and precludes any such "setoff" claim in an enforcement proceeding under the New York convention and the FAA. In any event, should the Court permit the Trust to litigate its claims in "setoff," PTSW would take the position, and would ask the Court to confirm, that the Trust would forego and be barred from the pursuit of any further recovery on its claims in this or any other court or forum.

nature," with restricted inquiry into factual issues only as necessary to conduct the "narrowly limited" scope of review. *Id.* at 932. The Court observed that arbitration enforcement proceedings are not commenced by the filing of a complaint, but rather, are conducted per the rules of motion practice in which a court need not even hear testimony. Therefore, the Court concluded:

> To allow a respondent to assert counterclaims that are beyond the scope of the defenses enumerated in the [FAA] would change the nature of the confirmation proceedings and would defeat the purpose of the Act.

*Id.* at 933.

The Trust relies on the case *Jugometal v. Samicorp.*, 78 F.R.D. 504 (S.D.N.Y. 1978) – and a treatise which cites it – to support its argument that "counterclaims" are permitted in a New York Convention and FAA enforcement action.[7] *Jugometal* was a brief, 9-page decision, which failed to engage in any rigorous analysis of the issue.[8] In addition, the respondent did not seek actually to *litigate* its "counterclaims" in the FAA enforcement proceeding. Rather, those claims already had been arbitrated and the respondent wished to assert the *results* of those arbitrations as "setoff." Thus, the *Jugometal* court took care to note that "[t]his is not a situation in which a lengthy hearing on an unliquidated claim would defer the trial of the main case, or frustrate the fair and speedy administration of justice as required by the Convention." *Id.* at 507. The exact opposite would be true in this case.

---

[7]  The other case relied upon by the Trust, *Pike v. Freeman*, 266 F.3d 78 (2nd Cir. 2001), dealt with questions of issue preclusion in arbitration. It did not address the question of whether counterclaims could be asserted in an FAA enforcement action, apparently because it was not among the several arguments raised by the applicant. A more recent case from the Second Circuit, *McAllister Towing and Transport Company, Inc v. Offshore Express, Inc.*, 2004 WL 1488192 (S.D.N.Y. 2004), cited with apparent approval (in *dicta*) *Booth*'s holding that counterclaims are not allowed in an arbitration confirmation proceeding.

[8]  Judge Tauro's decision in *Hewlett Packard*, *supra*, as well as the *Booth* court, expressly considered and rejected the holding of *Jugometal*. Moreover, a more thoughtful treatise on the subject has limited the effective application of the holding in *Jugometal* to "counterclaims that fall within specific defenses permitted" under the FAA. 3 Fed.Proc., L.Ed. § 4:188 (citing *Booth*).

There are other sound policy reasons for refusing to permit "counterclaims" in enforcement actions under the New York Convention and the FAA. Well over 100 nations, plus dozens more of their territories and protectorates, have acceded to the Convention over the past 45 years. Congress could not have intended to permit a foreign person subject to a final foreign arbitral award in favor of another foreign person to defend a New York Convention and FAA enforcement action by asserting "counterclaims," setting up full-blown litigation in a distant forum for both parties, in circumstances where our federal courts would otherwise have no subject matter jurisdiction to hear the "counterclaim." Constitutional issues aside (they are addressed further below), to permit such "counterclaims" would be severely to undermine the certainty and predictability in international commercial dealings that the New York Convention was designed to create. As one commentator has recently explained:[9]

> International arbitration in business disputes has become an irreplaceable alternative to litigation. . . . It is, perhaps, the finality inherent in international arbitration awards which the parties appreciate above all else; after all, it is especially inefficient and frustrating to have to engage in global forum shopping in order to finally find a court willing to recognize and enforce an arbitral award. The New York Convention was meant to act as a shield against such uncertainty; its goal was to prevent forum shopping by ensuring that awards would be recognized and enforced in each and every member state. To fulfill this purpose, the Convention was drafted as a rigid statute, one that would not yield to flexible interpretation or invite unwanted judicial tampering. Consequently, the grounds for judicial review allowed for under the Convention are strictly limited by the exclusive list of exceptions contained in Article V. Any departure from those limitations threatens to destroy the ground on which the Convention was built and to undermine the advantages of the international arbitration of commercial disputes.

---

[9]    Note, "Forum Non Conveniens and Personal Jurisdiction: Procedural Limitations on The Enforcement of Foreign Arbitral Awards Under the New York Convention," 83 B.U.L.Rev. 899 (2003).

III.    **THE COURT HAS NO PERSONAL JURISDICTION OVER PTSW.**

A.    **The Legal Standards**

Even if the Trust could properly assert a "counterclaim" to an application under the New York Convention and the FAA to confirm and enforce a foreign arbitral award, and even if the Court had subject matter jurisdiction over the Trust's claims against PTSW (as discussed below, the Court lacks subject matter jurisdiction), the Court should decline to hear the Trust's purported "counterclaim" because the exercise of personal jurisdiction over PTSW in connection with such claim would be unconstitutional. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (1st Cir. 1997) (even when a statute potentially confers personal jurisdiction, court must determine "whether the exercise of jurisdiction comports with due process").

It is well-established that personal jurisdiction over a nonresident defendant requires "minimum contacts" with the forum in which it is sued, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citations and internal quotations omitted). This requirement leads to a well-established three-pronged inquiry:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995).

"Th[e] 'purposeful availment' requirement ensures that a defendant will not be hailed into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of

the 'unilateral activity of another party or a third person'" . . .. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted).  The requirement is intended to ensure that a defendant has "engaged in . . . purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable." *Sawtelle* at 1391, *quoting Rush v. Savchuk*, 444 U.S. 320, 329 (1980).   "The cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability."  *Id.*

To determine whether the exercise of jurisdiction is "reasonable", the Court considers that so-called "gestalt factors", to wit: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." *Levin v. Harned*, 304 F.Supp.2d 136, 146 (D.Mass.  2003).  However, "[t]he Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled." *United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 n. 11 (1st Cir.1992).

With these constitutional standards in mind, it can be seen that the Trust is unable to establish this Court's personal jurisdiction over PTSW with respect to the claims against PTSW that the Trust seeks to assert in this Court.[10]

---

[10]   There are three methods for determining issues of  personal jurisdiction.  As outlined in *Digital Equipment Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456, 463-464 (D.Mass. 1997), the Court may utilize: (1) a "prima facie standard," wherein the plaintiff must introduce evidence to establish a prima facie case of personal jurisdiction, subject to reconsideration at a later stage; (2) a "preponderance-of-the-evidence standard," which involves a full evidentiary hearing and a definitive determination of the personal jurisdiction issue; or (3) a "middle course" in which the Court engages in sufficient factual inquiry to determine whether the plaintiff will probably be able to establish personal jurisdiction, definitively, at a later time.  Regardless of which method the Court would choose to employ (if it rules that "counterclaims" are permissible in New York Convention and FAA enforcement proceedings) the Trust will be unable to establish personal jurisdiction.

**B.    PTSW Has Insufficient Minimum Contacts With Massachusetts to
Support the Constitutional Exercise of Personal Jurisdiction.**

The Trust's assertion that the Court has personal jurisdiction over PTSW is premised upon the following allegations found in the purported "Counterclaim" at ¶¶ 4-6: (1) PTSW came to this Court to confirm and enforce the SIAC Final Award under the New York Convention and the FAA; (2) "upon information and belief," PTSW has allegedly solicited and/or obtained investments – at unnamed times in unnamed amounts from unnamed persons – in Massachusetts and other unnamed States; (3) at least one of PTSW's directors is allegedly a United States resident (the evidence will prove this allegation to be untrue); and (4) a "major part" of the negotiations of the 1998 Loan Agreement upon which the Trust purports to base its claim allegedly took place in the United States (the evidence will show that negotiations also took place in Canada, Switzerland, Germany, Spain and Columbia as well); and (5) numerous beneficiaries of the Trust reside in Massachusetts and other unnamed States.

The Trust does not allege that PTSW has ever conducted any business in Massachusetts (the evidence will show that it has not), or that PTSW has any offices or owns any property here (same). Instead, the Trust recites in detail the activity of PTSW in its place of business, Indonesia, as well as in Singapore, where PTSW was hailed by the Trust to participate in a SIAC arbitration, at least until the Trust abruptly and unilaterally decided to quit the arbitration. The location of the Trust's beneficiaries is entirely irrelevant, and none of them are parties to the Loan Agreement upon which the Trust purports to base its claim.

In particular, the Trust's claim does not in any way arise out of or relate to PTSW's resort to this Court to confirm and enforce the SIAC Final Award. Obviously, the Trust's claim arose long before the present proceedings were commenced, according to the Trust, at least as early as

December *2002*, when PTSW allegedly failed to make payments allegedly due under the Loan Agreement. *See* "Counterclaim," ¶ 23. Moreover, PTSW's resort to this Court in December 2004 stemmed from an award of costs by the SIAC Tribunal as the result of the Trust's unilateral abandonment of arbitration proceedings it had commenced in January 2004, pursuing the same claims against PTSW that it seeks to pursue here.

As a result, none of the Trust's sparse allegations with respect to personal jurisdiction establish the requirement that the Trust's claim "arise out of or relate to" any activity by PTSW here. The Trust fails the first "prong" of the personal jurisdiction test.

## C.     PTSW's Resort to This Court Was Not "Purposeful" in the Constitutional Sense, and Was Due to the Trust's Unilateral Activity.

There are two, and *only* two, reasons why PTSW was compelled to come to this Court to confirm and enforce the SIAC Final Award against the Trust. The first and obvious reason is that the Trust unilaterally failed and refused to abide by the Final Award of the SIAC Tribunal to which *the Trust* originally chose to submit its claim against PTSW. The Trust's obdurate refusal to obey the SIAC Final Award flies in the face of SIAC Rule 28.8,[11]  which expressly provides that: "By agreeing to have an arbitration under these Rules, the parties *undertake to carry out the award without delay*." (Emphasis added). PTSW was thus compelled to seek judicial enforcement of the Trust's supposedly solemn undertaking.

The second and most pertinent reason that PTSW came to this Court is that the Trust unilaterally chose to place its alleged sole "liquid" assets in a bank account in Massachusetts. PTSW was aware of only one account held by the Trust, and thus it had no place else to go effectively to enforce the SIAC Final Award that the Trust refused to pay. What if the Trust had

---

[11] A copy of the Rules was previously submitted  to the Court as an exhibit to the Affidavit of Richard S. Nicholson, Esq., dated March 17, 2005, which was submitted in connection with PTSW's Opposition to Respondent's Motion to Vacate or Reduce Ex Parte Attachment.

placed (or, if PTSW had given notice that it was seeking an attachment, deliberately moved) its alleged sole "liquid" assets in Louisiana, Montana, New Mexico, Alaska or Hawaii, or to Bosnia and Herzegovina, Kyrgyzstan, Tanzania or Zimbabwe – requiring PTSW to chase the Trust in those fora? Would the Trust then argue that the courts of those States and countries (or whatever tribunals administer justice there) would, consistent with "traditional notions of fair play and substantial justice" (assuming that those fora would apply cognate constitutional principles) acquire personal jurisdiction over PTSW?

