UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of an Arbitration Between: ) <br><br> PT SUMOHADIWIDJOJO, ) <br><br> Applicant and ) <br> Counterclaim Defendant ) <br> (Respondent below) ) <br><br> and ) <br><br> BSB RESIDUAL ASSETS TRUST, ) <br> BSB TRUST COMPANY, LTD., Trustee, ) <br><br> Respondent and ) <br> Counterclaim Plaintiff ) <br> (Claimant below). ) <br><br> CITIZENS BANK ) <br><br> Trustee. ) | CIVIL ACTION NO. 04 12646 NG <br><br> MEMORANDUM IN OPPOSITION TO APPLICANT'S MOTION TO STRIKE OR DISMISS, OR TO STAY, RESPONDENT'S COUNTERCLAIM |

Respondent BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee (collectively "BSB") submits this memorandum in opposition to the Motion to Strike or Dismiss, or to Stay, Respondents' Purported "Counterclaim" filed by Applicant PT Sumohadiwidjojo ("PTSW").

## **INTRODUCTION**

Despite having invoked this Court's jurisdiction, PTSW now seeks to withhold the same right from BSB.  PTSW raises a barrage of procedural and jurisdictional objections to BSB's effort to resolve the parties' contractual dispute in an efficient and appropriate manner.  None of PTSW's objections survives scrutiny.  BSB's counterclaim is permissible in this proceeding given the unusual nature of the arbitral award that PTSW seeks to enforce—an award that

addressed costs only and resolved no claim on the merits. This Court plainly has personal

jurisdiction over PTSW, which has voluntarily submitted to the jurisdiction of this Court and

pursued prejudgment remedies under Massachusetts law. BSB's counterclaim also manifestly

falls within this Court's supplemental jurisdiction under 28 U.S.C. § 1367, since both BSB's

counterclaim and PTSW's claim arise from the same contractual dispute and require

determination of BSB's rights under the parties' Loan Agreement. Finally, PTSW's effort to

escape this Court's jurisdiction by filing a duplicative and belated "lawsuit" in Indonesia does

not warrant staying BSB's counterclaim. If anything, PTSW's second lawsuit confirms PTSW's

propensity to manipulate judicial procedures in order to prevent BSB from obtaining any relief

on the merits of its contractual claim. This Court should reject PTSW's efforts to evade the

jurisdiction PTSW has voluntarily invoked.


## FACTS

The underlying facts and procedural history of this dispute are well known to the Court.

*See generally* Order on Respondents' Motion to Vacate or Reduce Ex Parte Attachment (Apr. 12,

2005) ("April 12 Order"). In the interests of brevity, BSB incorporates by reference the

statement of the facts contained in its Memorandum in Support of Respondent's Motion to Stay

Confirmation and Enforcement of the SIAC Award and in its Counterclaim, both filed on April

28, 2005. *See* Memorandum in Support of Respondent's Motion to Stay Confirmation and

Enforcement of the SIAC Award at 3-6 (Dkt. 30); Counterclaim ¶¶ 8-39 (Dkt. 28).

# ARGUMENT

## I.    BSB'S COUNTERCLAIM MAY BE HEARD IN THIS PROCEEDING.

PTSW moves to "strike" BSB's counterclaim because, in PTSW's view, Fed. R. Civ. P.

13 does not apply in proceedings to confirm an arbitral award at all.  Applicant's Memorandum

in Support of Motion to Strike or Dismiss, or to Stay, Respondents' Purported "Counterclaim,"

("PTSW Mem.") at 4-5.  PTSW reaches this conclusion through citation to Fed. R. Civ. P.

81(a)(3), which provides that the Federal Rules of Civil Procedure apply to proceedings relating

to arbitration "only to the extent that matters of procedure are not provided for" in the Federal

Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA").  Yet the FAA nowhere "provide[s]" that

counterclaims are impermissible; indeed, it does not mention counterclaims at all.  Nor is it

relevant that there is "no such thing as a 'counterclaim' to a motion."  PTSW Mem. at 5.

Motions are not subject to dismissal under Rule 12(b)(6) or summary judgment under Rule 56

either, yet those procedures apply to enforcement proceedings under the FAA.  *See Milwaukee*

*Typographical Union No. 23 v. Newspapers, Inc.*, 639 F.2d 386, 390 (7th Cir. 1981) (applying

Rules 12(b) and 56 because "[n]othing in [the FAA] precludes application of these rules" and

citing cases in which "[c]ourts have applied various sections of the Rules of Civil Procedure in

actions under the Arbitration Act").

Counterclaims in proceedings seeking confirmation of an arbitral award are admittedly

rare, but this fact is hardly surprising.  Parties to an arbitration agreement normally arbitrate the

entirety of their dispute, and the issuance of an arbitral award usually leaves no issues for a court

to decide other than the enforceability of the award.  In most cases, therefore, issues that could be

raised by counterclaim have already been resolved by the arbitration.  *See, e.g.*, *Island Territory*

*of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 3, 14 (S.D.N.Y.) (considering "an answer

asserting many defenses and with a counterclaim for money damages" in a New York

-3-

Convention case, but concluding that the issue raised by the counterclaim had been decided by the arbitrators), *aff'd*, 489 F.2d 1313 (2d Cir. 1973).

In some unusual cases, however, an arbitral award fails to resolve important portions of the parties' dispute, such that enforcing the partial award would cause substantial harm to one party's ability to obtain a full determination of its rights.  In such limited situations, courts have heard counterclaims in order to serve the interests of substantial justice between the parties.  *See Jugometal v. Samincorp, Inc.*, 78 F.R.D. 504, 506-07 (S.D.N.Y. 1978) ("It would be inequitable to permit this plaintiff to recover a judgment here against the defendant on the concededly valid arbitral award in its favor, and at the same time to withhold enforcement of the three counterclaims . . . .  The Convention does not prevent this Court from entertaining set-offs or counterclaims . . . ."); *see generally* 1 Thomas H. Oehmke, *Commercial Arbitration* § 41:106 (3d ed. 2004) ("U.S. district courts enforcing foreign arbitral awards can entertain setoffs or counterclaims, even though these same claims may not have been considered by the arbitrator when issuing the award.").

