UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In the Matter of the Arbitration Between: | ) ) ) | CIVIL ACTION NO. 04 12646 NG |
| **PT SUMOHADIWIDJOJO,** | ) ) | |
| Applicant<br>(Respondent below) | ) ) ) | |
| and | ) ) | |
| **BSB RESIDUAL ASSETS TRUST,**<br>**BSB TRUST COMPANY, LTD**., Trustee, | ) ) ) | |
| Respondent<br>(Claimant below). | ) ) ) | |
| and | ) ) | |
| **CITIZENS BANK**, Trustee. | ) ) | |

APPLICANT'S REPLY MEMORANDUM IN
SUPPORT OF ITS MOTION TO STRIKE OR DISMISS,
OR TO STAY, RESPONDENTS' PURPORTED "COUNTERCLAIM"

## I. INTRODUCTION

Applicant, PT Sumohadiwidjojo ("PTSW"), by its undersigned counsel, respectfully submits this Reply Memorandum in support of its Motion to Strike or Dismiss, or to Stay, Respondents' Purported "Counterclaim."

Respondents BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee (collectively, "BSB") seek to misuse and abuse PTSW's assertion of its rights in this Court, pursuant to international and United States law, to obtain expeditious enforcement of an undisputed, final award of costs by the Singapore Internal Arbitration Centre ("SIAC"). BSB has no defenses in this proceeding commended by PTSW under the New York Convention on

the Recognition and Enforcement of Foreign Arbitral Awards and the Federal Arbitration Act (for shorthand purposes, hereinafter "NYC/FAA proceeding"). Instead, BSB seeks to obtain a toehold for embarking upon a full-scale lawsuit against PTSW in a long-running contract dispute involving citizens of foreign nations, governed by foreign law, which has been and is at present the subject of proceedings in a foreign court (as specified in the relevant contract), which unquestionably is not within any of the recognized bases for the limited, original subject matter jurisdiction of the United States federal courts, and in which neither this Court nor the citizens of this Commonwealth have the slightest interest.  BSB's Memorandum in Opposition to PTSW's Motion to Strike, etc. ("BSB Mem. Opp."), does not succeed in justifying these results.

PTSW, of course, continues to rely principally upon the "barrage of procedural and jurisdictional objections" BSB Mem. Opp., at 1, as set forth in PTSW's initial Memorandum, which doom BSB's effort to assert a "counterclaim" in this summary NYC/FAA proceeding. By this Reply, PTSW will respond to and expose the most glaring flaws, omissions, inconsistencies, false premises and circular reasoning contained in BSB's Opposition.

## II. ARGUMENT

### A.    BSB cannot establish that full-scale "counterclaim" litigation is legally permitted in a NYC/FAA proceeding.

PTSW has demonstrated, by reference to statutory language, purpose and persuasive legal reasoning, including Judge Tauro's decision in *Hewlett-Packard Co., Inc. v. Berg*, 867 F.Supp. 1126 (D.Mass. 1994), *vacated and remanded on other grounds*, 61 F.3d 101 (1st Cir. 1995), that "counterclaims" are not permissible in a NYC/FAA proceeding. BSB asserts that PTSW "reached this conclusion through citation to Fed.R.Civ.P. 81(a)(3)," BSB Mem. Opp. at 3, which makes the Federal Rules inapplicable to FAA proceedings *unless* the FAA prescribes its own procedures.  BSB then tries to reason that since the FAA does not mention "counterclaims,"

therefore counterclaims under Rule 13 of the Federal Rules is applicable by "default" to FAA proceedings. However, BSB ignores PTSW's reliance not only upon Rule 81, but upon the critical, other half of the analysis, namely, the express language of Section 6 of the FAA, as made applicable to NYC/FAA proceedings by Section 208 of the FAA.

In Section 6, the FAA clearly does prescribe the required procedure in this case: "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions . . .."  No rational reading of this section permits the result urged by BSB, *i.e.*, that full-scale litigation procedures, such as counterclaims, replies to counterclaims, cross-claims and third-party claims, automatic discovery disclosures, pre-trial discovery, jury trial demands, pre-trial hearings, trial procedures, post-trial motions, etc., have any place in a NYC/FAA proceeding.[1] *See, e.g.*, *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.,* 23 F.3d 41, 46 (2nd Cir. 1994)(pleading rules of Fed.R.Civ.P. 12 do not apply to FAA proceedings), *citing O.R. Sec., Inc. v. Professional Planning Assocs., Inc.*, 857 F.2d 742, 748 (11 Cir.1988)(pleading rules of Fed.R.Civ.P. 8 do not apply FAA proceedings); *Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1257 (7th Cir. 1992)(Section 6 of the FAA "preempts" Federal Rules governing pre-trial hearings, scheduling conference, discovery, etc.); *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 931 (11th Cir. 1990).[2]

---

[1] BSB cites a 1981 case for the proposition that the procedures of Rule 12(b)(6) and Rule 56 might be employed in an FAA case.  That may be so, but it proves nothing, The FAA does not say which *motion* practice procedures apply, but there is no reason why dispositive motions under Rule 12 and/or 56 could not be employed to adjudicate issues properly raised in a NYC/FAA proceeding. There is nothing inherently inconsistent with the utilization of *summary* judgment and other like procedures, on the one hand, and the NYC/FAA's goal of making enforcement procedures *summary* in nature, on the other. But BSB does not argue that a "counterclaim," if permitted in an NYC/FAA proceeding, could or even should be heard in a summary fashion in accordance with motion practice procedures.  Indeed, such a suggestion might well offend the due process rights of an applicant in a NYC/FAA proceeding.

[2] BSB attempts to distinguish *Booth* on the facts of the case, but the fact are irrelevant. The reasoning of *Booth* – based upon the clear prescriptions of the NYC and the FAA and their overarching intent that enforcement proceedings thereunder be summary in nature, is fully applicable in this case.

As discussed in PTSW's original Memorandum, the cases upon which BSB principally relies, the *Jugometal* decision,[3] and the First Circuit's opinion in *Hewlett-Packard*, do not stand for the proposition that full-scale litigation of counterclaims is permitted in a NYC/FAA proceeding. Rather, those cases dealt with a "counterclaim" in the nature of a claim that there is, or will soon be, a competing arbitral award in favor of the respondent and against the applicant in a NYC/FAA proceeding. This would appear, in some circumstances, to be a logical process that would not necessarily offend the purpose and intent of the NYC or the FAA.[4] But this is clearly *not* the same as allowing *impermissible* NYC "defenses" to be asserted, or allowing the full-scale litigation of "counterclaims," in a NYC/FAA proceeding to enforce an otherwise undisputed foreign arbitral award.

The First Circuit's *Hewlett-Packard* decision does not "strongly suggest[]" that full-scale counterclaim litigation should be permitted in a NYC/FAA proceeding, BSB Mem. Opp. at 4, or even stand for the murkier proposition advanced by BSB, namely, that there should be a

---

[3] 78 F.R.D. 504 (S.D.N.Y. 1978). The 9-page *Jugometal* decision has been cited for its "counterclaim" holding by only *two* other courts in the ensuing three decades – by Judge Tauro in *Hewlet-Packard*, *supra*, who distinguished it and noted that it had been criticized by *Booth*, *supra*, and by *Booth*, which rejected *Jugometal's* holding.