Moreover, although PTSW has availed itself of the benefits of this Court's willingness to perform its duties under the New York Convention and the FFA to enforce a final and uncontested foreign arbitral award, PTSW certainly could not have foreseen that it would be required to defend itself against the Trust's claim here in this Court. After all, the Trust initially invoked the jurisdiction of the SIAC in *Singapore*, arguing strenuously (in opposition to PTSW's jurisdictional objections), that SIAC was the *sole* forum for the adjudication of the Trust's claims. In the meantime, however, the Trust was resorting to the High Court of *Indonesia* and the Land Office of *South Jakarta, Indonesia* to vindicate its claims against PTSW.

When the High Court of Indonesia ruled, upon the application of the Trust, that the dispute between the Trust and PTSW "should be submitted as a formal civil claim," *see* "Counterclaim," Ex. E, the High Court clearly meant that the dispute should be submitted to the South Jakarta District Court. Indeed, the Trust so advised the SIAC in its Application to Withdraw from the SIAC arbitration, at ¶ 3.3,[12] stating that the High Court ruling "authorized the parties to *return to the [South Jakarta] District Court* if further adjudication of matters related to

---

[12]    The Application is attached as Exhibit 9 to the Affidavit of Alison Aubry, Esq. in Further Support of Respondent's Motion to Vacate or Reduce Ex Parte Attachment.

this dispute becomes necessary," and at ¶ 5.4, that is was "able and prepared to seek immediate relief . . . in *Indonesia*." (Emphasis added).

As a matter of fact, the key premise of the Trust's Application to Withdraw was that the SIAC arbitration was an inefficient alternative to the institution of foreclosure proceedings in Indonesia, since "any award granted by the [SIAC] Tribunal in favor of [the Trust] would ultimately require enforcement against [PTSW] by judicial action in Indonesia." (¶ 1.5).  PTSW clearly had good reason and the right to believe that the Trust was being forthright with the SIAC Tribunal, and no reason to believe that the Trust would seek to resort in this Court to the same, inefficient two-step process that it had previously eschewed.

Finally, consistent with the most recent and persuasive authority set forth above, which demonstrates that actions to confirm and enforce foreign arbitral awards under the New York Convention and the FAA are designed to be summary, expeditious, motion-like proceedings, in which "counterclaims" have no proper place, it should be determined as a matter of law that PTSW had no reason to foresee that its commencement of the present FAA proceedings in this Court would result in its being hailed 10,000 miles (as the crow flies), from Jakarta to Boston, to defend against the Trust's claims.

   D.    **Requiring PTSW to Defend Against the Trust's "Counterclaims"**
         **In Massachusetts Would Violate Fundamental Principles of Fairness.**

Since the Trust will be unable to satisfy the first two prongs of the First Circuit's personal jurisdiction test, it should not be necessary to rehearse all of the "Gestalt" factor which clearly establish the unfairness that would result from this Court's exercise of personal jurisdiction over PTSW.  There can be no dispute that requiring PTSW to appear here, 10,000 miles from home, would be burdensome.  It is one thing to send a duly certified copy of a valid and binding foreign arbitral award to specially-retained local Boston counsel (the undersigned), for confirmation and

enforcement under the summary, expeditious, non-evidentiary proceedings under the New York Convention and FAA – to which the majority of the Rules of Civil Procedure do not apply. It would obviously be quite another thing for PTSW and its principal counsel in Indonesia to be required to engage in this Court in a full-blown civil litigation matter, including discovery under our Rules, on a purported $3 million claim, involving events from many years ago, persons in Indonesia and other distant parts of the world, and complex issues, *inter alia*, of Indonesian contract, agrarian, property, agency and procedural laws. Nor should this Court have any pressing interest in adjudicating a dispute among foreign entities involving foreign laws.

The Trust, likewise, has no need to litigate its claims in this Court, and it has already recognized and conceded that the Indonesian courts and land agencies are the proper fora for resolving the Trust's claims against PTSW. Indeed, as the result of the Trust's schizophrenic approach to the proper place for the resolution of its dispute with PTSW – one day in Singapore, the next in Jakarta, and around the bend to Boston, PTSW has elected to commence proceedings in the South Jakarta District Court ("SJDC") to once and for all bring this matter to an end. On April 29, 2005, PTSW filed a Lawsuit in the SJDC, a true and accurate copy of which is attached hereto as Exhibit B (the Indonesian version and an Official English Translation). It is beyond peradventure that this matter of Indonesian law involving an Indonesian entity and Indonesian property belongs in Indonesia, not Boston.

Finally, as discussed further below, there is absolutely no reason for this Court to devote its scarce resources to the conduct of a parallel proceeding with one in the SJDC, which might result in conflicting legal decisions concerning Indonesian law, and where any decision of this Court would, in any event, need to be enforced in Indonesia. The Gestalt of this matter tips decidedly in favor of dismissal of the Trust's purported "counterclaim" against PTSW.

**IV.    THE COURT HAS NO SUBJECT MATTER JURISDICTION OVER THE TRUST'S PURPORTED "COUNTERCLAIM" AGAINST PTSW.**

    **A.    The Court Has No Independent Basis for Subject Matter Jurisdiction.**

There is yet a further reason why, even if a "counterclaim" could be asserted in a New York Convention and FAA enforcement proceeding, the Court should not permit the Trust to pursue a "counterclaim" in this proceeding.  The Court has no subject matter jurisdiction over such a claim.

"Federal courts are courts of limited jurisdiction; a court may not address the merits until 'after ... the court has assumed jurisdiction over the controversy.'"  *Iglesias v. Mutual Life Ins. Co. of New York*, 156 F.3d 237 (1st Cir. 1998), *quoting Bell v. Hood,* 327 U.S. 678, 681 (1946). The dispute between the Trust, purportedly a British Virgin Island entity, and PTSW, an Indonesian entity, arises, *inter alia*, under Indonesian contract, agrarian, property, agency and procedural law.  As an original matter, there is no doubt that this Court would not have subject matter jurisdiction to adjudicate such a claim. *Cf.* 28 U.S.C. § 1332 (diversity jurisdiction between citizens of different States, or citizens of a State and citizens of a foreign state, but *not* between citizens of foreign states).

The Trust nevertheless relies upon 28 U.S.C. § 1367(a), giving the Court "supplemental" jurisdiction over certain claims over which the Court would otherwise have no original jurisdiction.  For the reasons given below, the Court does not have, and even if it did, should decline to exercise, "supplemental jurisdiction."

    **B.    The Court Has No "Supplemental Jurisdiction" Under 28 U.S.C. § 1367(a) Over the Trust's Purported "Counterclaim".**

        **1.    The Trust's purported "counterclaim" is not a part of the same case or controversy as PTSW's Application.**

The supplemental jurisdiction statute, 28 U.S.C. § 1367(a), provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

PTSW does not dispute that this Court has original jurisdiction to hear enforcement proceedings under the New York Convention and the FAA – the statute expressly so provides. 9 U.S.C. § 203. Further, PTSW will assume, *arguendo*, that such proceedings are "civil actions" for purposes of the supplemental jurisdiction statute. Nevertheless, given that the claim in an enforcement action under the New York Convention and the FAA is simple and straightforward – *i.e.*, the applicant has a valid and binding foreign arbitral award and wants the court to confirm and enforce it, it is difficult to imagine a "supplemental" claim that would meet the "same case or controversy" requirement of § 1367(a). The Trust's purported "counterclaim" in this proceeding most certainly does not fit the bill.

The most basic test for determining whether two otherwise separate claims "form part of the same case or controversy under Article III of the United States Constitution" was set forth in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966), which held that the two claims must have the same "nucleus of operative facts." But there really is only *one* operative fact with respect to PTSW's Application to this Court, namely, that the SIAC Final Award orders the Trust to pay PTSW approximately $287,000 as reimbursement for the costs of the arbitration. Period.

The merits of the underlying dispute between the Trust and PTSW – the "operative facts" of the Trust's purported counterclaim, are irrelevant. The SIAC Tribunal made this abundantly clear in its Final Award, at ¶ 13 (emphasis added):

It is unnecessary to rehearse here the respective submissions of the Claimant and the Respondent.  Suffice it to say that their submissions have been considered at length by the Tribunal.  *Most of the submissions made by them relate to the merits of the claim, and for the purpose of the application they are not of great relevance and assistance.*  In the opinion of the Tribunal, the Claimant is at liberty to withdraw the claim, and the *only* question is on what terms it should be allowed to do so.

The dispute between the Trust and PTSW, which has been ongoing since at least *2002*, has nothing whatsoever to do with the fact that the Trust, having unilaterally decided to abandon its claims in arbitration, has been ordered to pay PTSW's SIAC approved costs.  The Trust's purported "counterclaim" is not a part of the same case or controversy as PTSW's Application to confirm and enforce the SIAC Final Award.  The "counterclaim" does not fall within the Court's jurisdiction under § 1367(a), and there is no independent basis for jurisdiction.  The Court cannot hear such a claim.

### 2.    The "counterclaim" would not be deemed compulsory for purposes of Fed.R.Civ.P. 13.

The First Circuit employs a proxy for determining when a counterclaim, not otherwise within a federal court's jurisdiction, is properly within the court's supplemental jurisdiction under § 1367(a):

> Federal courts have [supplemental] jurisdiction over compulsory counterclaims. . . .  Permissive counterclaims, however, do not fall within [supplemental] jurisdiction and therefore may not be heard in federal court unless supported by an independent basis of jurisdiction.

*Iglesius*, *supra* at 241.  Thus, in order to come within the Court's supplemental jurisdiction, the Trust would need to establish that its purported "counterclaim" was compulsory and not permissive.  This it cannot do.

To be sure, no counterclaim could *ever* be "compulsory" in an enforcement action under the New York Convention and the FAA if no such claims are even *permitted*.  But even under

the reasoning of *Jugometal*, it appears that whether or not to allow a "counterclaim" would be a *discretionary* matter and, therefore, could hardly be considered "compulsory" in the sense that the claimant could never bring it elsewhere if the Court, as a discretionary matter, declined to hear it.

More generally, the First Circuit employs the following tests to determine whether counterclaims are compulsory or permissive:

1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

4) Is there any logical relation between the claim and the counterclaim?

*Iglesius*, *supra* at 241.