The United States Court of Appeals for the First Circuit strongly suggested the possibility of a counterclaim in proceedings brought to enforce an arbitral award in *Hewlett-Packard, Inc. v. Berg*, 61 F.3d 101 (1st Cir. 1995).  In *Hewlett-Packard*, the applicants had obtained an arbitral award on claims against Hewlett-Packard's predecessor under a 1984 contract, but Hewlett-Packard's own claims against the applicants under a 1982 contract were still the subject of arbitral proceedings.  *See id.* at 103.  The District Court confirmed the 1984 award, stating (in *dicta*) that a counterclaim could not be raised as a defense to confirmation.  *Hewlett-Packard, Inc. v. Berg*,  867 F. Supp. 1126, 1132 (D. Mass. 1994).  The First Circuit vacated and remanded, stating that the circumstances of the dispute gave Hewlett-Packard a "very substantial prudential

-4-

argument" against immediate confirmation of the 1984 award. 61 F.3d at 105. The First Circuit

reasoned that, because the applicants were successors-in-interest to a bankrupt company,

immediate enforcement of the award might deprive Hewlett-Packard of the opportunity to collect

on its claims under the 1982 contract, a transaction that was "closely related" to the subject

matter of the award. *Id.* The First Circuit also noted that Hewlett-Packard "cannot be blamed

for the discrepant timing in the resolution of its claim" because it had "made a reasonable effort"

to have all claims resolved "in one proceeding at the same time." *Id.* The First Circuit

concluded that "the seemingly fair solution" was to confirm the uncontested portion of the award

on the 1984 contract, "reserving confirmation of the balance until the 1982 contract dispute is

arbitrated." *Id.* The First Circuit's reasoning certainly implies (and arguably presupposes) that

Hewlett-Packard could return to the District Court with its award on the 1982 contract and assert

it as a counterclaim to offset the award on the 1984 contract. The First Circuit's holding that a

stay of enforcement proceedings was possible pending the arbitration of the 1982 claim, *see id.*

at 106, would have made little sense if the results of that arbitration could not have been asserted

once the enforcement proceedings resumed.

Like the respondent in *Hewlett-Packard*, BSB has consistently sought a fair and prompt

decision on its claim that PTSW has defaulted on the Loan Agreement, despite PTSW's efforts

to prevent any decision maker (whether in Indonesia, Singapore, or the United States) from

reaching the merits in any *inter partes* proceeding. BSB has always sought to have its claims

resolved "in one proceeding at the same time": once the High Court of Jakarta and the South

Jakarta land office restored the legal rights that BSB sought to vindicate at arbitration, BSB

informed the SIAC tribunal that BSB intended to have its claims decided in a single action rather

than the two steps (arbitration and enforcement) that the SIAC arbitration would have required.[1] Termination of the arbitration also served the interests of judicial efficiency by putting an end to PTSW's objections to the jurisdiction of the arbitral tribunal, which delayed adjudication of the merits of the dispute.[2]  BSB's manifest efforts to resolve this case efficiently and effectively bring it within the reasoning of *Hewlett-Packard* and *Jugometal*.

PTSW relies on a decision of the Eleventh Circuit, which predated *Hewlett-Packard*, for the proposition that counterclaims are inconsistent with the "language and purpose" of the Federal Arbitration Act.  PTSW Mem. at 5 (quoting *Booth v. Hume Publ'g, Inc.*, 902 F.2d 925, 931 (11th Cir. 1990)).  PTSW does not confront either the facts or the reasoning of the Eleventh Circuit's decision, which demonstrate that *Booth* does not stand for the unequivocal and inflexible rule PTSW advances and, moreover, cannot supersede the flexible approach subsequently taken by the First Circuit in *Hewlett-Packard*.

In *Booth*, the respondent sought to assert a counterclaim that was "separate and distinct from the arbitration award," 902 F.2d at 928.  By contrast, in *Hewlett-Packard*, as in this case, the unresolved claim was "closely related" to the claim underlying the arbitral award, 61 F.3d at 105.  *See also Jugometal*, 78 F.R.D. at 507 ("The disputes … each arose out of the same series of transactions….").  Moreover, whereas Hewlett-Packard (like BSB) had "made a reasonable effort" to have all claims resolved "in one proceeding at the same time," *Hewlett-Packard*, 61 F.3d at 105, the *Booth* respondent had failed to raise its claims at any point prior to the confirmation proceeding.  *See Booth*, 902 F.2d at 927 (stating that the counterclaim issues "were

---

[1] BSB's claim under the Loan Agreement may be heard by any "court of competent jurisdiction."  BSB Counterclaim ¶ 21.  Accordingly, the concern that a judicial determination of BSB's claim would interfere with the "pro-arbitration policies" of the New York Convention does not arise.  *Hewlett-Packard*, 61 F.3d at 105.

[2] BSB does not "agree" that BSB's claim was not properly before the SIAC tribunal (PTSW Mem. at 2 n.3).  At any rate, this issue is immaterial to BSB's right to apply to any "court of competent jurisdiction" to recover PTSW's debt under the parties' Loan Agreement.  BSB Counterclaim ¶ 21.

not raised in the arbitration proceedings").  At most, therefore, *Booth* stands for the proposition that *counterclaims unrelated to the dispute that yielded the arbitral award* are disfavored in confirmation proceedings, particularly where the counterclaimant has not sought to have them resolved in an efficient manner.[3]  This unremarkable holding in no way undermines BSB's position in this case.