[4] In effect, all it involves is subtraction of one award from another, and perhaps resolution of permissible defenses to the respective awards. However, the rationale for permitting one arbitration award to be set off against another, and to stay the enforcement of one arbitration award while a second arbitration is imminent or in process, is logically premised upon some risk that the respondent in the first arbitration will have to pay, but then may be unable to collect on the award it its favor. BSB makes no such argument here, nor could it. As set forth in the Affidavit of Konrad Baerveldt ("Baerveldt Aff."), submitted herewith, at ¶ 18, there is no need for BSB to seek to "collect" $287,000 of its purported $4,000,000 claim by litigating its claim here to achieve an "offset" against the undisputed SIAC Final Award, and then go to Indonesia to seek to collect the remaining $3,713,000 through litigation and foreclosure proceedings in that country. It is undisputed that if BSB prevailed upon its claim in Indonesia, its security interest in PTSW's Indonesian property would be more than sufficient to ensure full payment of its $4,000,000 claim. If fact, this is precisely what BSB told the SIAC when it represented to that Tribunal that it was ready, able and willing fully to vindicate its alleged rights in Indonesia through foreclosure upon PTSW's Indonesian property.

Conversely, if this Court were to decide BSB's claim adversely to PTSW by its prediction of Indonesian law, and then release BSB's frozen funds, but the South Jakarta District Court subsequently ruled in PTSW's favor – proving this Court's Indonesian law analyses to have been erroneous, then BSB will have obtained an undeserved and unjust windfall at PTSW's expense.

"flexible approach" and "prudential" consideration in the determination of whether a "counterclaim" should be permitted in a NYC/FAA proceeding. *Id.* at 8. To the contrary, the District Court in *Hewlett-Packard* had squarely held, endorsing the decision in *Booth*, *supra*, that the NYC and FAA expressly forbid counterclaims.[5] The First Circuit deliberately did not disturb this holding, and instead dealt solely with the issue of whether a lower court could stay enforcement of an undisputed arbitration award in a NYC/FAA proceeding, in order to permit a potential, forthcoming arbitration award to be set off against the first award. The "flexible approach" and "prudential" considerations as to *whether to issue a stay* would, in fact, be totally unnecessary if a "counterclaim" was permitted, since under Fed.R.Civ.P. 54(b), absent court order, a claim is not final and enforceable until the adjudication of counterclaims.

BSB also seeks to bolster its argument by setting up and relying upon a questionable premise, *i.e.*, that "[i]n most [arbitration] cases . . . issues that could be raised by counterclaim have already been resolved by the arbitration." BSB Mem. Opp. at 3. Not only is this total

---

[5] Shortly after deciding *Hewlett-Packard*, Judge Tauro ruled in an analogous case under the Massachusetts version of the Uniform Foreign Money-Judgments Act ("UFM-JA"), Mass.Gen.L. c. 235, § 23A, that the respondent could *not* defend against the enforcement of a foreign judgment by asserting a claim of "set off" not raised before the foreign court. *McCord v. Jet Spray Int'l Corp.*, 874 F.Supp 436, 440 (D.Mass. 1994)(holding that the UFM-JA "specifically limits the defenses that may be raised in an action to enforce a foreign judgment"). Similarly, state courts considering whether to permit "counterclaims" under their versions of the Uniform Enforcement of Foreign Judgments Act have routinely ruled in the *negative*. *See, e.g., Landon v. Artz,* 6 Kan.App.2d 617, 619-621 (1981)("it is evident this section does not contemplate allowing a defendant, in an action against him to enforce a foreign judgment, to pursue a counterclaim neither pleaded nor considered in the other state's forum"); *Thompson v. Safeway Enterprises, Inc.,* 67 Ill.App.3d 914, 916-919 (1978)("the assertion of a counterclaim against a foreign judgment is a collateral attack on that judgment"; respondent "is not permitted to raise defenses or setoffs, except for lack of jurisdiction and fraud in the procurement of the judgment, that he could have advanced before the judgment became final"); *Purser v. Corpus Christi State National Bank,* 256 Ark. 452 (1974)("to apply the compulsory counterclaim statute to these facts would be subversive of the salutary intent of the Uniform Act to provide for a prompt summary procedure to register such judgments without furthering the purposes of the counterclaim statute to prevent piecemeal, multiplicitous litigation"); *Van Kooten Holding v. Dumarco Corp.,* 1988 WL 6677 (N.D.Ill. 1988)(purported counterclaim was an "impermissible collateral attack on the Netherlands judgment"); *Concannon v. Hampton,* 584 P.2d 217, 221-222 (1978)("it is evident this section does not contemplate allowing a defendant, in an action against him to enforce a foreign judgment, to pursue a counterclaim neither pleaded nor considered in the other state's forum").

conjecture, but it is also an improbable assertion. Arbitration provisions are generally contained in and directed toward a specific contract, not the entirety of commercial dealings between two parties. This case is a good example: the 1998 Transfer of Rights and Interest Agreement between the parties called for arbitration, while the 1998 Loan Agreement called for judicial proceedings to resolve disputes.

In the same vein, BSB also argues that, whatever the usual rule is, there is something "unique" about this case because, it asserts, the SIAC Final Award is some sort of "partial" resolution of the contract dispute between PTSW and BSB. BSB Opp. Mem. at 7. That is not true. PTSW requested arbitration costs and BSB opposed the request. *That* dispute was fully and finally resolved against BSB *on the merits* by the SIAC. It had nothing to do with, and is no "partial award" with respect to, BSB's contract claim against PTSW.

Finally, although plain language, logic, and well-reasoned case law should be sufficient, it may also be noted that Section 6 of the FAA derives from the Act's original version enacted in 1925, Act. Feb. 12, c. 213, 43 Stat 884. The legislative history of that original version is instructive:

> The bill . . . provides a procedure in the Federal courts for . . . enforcement [of arbitration awards]. The procedure is very simple, following the lines of ordinary motion procedure, reducing technicality, delay, and expense to a minimum and at the same time safeguarding the rights of the parties. There is provided . . . a hearing if the defeated party contends that the award was secured by fraud or other corruption or undue influence, or that some evident mistake not affecting the merits exists in the award. . . .

There are no "counterclaims" in a NYC/FAA proceeding. The Court should so rule and obviate the need to conduct the complex jurisdictional and constitutional analyses that would otherwise be implicated. This proceeding would then finally, as it should, become summary in nature.