As for the fourth test, the "logical relation" test, the First Circuit applies the following criteria:

[A] claim qualifies as compulsory only if:

it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

*Iglesius*, *supra* at 242, *quoting McCaffrey v. Rex Motor Tansp., Inc.*, 672 F.2d 246, 248 (1st Cir. 1982), quoting *Revere Copper & Brass, inc. v. Aetna Cas. & Sur. Co.*, 426 F.2d 709, 715 (5th Cir. 1970).

As previously noted, there are no issues of fact and law raised by PTSW's Application to confirm and enforce the SIAC Final Award, and no evidence in support of such claim, that could conceivably overlap with any issues of fact and law, or any of the evidence, that might be

involved in the Trust's purported "counterclaim."  Nor is there any serious argument that if the Trust does not assert its purported "counterclaim" in this proceeding that it will be forever barred under principles of *res judicata* from ever asserting such claim in another forum.  The only test even theoretically applicable is the "logical relation" test.  Yet, the Trust fails that test as well.

The Trust's purported "counterclaim" does not "arise out of the same aggregate of operative facts" as PTSW's Application to confirm and enforce the SIAC Final Award of costs. To repeat, the only fact that serves as the basis for PTSW's claim is that the SIAC Tribunal entered a valid and binding award in PTSW's favor and against the Trust.  In addition, nothing about PTSW's Application "activate[d] additional legal rights" in the Trust.  To repeat, the Trust had its purported claim against PTSW since 2002 – the claim was "activated" when PTSW failed to make payment allegedly due to the Trust.  Even if the Trust would argue that its "setoff" rights were not activated until the SIAC Final Award issued, that occurred *as the result of the Award*, and not as the result of PTSW's Application to confirm and enforce the Award under the New York Convention and the FAA.

There is no "logical relation" between PTSW's Application and the Trust's purported "counterclaim," within the meaning of the First Circuit test for determining whether the Trust's "counterclaim" is compulsory.  It is not; and this Court therefore has no jurisdiction to hear it under § 1367(a).

## V.    THE COURT, EVEN IF IT HAD JURISDICTION OVER THE TRUST'S "COUNTERCLAIM," SHOULD DECLINE TO EXERCISE    JURISDICTION UNDER 28 U.S.C § 1367(c).

Even if the Court were to determine that the Trust's purported "counterclaim" was a part of the "same case or controversy" as PTSW's Application to enforce the SIAC Final Award, that

would not end the matter. That is because § 1367(c) permits a court to decline to exercise supplemental jurisdiction over claim where:

> (1)  the claim raises a novel or complex issue of State law;
>
> (2)  the claim substantially predominates over the claims or claims over which the district court has original jurisdiction; [or]
>
> * * *
>
> (4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

A court has broad discretion in making decisions regarding supplemental jurisdiction, and in doing so, should examine the "totality of the circumstances," including such issues as "comity, judicial economy, convenience, fairness and the like." *Che v. MBTA*, 342 F.3d 31, 37 (1st Cir. 2003), *quoting Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996).

In this case, each of the factors favoring the the declination of supplemental jurisdiction is present. That is: (1) the Trust's claims against, and PTSW's defenses, depend upon issues arising under Indonesian contract, agrarian, agency, property and procedural law, with which presumably this Court lacks any significant prior experience; (2) clearly the Trust's $3 million claim against PTSW, and PTSW's defenses, will predominate over the matter of confirming and enforcing the SIAC Final Award; and (3) there are exceptional circumstances in that: the legal propriety of exercising jurisdiction over a "counterclaim" in a New York Convention and FAA enforcement action is problematic, at best; any judgment of this Court in favor of the Trust would, in any event, need to be enforced in Indonesia, *if* the courts there are willing to do so; PTSW would be required to defend itself 10,000 miles away from its location in Indonesia, even though the Trust has previously indicated a willingness and readiness to have its claims heard in Indonesia; and, in light of the Trust's flip-flopping about where and when it wishes to resolve its

dispute with PTSW, PTSW has commenced a suit in Indonesia in an effort once and for all to have the Trust's purported claims resolved under Indonesian law.

One could scarcely imagine a set of circumstances where this Court should be more inclined to resist an effort to hail a foreign firm into this Court to adjudicate claims that do not belong in our federal court system. Even if "counterclaims" could be asserted under the New York Convention and the FAA; and even if the Trust's purported "counterclaim" was so logically related to PTSW's Application to confirm and enforce the SIAC Final Award that it could deemed a "compulsory" claim; this Court – as a matter of comity, judicial economy, convenience, and fairness – should decline to hear the Trust's purported "counterclaims" and, instead, permit the dispute between the Trust and PTSW to be resolved where its belongs, in the courts and agencies of Indonesia.

## VI.  THE COURT, EVEN IF IT HAD JURISDICTION OVER THE TRUST'S "COUNTERCLAIM," SHOULD STAY PROCEEDINGS THEREUNDER.

"Federal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Goldhammer v. Dunkin' Donuts*, 59 F.Supp.2d 248 (D.Mass. 1999). Accordingly, this Court, even if it determined that the Trust could lawfully pursue a "counterclaim" in this proceeding, would be advised to stay the prosecution of any such "counterclaim" due to the pendency of PTSW's concurrent action filed in the South Jakarta District Court.

The principles to be followed were explained in detail in the *Goldhammer* case, at 251-253 (quotations and internal citations omitted), to wit:

> The policies underpinning international abstention case law are rooted in concerns about international comity. International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law. "Comity," in the legal sense, is

neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

* * *

The federal trial courts have developed a roster of relevant factors in determining whether to grant a stay because of parallel litigation in a foreign forum: (1) similarity of parties and issues involved in the foreign litigation; (2) the promotion of judicial efficiency; (3) adequacy of relief available in the alternative forum; (4) issues of fairness to and convenience of the parties, counsel, and witnesses; (5) the possibility of prejudice to any of the parties; and (6) the temporal sequence of the filing of the actions.

* * *

The overarching concerns for a federal court facing concurrent international jurisdiction are demonstrating a proper level of respect for the acts of other sovereign nations, ensuring fairness to litigants, and efficiently using scarce judicial resources.

The courts have also employed the concept of "forum non conveniens" when considering whether to exercise jurisdiction over a matter that is also pending in the courts of a foreign jurisdiction. In *Linko, Inc. v. Nichimen Corp*, 164 F.Supp.2d 203, 209-210 (D.Mass. 2001) (quotation and internal citation omitted), the Court explained the relevant considerations as follows:

The doctrine of forum non conveniens permits a trial court, on a discretionary basis, to dismiss a case where an alternative forum is ... available in another country that is fair to the parties and substantially more convenient for them or the courts. . . ..

* * *

The first criterion, the availability of an alternative forum, is straightforward: it is satisfied if the defendant demonstrates that the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there.

The second criterion, however, evokes a more sophisticated balancing: the defendant must show that the compendium of factors relevant to the private and public interests

implicated by the case strongly favors dismissal. The "private" interest factors include relative ease of access to sources of proof, availability of compulsory process, comparative trial costs, ability to enforce a judgment, and all other practical problems that make trial of a case easy, expeditious and inexpensive. "Public" interest factors include the practical difficulties of unnecessarily imposing upon a busy court the obligation to hear a case more fairly adjudicated elsewhere, the imposition on jurors called to hear a case that has no relation to their community, and the familiarity of the court with applicable laws.

* * *

The ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice.

Virtually every factor in this case favors a stay or dismissal of the Trust's purported "counterclaim," in light of the pendency of PTSW's action commenced in the SJDC.

The parties to the Trust's purported "counterclaim" here, the Trust and PTSW, are the same parties to PTSW's claim in the SJDC (PTSW has also named in its SJDC claim the Land Office of South Jakarta). The issues involved in both proceedings will be identical. There can be no question that the Trust can obtain adequate relief in Indonesia – after all, that is where the Trust told the SIAC Tribunal that it *intended* to seek its remedies; and, in any event, a judgment of this Court will still need to be enforced in Indonesia.

The convenience of the parties, counsel and witnesses will surely be enhanced by permitting a dispute arising under Indonesian law and involving Indonesian property and Indonesian documents and witnesses, to be tried in Indonesia.  By the same token, this Court would spend a great deal of its scarce resources if it is compelled to oversee extensive overseas discovery and if it is required to become well-versed in complex areas of foreign law.

In addition, PTSW would suffer tremendous prejudice if forced to litigate the same issues in two fora 10,000 miles apart.  One can only wonder why the Trust would wish to engage in

concurrent litigation in Indonesia and Boston, particularly after it has cried to this Court that it has no funds.[13]

This Court can make far better use of its precious time and resources by attending to matters clearly and directly within its subject matter jurisdiction, and by avoiding, through the various means and doctrines available to it, the quagmire that would result from the Court's acceptance of the Trust's purported "counterclaim" in this otherwise cut-and-dried New York Convention and FAA enforcement proceeding.

**VII.  CONCLUSION**

For all of the foregoing reasons and based upon the foregoing points and authorities, PTSW respectfully requests that the Court strike or dismiss, or in the alternative, stay, the Trust's purported "counterclaims" in this proceeding, and grant PTSW such other and further relief as the Court deems just and proper.

Respectfully submitted,

**PT SUMOHADIWIDJOJO**, Applicant

By its Attorneys,

/s/ Richard S. Nicholson
Marjorie Sommer Cooke (BBO # 097800)
Richard S. Nicholson (BBO # 542182)
COOKE CLANCY & GRUENTHAL LLP
265 Franklin Street
Boston, MA 02110
(617) 428-6800

Dated: May 19, 2005

---

[13]    The Trust's purported "counterclaim" and PTSW's lawsuit in the SJDC were filed only one day apart, so the "temporal sequence" of filing should not play any significant role in the Court's decision.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of May, 2005, I filed the within motion with the

Court's CM/ECF system for service in accordance with the Court's Electronic Filing Rules.


/s/ Richard S. Nicholson
Richard S. Nicholson

HADIPUTRANTO, HADINOTO & PARTNERS

The Jakarta Stock Exchange Building
Tower II, 21° Floor
Sudirman Central Business District
Jl. Jenderal Sudirman Kav. 52-53
Jakarta 12190 Indonesia

Tel: +62 21 515 5090 91 92 93
Fax: +62 21 515 0824 55 45 66 66
www.hhp.co.id

4 October 2004

Ref: RAD/0109rad04 00

- **Mr. L. P. Thean**
  KHATTAR WONG & PARTNERS
  80 Raffles Place
  #25-01 UOB Plaza 1
  Singapore 048624

  BY FAX NO: (65) 6534 1909
  AND COURIER

- **Mr. Michael Hwang, SC**
  One Marina Boulevard #25-01
  Singapore 018989

  BY FAX NO: (65) 6557 0165
  AND COURIER

- **Mr. Felix O. Soebagjo**
  SOEBAGJO, JATIM & DJAROT
  Plaza DM, 17th Floor
  Jl. Jenderal Sudirman Kav. 25
  Jakarta 12920, Indonesia

  BY FAX NO: (62-21) 522 9752
  AND COURIER

- **Ms. Retno Muljosantoso / Mr. Robert Reid**
  SOEMADIPRADJA & TAHER
  Wisma GKBI, Level 9
  Jl. Jenderal Sudirman No. 28
  Jakarta 10210, Indonesia

  BY FAX NO: (62-21) 574 0068
  AND COURIER

## SIAC ARBITRATION No. 002 of 2004 (ARB002/04)
### RESPONSE TO THE CLAIMANT'S APPLICATION FOR WITHDRAWAL OF CLAIM

Dear Sir and Madam,

We refer to the Claimant's application to withdraw from the present arbitration proceedings dated 21 September 2004.