The reasoning of *Booth* confirms that it has no bearing on the situation at bar, namely where the arbitration has not resolved the parties' dispute on the merits.  *Booth* viewed the FAA as incorporating a "policy of expedited judicial action" in order to "prevent a party *who has lost in the arbitration process* from filing a new suit in federal court and *forcing relitigation of the issues*."  902 F.2d at 932 (emphasis added).  Similarly, the Eleventh Circuit considered that the judicial role in the confirmation process should be limited in order to further "the ostensible purpose for resort to arbitration, i.e., *avoidance of litigation*."  *Id.* (quoting *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir. 1960)) (emphasis added).  The policies mentioned in *Booth* are relevant where (as in most enforcement proceedings) the arbitration award actually "avoid[s] … litigation" by resolving a dispute on the merits, such that a counterclaim would produce "relitigation" of issues decided at arbitration.  But the *Booth* opinion neither anticipated nor addressed the unusual situation in this case, where an arbitral award addressed costs only and did not resolve any substantive claim.  Neither PTSW nor BSB expected the SIAC Award to "avoid" further litigation regarding PTSW's debt under the Loan Agreement.  Indeed, BSB's withdrawal of the arbitration claim was expressly premised on the opportunity to vindicate its interests in court.  There is also no risk that BSB's

---

[3] Moreover, the Eleventh Circuit's statement that a court may not "determine the most efficient method of resolving the claims between the parties," *id.* at 931, is in tension with the First Circuit's decision in *Hewlett-Packard*, which did precisely that.  *See Hewlett-Packard*, 61 F.3d at 105 ("Under these circumstances, the seemingly fair solution would be to confirm the award in its uncontested part, reserving confirmation of the balance until the 1982 contract dispute is arbitrated.").

counterclaim would "relitigate" issues already decided at arbitration; the arbitration concededly decided no substantive claim.

The circumstances of this case do not implicate the policy concerns underlying the Eleventh Circuit's decision in *Booth*. In light of the unusual nature of the SIAC Award and the clear expectation that the parties would continue to litigate their dispute in court, this Court should follow the flexible approach taken by the First Circuit in *Hewlett-Packard* and by the Southern District of New York in *Jugometal*, which takes account of the totality of the circumstances and the relative equities in the case. Accordingly, BSB's counterclaim is properly raised in this proceeding.[4]

## II.    PTSW'S OBJECTION TO PERSONAL JURISDICTION FAILS.

### A.    PTSW Has Voluntarily Submitted To The Jurisdiction Of This Court.

PTSW's lengthy discussion of personal jurisdiction (PTSW Mem. at 8-14) ignores the basic principle that a party that brings suit submits itself to the court's jurisdiction for purposes of the defendant's counterclaims. *See, e.g.*, *Adam v. Saenger*, 303 U.S. 59, 67-68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence. It is the price

---

[4] As in its earlier submission to this Court, PTSW once again misleadingly states that a New York district court cited *Booth* "with apparent approval (in *dicta*)." PTSW Mem. at 6 n.7; *see also* Applicant PTSW's Opposition to Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment at 10 n.18 (Dkt. 18). In fact, that court merely pointed out that *Booth* supported an argument that the court declined to reach; there was no statement, even in dicta, "approving" that argument. *McAllister Towing & Transp. Co. v. Offshore Express, Inc.*, No. 03 Civ. 6168 (RJH), 2004 WL 1488192, at *1 n.1 (S.D.N.Y. July 1, 2004).

The "treatise" cited by PTSW (Mem. at 6 n.8) recognizes that "[d]istrict courts enforcing foreign arbitral awards can entertain setoffs or counterclaims under [Rule 13] where they were not considered in arriving at the amount of the arbitral award." 3 *Federal Procedure, Lawyer's Edition* § 4:188 (citing *Jugometal* and *Solitron*).

which the state may exact as the condition of opening its courts to the plaintiff."). PTSW voluntarily began this case in this Court and filed an *ex parte* motion to attach BSB's assets through trustee process. PTSW therefore cannot object to this Court's assertion of personal jurisdiction over it with respect to BSB's counterclaim.

The First Circuit's decision in *General Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991), establishes that PTSW's invocation of this Court's jurisdiction precludes any objection to personal jurisdiction with regard to BSB's counterclaim. In *Interpole*, a construction company, GCT, ordered utility poles from Interpole, a New Hampshire company, which arranged for a third company, Trastco, to ship the poles from Alabama to Oman. The delivery was delayed, and GCT sued Interpole in federal court in New Hampshire. Interpole filed a third-party complaint against Trastco, which failed to appear and became subject to a default judgment. Trastco then sued Interpole separately in the New Hampshire court for fraud and misrepresentation in connection with the same transaction. *See id.* at 21.

On appeal, Trastco argued that the default judgment against it was void for lack of personal jurisdiction. The First Circuit's decision, written by Judge Selya for a panel including Chief Judge (now Supreme Court Justice) Breyer, held that there was no need to decide whether Interpole's third-party complaint against Trastco fell within New Hampshire's long arm statute or whether exercising personal jurisdiction would "offend due process." *Id.* at 22. The First Circuit found that a conventional personal jurisdiction analysis was "irrelevant" because Trastco had "submitted itself to the court's personal jurisdiction by instituting [its own lawsuit against Interpole]." *Id.*

The First Circuit's discussion is directly applicable to PTSW's actions in this case:

> "[A] ruling that Trastco did not submit to the court's jurisdiction in
> Suit No. 1 when it instituted Suit No. 2 would produce an unjust

asymmetry, allowing a party (here, Trastco) to enjoy the full benefits of access to a state's courts *qua* plaintiff, while nonetheless retaining immunity from the courts' authority *qua* defendant in respect to claims asserted by the very party it was suing (here, Interpole). This asymmetry would be starker still, because Trastco, on its view of the jurisdictional universe, would be permitted to sue Interpole in a New Hampshire court on a claim arising out of the Oman shipment but Interpole would be precluded from bringing a claim against Trastco in the same court based on the same transaction. There is no warrant in either law or logic for accepting such an incongruous result. We, therefore, hold that the appellant, by initiating its own suit, submitted to the district court's jurisdiction…." *Id.* at 23-24 (footnote omitted).