**B.      BSB employs a false premise and circular reasoning to argue that this Court has supplemental subject matter jurisdiction over BSB's claim against PTSW.**

A false premise underlies BSB's argument that PTSW's Application is sufficiently "related" to BSB's claims to support the constitutional exercise of the Court's supplemental jurisdiction over BSB's claims.  BSB argues that its claim it is "related" because BSB's "set off" rights are a "defense" to PTSW's Application which must be litigated.  BSB Mem. Opp. at 19. That is not true.  The provisions of the NYC, a copy of which is attached to PTSW's Application, do not permit any such defense.  Indeed, early on in this matter BSB conceded that *it has no defenses* under the NYC.  *See* Order on Respondent's Motion to Vacate or Reduce *Ex Parte* Attachment, dated April 12, 2005 (Dein, U.S.M.J.), at 9 ("BSB is not seeking to vacate the award").

The question for purposes of supplemental jurisdiction is whether there is a relationship between *the facts* underlying the SIAC Award, on the one hand, and *the facts* underlying the dispute that leads to BSB's claim under the Loan Agreement, on the other.  There is no relationship.  PTSW's Application does not, as BSB preposterously claims, implicate "'one controversy' arising from . . . 'common matters,' namely whether PTSW should be made to abide by its contractual commitments." BSB Mem. Opp. at 17.  PTSW's Application arises from the SIAC's exercise of its discretion to award costs under its arbitration procedures.  The only "fact" was that BSB started, and then abandoned an arbitration after causing PTSW to incur significant expense.  As BSB's acknowledges, the SIAC Final Award "addressed costs only and *did not resolve any substantive claims*."  *Id.* at 7 (emphasis added).

BSB's reasoning is circular.  Because BSB can assert its claim against PTSW to establish an "offset defense" to the SIAC Final Award, the reasoning goes, its claim is "related" to PTSW's claim and can be heard as a counterclaim.  By this reasoning, *every* unadjudicated claim

that might be "set off" against an undisputed arbitral award, regardless of the subject matter of the claim and regardless of whether the claim could originally be brought, would be "related" to the enforcement of the award in a NYC/FAA proceeding, and could be fully litigated therein. This would completely defeat the purpose and intent of the NYC and the FAA.

Given that BSB *cannot* assert and litigate a defense of "set off" under the NYC or the FAA, its counterclaim would effectively be a whole new lawsuit merely appended, but unrelated, to the merits of PTSW's Application. This Court has no subject matter jurisdiction over such a claim.

**C.     BSB offers rote, mechanical, weak and illogical arguments in support of this Court's exercise of personal jurisdiction over PTSW.**

BSB concedes that the matter of personal jurisdiction cannot be decided by a "rote, mechanical" analysis and is "context-specific" with respect to "a variety of factors relating to the particular cause of action." BSB Mem. Opp. at 11. Yet, BSB asks the Court rotely and mechanically to apply a rule that a party's resort to a court for *any* purpose in *any* context results in a "waiver" or "consent" to personal jurisdiction for *any and all other* purposes. This ignores the specific context of PTSW's resort to this Court, *i.e.*, its use of internationally agreed-upon procedures as implemented by federal statute to come to the only forum where BSB has assets to collect upon an undisputed foreign arbitral award.

Contrast the context of this case with that of *General Contracting & Trading Co. v. Interpole*, 904 F.2d 20 (1st Cir. 1991), where the plaintiff was deemed to have submitted itself to personal jurisdiction with respect to a subsequent suit by the defendant "in the same court based on the same transaction." *Id.* at 24. The First Circuit ruled that the plaintiff could not, in these circumstances, contest personal jurisdiction as a matter of "law and logic." *Id.* Law and logic

dictate an opposite result in this case. At the very least, law and logic must be considered by this Court in the specific context of this case.

BSB's arguments related to the "gestalt factors" – which it concedes are paramount in assessing the constitutionality of this Court's assertion of personal jurisdiction over PTSW – are weak and illogical. PTSW, by seeking to enforce the SIAC Final Award here, took on a relatively light burden by the express design of the NYC and the FAA. This is a far cry from engaging in full-blow litigation 10,000 miles from home, which would be enormously burdensome. *See* Baerveldt Aff., ¶¶ 15-17. BSB cannot seriously argue otherwise

BSB never explains why it finds this Court such a attractive venue, or why the two-step process against which it railed in seeking to withdraw from the SIAC litigation – *i.e.*, obtaining a monetary award outside of Indonesia that will need to be enforced, if at all, in Indonesia, suddenly is a process worthy of the gyrations in which it BSB is now engaged in this Court.

BSB's assertion that "this Court plainly has an interest in adjudicating the entire dispute between the parties," would probably come as a surprise to the Court. One is compelled to ask – since there is no shortage of United States citizens seeking the Court's assistance in resolving disputes under United States and State laws, or foreign citizens or states seeking to assert enforceable claims against United States citizens, since the United States government, including its agencies and prosecutors, as well as criminal defendants, require the Court's attention to the myriad of difficult matters arising under United States statutes, rules, regulations and the Constitution and its Bill of Rights, since United States consumers, investors and workers need access to the Court to resolve complex consumer protection, securities fraud and anti-discrimination individual and class actions, and since the Court is, as always, working with finite resources – *what then exactly is this Court's "interest"* in hearing and deciding a dispute

between an alleged British Virgin Island Trust and an Indonesian entity, concerning a contract that the parties agreed would be governed by Indonesian law and could be decided in the Indonesian courts, involving property interests in Indonesia, and potentially resulting in a judgment of this Court that would need to be enforced in Indonesia, if at all, or worse, would be unenforceable in Indonesia against the Indonesian defendant and its Indonesian property?

BSB completely ignores Indonesia's interest in resolving a claim which turns on matters of Indonesian law, in accordance with Indonesian substantive social policies, against an Indonesian entity, involving Indonesian property, under a contract in which the other party agreed that resort to the Indonesian courts were appropriate, and with which the Indonesian courts, including both a lower court and an appellate court, have *already* dealt. This Court has no reason to, and should not, ignore these important interests of Indonesia. *See Whallon v. Lynn*, 230 F.3d 450, 456 (1ˢᵗ Cir. 2000)(when interpreting and applying foreign law of a country that "comes from a different legal tradition," "[c]are must be taken to avoid imposing American legal concepts onto another legal culture").

**D.    BSB's assertion that litigating its claim against PTSW in this Court would be efficient and fair beggars belief.**

BSB repeatedly asserts that litigating its claims against PTSW in this Court would be efficient and fair with respect to PTSW, BSB and the Court. Such an assertion (to borrow BSB's colorful language, *see* BSB Mem. Opp. at 14) "beggars belief" for a myriad of reasons.

First, PTSW intends to pursue its claim in South Jakarta District Court ("SJDC"), seeking to resolve the dispute with BSB, as BSB expressly agreed PTSW could do under the Loan Agreement. Thus, if BSB's "counterclaim" is permitted here, there *will* be two parallel litigation matters concerning the same dispute. How could this be an efficient use of BSB's allegedly meager resources and how would BSB pay for both proceedings?