The Respondent submits that the application is being made in bad faith and shows that the Claimant, having used the current arbitration proceeding for its own purposes, is now attempting to withdraw from this proceeding, as the Claimant is clearly unwilling to comply with the Tribunal's directions that the trustee of the Claimant be made a party to the proceedings.

<u>**Legal construct apparently carefully chosen to create the perception of legality where the basic underlying elements lack this legality and validity**</u>

1    It cannot be seriously disputed that the genesis of the dispute is an alleged failure by the Respondent to repay a loan. The Respondent challenged the existence of



**HADIPUTRANTO, HADINOTO & PARTNERS**

the loan in the District Court of South Jakarta on 4 October 2003 and that court ruled in the Respondent's favor on 16 October 2003. The Respondent's lawyers informed the Claimant's United States-based lawyers, Hale & Dorr LLP (now Wilmer Cutler Pickering Hale & Dorr LLP), accordingly by a letter dated 10 December 2003, [Attachment 1]. The Respondent's position on the merits is set out in this letter.

2   Prior to October 2003, the Respondent had been led to assume that the Claimant had valid interests and rights in the property, as the Claimant had strenuously continued to assert "ownership rights", including the legal existence of the Claimant, since 1993.

3   In effect, substantive elements of the complex legal construct and the reasons for this legal construct only came to light after January 2004 when the Claimant initiated arbitration proceedings. Only subsequent to the Notice of Arbitration filed by the Claimant in mid-January this year and the events of 4 October 2003, did the Respondent become aware of the Claimant's status as a non-legal entity, and that the Claimant is not on the file at the Companies Registry or incorporated under the International Business Companies Act (Cap. 291) in the British Virgin Islands. This prompted further investigations by the Respondent into the legal construct set up by the Claimant.

4   Following 3rd party investigations in March of this year, the Respondent found out about the true legal construct of the Claimant, as well as further facts which support the position that the Claimant did not in fact own (and has never owned) the property or "rights" it purportedly sold to the Respondent. These facts now include the date of incorporation of BSB Trust Company, Ltd. as being 26th of January 1995, eighteen months after the "Declaration of Trust" and "Deed of Transfer" both dated 26th of July 1993. Most significantly, verified copies of the Principal Register of Subud Brotherhood International Foundation ("SBIF") have now been obtained by the Respondent. These documents state the legally authorized signatories of SBIF, [Attachment 2].

5   The Claimant's fundamental claim is based on a transfer of the property in question, allegedly transferred to it by SBIF, pursuant to a Deed of Transfer 26 July 1993, (the "Deed of Transfer" – see Tab 5 of the Claimant's Statement of Case). The documents in Attachment 2 clearly establish the legal signatories for SBIF. These documents confirm that any two of the following were the only legally authorized signatories of SBIF over this period:

   a.   Varindra Vittachi;
   b.   Ian Arnold; and
   c.   Garrett Thomson.

6   These legal powers were exclusively held for the period from 2 March 1985 to 24 April 1995, when SBIF was officially dissolved. The signatories to the Deed of Transfer representing SBIF were Michael Irwin, Juan Andujar, Elke Goebel



HADIPUTRANTO, HADINOTO & PARTNERS

and Joel Lorot. None of these signatories were the legally authorized signatories of SBIF. The name of Garrett Thomson was included as one of the signatories signing on behalf of SBIF. However, Garrett Thomson *refused to sign* the Deed of Transfer at that time since he was aware that it will be tainted with illegality. Following enquiries made by the Respondent, Mr. Thomson confirmed this verbally, in a meeting with the Respondent's representatives on 12 June 2004. The Respondent is happy to obtain necessary affidavit to the effect, if necessary. The same 4 persons who signed on behalf of SBIF (without legal authority to do so), also signed on behalf of the Claimant, although never having been granted by SBIF (as "trustees" of SBIF) the authority to enter into the Deed of Transfer in the first place. Significantly, Garrett Thomson was not named as a representative of the Claimant.

7       Clearly, quite apart from the merits as outlined in Attachment 1, the Deed of Transfer is invalid. In the Respondent's view, the careful legal construct was chosen to protect signatories from possible personal legal consequences arising from being signatories to the Deed of Transfer.

## Arbitration intended to prejudice the Respondent

8       The question then arises as to why the Claimant commenced these arbitration proceedings. In particular, why did the Claimant continue to engage the Respondent in substantial submissions on security for costs and objections to jurisdiction, when the Claimant was fully aware that the High Court in Jakarta had already on 28 May 2004 nullified the ruling of the District Court?

9       The Claimant is a trust. As the Tribunal has ruled, it is not a legal person. The persons taking the decisions concerning the trust have clearly sought to cause the Respondent to expend substantial resources in contesting this arbitration without the ability to recover any financial expenditure from them. The timing of the application to withdraw is not co-incidental. It comes *immediately* following the Tribunal's direction that the trustee (BSB Trust Company, Ltd.), who is a legal person against whom recovery can be sought, be made a party to the proceedings.

10      The application is an attempt by the Claimant to *evade* the consequences of the Tribunal's ruling. It is an attempt by the Claimant to prevent further arbitral proceedings and the (likely) submission, following the Tribunal's directions that it needs to consider all issues at the merits phase, which would necessarily include *issues on the legality and validity of the Deed of Transfer*.

11      Further, the view expressed by the Claimant that it "now has the ability to pursue foreclosure of its security rights" (paragraph 1.3 of the Claimant's Notice of Withdrawal) appears to be quite contrary to the direction of the Tribunal as it is only the trustee, BSB Trust Company, Ltd., that has the ability to pursue foreclosure.



HADIPUTRANTO, HADINOTO & PARTNERS

12    As the Tribunal is already aware, the Claimant has repeatedly attempted to infer that the Loan Agreement, Security Rights, and the Transfer of Right and Interest Agreement represent a "suite of agreements" with the Transfer of Right and Interest Agreement purportedly the principal agreement. The Respondent must emphasize that this is is a self serving unilateral viewpoint. Repetition of this unilateral viewpoint by the Claimant provides additional insight into the misleading nature of the Claimant's assertions since 1993.

13    Similarly, the Tribunal may regard aspects relating to the Powers of Attorney ("PoA's") now being displayed by the Claimant in light of the above. How is it possible that PoA's (authorized signatories) and documentation fundamental to the "suite of agreements" inferred by the Claimant now be excused by the Claimant as "errors of omission" and "typographical errors" when this documentation apparently had been created and approved by legal counsel for the Claimant in both the United States and Indonesia prior to the signing of the agreements?

14    Additionally, the Respondent invites the Tribunal to note that while the Jakarta Regional Land Office took cognizance of the High Court's ruling in its letter of 16 August 2004, and the South Jakarta Land Office apparently acted on the advice in that letter on 9 September 2004, the Claimant has not indicated when it became aware of these matters.

15    Further, the Claimant's reasons in paragraph 5 of its application for not proceeding with this arbitration are flawed when analyzed. Firstly, they show that the primary remedy sought is financial relief. This is a remedy under the Loan Agreement which is subject to the jurisdiction of the District Court of South Jakarta. Secondly, insofar as recourse to security rights are concerned, this Tribunal, with respect, could not have addressed the issue of the Claimant's security rights in any event. Those rights were the subject of the on-going court proceedings in Jakarta.

16    Bearing in mind that the Claimant's purpose was to seek repayment of the alleged loan and that the Loan Agreement dated 17 February 1998 provides for the District Court of South Jakarta to have jurisdiction, the proper course of action, on any sensible reading of the situation, would have been for the Claimant to address the ruling of 16 October by the District Court of South Jakarta.

17    The Claimant's own actions show that it recognized this as Claimant petitioned the High Court in Jakarta on 6 May 2004 to nullify the ruling of the District Court.

**Award sought by the Respondent**

18    The Claimant is presently in breach of the Tribunal's direction to amend its Statement of Case. The Claimant has indicated it has no intention of complying



HADIPUTRANTO, HADINOTO & PARTNERS

with the direction of the Tribunal. The Tribunal can now rule in favor of the Respondent on the ground that the Claimant, as a trust, has no legal personality to bring these proceedings.

19   Such an award is necessary to avoid a future arbitration by the trust with the consequent expenditure of time and expenditure on the part of the Respondent.

20   In any event, the Claimant should be ordered to pay the Respondent's legal costs and the arbitration costs of these proceedings. An application to withdraw is, in the ordinary case, a concession to the success of the other party: see Handbook of Arbitration Practice, published by Sweet & Maxwell in conjunction with the Chartered Institute of Arbitrators, 1998, where it is stated in paragraph 2-818 that,

> "Where a party *withdraws his claim or defence*, the usual rule is that he must pay the costs of the other party, because by his withdrawal he is conceding to the success of the other party."

21   In *The Arglios Shipping Co v Midwest Steel & Alloy Corporation, The Angeliki* [1982] 2 Lloyd's Report 594, [Attachment 3] the arbitrators made a global award on costs in favor of the owners despite the fact that one of the issues in arbitration which had been put forward by the owners had been withdrawn by them. The charterers applied to the court to remit the award to the arbitrators for further consideration with regard to the order for costs on the ground that the arbitrators were wrong to award the owners the whole of their costs when they have withdrawn one of the issues. They argued that the owners ought to have been ordered to bear their own costs of issue which they had withdrawn. In the judgment, Lloyd J said,

> "Now, of course the tribunal may order costs to follow the event though the successful party has failed on one or more issues. But here, the issues which were *withdrawn* from the consideration of the arbitrators were the central issues in the case. That in itself would be seems to be, a sufficient ground why I ought to remit the question of costs to the arbitrators."

22   Although the case dealt with a point in claim being withdrawn, as opposed to the entire claim being withdrawn, the Respondent submits that it is relevant given that in essence, this is simply a case where ALL the points in claim have been withdrawn.

23   In this case, for the reasons set out above, the application to withdraw is a further indication that the Claimant believes that the legality and validity of its case will not stand up to scrutiny in any possible merit phase.