This reasoning applies with full force to PTSW. PTSW instituted its own action in this Court, seeking judgment on an arbitral award arising from the commercial transaction between BSB and PTSW and securing prejudgment remedies under Massachusetts law. There is "no conceivable unfairness" in requiring PTSW to defend BSB's counterclaim, since "the choice to sue in [this Court], or to abstain, was [PTSW]'s." *Id.* at 24. Personal jurisdiction over PTSW for purposes of BSB's counterclaim "seems a small price to exact for allowing [PTSW] purposefully to avail itself of the benefits of [this] forum as a plaintiff." *Id.* Thus, PTSW's invocation of this Court's jurisdiction—whether viewed as "consent" to jurisdiction or a "waiver" of jurisdictional objections, *see id.* at 22-23—established personal jurisdiction and obviates any need for further analysis.

**B.      PTSW Is Also Subject To Personal Jurisdiction For Purposes Of BSB's Counterclaim Under A Traditional Due Process Analysis.**

Even were this Court to embark upon a traditional due process analysis—which, as shown above, it need not do in light of PTSW's institution of suit in this Court—this Court has personal jurisdiction over PTSW for the purpose of deciding BSB's counterclaim.

On a motion to dismiss for lack of personal jurisdiction, this Court "tak[es] facts affirmatively alleged by the plaintiff as true and view[s] disputed facts in the light most favorable to plaintiff." *Sawtelle v. Farrell*, 70 F.3d 1381, 1385 (1st Cir. 1995). Accordingly, for purposes of this motion, PTSW cannot dispute that it has solicited investments from persons residing in Massachusetts and has obtained funds from persons residing in Massachusetts. *See* BSB Counterclaim ¶ 5. Moreover, at least one of PTSW's directors is a United States resident, and a major part of the negotiation of the transaction between PTSW and BSB occurred in the United States. *See id.* ¶¶ 5-6. Finally, and most obviously, PTSW "voluntarily sought the benefit of this Court's jurisdiction by filing its Application to Confirm and Enforce Arbitral Award dated December 16, 2004 … and by filing an *ex parte* motion to attach the assets of BSB through trustee process on or about the same date." *Id.* ¶ 4.

The First Circuit has described traditional personal jurisdiction analysis as "far from precise," *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992) and "more an art than a science," *Donatelli v. National Hockey League*, 893 F.2d 459, 468 n.7 (1st Cir. 1990). Whether assertion of jurisdiction comports with "traditional notions of fair play and substantial justice" is ultimately a context-specific determination that implicates "a variety of factors relating to the particular cause of action." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980); *see also Sawtelle*, 70 F.3d at 1388 (due process analysis does not involve a "rote, mechanical analysis").

-11-

Within this framework, the First Circuit has elaborated three factors that courts should consider in determining the propriety of exercising specific jurisdiction over a defendant. First, the claim "must directly arise out of, or relate to, the defendant's forum-state activities" (the "relatedness" factor). *Pleasant Street*, 960 F.2d at 1089. Second, the defendant's contacts with the forum state "must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable" (the "purposeful availment" factor). *Id.* And third, the exercise of jurisdiction must "be reasonable" in light of five so-called "Gestalt" factors:

> "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Id.* at 1088, 1089.

Of the three factors, the most important inquiry is that of reasonableness pursuant to the "Gestalt" factors: "a strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness." *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 470 (D. Mass. 1997) (quoting *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 717 (1st Cir. 1996)) (internal quotation marks omitted).

The "relatedness" factor, which the First Circuit has described as a "flexible, relaxed standard," *Sawtelle*, 70 F.3d at 1389 (quoting *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994)), is amply satisfied by PTSW's voluntary contact with this forum. PTSW's actions in this Court, particularly its freezing of BSB's only liquid assets, forced BSB to defend itself in Massachusetts. Assertion of BSB's counterclaim in this Court was essential to avoid splitting the parties' dispute between jurisdictions—a risk that came about through PTSW's unilateral

-12-

action.  Moreover, BSB's counterclaim clearly "relates to" PTSW's attempt to confirm the SIAC

Award in this Court: PTSW's claim and BSB's counterclaim both arise from BSB's sale of

economic rights to the Mezzanine Floor of the S. Widjojo Centre and PTSW's failure to fulfill its

contractual obligations pursuant to the parties' agreements.  *See* BSB Counterclaim ¶¶ 28-31, 40-

47.

Similarly, it is difficult to imagine a more "purposeful" availment of the benefits of

Massachusetts law than a deliberate invocation of trustee process under Mass. Gen. L. ch. 246,

§§ 1 *et seq.* and Mass. R. Civ. P. 4.2.  PTSW cannot plausibly complain that it could not

"reasonably anticipate being haled into court" in Massachusetts given that it walked into this

Court on its own initiative and demanded relief under acts of the Massachusetts legislature.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  The fact that PTSW

chose this Court because of the location of BSB's assets is irrelevant to a personal jurisdiction

analysis.  Traditional personal jurisdiction analysis does not consider *why* PTSW availed itself of

the benefits of Massachusetts law.  Rather, the inquiry is complete once it is clear that the

defendant's action was voluntary and not "random, isolated or fortuitous."  *Sawtelle*, 70 F.3d at

1391 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)) (internal quotation

marks omitted).