Second, if BSB's "counterclaim" is permitted here, then PTSW will be compelled to pursue its appellate rights in the First Circuit – either on an interlocutory basis if permitted,[6] or in a post-decision appeal in the event that this Court decided the dispute adversely to PTSW.  In this regard, it should be noted that the issue of this Court's subject matter jurisdiction, as well as its determinations of foreign law, will both be subject to *de novo* review by the First Circuit, including by resort to additional sources and experts if necessary.  *See* Fed.R.Civ.P. 41.1 ("The court's determination [of foreign law] shall be treated as a ruling on a question of law."); *Grupo Protexa, S.A. v. All American Marine Slip, a Div. of Marine Office of America Corp.*, 20 F.3d 1224 (3rd Cir, 1994) (Court of Appeals exercises plenary review of lower court determinations of foreign law, and may consult information not considered by or available to district court).  How could this possibly be an efficient use of BSB's resources?

Third, even if BSB was permitted to assert its "counterclaim" here, and eventually prevailed in the lower court and on appeal, BSB would still have to return to Indonesia to try to enforce a judgment of this Court.  However, according to the Affidavit of Mohamad Zaky Achtar, PTSW's Indonesian counsel, submitted herewith ("Achtar Aff."), ¶ 8, the Indonesian courts would not enforce the judgment and BSB would need to commence a new case (assuming that the SDJC action had not already been concluded adversely to BSB), or continue with the SJDC proceeding. How could this be an efficient use of BSB's, PTSW's or the Court's resources?  On the other hand, if PTSW prevails in its lawsuit in the SJDC, before this Court could adjudicate BSB's "counterclaim," then PTSW would seek dismissal of BSB's claim on the

---

[6] A decision by this Court that counterclaims are permitted in NYC/FAA proceedings would, of course, create a split of opinion with Judge Tauro's decision, left undisturbed by the First Circuit, in *Hewlett-Packard*. Coupled with the personal jurisdiction, subject matter jurisdiction, and comity issues, which appear to be matters of first impression in the context of a NYC/FAA proceeding, an interlocutory appeal would be appropriate.

grounds of *res judicata*.  BSB's resources expended in this Court, not to mention PTSW's and the Court's resources, will have been completely wasted.

Fourth, since BSB's factual allegations with respect to the matter of personal jurisdiction, including its assertion that PTSW has U.S. Directors and that PTSW would not find it burdensome to litigate here, are in dispute, personal jurisdiction may have to be decided, at least tentatively, upon some form of evidentiary hearing as outlined in *Digital Equipment Corp. v. AltaVista Technology, Inc.,* 960 F.Supp. 456, 463-464 (D.Mass. 1997.  The costs of such pre-merit-phase proceedings are precisely what BSB has complained so bitterly about in connection with the SIAC arbitration that BSB commenced and then abandoned.

Fifth, this Court has no special "familiarity" with the parties' dispute, which has its roots in a complex web of events and foreign parties going back to at least the early 1990's.  The Court has merely heard summary descriptions of both parties' respective positions.  Nor is the dispute a simple matter, either factually or legally, as demonstrated in the Baerveldt Affidavit, ¶¶ 3-7, the Achtar Affidavit, ¶¶ 9-31, and the parties' SIAC submissions previously provided to the Court.[7] Without questioning for one second that this Court is *competent* to attempt to decide BSB's

---

[7]  The Loan Agreement upon which BSB now bases its claim (in the SIAC, it argued that the claim was under the Transfer of Right and Interest Agreement, not the Loan Agreement) expressly provides that disputes thereunder shall be governed by Indonesian law.  Baerveldt Aff., ¶ 5.  As one court has observed:

> Indonesian law contains "a bewildering variety of types of laws – statutes, regulations, decrees, circulars, etc."  Eddy Damian & Robert N. Hornick, *Indonesia's Formal Legal System:  An Introduction,* 20 Am. J. Comp. L. 492, 523 (1972).  Among the varieties of law enumerated in the aforementioned article are "Government Regulation[s]," "Presidential Decision[s]," "Regulation[s] of the Minister," and "internal memoranda." *Id.* at 524-25.  This plethora of legal instruments in part ensues because the Indonesian executive branch has "considerably more executive law-making discretion than is the case, e.g. in the legal system of the U.S." *Id.* at 529.  And under Indonesian law, "[e]ven statutes passed by the House of Representative commonly look[ ] to the executive orders and Presidential speeches for their inspiration and legal base." *Id.* at 507.

*Karaha Bodas Company, L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 91 n.18 (2nd Cir. 2002).

purported "counterclaim" based upon its prediction of Indonesian law governing the parties' dispute under the Loan Agreement (there are also Swiss law issues), that does not mean that the Court can *efficiently* do so.

It is presumed that the Court has no close familiarity with such laws, and it will be unable to obtain official English language versions of the myriad sources of Indonesian legal authority. Achtar Aff., ¶ 9-12.   The Court, in accordance with Fed.R.Civ.P. 44.1, would almost certainly have to rely exclusively upon legal "experts," perhaps several in their respective fields of expertise, who would be retained by both parties and perhaps by the Court at the parties' additional expense. These experts, especially if they must travel here or the parties must travel to them, will not come cheap.  And as noted, the Court's determinations of foreign law would be subject to *de* novo review in the Court of Appeals.  The process would not be easy or efficient. *See, generally,* "From The Courthouse In Tobago To The Internet: The Increasing Need to Prove Foreign Law in U.S. Courts," 34 J. Mar. L. & Com. 97 (2003).  Indeed, the notion of embarking upon an expensive "battle of the foreign law experts" borders on the absurd, where the *Indonesian courts have already dealt with this matter* and stand prepared to decide the dispute under their own laws, in accordance with the parties' express agreement.

BSB rants and raves that PTSW is "playing games" and preventing a resolution of the dispute with BSB. Not so. Rather, it is BSB that has so far avoided a resolution of its dispute with PTSW. PTSW opposed BSB's Application to Withdraw from the SIAC arbitration and pressed the SIAC to rule with respect to PTSW's defenses to BSB's claim. BSB thus prevented a resolution of the dispute with PTSW by seeking to withdraw from the SIAC arbitration when it sensed that the SIAC was prepared to accept PTSW's defenses. BSB told the SIAC that a

decision of the Jakarta High Court permitted it more efficiently to litigate its dispute with PTSW in Indonesia.  Yet, several months passed and BSB never proceeded in Indonesia.

Who is "playing games"? The Court should carefully consider the fact that PTSW, in the SIAC Arbitration, requested an order that BSB post security for costs that might be awarded to PTSW.  PTSW argued that security was needed because of the potential difficulty of ever collecting from BSB.  BSB successfully opposed the motion.  Listen to what it told the SIAC:[8]

> [T]he Trust currently has unencumbered liquid assets of US $240,000, *which are available* for the costs of this arbitration, including *to pay any of the [PTSW's] costs, if so ordered.*

> The Claimant's liquid assets are located in financial institutions in the United States of America, *which is a signatory to the New York Convention.* Accordingly, *the point made by [PTSW] as to its inability to enforce an award [of costs]. . . is irrelevant.*

Had BSB been honest and revealed that it would *refuse to pay and seek to litigate a "set off"* to any SIAC award of costs, PTSW might have received security and obviated the need to come 10,000 miles to invoke this Court's jurisdiction under the NYC and FAA.[9]

In sharp contrast, PTSW has taken the initiative and commenced its SJDC lawsuit.  How can this be a "manipulation of the judicial process" when the SJDC was a forum to which BSB expressly agreed in the Loan Agreement, and when BSB told the SIAC that Indonesia was the proper forum to adjudicate its dispute with PTSW.  PTSW never "chose" this Court as its forum for resolving its dispute with BSB.  Baerveldt Aff., ¶ 15.  It wishes to litigate in the Court that BSB agreed could resolve the dispute, the SJDC.  There is absolutely nothing wrong with that.