HADIPUTRANTO, HADINOTO & PARTNERS

24    Further, the Tribunal ought to impose a condition on the Claimant's withdrawal
       by analogy to the practice of the Singapore courts, which analogy the Tribunal is
       empowered to adopt by s 12(4)(a) of the International Arbitration Act,

            "The Tribunal may award any remedy or relief that could have been
            ordered by the High Court if the dispute had been the subject of civil
            proceedings in that Court."

25    The appropriate condition would be that the Claimant be barred from
       commencing any future arbitration on the basis of the issues raised in its
       Statement of Case.

26    The Respondent has at all times been respectful of the Tribunal, its rulings, and
       its instructions, despite its challenge to the Tribunal's jurisdiction.

For the avoidance of doubt, the Respondent maintains its preliminary objections in their
entirety.

Respectfully submitted,
**For and on behalf of PT SUMOHADIWIDJOJO**

Tony Budidjaja

cc:
* SINGAPORE INTERNATIONAL ARBITRATION CENTRE          BY FAX: (65) 68830823
   City Hall 3 St. Andrew's Road                                        AND COURIER
   Singapore 178958
   Attn.: Registrar of the Singapore International Arbitration Centre

* Client (PT SUMOHADIWIDJOJO)

ATTACHMENT # 1

LAW OFFICES

## HADIPUTRANTO, HADINOTO & PARTNERS

THE JAKARTA STOCK EXCHANGE BUILDING
TOWER II, FLOOR 21
SUDIRMAN CENTRAL BUSINESS DISTRICT
JL. JEND. SUDIRMAN KAV. 52-53
JAKARTA 12190, INDONESIA
TELEPHONE : (62-21) 515 5090, 515 5091, 515 5092, 515 5093
FACSIMILE : (62-21) 515 4840, 515 4845, 515 4850, 515 4855, 515 4860, 515 4865

*Our Ref.: TAM/IPG/PK/6787TAM03 04*

10 December 2003

William C. Benjamin
Hale & Dorr LLP
60 State Street
Boston, MA 02109

Via e-mail to william.benjamin@haledorr.com

**Loan Agreement between BSB Residual Assets Trust and PT S. Widjojo dated 17 February 1998 ("Loan Agreement")**

Dear Mr. Benjamin,

We have been requested by PT S. Widjojo to advise them in respect to your letter to them dated 22 October 2003 regarding the above referenced subject and to respond to that Letter. We have reviewed the Loan Agreement and the Transfer of Right and Interest dated 17 February 1998 (the "Transfer Agreement") and the documents referred to in the Transfer Agreement, including the Purchase and Sale Agreement entered into on 11 August 1997 in which it was stated that PT S. Widjojo had purchased from BSB Residual Assets Trust 144,960 Shares of Kalimantan Investment Corporation (the "Shares"), together with various correspondence, newsletters and other documents relating to transactions referred to in the documents mentioned above.

The Loan Agreement is an interesting document. It purports to provide for a loan from BSB Residual Assets Trust in the amount of $3,060,000 to be used "to pay the Purchase Price and to maintain S. Widjojo Centre." Purchase Price is defined in the third Whereas clause as the "aggregate amount of the purchase price of the Shares and the amount of the financial assistance from the Lender to the Borrower for the maintenance of S. Widjojo Centre", i.e., US$3,060,000. The purchase price for the Shares was US$144,960. The remaining portion of the Purchase Price, i.e., US$2,915,040, was for the financial assistance to be provided by BSB Residual Assets Trust to assist in the



*www.hhp.co.id*

HADIPUTRANTO, HADINOTO & PARTNERS

2

maintenance of the S. Widjojo Centre. As we understand it, this amount of the loan was never made available to PT S. Widjojo, and thus the amount of the loan that was advanced to PT S. Widjojo is limited to the amount required to purchase the Shares, i.e., US144,960.

Your 22 October 2003 letter refers to the document referred to as the "Transfer of Right and Interest ... pursuant to which BSB Residual Assets Trust transferred the Bank Floor...." The Loan Agreement makes no mention of this, and in fact refers only to the purchase of the Shares. We believe there is a very clear reason why the Loan Agreement did not refer to the "Transfer of Right and Interest" or the transfer of the Bank Floor to by BSB Residual Assets Trust. Michael Irwin, chairman of BSB Assets Trustees, in a report to the BSB investors in April 1991, although with some errors (not of his making) summed up the position fairly succinctly:

"... When it was in Blok M, prior to moving to S Widjojo, BSB discovered that Indonesian law required it to own its own headquarters [*Note: although it appears that this view may have been a commonly held belief, in point of fact Indonesian law never required banks such as BSB to own the buildings or location where their headquarters were*]. The S Widjojo building was under construction and BSB decided to purchase the mezzanine floor. BSB and PTSW tried to establish by documentation ownership rights to the floor to BSB. However, Indonesian law does not provide for strata-titling, that is, legal ownership of individual buildings. **Consequently, the BSB investors do not have legal ownership of the floor.**"

The conclusion was absolutely correct, although the reasoning was not correct. In fact Indonesian law does provide for two or more separate parties to have ownership rights in different parts of a building on the same plot or several plots of land. The Deed of Sale and Purchase of Building and Transfer of Land Rights No. 117, dated 23 July 1979 ("Deed 117/1979") between PT S. Widjojo and PT Bank Susila Bakti ("BSB") provided the basis upon which BSB could have obtained title rights to the Mezzanine Floor. However BSB never followed up to register a transfer of ownership rights to the property and the Mezzanine Floor. All the relevant title documents are and have continued to be in the name only of PT S. Widjojo. Since BSB never had any title to the Mezzanine Floor, it could not convey any title rights to any third party. In addition, however, and as was recognised in 1986 (in an Agreement with Respect to Transfer of Rights dated 31 December 1986, between PPK Subud and SBIF), PPK Subud could not own title to the property because it is not a legal entity, so that even had BSB held ownership rights, it could not have transferred such rights to PPK Subud. In addition, neither SBIF nor BSB Residual Assets Trust could own title to the property under the applicable law as they are not Indonesian citizens or Indonesian legal entities. It is clear that at no time, including on 17 February 1998, when the Transfer Agreement and the Loan Agreement were entered



HADIPUTRANTO HADINOTO & PARTNERS

3

into, could BSB Residual Assets Trust transfer the Mezzanine Floor to PT S. Widjojo. It is possible that there may have been some confusion about this matter at the time. However we believe that Michael Irwin had the essence of the matter very clear: **"the BSB investors do not have legal ownership of the floor."** The substantive position with respect to whether BSB Residual Assets Trust had any title to the transfer is quite clear – it did not. In addition, had it had any title rights to the Mezzanine Floor, those rights would not have been capable of being transferred other than by a deed drawn by a PPAT, and not by a private "underhand" agreement such as the Transfer of Right and Interest Agreement.

Your letter of 22 October 2003 refers to Note 10 of the audited financial statement of PT S. Widjojo for 2001 as acknowledging the amount of US3,060,000, presumably as the amount of the loan from BSB Residual Assets Trust. Auditors cannot, through audited financial statement or otherwise, create assets where none exist, nor can they create liabilities where none exist.

In order for PT S. Widjojo to have an obligation to repay any amount in excess of the purchase price for the Shares together with interest (including default interest on that amount), BSB Residual Assets would have had to have advanced those additional funds to PT S. Widjojo, in this case, as stated in the Loan Agreement, "as financial assistance from the Lender to the Borrower for the maintenance of S. Widjojo Centre." No such funds were advanced, and thus there exists no obligation to repay amounts other than as required for the purchase of the KIC Shares, together with accrued interest and penalties.

On 30 September 2003, PT S. Widjojo paid to BSB Residual Assets Trust the amount of $168,809.42, as payment in full of the amount of the loan - $144,960 – plus accrued interest and penalties in the amount of $23,849.42, thus fully discharging its obligations under the Loan Agreement.

On 4 October 2003, PT S. Widjojo filed a petition in the District Court of South Jakarta, requesting the Court to declare, inter alia, the loan under the Loan.Agreement as fully paid, the land clear of the security interest as evidenced by the Hak Tanggungan Certificate No. 319/1998, and to instruct the South Jakarta Land office to release (Roya) the Hak Tanggungan from the relevant land titles. The Court's Ruling to this effect was issued on 16 October 2003. The District Court of South Jakarta, subsequently on 28 October 2003 issued a letter to the South Jakarta Land Office instructing it to release (Roya) the second rank Hak Tanggungan over the six plots of land. The second rank Hak Tanggungan over the six plots of land was annulled (Roya) by the South Jakarta Land Office on 5 December 2003. We attach copies of the Decision of the District Court and the actions taken by the South Jakarta Land Office.



HADIPUTRANTO, HADINOTO & PARTNERS

4

In our view all appropriate action has been taken and all matters relating to PT S. Widjojo's obligations under the Loan Agreement are closed. We understand that PT S. Widjojo has been considering whether the periodic payments that have been made to and received by BSB Residual Assets Trust in respect of the rental income from the Mezzanine floor were induced under false pretences. However, PT S. Widjojo is prepared to forego any actions relating to the above matter if BSB Residual Assets Trust enters into the Amicable Settlement Agreement ("ASA") referred to below and takes the other steps set forth below.

In order to close all matters relating to the Loan Agreement and any actual or alleged rights BSB Residual Assets Trust believes it may have had with respect to the Mezzanine Floor or any other property of PT S. Widjojo, PT S. Widjojo has requested that we prepare and forward to you the ASA to be entered into by PT S. Widjojo and BSB Residual Assets Trust and to be acknowledged and agreed to by George H. Helmer. A copy of the ASA is attached to this Letter. If BSB Residual Assets Trust wishes to settle this matter it is of utmost importance that it sign the ASA and obtain the signature of George Helmer promptly, without delay. For this reason PT S Widjojo has advised us that the following schedule must be observed and that it will not accept any deviation from this schedule or any change to the ASA:

1.    Within seven days from the date of this letter BSB Residual Assets Trust ("BSBRAT") must:

   (a)    sign the ASA and obtain the acknowledgement and acceptance of George H. Helmer as evidenced by his signature, and

   (b)    deposit with Hale and Dorr LLP the sum of US$25,000 to reimburse PT S. Widjojo for all legal and other professional or notarial services, court fees, fees for the Roya of the second ranking Hak Tanggungan and other charges incurred or to be incurred by PT S Widjojo in connection with the Loan Agreement and the ASA.