Moreover, the suggestion that PTSW was "compelled" to come to this Court because

BSB "unilaterally failed and refused to abide by" the SIAC Award (PTSW Mem. at 11) is at

odds with any fair reading of the record in this matter.  PTSW filed its action in this Court *the*

*day after* the SIAC Tribunal issued its award and *nearly three months before* the SIAC Registrar

taxed the amount of costs due under the SIAC Award.  BSB Counterclaim ¶¶ 33, 36.  The notion

that BSB "obdurate[ly] refus[ed]" to pay an amount that had not even been set (PTSW Mem. at

11) beggars belief.  The timing of PTSW's actions reveals the true course of events: PTSW

prepared its Massachusetts counsel to rush to this Court as soon as the SIAC Award was issued

in order to take advantage of Massachusetts' trustee process remedy and to lock up BSB's assets,

thereby preventing BSB from pursuing its substantive claim in any forum.  That is a clear

"purposeful availment" of this Court's jurisdiction.[5]

PTSW argues that, based on BSB's conduct prior to December 15, 2004, it had "no

reason to believe that [BSB] would seek to resort [to] this Court" for resolution of its substantive

claim.  PTSW Mem. at 13.  This argument is highly disingenuous.  BSB did not "resort to this

Court" for relief until PTSW did so first.  PTSW has been well aware of BSB's desire to resolve

the parties' dispute in a single proceeding, including by mediation or other alternative means.

*See* BSB Counterclaim ¶ 38.  BSB's pursuit of an efficient resolution was the express basis for

BSB's request to withdraw its arbitration claim, as PTSW concedes.  PTSW Mem. at 12-13.  In

contrast, BSB had no way of knowing that PTSW was planning to open a new front by making

*ex parte* submissions in this Court.  PTSW could certainly have anticipated that, in light of the

peculiar nature of the SIAC Award and the parties' unresolved dispute, BSB would have

continued its effort to resolve the parties' dispute in a single proceeding, notwithstanding

PTSW's efforts to avoid its responsibilities at every turn.  PTSW should therefore have

reasonably foreseen that its efforts to pretermit resolution of the parties' dispute would trigger a

countervailing effort by BSB to obtain such resolution, even in the forum of PTSW's choice.

PTSW was not "haled into court" at all; it came to this Court voluntarily.

---

[5] Rule 28.8 of the SIAC Rules, which states that parties should carry out awards without delay, has no bearing on this issue.  Whatever this provision may mean, it did not obligate BSB to make payment to PTSW three months before the SIAC Registrar fixed the amount payable, and it certainly does not make PTSW's invocation of this Court's jurisdiction any less "purposeful" or "voluntary."

Finally, the so-called "Gestalt" factors make plain the reasonableness of exercising personal jurisdiction over PTSW.  First, PTSW's decision to invoke this Court's process affirmatively shows that it does not believe litigation in this Court to be "burdensome."  PTSW has already brought itself to Massachusetts to solicit and obtain funds for its own purposes. Even if PTSW insists on extensive "discovery" on BSB's simple counterclaim to enforce a clear contractual debt (PTSW Mem. at 14), and this Court decides to permit such procedures, many of the relevant witnesses (including at least one of PTSW's directors) are located in the United States, Canada, and Europe.  These persons will suffer no greater burden in participating in proceedings in Boston than they would participating in proceedings in Jakarta.   Moreover, "there is no evidence that [BSB] chose this forum to 'harass' or 'vex' [PTSW]."  *Digital Equip. Corp.*, 960 F. Supp. at 471.  On the contrary, BSB is simply following PTSW's lead.

Second, this Court plainly has an interest in adjudicating the entire dispute between the parties, now that PTSW has invoked this Court's procedures in order to block BSB from asserting its rights in *any* forum.  This Court, like any court, has a substantial interest in "'provid[ing] a forum for efficiently litigating all issues' involved."  *Interpole*, 940 F.2d at 23 n.4 (quoting *Keeton*, 465 U.S. at 777).

Third, BSB's interest in obtaining convenient and effective relief cuts heavily in favor of exercising personal jurisdiction over PTSW, particularly given PTSW's repeated maneuvers to make BSB's relief as inconvenient and ineffective as possible.  Fourth (and similarly), the judicial system's interest in an effective resolution of the parties' dispute warrants resolving BSB's claim together with PTSW's.  BSB's claim is an action on a debt.  Although PTSW repeatedly threatens to raise issues of "Indonesian contract, agrarian, property, agency and procedural law" in its effort to forestall recovery by BSB (PTSW Mem. at 1 n.1, 14, 15), there is

-15-

no doubt that this Court is equal to the task of considering any such issues and resolving them promptly. On the other hand, enforcement of the SIAC Award before BSB's substantive claim is resolved will eliminate BSB's ability to defend itself and enable PTSW to raise additional obstacles to adjudication of the merits, thereby removing any chance of a fair and just resolution of the parties' dispute. The judicial system has no interest in such an outcome.

Fifth and finally, resolution of BSB's counterclaim together with PTSW's claim on the SIAC Award will prevent PTSW from profiting from its sharp litigation tactics. Throughout this dispute, PTSW has sought to secure and protect a windfall worth millions of dollars at BSB's expense. PTSW's procurement of an improper *ex parte* order in Indonesia, its obstruction of the SIAC arbitration, its freezing of BSB's assets the day after the SIAC Award issued, and now its commencement of duplicative litigation in Indonesia in a clear attempt to evade this Court's jurisdiction are all clear examples of PTSW's manipulation of the judicial process for its own ends and to BSB's prejudice. This Court should put an end to this by hearing BSB's counterclaim and adjudicating the parties' rights and obligations.