---

[8] Claimant's Submission in Respect of the Respondent's Application for Security for costs, dated June 30, 2004, at ¶¶ 5.6, 5.7 (emphasis added).

[9] In light of such devious behavior, PTSW has good reason to suspect that BSB has long planned to ambush PTSW by placing its only funds here, representing that PTSW could come here and bring a NYC proceeding to collect any costs that might be awarded, then causing PTSW to incur tremendous costs in the SIAC Arbitration before abruptly quitting, and ultimately springing the trap to snare PTSW into litigation in a distant forum.

Respectfully, rancor and rhetoric aside, the Court should honor and enforce PTSW's rights under international and United States law by adhering to the requirements of the NYC and FAA and permitting PTSW to collect upon its undisputed SIAC Final Award. The Court should recognize that the Indonesian courts can and will determine whether BSB has a valid and enforceable claim under Indonesian law that can be enforced against PTSW's Indonesian property. The Court should decline to conduct – or at a minimum stay, duplicative proceedings that will inevitably result in a colossal waste of the parties' resources. In doing so, the Court will also preserve its own resources for more appropriate cases and controversies, which have at least a modicum of relevance and importance to the United States, its citizens and the citizens of this Commonwealth.

### III.  CONCLUSION

For all of the foregoing reasons, based upon the foregoing points and authorities, as well as the reasons and authorities set forth in PTSW's original Memorandum in Support, PTSW respectfully prays that the Court strike or dismiss, or at a minimum stay, BSB's purported "counterclaim," and grant such other and further relief as it deems just and proper.

Respectfully submitted,

**PT SUMOHADIWIDJOJO**, Applicant

By its Attorneys,

/s/ Richard S. Nicholson
Marjorie Sommer Cooke (BBO # 097800)
Richard S. Nicholson (BBO # 542182)
COOKE CLANCY & GRUENTHAL LLP
265 Franklin Street
Boston, MA 02110
(617) 428-6800

Dated: July 8, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of July, 2005, I filed with the Court's CM/ECF system

for service upon opposing counsel in accordance with the Court's Electronic Filing Rules:

1.    APPLICANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE OR DISMISS, OR TO STAY, RESPONDENTS' PURPORTED "COUNTERCLAIM";

2.    the AFFIDAVIT OF KONRAD BAERVEDLT in support thereof; and

3.    the AFFIDAVIT OF MOHAMED ZAKY ACHTAER in support thereof.

.                          /s/ Richard S. Nicholson
                           Richard S. Nicholson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| **PT SUMOHADIWIDJOJO,** | )     **CIVIL ACTION NO. 04 12646 NG** |
| | ) |
|     Applicant | )     **AFFIDAVIT OF KONRAD BAERVELDT** |
|     (Respondent below) | )     **IN SUPPORT OF APPLICANT'S** |
| | )     **MOTION TO STRIKE OR DISMISS,** |
| and | )     **OR TO STAY, RESPONDENT'S** |
| | )     **PURPORTED "COUNTERCLAIM"** |
| **BSB RESIDUAL ASSETS TRUST,** | ) |
| **BSB TRUST COMPANY, LTD.,** Trustee, | ) |
| | ) |
|     Respondent | ) |
|     (Claimant below). | ) |
| | ) |
| **CITIZENS BANK,**   Trustee. | ) |
| | ) |

I, Konrad Baerveldt, upon oath do hereby state as follows:

1.    I am the President Director of PT Sumohadiwidjojo ("PTSW"), an Indonesian limited liability company with a principal place of business at J1. Jenderal Sudirman 71, Jakarta, 12190, Indonesia.

2.    I respectfully submit this Affidavit in support of PTSW's Motion To Strike Or Dismiss, Or To Stay, Applicant's Purported "Counterclaim" ("PTSW Motion"). I make this Affidavit upon my personal knowledge, information and belief.

3.    As this court has been made aware, there is a dispute between PTSW and BSB Residual Assets Trust ("BSBRAT") involving certain property in Jakarta, Indonesia owned by PTSW, namely, the S. Widjojo Centre, a 20,000 square-meter (approximately 200,000 square-foot) office building located in the Central Business District of Jakarta, Indonesia. The dispute

concerns the mezzanine floor of the S. Widjojo Centre (approximately 800 square meters; roughly 8,000 square feet) ("Indonesian Property") in which BSBRAT claims to have acquired an "economic interest" in 1993 by means of a Deed of Transfer ("1993 Deed of Transfer") from Subud Brotherhood International Foundation ("SBIF"), a Swiss Foundation registered in the Canton of Geneva according to Swiss Law.

4.      BSBRAT subsequently purported to transfer its "economic interest" in the Indonesian Property to PTSW, by means of a Transfer of Rights and Interest Agreement made in 1998. Also at that time, PTSW and BSBRAT signed a Loan Agreement[1] calling for a loan from BSBRAT in the amount of US$3,060,000 to be used "to pay the Purchase Price and to maintain S. Widjojo Centre". Purchase Price is defined in the third *whereas* clause of the Loan Agreement as the "aggregate amount of the purchase price of the Shares and that amount of the financial assistance from the Lender to the Borrower for the maintenance of S. Widjojo Centre", i.e. US$3,060,000. The purchase price for the Shares was US$144,960. The remaining portion of the Purchase Price, i.e., US$2,915,040, was for the financial assistance to be provided by BSBRAT to assist in the maintenance of the S. Widjojo Centre. This amount of the loan, namely US$2,915,040, was never made available to PTSW. The amount of the loan that was advanced to PTSW was limited to the amount required to purchase the Shares, i.e., US$144,960.

5.      Clause 22 of the Loan Agreement states: "This Loan Agreement shall be governed by and construed in accordance with the laws of the Republic of Indonesia." Based upon facts, circumstances and Indonesian law (and as noted below, Swiss law) analyses discovered, obtained and developed by PTSW during the years since 1998, PTSW reached the firm conclusion that:

---

[1] Clause 21.5 of the Loan Agreement states: "This Loan Agreement contains the entire understanding of the Parties and supersedes all prior agreements and understandings (except for those agreements explicitly referred to herein) between the Parties relating to the subject matter hereof."