Hale and Dorr must notify Hadiputranto, Hadinoto and Partners, attention Indri Pramitaswari Guritno, by fax - (62-21) 515-4840 or 515-4845 - or e-mail, no later than 17:00 hours on 17 December 2003 (Jakarta, Indonesia time) that BSBRAT has duly signed the ASA and deposited US$25,000 with Hale and Dorr for the reimbursement of PT S. Widjojo costs as provided in this Clause. Hale and Dorr will, without dispute, promptly, but in no event more than five days following receipt from Hadiputranto Hadinoto & Partners of the statement referred to below, transfer to the Bank Account of Hadiputranto, Hadinoto and Partners amounts in the



HADIPUTRANTO, HADINOTO & PARTNERS

5

aggregate up to US$25,000 upon receipt of a statement from Hadiputranto, Hadinoto & Partners specifying amounts spent by PT S. Widjojo on legal and other professional fees, notarial fees, court costs and fees for the Roya of the second ranking Hak Tanggungan;

2.  The seven day period mentioned in clause 1 above will allow Hale and Dorr sufficient time to confirm with their Indonesian correspondents the validity of the Court Decree and the Roya of the second Hak Tanggungan as well as verification of any other relevant Indonesian law aspects to the loan transaction;

3.  Should Hadiputranto, Hadinoto and Partners not receive confirmation from Hale and Dorr of acceptance by the parties to the ASA within the stipulated seven day time limit, the offer to settle all matters amicably in accordance with the ASA will expire automatically and PT S Widjojo will be free to communicate directly with PT S. Widjojo and all BSBRAT Unit Holders under applicable laws, regulations, orders, judgements and agreements;

4.  Within 14 days from the date of this letter, i.e. not later than 17.00 hours on 24 December 2003 (Jakarta, Indonesia time) Hadiputranto, Hadinoto and Partners must receive at least two copies of the ASA, duly signed by BSBRAT and George H. Helmer, together with the documentation intended to be provided as part of the ASA and fully described in the ASA, for further signing and completion by PT. S Widjojo;

5.  Should PT S Widjojo become aware prior to the signing of the ASA by BSBRAT that BSBRAT or BSB Trust Co. (BVI) or George H. Helmer or any other person or party is seeking any form of judicial proceedings in connection with the matters raised in this letter or that any of the confidential information provided in or included with this letter and the ASA or provided to BSB Trust Co. (BVI), the Trustees of BSBRAT or to George H. Helmer, has been disclosed or communicated to any other person or party other than to Hale and Dorr, then it is further fully understood that PT S Widjojo will be free to immediately withdraw its offer to settle matters amicably in accordance with the ASA and to act according to the rights granted to it under the applicable laws, regulations, orders, judgements and agreements.

The above course of action is intended to (i) finally settle issues that, while being contentious, may not have been clearly understood by all the Trustees of BSB Residual Assets Trust or, *more importantly*, may not have been clearly explained or even



HADIPUTRANTO, HADINOTO & PARTNERS

6

communicated to all former Trustees of BSB Residual Assets Trust prior to this letter, (ii) ensure that confidential and very sensitive information is not disclosed to parties other than as stated above.

Very sincerely,

Timothy A. Manring/Indri Pramitaswari Guritno

Attachments: -   Draft of Amicable Settlement Agreement (in PDF format).
             -   The English Translation of Court Ruling No. 275/Pdt.P/2003/PN.
                 Jak.Sel, dated 16 October 2003.
             -   The copies of land certificates (in PDF format).


Cc:     Konrad Baerveldt – PT S. Widjojo





**[Official Translation]**

*(LETTERHEAD OF SABAR SIMAMORA & PARTNERS)*

April 29th, 2005

To

Chairman of the District
Court of South Jakarta

The District Court of

South Jakarta

Jl. Ampera Raya No. 133

South Jakarta

Having been registered in

the Court Clerk office

South Jakarta District Court

Under Reg.No. 413/Pdt G/2005/

PN JAKSEL Dated April 29, 2005

**Re: LAWSUIT**

Dear Sir,

We the undersigned, Sabar M. Simamora, SH and Andi Perdana, SH, advocates and legal consultants of the **SABAR SIMAMORA & PARTNERS** Advocate and Legal Consultant Office, based on a special Power of Attorney of April 26th, 2005, hereby acts for and on behalf of PT SUMOHADIWIDJOJO or PT S. Widjojo with its address at Jl. Jend. Sudirman Kav. 71, South Jakarta, acting as a Plaintiff filing its lawsuit against

1.  BSB Residual Assets Trust with its address at Trident Chambers, Wickhams Cay, PO Box 146, Road Town, Tortola, British Virgin Islands, hereinafter referred to as the Defendant.

2.  The Government of the Republic of Indonesia cq. The National Land Agency cq. The Land Office of South Jakarta Municipality with its address at Jl. Prapanca Raya No. 9,

1/13

South Jakarta, hereinafter referred to as the Co-Defendant.

Whereas reasons of the aquo lawsuit are as follows:

1. That the Plaintiff and the Defendant have made and signed a Loan Agreement ("Loan Agreement") dated February 17th, 1998 (Attached as Evidence P-1). That of the Total Loan agreed by the Defendant to be given to the Plaintiff is US$ 3,060,000.00 (three million and sixty thousand United States dollars), **the Plaintiff has received US$ 144,960.00 (one hundred and forty four thousand nine hundred and sixty United States dollars) from the Defendant** and it was used by the Plaintiff to purchase 144,960 shares in Kalimantan Investment Corporation (Attached as Evidence P-2)

2. In accordance with the Loan Agreement, the Defendant is required to provide a loan to the Plaintiff amounting to US$ 3,060,000.00 (three million and sixty thousand United States dollars). After having been deducted by US$ 144,960.00 that has been received and used by the Plaintiff to purchase shares in Kalimantan Investment Corporation from the Defendant, the remaining amount of the Loan that must be given by Defendant to the Plaintiff is US$ 2,915,040.00 (two million nine hundred and fifteen thousand and forty United States dollars).

3. That although the Plaintiff still has a right to act on the remaining loan amounting to US$ 2,915,040.00, but it turns out that the Plaintiff has **never** been given the loan and thereby the **Plaintiff never received the fund of**

2/13

**US\$ 2,915,040.00 (two million nine hundred and fifteen and forty United States dollars)** from the Defendant. Thus, the Plaintiff only has a principal debt of to the Defendant, based on the Evidence P-1 in the Loan Agreement, amounting to US\$ 144,960.00 and **NOT** US\$ 3,060,000.00 (three million and sixty thousand United States dollars).

4. That on the debt of the Plaintiff to the Defendant, amounting to US\$ 144,960.00, on September 30th, 2003 the Plaintiff fully repaid all of the loan plus its interest and fine to the Defendant. Whereas details of the repayment by the Plaintiff to the Defendant are as follows:

| | |
|---|---|
| The Principal Loan | US\$ 144,960.00 |
| Interest and Fine | US\$  23,849.42 |
| Total | US\$ 168,809.42 |

(Attached as Evidence P-3)

5. As the Plaintiff has never received the remaining loan of US\$ 2,915,040.00 (two million nine hundred and fifteen thousand and forty United States dollars) from the Defendant, then the payment of US\$ 168,809.42 (one hundred and sixty eight thousand eight hundred and nine United States dollars and forty two cents) to the Defendant is a proof that the Plaintiff has FULLY repaid the Plaintiff's debt to the Defendant and thereby the Loan Agreement ended with the Plaintiff's debt repayment. On September 30th, 2003 the Plaintiff gave a notice to the

Defendant to end the Evidence P-1 Agreement (<u>Attached as Evidence P-4</u>).

6.  That as a guarantee of a loan payment of the Plaintiff to the Defendant, based on the Evidence P-1 in the Loan Agreement, the Plaintiff has given to the Defendant a guarantee rights on plots of land as follows:

    a.  The Building Utilization Right Certificate No. 174/Senayan, 5,856 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-5</u>).

    b.  The Building Utilization Right Certificate No. 176/Senayan, 2,203 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-6</u>).

    c.  The Building Utilization Right Certificate No. 331/Senayan, 1,660 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-7</u>).

    d.  The Building Utilization Right Certificate No. 386/Senayan, 551 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-8</u>).

    e.  The Building Utilization Right Certificate No. 447/Senayan, 58 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-9</u>).

    f.  The Building Utilization Right Certificate No. 451/Senayan, 666 m$^2$ in size, listed in the name of PT S Widjojo (<u>Attached as Evidence P-10</u>).

The guarantee provision is provided by the Plaintiff based on the Certificate of Guarantee Right no. 319/1998 jo. The Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998 (<u>Attached as Evidence P-11 and P12</u>).

4/13

7.    That the Loan Agreement between the Plaintiff and the Defendant has been revoked with a letter dated September 30th, 2003 from the Plaintiff to the Defendant. That the termination of the loan is regulated in the Article 21.7 of the Loan Agreement as follows:

"*The parties hereto waive the applicability of Section 1266 of the Indonesian Civil Code to the extent judicial intervention is required to terminate the Loan Agreement.*"

Thus, the revocation of the Evidence P-1 Loan Agreement by the Plaintiff has been in accordance with the law as the Plaintiff and the Defendant have agreed not to apply the stipulation of the Section 1266 of the Indonesian Civil Code (Vide Evidence P-1).

8.    That due to the Evidence P-1 Loan Agreement, which is a principal agreement and has become a basis for the issuance of the Guarantee Right Certificate jo. The Evidence P-11 and P-12 Guarantee Right Provision Deed has been revoked/terminated as the repayment of the Plaintiff's debt to the Defendant, then the guarantee on the Plaintiff's debt to the Defendant, which is an accessory agreement is annulled according to the law. This is in accordance with the stipulation of the Article 10 paragraph (1) and Article 18 paragraph (1) letter a of the Guarantee Right Law, which respectively states as follows:

Article 10 paragraph (1) of the Guarantee Right Law:

*"The Provision of the Guarantee Right is preceded with a promise to give the Guarantee Right as a guarantee for a repayment of a certain debt, which is stated in and is an inseparable part of the loan agreement or other agreement that arises such debt,"*

Article 18 paragraph (1)(a) of the Guarantee Right Law:

"The Guarantee Right is waived due to cases as follows:

a.  *The debt is secured by the Guarantee Right has been repaid.*

Thereby 6 (six) plots of land that are made into the Guarantee Right to the Defendant are as follows:

a.  The Building Utilization Right Certificate No. 174/Senayan, 5,856 $m^2$ in size, listed in the name of PT S. Widjojo.

b.  The Building Utilization Right Certificate No. 176/Senayan, 2,203 $m^2$ in size, listed in the name of PT S. Widjojo.

c.  The Building Utilization Right Certificate No. 331/Senayan, 1,660 $m^2$ in size, listed in the name of PT S. Widjojo.

d.  The Building Utilization Right Certificate No. 386/Senayan, 551 $m^2$ in size, listed in the name of PT S. Widjojo.

e.  The Building Utilization Right Certificate No. 447/Senayan, 58 $m^2$ in size, listed in the name of PT S. Widjojo.

6/13



    f.   The Building Utilization Right Certificate No. 451/Senayan, 666 $m^2$ in size, listed in the name of PT S. Widjojo.