Assertion of personal jurisdiction over PTSW is not only "reasonable"; it is the only reasonable course in these circumstances. Permitting PTSW to invoke this Court's jurisdiction with regard to part of the parties' dispute, while allowing it to shield itself from adjudication of the remainder, would be unfair and unreasonable. Consequently, the "Gestalt" factors, as well as the "relatedness" and "purposeful availment" factors, compel exercise of personal jurisdiction over PTSW in this case.

## III.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER BSB'S COUNTERCLAIM.

### A.   This Court Has Supplemental Jurisdiction Under 28 U.S.C. § 1367(a).

This Court has subject matter jurisdiction over BSB's counterclaim because both it and PTSW's claim are "part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

PTSW concedes that this Court has supplemental jurisdiction over counterclaims that are "compulsory" because they arise "out of the *transaction or occurrence* that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a) (emphasis added); *see also Iglesias v. Mutual Life Ins. Co. of N.Y.*, 156 F.3d 237, 241 (1st Cir. 1998) ("Federal courts have ancillary jurisdiction over compulsory counterclaims.").  As the Supreme Court has stated, this rule was "designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters."  *Southern Constr. Co. v. Pickard*, 371 U.S. 57, 60 (1962); *see also United Fruit Co. v. Standard Fruit & S.S. Co.*, 282 F. Supp. 338, 339 (D. Mass. 1968) ("'Courts should give the phrase "transaction or occurrence that is the subject matter" of the suit a broad realistic interpretation in the interest of avoiding a multiplicity of suits.'" (quoting 3 Moore ¶ 13.13)); 6 C.A. Wright, A.R. Miller & M.K. Kane, *Federal Practice and Procedure* § 1410 at 60 (1990) ("[T]here is no sound reason why two suits should be required, or even permitted, to resolve what essentially is one controversy between the parties.").  There is no question that there has only ever been "one controversy" arising out of these "common matters," namely whether PTSW should be made to abide by its contractual commitments.  PTSW's attempts to hive off portions of the parties' dispute into different fora cannot transform this single controversy into multiple independent claims.

US1DOCS 5145655v4

The First Circuit has recognized that supplemental jurisdiction exists under section 1367(a) where "substantially the same evidence [will] support or refute plaintiff's claim as well as defendant's counterclaim." *Iglesias*, 156 F.3d at 241. PTSW's claim under the SIAC Award is subject to BSB's contractual right of setoff under the parties' Loan Agreement. *See* BSB Answer ¶¶ 19-24. Under that Agreement, BSB "may at any time set off any claims of [PTSW] against [BSB] in whatever currency and whether or not contingent and whether or not due and payable in or towards satisfaction of any sum whether or not contingent and whether or not due and payable to [BSB] under or in connection with this Loan Agreement." *Id.* ¶ 22. Because PTSW's debt to BSB exceeds its claim under the SIAC Award several times over, PSTW is entitled to no net payment under the SIAC Award. PTSW will doubtless dispute BSB's contractual setoff right by interposing dilatory discovery demands and meritless legal objections. These issues, however, will be identical to PTSW's supposed defenses to BSB's counterclaim. Resolution of BSB's obligations under the SIAC Award will therefore implicate precisely the same evidence as resolution of PTSW's obligations under the Loan Agreement. Accordingly, the counterclaim is part of the same "case or controversy" under Article III and section 1367. *See Landmark Bank v. Machera*, 736 F. Supp. 375, 379 n.5 (D. Mass. 1990) (holding that supplemental jurisdiction exists over a counterclaim that "essentially restate[s] in affirmative form" the counterclaimant's defense to the plaintiff's action).[6]

Moreover, PTSW appears to contend that, if BSB asserts its setoff right in this Court, BSB "would forego and be barred from the pursuit of any further recovery on its claims in this or any other court or forum." PTSW Mem. at 5 n.6. BSB disagrees with this position, for which

---

[6] PTSW's only response to BSB's right of setoff is its citation to the District Court opinion in *Hewlett-Packard*, which was vacated by the First Circuit. *See* PTSW Mem. at 5 n.6. That opinion stated only that there was no "common law right" of "set-off and recoupment" under Massachusetts law. *Hewlett-Packard, Inc. v. Berg*, 867 F. Supp. 1126, 1133 (D. Mass. 1994), *vacated*, 61 F.3d 101 (1st Cir. 1995). A decision regarding *common law* setoff rights has no bearing on BSB's *contractual* right of setoff in this case.

-18-

PTSW provides neither authority nor support.  It bears noting, however, that PTSW's argument appears to suggest thatBSB's setoff right would bar a subsequent suit on BSB's substantive claim under the doctrine of *res judicata*.  If PTSW is correct, that is yet further proof of this Court's subject matter jurisdiction over BSB's counterclaim.  *See Iglesias*, 156 F.3d at 241 (stating that supplemental jurisdiction exists where "res judicata [would] bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule").

By the same token, BSB's counterclaim is clearly "logically related" to PTSW's claim.  *See id.*  PTSW's ability to recover any payment from BSB depends on the success or failure of BSB's contractual rights.  If BSB's rights under the Loan Agreement are upheld, then BSB will offset PTSW's claim under the SIAC Award against PTSW's much larger debt to BSB.  BSB's counterclaim will not implicate any disputed issues that would not already be determined in adjudicating PTSW's claim for immediate payment under the SIAC Award.  Given that the "logical relation" approach to subject-matter jurisdiction is one of "flexibility," 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1410 at 61, this Court clearly has the power to ensure that BSB's defense of setoff and its substantive counterclaim are heard together.

BSB's claim and PTSW's claim would "ordinarily be expected to [be tried] all in one judicial proceeding."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Both have arisen through BSB's efforts to pursue an effective and efficient resolution to one overarching dispute—efforts that PTSW has repeatedly sought to derail.  Given the close interrelationship of the two claims, and particularly in light of BSB's right of setoff, this Court has supplemental jurisdiction over BSB's counterclaim.