(a)    the 1993 Deed of Transfer from SBIF to BSBRAT was invalid because the signatories to the 1993 Deed of Transfer, under Swiss law, were unauthorized, and BSBRAT knew it. As a result, BSBRAT had no interest in the Indonesian Property to transfer to PTSW;

(b)    under Indonesian Law, ownership rights in the Indonesian Property could only have been transferred under a deed drawn up by a PPAT (a special Notary authorized to draw up such an agreement), which the 1993 Deed of Transfer from the SBIF was not;

(c)    as a non-Indonesian entity, which was not registered with the relevant authorities in Indonesia, BSBRAT could not hold rights in the Indonesian Property;

(d)    as a matter of Indonesian agrarian law, an economic right and interest cannot be split or separated from an ownership right, and that BSBRAT therefore could not have had any economic interest in the Indonesian Property because it never had any ownership interest; and

(e)    BSBRAT was required under the Loan Agreement to loan PTSW US$2,915,040 for the maintenance of Indonesian Property, although it never did.

6.    Accordingly, on September 30, 2003, PTSW terminated the Loan Agreement by paying to BSBRAT the amount of US$168,809.42 as payment in full of the amount of the loan actually made – US$144,960 – plus accrued interest and penalties in the amount of US$23,849.42, thus fully discharging its obligations under the Loan Agreement.[2]

7.    It is therefore PTSW's position – and the basis for the dispute between PTSW and BSBRAT – that PTSW owes BSBRAT nothing and, indeed, PTSW may be owed sums paid to BSBRAT based upon BSBRAT's fraudulent inducement of PTSW to enter into a Transfer of Right and Interest Agreement with respect to property in which BSBRAT had no rights or interest.

---

[2] Clause 21.7 of the Loan Agreement states: "The Parties hereto waive the applicability of Section 1266 of the Indonesian Civil Code to the extent judicial intervention is required to terminate this Loan Agreement."

3

8.      These issues will be decided by the South Jakarta District Court in the lawsuit that PTSW commenced in that Court in April 2005.  The issues would likely already have been decided, but for BSBRAT's earlier strategic behavior aimed at forcing PTSW to engage in arbitration proceedings outside of Indonesia, and its subsequent unilateral abandonment of those arbitration proceedings.

9.      BSBRAT's claim to this Court that it abandoned the SIAC arbitration because of some improper behavior by PTSW is wrong.  It was BSBRAT that engaged in sharp, strategic behavior when it asserted its claim in January 2004 against PTSW under the 1998 Transfer of Right and Interest Agreement, rather than the 1998 Loan Agreement upon which it now relies.

10.     In the SIAC arbitration, PTSW took the position that the matter was not properly before the SIAC Tribunal because BSBRAT was really claiming under the Loan Agreement, which has no arbitration clause and which contemplated that disputes thereunder would be resolved according to Indonesian law in the Indonesian courts, specifically the South Jakarta District Court.  PTSW also took the position that BSBRAT was not a legal entity capable of participating in the arbitration.  Neither position was improper or illegitimate.  Indeed, the SIAC Tribunal agreed that BSBRAT was not a legal entity, and deferred ruling on the question of its authority to hear the merits of the dispute.

11.     After nine months of arbitration proceedings, in September 2004, before the SIAC Tribunal could consider and rule on the merits of the dispute between PTSW and BSBRAT, BSBRAT unilaterally sought to withdraw from the arbitration, claiming that it intended to pursue matters further under Indonesian court jurisdiction.  PTSW, which had incurred hundreds of thousands of dollars in expenses in the arbitration commenced by BSBRAT, requested that the SIAC Tribunal continue with the arbitration, or at the very least, order BSBRAT to reimburse

4

PTSW's costs as a condition of permitting BSBRAT to abandon the proceedings and start over again in Indonesia.

12.     The SIAC Tribunal, without regard to any of the merits of the dispute, ruled that BSBRAT could withdraw its claims but agreed with PTSW that BSBRAT should pay PTSW's costs. The award of costs was contained in the SIAC Final Award, and it is this Final Award – and nothing more – that PTSW seeks to enforce in accordance with international law, as accepted by the United States (and Indonesia), providing that foreign arbitration awards should be summarily enforced by all countries adhering to such law.

13.     It is BSBRAT, and not PTSW, that is playing games. BSBRAT chose one forum (Singapore), abandoned it and claimed to prefer another forum (Indonesia), and now turns around and claims to prefer this Court. BSBRAT chose not to argue to the SIAC that it should be subject to or have to honor the SIAC Final Award because of "set off" rights. In all likelihood, it made this choice because the matter of "set off" is referenced in the 1998 Loan Agreement, while BSBRAT had deceptively claimed that the governing agreement in the dispute was the 1998 Transfer Agreement in order to compel PTSW to arbitrate in Singapore. Only now, in this straightforward arbitration enforcement proceeding under international and United States law does BSBRAT seek to assert the impermissible "defense" of "set off."

14.     BSBRAT, which has the necessary funds, refuses to pay the SIAC Final Award with respect to which it has no defenses. This is patently unfair to PTSW. In this regard, it should also be noted that in order to obtain a copy of the SIAC Final Award, PTSW had first to pay SIAC all SIAC-related charges for both PTSW and BSBRAT. BSBRAT had declined to pay these SIAC costs and BSBRAT has not even reimbursed PTSW for its portion of these costs.

15.    Respectfully, the United States District Court for the District of Massachusetts is not PTSW's "chosen" forum for resolving its dispute with BSBRAT. PTSW is before this Court for no other reason than that it was the only place that BSBRAT had assets that could be used to satisfy the SIAC Final Award under international and United States law.

16.    Resolving the dispute between PTSW and BSBRAT before this Court would impose a tremendous burden and expense upon PTSW. Contrary to BSBRAT's assertion, PTSW has neither United States directors nor offices, nor owns any property in the United States.

17.    In addition, travel between Jakarta and Boston involves routing through major international air-hubs such as Singapore or Hong Kong, the total travel time involved exceeding 24 hours, with standard business class round-trip fares now amounting to approximately US$6,500. Coupled with this, the uninterrupted trip commences and ends on the same day, due to crossing the international dateline, when one is traveling East from Jakarta to Boston. The time in Indonesia is 11 hours ahead of the time in Boston, meaning that day is night and night is day between the two locations, making it difficult to coordinate live communication between parties in each location.

18.    There is no logical reason why BSBRAT needs to "set off" the amount of the SIAC Final Award – which is approximately US$287,000 and is accruing 6% interest. Although that would mean BSBRAT would only need to collect US$3,713,000 (subtracting from US$4,000,000 BSBRAT now claims to be owed the US$287,000 that it admittedly owes PTSW) if it prevailed on its claim, this is irrelevant. The reason is that the Indonesian Property in issue, upon which BSBRAT claims to hold a mortgage to secure its claim against PTSW, is worth several times the US$4,000,000 that BSBRAT claims to be owed by PTSW. If BSBRAT

6

prevails on its claim under Indonesian law, it will be able to obtain a full, 100% recovery. BSBRAT does not need to have the amount of the SIAC Final Award "frozen" by this Court in order to protect its rights.

19.    Regardless of the outcome a lawsuit heard in the United States, and without any disrespect whatsoever intended to this Honorable Court, PTSW would object by all proper means to the enforcement of such an award in Indonesia against the Indonesian Property, and would insist that only rulings of the Indonesian courts concerning the Indonesian law issues involved in the dispute between PTSW and BSBRAT should govern.