Are no longer a debt guarantee of the Plaintiff to the Defendant and thereby the record of the Level II Guarantee Right in the name of the Defendant on the land certificates must be deleted. Thus, the Co-Defendant must carry out the deletion of Level II Guarantee Right from the Evidence P-5 to P-10 in the Building Utilization Right Certificate.

9.   Thereby in the aquo case the Plaintiff has asked the revocation of the Guarantee Right Certificate No. 319/1998 and the Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998, then the Co-Defendant deserves to be made in a party in the aquo case.

10.  That the stipulation of the Article 22 of the Evidence P-1 in the Loan Agreement states:

*"Governing Law/Jurisdiction*

*This Loan Agreement shall be governed by and construed in accordance with the laws of the Republic of Indonesia. All disputes arising out of this Loan Agreement shall be submitted to the District Court of South Jakarta."*

Thereby submission of aquo by the Plaintiff at South Jakarta District Court is right and appropriate.

11.  Thereby in the aquo case the Defendant is required to return the Guarantee Right Certificate No. 319/1998 jo. The Guarantee Right Provision Deed No. 29/Kebayoran

Baru/1998, thus with the Building Utilization Right Certificate No. 174/Senayan, 5,856 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 386/Senayan, 551 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 451/Senayan, 666 $m^2$ in size, listed in the name of PT S. Widjojo; then the Defendant deserves to be imposed a fine of Rp. 1,000,000 (one million Rupiah per late days of the date of the aquo decision until the Defendant settles its liabilities with the Plaintiff.

12. Thus with the liability of the Co-Defendant to carry out the deletion of the level II guarantee right from the Building Utilization Right Certificate No. 174/Senayan, 5,856 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 386/Senayan, 551 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 $m^2$ in size, listed in the name of PT S. Widjojo; the

8/13

Building Utilization Right Certificate No. 451/Senayan, 666 m$^2$ in size, listed in the name of PT S. Widjojo; the Co-Defendant deserves to be imposed with a fine of Rp. 1,000,000 (one million Rupiah) every late day as of the date of the aquo decision until the Co-Defendant settles its liabilities with the Plaintiff.

13. The aquo lawsuit has been filed based on authentic proofs, then the decision in the aquo case is immediate.

Based on the case above, we request that the Chairman of the District Court of South Jakarta or the Judge Committee of the aquo case makes a decision as follows:

- Granting the Plaintiff's lawsuit completely.

- Stating legally the revocation of the Loan Agreement of February 17th, 1998, which is carried out by the Plaintiff with all legal implications and thereby the Loan Agreement of February 17th, 1998 does not have binding power between the Plaintiff and the Defendant.

- Stating the Guarantee Right Certificate No. 319/1998 jo. The Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998 is revoked.

- Requiring the Defendant to return to the Plaintiff the Guarantee Right Certificate No. 319/1998 jo. The Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998.

- Requiring the Defendant to submit to the Plaintiff 6 (six) plots of land that have been made as a Guarantee Right to the Defendant, i.e.:

9/13

a.  The Building Utilization Right Certificate No. 174/Senayan, 5,856 m$^2$ in size, listed in the name of PT S. Widjojo.

b.  The Building Utilization Right Certificate No. 176/Senayan, 2,203 m$^2$ in size, listed in the name of PT S. Widjojo.

c.  The Building Utilization Right Certificate No. 331/Senayan, 1,660 m$^2$ in size, listed in the name of PT S. Widjojo.

d.  The Building Utilization Right Certificate No. 386/Senayan, 551 m$^2$ in size, listed in the name of PT S. Widjojo.

e.  The Building Utilization Right Certificate No. 447/Senayan, 58 m$^2$ in size, listed in the name of PT S. Widjojo.

f.  The Building Utilization Right Certificate No. 451/Senayan, 666 m$^2$ in size, listed in the name of PT S. Widjojo.

- Imposing the Defendant to pay a fine of Rp. 1,000,000 (one million Rupiah) for every late day as of the date of the aquo decision until the Defendant settles its liabilities to the Plaintiff, i.e. returning the Guarantee Right Certificate No. 319/1998 jo. The Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998; the Guarantee Right Certificate No. 319/1998 jo. The Guarantee Right Provision Deed No. 28/Kebayoran Baru/1998; from the Building Utilization Right Certificate No.

10/13

174/Senayan, 5,856 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 386/Senayan, 551 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 451/Senayan, 666 m$^2$ in size, listed in the name of PT S. Widjojo from the Building Utilization Right Certificate No. 174/Senayan, 5,856 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 386/Senayan, 551 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 m$^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 451/Senayan, 666 m$^2$ in size, listed in the name of PT S. Widjojo.



- Requesting the Co-Defendant to delete the level II guarantee right from the Building Utilization Right Certificate No. 174/Senayan, 5,856 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 386/Senayan, 551 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 451/Senayan, 666 $m^2$ in size, listed in the name of PT S. Widjojo.

- Imposing the Co-Defendant to pay a fine of Rp. 1,000,000 (one million Rupiah) every late date as of the date of the aquo decision until the Co-Defendant settles its liabilities with the Plaintiff, i.e. deleting the level II guarantee right from the Building Utilization Right Certificate No. 174/Senayan, 5,856 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 176/Senayan, 2,203 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 331/Senayan, 1,660 $m^2$ in size, listed in the name of PT S. Widjojo; the

12/13

Building Utilization Right Certificate No. 386/Senayan, 551 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 447/Senayan, 58 $m^2$ in size, listed in the name of PT S. Widjojo; the Building Utilization Right Certificate No. 451/Senayan, 666 $m^2$ in size, listed in the name of PT S. Widjojo.

- Imposing the Defendant to pay the cost of the case.

Or other decision that is made fairly (*aquo et bono*)

Sincerely yours,

Advocate of the Plaintiff

SABAR SIMAMORA & PARTNERS

Advocate & Legal Consultant Office

[sealed and signed]                [signed]

Sabar M. Simamora, SH          Andi Perdana, SH

---

I, **Abdul Djalal**, alias, **Abdul Djalal Chusairi**, Authorized and Sworn Translator of Indonesian and English languages, practicing in Jakarta, do hereby certify that the foregoing Indonesian-into-English translation is a true and correct English version of the original text.

Jakarta, May 2, 2005

**Abdul Djalal Chusairi**
Gubernatorial Decree Number: 1715/2000

13/13

# SABAR SIMAMORA & PARTNERS
## Advocates & Legal Consultants
Wisma Daria 3rd Floor # 302, Jl. Iskandarsyah Raya No. 7, Jakarta 12160
Phone : (62-21) 720 0786, 727 94408  Fax. : ( 62-21) 727 94408
E-mail : sabarsim@yahoo.com

29 April 2005

Kepada Yth.
Ketua Pengadilan Negeri Jakarta Selatan
Pengadilan Negeri Jakarta Selatan
Jl. Ampera Raya No. 133
Jakarta Selatan

*ELAH DIDAFTARKAN DIKEPANITERAAN*
*PENGADILAN NEGERI JAKARTA SELATAN*
*DIBAWAH DAFTAR NO. 413 IPdt G 'Jot PN JAK*
*TANGGAl*
*29 - April - 2005*

### Perihal: GUGATAN

Dengan hormat,

Kami yang bertandatangan di bawah ini Sabar M. Simamora, SH dan Andi Perdana, SH, para advokat dan penasihat hukum dari Kantor Advokat & Konsultan Hukum **SABAR SIMAMORA & PARTNERS**, berdasarkan surat kuasa khusus tertanggal 26 April 2005, dari dan karenanya bertindak untuk dan atas nama PT. SUMOHADIWIDJOJO atau disingkat PT. S. Widjojo, beralamat di Jl. Jend. Sudirman, Kav. 71, Jakarta Selatan, selaku Penggugat dengan ini mengajukan gugatan terhadap:

1.  BSB Residual Assets Trust, beralamat di Trident Chambers, Wickhams Cay, PO Box 146, Road Town, Tortola, British Virgin Islands, selanjutnya disebut Tergugat.

2.  Pemerintah Republik Indonesia cq Badan Pertanahan Nasional cq Kantor Pertanahan Kotamadya Jakarta Selatan, beralamat di Jl. Prapanca Raya No. 9, Jakarta Selatan, selanjutnya disebut Turut Tergugat.

Adapun alasan gugatan aquo diajukan adalah sebagai berikut:

1.  Bahwa Penggugat dan Tergugat telah membuat dan menandatangani *Loan Agreement* ("Perjanjian Pinjaman") tertanggal 17 Februari 1998 (<u>Terlampir sebagai Bukti P-1</u>). Bahwa dari total Jumlah Pinjaman yang disepakati Tergugat

2

untuk diberikan kepada Penggugat yaitu sebesar US$ 3,060,000.00 (tiga juta enam puluh ribu dolar Amerika Serikat), **Penggugat telah menerima US$144,960.00** (seratus empat puluh empat ribu sembilan ratus enam puluh ribu dolar Amerika Serikat) **dari Tergugat** dan digunakan oleh Penggugat untuk membeli 144.960 saham di Kalimantan Investment Corporation. (Terlampir sebagai Bukti P-2)

2.  Sesuai dengan Perjanjian Pinjaman, Tergugat diwajibkan menyediakan pinjaman untuk Penggugat sebesar US$ 3,060,000.00 (Tiga Juta Enam Puluh Ribu Dolar Amerika Serikat). Setelah dikurangi US$144,960.00 yang telah diterima dan digunakan Penggugat untuk membeli saham di Kalimantan Investment Corporation dari Tergugat, maka sisa jumlah Pinjaman yang masih harus diberikan oleh Tergugat kepada Penggugat berjumlah US$2,915,040.00 (Dua juta sembilan ratus lima belas ribu empat puluh dolar Amerika Serikat).

3.  Bahwa walaupun Penggugat masih berhak atas sisa pinjaman sebesar US$ 2,915,040.00, namun ternyata Tergugat **tidak pernah** memberikan pinjaman dimaksud dan karenanya Penggugat tidak pernah menerima uang sejumlah US$ 2,915,040.00 (Dua juta sembilan ratus lima belas ribu empat puluh dolar Amerika Serikat) dari Tergugat. Dengan demikian Penggugat hanya mempunyai utang pokok kepada Tergugat berdasarkan Perjanjian Pinjaman Bukti P-1 sebesar US$ 144,960.00 dan **BUKAN** US$ 3,060,000.00 (Tiga juta enam puluh ribu dolar Amerika Serikat).