### B. None Of The Factors Of 28 U.S.C. § 1367(c) Justifies Abstention In This Case.

Federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Once this Court concludes that it has supplemental jurisdiction under section 1367(a), considerations of judicial economy and BSB's right to assert its claim in a forum of its (and PTSW's) choice counsel heavily against declining jurisdiction as a matter of discretion. Section 1367(c) countenances abstention in four circumstances only, none of which is applicable in this case.

The first potential ground of abstention reflects the federalism concern that federal courts possess the leeway to refrain from deciding "novel or complex issue[s] of State law," § 1367(c)(1), a concern plainly not implicated in this case.[7] The second ground for discretionary abstention would be if BSB's claim "substantially predominate[d]" over PTSW's claim. As has been noted, BSB's claim is a garden-variety contractual action based on PTSW's failure to pay an acknowledged debt. Although PTSW might seek to raise a host of meritless defenses based on Indonesian law, the fact that a counterclaim defendant may seek to introduce unnecessary complexities into the adjudication of a counterclaim cannot be grounds for declining jurisdiction over it. Otherwise, plaintiffs could take advantage of federal jurisdiction but insulate themselves from related counterclaims simply by threatening to raise complicated defenses. Moreover, as is explained above, PTSW will doubtless raise the same objections to BSB's right to offset PTSW's claim under the SIAC Award, such that any issues arising in relation to BSB's counterclaim will likely match issues arising in connection with PTSW's claim.

---

[7] Indonesian law is not "State law," and PTSW conspicuously does not suggest that any of the issues in this case are "novel or complex." PTSW Mem. at 20.

The fourth[8] possible ground for discretionary abstention—whether "in exceptional circumstances, there are other compelling reasons for declining jurisdiction," § 1367(c)(4)— implicates the "totality of the circumstances" surrounding this case. *Che v. MBTA*, 342 F.3d 31, 37 (1st Cir. 2003). If the "totality of the circumstances" shows anything in this case, it is that PTSW has no interest in the adjudication of the parties' dispute on the merits. PTSW's actions have been a lengthy effort to exhaust BSB's resolve and deplete its assets in order to achieve what PTSW originally received in the unwarranted and unfounded (and subsequently overturned) *ex parte* order from the South Jakarta District Court: absolution from its contractual debt to BSB without affording BSB any right to respond. Declining jurisdiction in this case would reward PTSW's manipulative litigation conduct and needlessly prejudice BSB. Such "circumstances" weigh heavily against abstention in this case.

PTSW refers to its recently-filed "lawsuit" in an Indonesian court and outrageously suggests that interests of "comity, judicial economy, convenience, and fairness" warrant abstention in favor of those proceedings (Mem. at 21). Yet PTSW itself commenced *both* of the concurrent actions in Boston and Jakarta. If PTSW finds it inconvenient, inefficient, or unfair to litigate in two fora, PTSW is free to dismiss one or both of its lawsuits. As for comity, PTSW's Indonesian "lawsuit"—filed the day after BSB's own counterclaim in this case and months after PTSW had notice of BSB's intent to file such a counterclaim in this Court[9]—is clearly an effort to evade this Court's jurisdiction, which PTSW itself invoked. This is not a standard comity case, where one party wishes to litigate in one forum and the opponent prefers another. Rather, PTSW is seeking to litigate in *two* fora in order to frustrate and oppress BSB and to prevent this

---

[8] The third ground listed in section 1367(c) (dismissal of PTSW's principal claim) is concededly inapplicable, since PTSW's claim remains live. *See* PTSW Mem. at 20.

[9] *See, e.g.*, Memorandum in Support of Respondents' Motion to Vacate or Reduce *Ex Parte* Attachment at 11 (filed January 19, 2005) ("BSB has a valid set off defense and counterclaim.").

Court from reaching the merits of the parties' dispute. Comity does not reward such strategic behavior.[10]

Section 1367(c)(4) permits abstention only in "exceptional circumstances." In this case, the only "exceptional circumstance" is PTSW's astonishing willingness to begin multiple litigations in multiple fora. PTSW has deliberately invited the risk of inconsistent determinations between two legal proceedings of its own creation. The proper response to such activity is not to reward PTSW by allowing it to have the benefit of this Court's jurisdiction and deny it to BSB. Rather, this Court should exercise the jurisdiction conferred by section 1367(a) and require PTSW to answer the accusations that it has so far successfully evaded.

## IV.    PTSW'S RECENT COMMENCEMENT OF DUPLICATIVE LITIGATION IN INDONESIA DOES NOT JUSTIFY A STAY OF BSB'S COUNTERCLAIM.

PTSW finally asks this Court to stay BSB's counterclaim "due to the pendency of PTSW's concurrent action" in Indonesia (Mem. at 21). But "the mere fact that there are parallel proceedings in a foreign jurisdiction will not constitute an 'exceptional circumstance' which justifies the abdication of federal jurisdiction." *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 251 (D. Mass. 1999). This principle is all the more applicable when the party seeking such abdication is the same party that filed *both* proceedings as strategic maneuvers to prevent adjudication of the merits.

PTSW's argument for a stay, much like its argument for discretionary abstention, forgets the fact that the pendency of dual litigation in Boston and Jakarta is entirely of its own making.

---

[10] Had PTSW truly wished to resolve the parties' dispute, it could have filed an Indonesian lawsuit at any time after the ruling of the High Court of Jakarta, which vacated the *ex parte* decision procured by PTSW on the grounds that any lawsuit by PTSW must be brought, if at all, as a claim "between the parties that have mutual interests," that is, as an *inter partes* "formal civil claim" between PTSW and BSB. BSB Counterclaim Ex. F. That PTSW waited until after BSB had filed a counterclaim in this Court shows that the Indonesian litigation was filed purely for strategic reasons.