20.    In any event, Indonesian counsel has advised PTSW that BSBRAT would be unable to enforce a United States judgment in Indonesia, and would have to start anew with a lawsuit there.  Similarly, there is already a lawsuit pending in Indonesia involving the dispute between PTSW and BSBRAT.

21.    PTSW respectfully requests that this Court reject BSBRAT's acerbic and outlandish rhetoric directed at PTSW, and decline to endorse BSBRAT's illogical, wasteful effort to have an unenforceable, parallel lawsuit go forward in this Court, when the courts of Indonesia stand ready, able and willing to rule on the dispute between PTSW and BSBRAT.

Signed under the pains and penalties of perjury of the laws of the United States of America this 6th day of July, 2005.

Konrad Baeryeldt,
President Director, PT Sumohadiwidjojo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In the Matter of the Arbitration Between: ) | CIVIL ACTION NO. 04 12646 NG |
| ) | |
| **PT SUMOHADIWIDJOJO,** ) | |
| ) | |
| Applicant ) | **AFFIDAVIT OF MOHAMAD ZAKY** |
| (Respondent below) ) | **ACHTAR IN SUPPORT OF APPLICANT'S** |
| ) | **MOTION TO STRIKE OR DISMISS,** |
| and ) | **OR TO STAY, RESPONDENT'S** |
| ) | **PURPORTED "COUNTERCLAIM"** |
| **BSB RESIDUAL ASSETS TRUST,** ) | |
| **BSB TRUST COMPANY, LTD.,** Trustee, ) | |
| ) | |
| Respondent ) | |
| (Claimant below). ) | |
| ) | |
| ) | |
| **CITIZENS BANK,**   Trustee. ) | |

I, Mohamad Zaky Achtar, upon oath do hereby state as follows:

## A.    Introduction

1.    I am an Indonesian advocate and partner of the firm Hiswara Bunjamin and Tandjung. My office is located at Gedung BRI II, 23rd Floor, Jl. Jend. Sudirman Kav. 44 – 46, Jakarta 10210.

2.    I am licensed to practice law in the Republic of Indonesia.  I acquired my law degree, *Sarjana Hukum* (SH), from the Faculty of Law, University of Indonesia, in 1993. I have practiced law in private practice in Indonesia since 1993.

3.    Counsel for PT Sumohadiwidjojo ("PTSW") have requested my legal assistance on matters relating to Indonesian law.

4.    I am informed that PTSW and BSB Residual Assets Trust ("BSBRAT") are involved in a dispute which is the subject of a pending action in the South Jakarta District Court, and that BSBRAT is also seeking to have the same dispute heard in the United States District Court for the District of Massachusetts.

5.    I am further informed that the dispute between PTSW and BSBRAT, as well as BSBRAT's effort to have the dispute heard in the United States Federal Courts, involves,

among others, the following issues of Indonesian law: (a) the enforceability of foreign judgments in Indonesia; (b) generally, the sources of Indonesian law; (c) the validity of contracts allegedly entered into by BSBRAT and PTSW; (d) the concept of Trust; (e) the availability of rectification of contracts; and (f) rights under agrarian and property law.

6.    I outline below aspects of Indonesian law which I consider would be relevant to a determination of these issues, but without intending to offer a conclusion as to the merits of the dispute between PTSW and BSBRAT.

7.    The views expressed are based on the laws in force in the Republic of Indonesia on the date of this affidavit.

## B.    General – Enforcement of Foreign Judgments

8.    Judgments of foreign courts are not enforceable in Indonesia.  Indonesia is not a party to any international convention for the recognition and enforcement of foreign court Judgments. Accordingly, if a party seeks satisfaction in Indonesia of an obligation from the losing party under a foreign court Judgment, the case must be filed again as an entirely fresh case with the relevant Indonesian district court.

## C.    General – Sources of Law

9.    Indonesia is a country that belongs to the civil law tradition.  Like other civil law countries, Indonesia does not recognize the concept of binding precedent (*stare decisis*). The previous decisions of the higher courts generally do not bind the lower courts (although decisions of the Indonesian High and Supreme Courts are influential).  Certain decisions of the Indonesian Supreme Court, however, can become firm jurisprudence (*yurispredensi tetap*) where there are a number of decisions over time dealing with similar questions of fact and law.  Firm jurisprudence is highly influential and can have the effect of actually amending or modifying existing laws.

10.   There is only a limited system of publication of previous judicial decisions and then only in respect of the Indonesian Supreme Court. Nevertheless, previous court decisions and academic legal writing can be considered by an Indonesian court and given such weight as the Court considers appropriate. Official English translations of these decisions do not exist.

11.   The sources of law in Indonesia are therefore code-based or legislative. There are a number of codes providing general principles of law in different areas, such as principles of contract law. There are then numerous laws, regulations and decrees in force relating to more specific subject matter. New regulations are sometimes enacted without making clear the resulting status of previous rules dealing with the same matters. This remains an area of some difficulty including with respect to laws enacted before Indonesian independence in 1945. Indonesia also has a system of regional governments, each of which has the power to enact regulations in certain spheres in its own region. Again, the boundaries are often not clear and inconsistent centrally and regionally enacted laws are



not uncommon.  Official English translations of these codes, legislative acts, regulations and decrees do not exist

12.   In some matters, particularly those involving approvals by or registration with government bodies or agencies, such as foreign investment, land law and security rights, the prevailing view of the relevant government agency will also be relevant to interpreting the way the laws are applied in practice.  It is common practice to adduce evidence from such government agencies in civil hearings.

**D.    Contract Law/Capacity to Contract**

<u>The Validity and Enforceability of Agreements</u>

13.   In determining the validity and enforceability of any agreements between PTSW and BSBRAT, the provisions of the Indonesian Civil Code setting out the basic requirements for a binding contract would be considered. Failure to meet any of these requirements would mean that the contract is void or voidable, depending on the circumstances.

14.   The first of these requirements is the consent of the parties to the contract. Having established that there was consent, and thus a valid contract, it would then be necessary to consider whether duress, mistake or fraud had occurred, within the meanings those terms are given under Indonesian law. If so, the contract is then voidable.

15.   Secondly, the parties must have capacity to contract. In relation to parties other than natural persons, consideration would need to be given to whether the party in question qualified as a "legal body". Assuming a party is a validly established legal body, consideration would then need to be given to the relevant body of rules that deals with the capacity of such legal persons. By way of example, for Indonesian *perseroan terbatas* (limited liability companies) the Law on Limited Liability Companies (Law No. 1 of 1995) and implementing regulations made thereunder, together with certain provisions of the Civil Code, must be considered.

16.   The third principle is that the "subject" of the contract must be determinable. By "subject" it is accepted that the Civil Code refers to both the object of performance and the nature of the performance to be rendered. The former may generally be rights, services or goods so long as these are capable of being sufficiently determined or identified in accordance with Indonesian law.