4.  Bahwa atas utang Penggugat kepada Tergugat sebesar US$ 144,960.00 tersebut Penggugat pada tanggal 30 September 2003 telah melunasi seluruh pinjaman berikut bunga dan denda kepada Tergugat. Adapun jumlah yang dibayarkan Penggugat kepada Tergugat adalah sebagai berikut :

| | |
|---|---|
| - Pinjaman Pokok | : US$ 144,960.00 |
| - Bunga dan Denda | : US$  23,849.42 |
| Jumlah Total | : US$ 168,809.42 |

(Terlampir sebagai Bukti P-3)

3

5.  Oleh karena Penggugat tidak pernah menerima sisa jumlah pinjaman sebesar US$ 2,915,040.00 (Dua juta sembilan ratus lima belas ribu empat puluh dolar Amerika Serikat) dari Tergugat, maka pembayaran sebesar US$ 168,809.42 (Seratus enam puluh delapan ribu delapan ratus sembilan dan empat puluh dua sen Dolar Amerika) kepada Tergugat merupakan bukti bahwa Penggugat telah melunasi SELURUH pinjaman Penggugat kepada Tergugat dan karenanya Perjanjian Pinjaman menjadi berakhir dengan pelunasan oleh Penggugat tersebut. Bahwa Penggugat pada tanggal 30 September 2003 telah memberitahukan Tergugat untuk mengakhiri Perjanjian Bukti P-1. (Terlampir sebagai Bukti P-4).

6.  Bahwa sebagai jaminan pembayaran pinjaman Penggugat kepada Tergugat berdasarkan Perjanjian Pinjaman Bukti P-1, Penggugat telah memberikan kepada Tergugat jaminan berupa hak tanggungan terhadap bidang tanah sebagai berikut:

    a.  Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo; (Terlampir sebagai Bukti P-5)
    b.  Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; (Terlampir sebagai Bukti P-6)
    c.  Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo; (Terlampir sebagai Bukti P-7)
    d.  Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; (Terlampir sebagai Bukti P-8)
    e.  Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo; (Terlampir sebagai Bukti P-9)
    f.  Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama  PT. S. Widjojo; (Terlampir sebagai Bukti P-10)

    Pemberian jaminan tersebut diberikan Penggugat berdasarkan Sertifikat Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998. (Terlampir sebagai Bukti P-11 dan P-12).

7.  Bahwa Perjanjian Pinjaman antara Penggugat dan Tergugat telah dibatalkan dengan surat tertanggal 30 September 2003 dari Penggugat kepada Tergugat.

4

Bahwa untuk pengakhiran pinjaman diatur dalam Pasal 21.7 Perjanjian Pinjaman sebagai berikut:

> *"The parties hereto waive the applicability of Section 1266 of the Indonesian Civil Code to the extent judicial intervention is required to terminate this Loan Agreement."*

Terjemahan:

> *"Para Pihak dengan ini melepaskan keberlakuan Pasal 1266 Kitab Undang-Undang Hukum Perdata Indonesia sepanjang yang mensyaratkan intervensi pengadilan untuk membatalkan Perjanjian Pinjaman ini."*

Dengan demikian pembatalan Perjanjian Pinjaman Bukti P-1 oleh Penggugat adalah telah sesuai dengan hukum, karena Penggugat dan Tergugat telah sepakat untuk tidak memberlakukan ketentuan Pasal 1266 Kitab Undang-Undang Hukum Perdata. . (Vide Bukti P-1).

8.      Bahwa oleh karena Perjanjian Pinjaman Bukti P-1 yang merupakan perjanjian induk dan menjadi dasar diterbitkannya Sertifikat Hak Tanggungan jo. Akta Pemberian Hak Tanggungan Bukti P-11 dan P-12 tersebut telah dibatalkan/berakhir karena telah lunasnya utang Penggugat kepada Tergugat, maka jaminan atas pinjaman Penggugat kepada Tergugat yang merupakan perjanjian accesoir menjadi batal menurut hukum. Hal ini sesuai dengan ketentuan Pasal 10 ayat (1) dan Pasal 18 ayat (1) huruf a Undang-Undang Hak Tanggungan, yang masing-masing  menyebutkan sebagai berikut:

> Pasal 10 ayat (1) Undang-Undang Hak Tanggungan:
> *"Pemberian Hak Tanggungan didahului dengan janji untuk memberikan Hak Tanggungan sebagai jaminan pelunasan utang tertentu, yang dituangkan di dalam dan merupakan bagian tak terpisahkan dari perjanjian utang-piutang yang bersangkutan atau perjanjian lainnya yang menimbulkan utang tersebut."*

> Pasal 18 ayat (1) (a) Undang-Undang Hak Tanggungan:
> *"Hak Tanggungan hapus karena hal-hal sebagai berikut:*
> *a.  hapusnya utang yang dijamin dengan Hak Tanggungan;*

5

Karenanya 6 (enam) bidang tanah yang dijadikan Hak Tanggungan kepada Tergugat yaitu:

a. Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo;

b. Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo;

c. Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo;

d. Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo;

e. Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo;

f. Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo;

tidak lagi merupakan jaminan utang Penggugat kepada Tergugat dan karenanya pencatatan Hak Tanggungan Peringkat II atas nama Tergugat pada sertifikat-sertifikat tanah tersebut harus dicoret. Dengan demikian Turut Tergugat harus melaksanakan pencoretan hak tanggungan peringkat II dari sertifikat HGB bukti P-5 sampai dengan P-10.

9.    Oleh karena dalam perkara aquo Penggugat meminta pembatalan Sertifikat Hak Tanggungan No. 319/1998 dan Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998, maka sudah sepatutnya Turut Tergugat dijadikan pihak dalam perkara aquo.

10.   Bahwa dalam ketentuan Pasal 22 Perjanjian Pinjaman Bukti P-1 disebutkan:

> "*Governing Law/Jurisdiction*
> *This Loan Agreement shall be governed by and construed in accordance with the laws of the Republic of Indonesia. All disputes arising out of this Loan Agreement shall be submitted to the District Court of South Jakarta.*"

Terjemahannya:

6

> *"Hukum/Yurisdiksi Yang Mengatur*
> *Perjanjian Pinjaman ini akan diatur oleh dan ditafsirkan sesuai dengan*
> *hukum Republik Indonesia. Segala sengketa yang timbul dari Perjanjian*
> *Pinjaman ini akan diajukan pada Pengadilan Negeri Jakarta Selatan."*

Dengan demikian pengajuan aquo oleh Penggugat di Pengadilan Negeri Jakarta
Selatan adalah sudah tepat dan benar.

11. Oleh karena dalam perkara aquo Tergugat diminta untuk mengembalikan Sertifikat
Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan
No.28/Kebayoran Baru/1998, demikian pula dengan Sertifikat Hak Guna
Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo;
Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas
nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660
m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan
No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak
Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo;
dan Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas
nama PT. S. Widjojo; maka sudah sepatutnya Tergugat dikenakan uang paksa
(dwangsom) sebesar Rp. 1.000.000,- (satu juta rupiah) tiap-tiap hari keterlambatan
terhitung sejak tanggal putusan aquo sampai dengan Tergugat melaksanakan
seluruh kewajibannya kepada Penggugat.

12. Demikian pula dengan kewajiban Turut Tergugat untuk melaksanakan pencoretan
hak tanggungan peringkat II dari Sertifikat Hak Guna Bangunan No.174/Senayan,
seluas 5856 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan
No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; Sertifikat
Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S.
Widjojo; Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat
atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.447/Senayan, seluas
58 m2, tercatat atas nama PT. S. Widjojo; dan Sertifikat Hak Guna Bangunan
No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo; maka sudah
sepatutnya Turut Tergugat dikenakan uang paksa (dwangsom) sebesar Rp.
1.000.000,- (satu juta rupiah) tiap-tiap hari keterlambatan terhitung sejak tanggal

7

putusan aquo sampai dengan Turut Tergugat melaksanakan seluruh kewajibannya kepada Penggugat.

13. Gugatan aquo diajukan Penggugat dengan didasarkan pada bukti-bukti otentik, maka sudah sepatutnya putusan dalam perkara aquo adalah serta merta (uitvoerbaar bij vooraad).

Berdasarkan hal tersebut di atas kami mohon agar Ketua Pengadilan Negeri Jakarta Selatan atau Majelis Hakim perkara aquo memutus sebagai berikut:

- Mengabulkan gugatan Penggugat untuk seluruhnya;

- Menyatakan sah pembatalan *Loan Agreement* ("Perjanjian Pinjaman") tertanggal 17 Februari 1998 yang dilakukan oleh Penggugat dengan segala akibat hukumnya dan karenanya *Loan Agreement* ("Perjanjian Pinjaman") tertanggal 17 Februari 1998 tidak mempunyai kekuatan mengikat antara Penggugat dan Tergugat;

- Menyatakan batal Sertifikat Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998;

- Memerintahkan kepada Tergugat untuk mengembalikan kepada Penggugat Sertifikat Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998;

- Memerintahkan kepada Tergugat untuk menyerahkan kepada Penggugat 6 (enam) bidang tanah yang dijadikan Hak Tanggungan kepada Tergugat yaitu:

  a. Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo;

  b. Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo;

  c. Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo;

  d. Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo;

  e. Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo;

  f. Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo;

8

Menghukum Tergugat untuk membayar uang paksa (dwangsom) sebesar Rp. 1.000.000,- (satu juta rupiah) tiap-tiap hari keterlambatan terhitung sejak tanggal putusan aquo sampai dengan Tergugat melaksanakan seluruh kewajibannya kepada Penggugat untuk mengembalikan Sertifikat Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998; Sertifikat Hak Tanggungan No.319/1998 jo. Akta Pemberian Hak Tanggungan No.28/Kebayoran Baru/1998; dari Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo; dan Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojodari Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo; dan Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo;

Memerintahkan kepada Turut Tergugat untuk melakukan pencoretan hak tanggungan peringkat II dari Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo; dan Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo;

Menghukum Turut Tergugat untuk membayar uang paksa (dwangsom) sebesar Rp. 1.000.000,- (satu juta rupiah) tiap-tiap hari keterlambatan terhitung sejak tanggal putusan aquo sampai dengan Turut Tergugat melaksanakan seluruh kewajibannya

9

kepada Penggugat untuk melakukan pencoretan hak tanggungan peringkat II dari Sertifikat Hak Guna Bangunan No.174/Senayan, seluas 5856 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.176/Senayan, seluas 2203 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.331/Senayan, seluas 1660 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.386/Senayan, seluas 551 m2, tercatat atas nama PT. S. Widjojo; Sertifikat Hak Guna Bangunan No.447/Senayan, seluas 58 m2, tercatat atas nama PT. S. Widjojo; dan Sertifikat Hak Guna Bangunan No.451/Senayan, seluas 666 m2, tercatat atas nama PT. S. Widjojo;

-       Menghukum Tergugat untuk membayar biaya perkara.

Atau putusan lain yang seadil-adilnya (aquo et bono).

Hormat kami,
Kuasa Penggugat/
Kantor Advokat & Konsultan Hukum
**SABAR SIMAMORA & PARTNERS**

Sabar M. Simamora, SH                                        Andi Perdana, SH