US1DOCS 5145655v4

PTSW's complaint that it would "suffer tremendous prejudice if forced to litigate the same issues in two fora 10,000 miles apart" (PTSW Mem. at 23) has a simple solution: discontinuance of PTSW's Jakarta lawsuit in favor of PTSW's *other* litigation in this Court, which (by virtue of BSB's right to setoff) will resolve whatever defenses to the Loan Agreement PTSW plans to raise. The suggestion that BSB "wish[es] to engage in concurrent litigation in Indonesia and Boston" (PTSW Mem. at 23-24) borders on the surreal, given that PTSW began both cases without any notice to BSB.

Nor will hearing this case in this Court inconvenience the parties or witnesses more than a hearing in Indonesia. Most, if not all, of the persons who negotiated the Loan Agreement live outside of Indonesia; indeed, the Agreement itself was negotiated in large part in the United States (and, according to PTSW, elsewhere in North and South America and Europe). *See* BSB Counterclaim ¶ 6; PTSW Mem. at 10. To the extent that any testimony is needed at all to resolve PTSW's debt to BSB, it will be no less (and perhaps more) convenient for witnesses to travel to Boston than to travel to Jakarta.

Furthermore, "[u]nder the principles of comity, priority is generally given to the suit first filed," and such priority "is particularly appropriate where, as here, the plaintiff itself commenced the original suit." *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*, 770 F. Supp. 880, 884-85 (S.D.N.Y. 1991); *see also Goldhammer*, 59 F. Supp. 2d at 255 ("[L]itigation lethargy is an important consideration."). The Indonesian lawsuit was filed after BSB's counterclaim and months after PTSW had notice of BSB's intent to file the counterclaim. As discussed above, this timing reveals that PTSW's Indonesian lawsuit was filed primarily to escape this Court's potential exercise of jurisdiction over BSB's substantive claim.

-23-

Moreover, the Indonesian proceeding has not "proceeded beyond an initial stage." *Caspian*, 770 F. Supp. at 885. Indeed, the purported "lawsuit" has not even been served on BSB; BSB only learned of the Indonesian lawsuit through PTSW's memorandum in support of the instant motion. There is no reason for this Court to defer to proceedings in a tribunal that will take months to acquire the familiarity that this Court already has regarding the parties' commercial relationship. *See Goldhammer*, 59 F. Supp. 2d at 255 (citing "support for declining motions to stay when the foreign litigation is in its early stages").

As this Court's April 12 Order shows, this Court is already conversant with the underlying transaction between the parties and could readily turn to the merits of BSB's counterclaim. Moreover, PTSW's Indonesian lawsuit, attached as Exhibit B to PTSW's Memorandum ("PTSW Lawsuit"), demonstrates that PTSW does not dispute many of the core facts of BSB's counterclaim. PTSW admits that the Parties "have made and signed a Loan Agreement … dated February 17th, 1998" and that the Loan was secured by an interest in land. PTSW Lawsuit ¶¶ 1, 6. PTSW also admits that the principal amount of the loan is $3,060,000 (U.S.), as alleged by BSB, and that $144,960 (U.S.) of that amount was used to purchase shares in Kalimantan Investment Corporation pursuant to the Loan Agreement. *See id*. ¶ 1; Counterclaim ¶ 13. PTSW also admits that it has not repaid the full amount of the loan; it contends rather that it has repaid only $168,809.42 (U.S.). *See* PTSW Lawsuit ¶ 4.

Although PTSW again threatens to flood this straightforward contract dispute with "complex areas of foreign law," PTSW Mem. at 23, there is no reason to think that this Court lacks the tools to resolve this matter promptly and correctly. Indeed, PTSW's principal defense to BSB's contract claim appears to be that PTSW "never received" $ 2,915,040.00 of the $3,060,000 loan. PTSW Lawsuit ¶ 3. This defense is easily dispatched: the loan of $2,915,040

-24-

was the consideration for BSB's transfer to PTSW of BSB's rights to the Mezzanine Floor of the S. Widjojo Centre, which PTSW unquestionably received. *See* Counterclaim ¶¶ 13-14; *see also id.* Exs. B & C. PTSW's suggestion that BSB gave PTSW its rights to the Mezzanine Floor for nothing is not only commercially irrational, but also plainly contradicted by the parties' agreements and by PTSW's own statements and actions acknowledging its debt to BSB. *See* Counterclaim ¶¶ 12-22. Given the weakness of PTSW's marquee defense, the interest of judicial efficiency favors allowing the parties' dispute to proceed to a quick resolution in this Court.

Finally, a stay of BSB's counterclaim would run a serious risk of inconsistent interpretations of the same commercial documents. As discussed above, adjudication of PTSW's claim under the SIAC Award necessarily triggers BSB's contractual right of setoff. If PTSW resists that right, it will necessarily do so on grounds that would also arise in its purported defense against BSB's substantive claim. Leaving that claim to the Indonesian court, while resolving the contractual setoff right here, would not only be inefficient, but would also potentially subject the parties to inconsistent obligations under the same instruments.

PTSW's Indonesian lawsuit is a singularly poor candidate for comity. This Court should exercise its jurisdiction over BSB's counterclaim and proceed to declare the parties' rights and obligations in a single, efficient and effective proceeding here in PTSW's chosen forum.

## **CONCLUSION**

For the foregoing reasons, the Court should deny PTSW's motion to strike or dismiss, or to stay, BSB's counterclaim.

Respectfully submitted,

_/s/ Mark C. Fleming_____
Richard A. Johnston (BBO # 253420)
Mark C. Fleming (BBO # 639358)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
richard.johnston@wilmerhale.com
mark.fleming@wilmerhale.com

Attorneys for Respondent and Counterclaim
Plaintiff BSB Residual Assets Trust and BSB Trust
Company, Ltd., Trustee

Dated: June 16, 2005

US1DOCS 5145655v4