17.   The fourth requirement is that the purpose of the contract must not be unlawful or contrary to good morals or Indonesian public policy. Notably, the Supreme Court has previously held that a contract of sale and purchase was unlawful for the purposes of this requirement where, under prevailing government regulations, the goods in question could only be purchased by a government appointed body and the purchaser did not fall into that category.



3

18.     The court would then have to consider whether the contract had been properly created or entered into. For a party to a purported contract who is not a natural person, whether or not that party has validly entered into a contract must be determined by reference to the actions of individuals purportedly acting on its behalf. This requires consideration of the laws of agency, including the law applicable to powers of attorney, contained in the Indonesian Civil Code, as well as the laws and regulations applicable to the relevant type of legal body (such as *perseroan terbatas*). Special rules apply to the granting of powers of attorney in relation to certain actions affecting real property.

19.     Under Indonesian law, formalities are required for some categories of contracts, including certain land contracts (for example, an authentic deed needed to transfer *hak pakai* or 'right of use' title to land). The contracts being considered would need to be characterized to see whether any of the formality requirements were applicable to their purpose and, if so, whether they had been met.

The Parties' Respective Obligations and Whether There Has Been Breach

20.     As a civil law jurisdiction, the matters which are taken into account in determining a party's obligations and whether there has been breach are likely to be broader than under a common law approach. The source of most relevance again is the Civil Code and related jurisprudence.

21.     A series of provisions in the Civil Code also stipulate certain rules for the interpretation of a contract where there is any scope for differing interpretations. The first of these provisions recognizes the primacy of the written word. Subsequent provisions emphasize the need for provisions to be interpreted in line with the nature of the agreement and local custom, taking into account the context of the entire agreement, for general words to be given effect only in so far as specifically intended by the parties, and for ambiguous provisions to be interpreted against the interests of the person who requested the inclusion of that provision.

Obligation of Good Faith under Article 1338 of the Indonesian Civil Code

22.     Article 1338 (3) states that "an agreement must be performed in good faith". It is not possible to be conclusive as to all the matters a court will refer to under this broad concept as this will depend on the nature of the contract in question. However, it is considered that this provision gives judges in civil suits the power to supervise performance drawing on the approach of local customary law and also to ensure that performance does not run contrary to what is considered proper or fair – the so-called 'appropriateness' requirement in contract performance. As an example, in a 1955 case dealing with an agreement relating to land that had been entered into before the Second World War, the court took into account currency fluctuations and inflation in the intervening period to adjust the values in the agreement.

4

**E.      Rectification of contracts**

23.      As noted above, under the Civil Code, matters of statute, custom and reasonableness are considered to be implied in a contract even in the absence of express provisions incorporating these matters. In addition, in all cases, the obligation of good faith under Article 1338 enables the court to supervise the contract by reference to what is proper or fair. Accordingly, the court would give consideration to these principles to determine whether the parties' obligations should take into account matters outside the wording of the contract or possibly be construed in a manner different to the provisions of the contract. As such, the court has power to vary the way the contract can be interpreted and even any inappropriate terms but there is no separate concept of "rectification" in the sense in which common law systems may use the term, as I understand the term.

24.      Consideration would also be given to the provisions of the Civil Code dealing with interpretation of an agreement. Under these provisions it is expressly stated that where the wording of an agreement is open to various interpretations, the court must investigate the intention of the parties rather than considering only the wording in the agreement. There are also various ancillary principles stated thereafter providing guidance on the interpretation of ambiguous agreements.

**F.      Agrarian/Real Property Law**

General

25.      This area of law was radically reformed from the system in place in the first half of the century by legislation enacted after independence. On all of the relevant issues, consideration would need to be given to the Basic Agrarian Law (Law No. 5 of 1960) and various subsequent laws and regulations enacted thereafter developing the Indonesian national system of land interests and title registration. Rather than a system of registrable freehold title, the Indonesian system of property law provides for various different types of ownership and rights of use to be created in different ways over land. There are different rules relating to how each is created and what can be done in enjoyment of the right granted.

Holding of Interests in Property

26.      There are various different types of interest in property in Indonesia as noted above. Each has its own rules under the Basic Agrarian Law and related legislation (including, for example, Government Regulation No. 40/1996 regarding Right to use (*Hak Guna Usaha*), Right to Build (*Hak Guna Bangunan*) and Right to Utilization of Land (*Hak Pakai Atas Tanah*); Indonesian Government Regulation No. 24/1997 regarding Land Registration; and the law regarding Storied House (Law No. 16 of 1985)). This includes stipulation as to who can hold that interest.

27.      In considering whether a party holds any ownership interest in the property in question (as opposed to a contractual right against another party that holds an interest in Indonesia)

a court would first consider whether, under the Basic Agrarian Law and subsequent laws and regulations, the rights granted are such as constitute any of the relevant interests in land which are recognized and whether the proper steps to grant that interest have been taken.

Transfer of Interest

28. The mode of transferring interests in land is also provided in the Basic Agrarian Law, including registration in appropriate cases. These provisions are supplemented by others regulating the form and requirement for certain land deeds to be made before a qualified land deed official (PPAT).

Economic Interest

29. It is important to understand that in general under Indonesian law there is no legal distinction between concepts of law and equity and no recognition of a division between legal and beneficial ownership of or entitlement to property. Only the valid legal holder of property has ownership rights with respect to it. In particular, Indonesian law has no concept of a trust as giving rise to legally defined rights and obligations between parties. Therefore, Indonesian law does not recognize an economic "ownership" right separate from the legal ownership of property. If the rights in question cannot be characterized as an "ownership" interest in or right to land the alternative is for them to be considered contractual rights against a person who has such an interest. Such contracts rights do not, however, constitute ownership interests enforceable against the relevant property. Whether the courts will recognize a concept of contractual "economic interest" on this basis will be determined by reference to contractual principles outlined in the first section above.

In this context, it should be noted further that the accepted view that where there is a stipulation in land law that would be breached by a particular transfer of land to a particular recipient, e.g. the requirement for the holder of certain types of land title to have Indonesian nationality under Article 26 (2) of the Basic Agrarian Law, an arrangement that is intended to transfer land "indirectly" to an ineligible recipient will be invalid or void.

Interest over *Hak Guna Bangunan* (Right to Build)

30. The law relating to HGB is contained in the Basic Agrarian Law and related rules and regulations. Again, consideration would need to be given as to whether the rights and interests being granted amounted to an unlawful attempt to provide the benefit of the HGB title to persons not entitled to hold the same.

G.  **Closing**

31. The dispute between PTSW and BSBRAT involves a number of complex issues of Indonesian law. These issues reflect Indonesia's civil law tradition, which involves

6

concepts very foreign to those of a common law system, requires consideration of numerous sources of Indonesian law which are often times not readily accessible, and implicates the broad discretion under Indonesian law for the courts to consider issues of Indonesian public policy.

Signed under the pains and penalties of perjury under the laws of the United States of America this 7 day of July, 2005.

Mohamad Zaky Achtar, Advocate and Partner,
Hiswara Bunjamin and Tandjung

7