UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In the Matter of the Arbitration Between: | ) | |
| | ) | |
| PT SUMOHADIWIDJOJO, | ) | |
| | ) | |
| Applicant and | ) | |
| Counterclaim Defendant | ) | |
| (Respondent below), | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 04-12646-NG |
| BSB RESIDUAL ASSETS TRUST, | ) | |
| BSB TRUST COMPANY, LTD., Trustee, | ) | |
| | ) | |
| Respondent and | ) | |
| Counterclaim Plaintiff | ) | |
| (Claimant below). | ) | |
| _____ | ) | |
| | ) | |
| CITIZENS BANK, | ) | |
| | ) | |
| Trustee. | ) | |

## REPORT AND RECOMMENDATION ON RESPONDENTS' MOTION TO STAY AND ON APPLICANT'S MOTION TO STRIKE, DISMISS OR STAY COUNTERCLAIM

December 6, 2005

DEIN, U.S.M.J.

## I.  INTRODUCTION

The applicant, PT Sumohadiwidjojo ("PTSW"), has brought this action to confirm and enforce an arbitral award, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), as implemented in 9 U.S.C. §§ 201 et seq., which the Singapore International Arbitration Centre ("SIAC") issued in

favor of PTSW, and against the respondents, BSB Residual Assets Trust and BSB Trust Company, Ltd., Trustee (collectively, "BSB"). In response, BSB contends that it has counterclaims against PTSW arising out of an Indonesian real estate transaction and related contracts between the parties. BSB has asked this court to adjudicate the merits of its dispute with PTSW, and to offset the amounts it believes it will recover in its counter-claims against the arbitration award PTSW obtained.[1]

This matter is before the court on PTSW's motion to strike, dismiss or stay BSB's counterclaims (Docket No. 36) and on BSB's motion to stay the confirmation and enforcement of the SIAC award pending the resolution of its counterclaims. (Docket No. 29). This court concludes that BSB is entitled to offset any amounts it may recover against PTSW, but that this court lacks jurisdiction to address the merits of BSB's contract dispute for damages. The court further concludes that the action to confirm and enforce the SIAC award should be stayed pending the resolution of BSB's claims in an appropriate forum. Consequently, this court recommends to the District Judge to whom this case is assigned that BSB's motion to stay be ALLOWED and that PTSW's motion to strike, dismiss or stay be ALLOWED IN PART and DENIED IN PART.

---

[1] Although there is only one count in the counterclaim, entitled "Breach of the Loan Agreement," it encompasses two distinct types of claims. First, BSB contends that PTSW breached the terms of the Loan Agreement by failing to make payments when due and repudiating the Agreement, as a result of which PTSW is owed approximately $3 million. (See Counterclaim at ¶¶ 41-45). Secondly, BSB contends that, under the Loan Agreement, it is contractually entitled to set off any amount due to PTSW. (See id. at ¶¶ 46-47). Since the jurisdictional analysis is different for these two types of claims, the claims will be referred to as if asserted in separate counterclaims.

## II.  <u>STATEMENT OF FACTS</u>[2]

### <u>The Parties</u>

Applicant PTSW is an Indonesian limited liability company having a principal place of business in Jakarta, Indonesia.  (Application ¶ 1; Counterclaim ¶ 2).[3] Respondent BSB Trust Company, Ltd. is a company established under the laws of the British Virgin Islands, with its registered office located in Tortola, British Virgin Islands. (Counterclaim ¶ 1).  BSB Trust Company, Ltd. is the trustee of respondent BSB Residual Assets Trust, which is a trust established in the British Virgin Islands by a Declaration of Trust dated July 26, 1993, as amended.  (<u>Id.</u>).

---

[2]  The facts are derived from affidavits that were submitted in connection with BSB's Motion to Vacate or Reduce <u>Ex</u> <u>Parte</u> Attachment (Docket No. 10), and on which the parties have relied in support of their present motions, as well as from documents and affidavits that PTSW submitted in connection with its present motion to strike, dismiss or stay.  These materials include the following: (1) Affidavit of Michael Irwin in Support of Respondents' Motion to Vacate or Reduce <u>Ex</u> <u>Parte</u> Attachment ("Irwin Aff.") (Docket No. 12); (2) Affidavit of Alison Aubry, Esq. in Further Support of Respondents' Motion to Vacate or Reduce <u>Ex</u> <u>Parte</u> Attachment ("Aubry Aff.") (Docket No. 13); (3) Affidavit of Richard S. Nicholson, Esq. ("Nicholson Aff.") (Docket No. 19); (4) Exhibits attached to the Applicant's Memorandum in Support of Motion to Strike or Dismiss, or to Stay, Respondents' Purported "Counterclaim" ("PTSW Mem.") (Docket No. 37); (5) Affidavit of Konrad Baerveldt in Support of Applicant's Motion to Strike or Dismiss, or to Stay, Respondent's Purported "Counterclaim" ("Baerveldt Aff.") (attached to Docket No. 45); and (6) Affidavit of Mohamad Zaky Achtar in Support of Applicant's Motion to Strike or Dismiss, or to Stay, Respondent's Purported "Counterclaim." ("Achtar Aff.") (attached to Docket No. 45).  Because the facts relevant to the parties' present motions are substantially similar to the facts set forth in this court's April 12, 2005 Order on Respondents' Motion to Vacate or Reduce <u>Ex</u> <u>Parte</u> Attachment ("Order") (Docket No. 26), most of the facts set forth in that Order are repeated here.

[3]  "Application" refers to PTSW's "Application to Confirm and Enforce Foreign Arbitral Award Pursuant to 9 U.S.C. § 201 <u>et</u> <u>seq.</u>"  (Docket No. 1).  "Counterclaim" refers to BSB's Counterclaim beginning on page 6 of BSB's "Answer and Counterclaim of BSB Residual Assets Trust and BSB Trust Company Ltd., Trustee."  (Docket No. 28).

### The Parties' Contractual Dispute

On August 11, 1997, PTSW and BSB entered into a Purchase and Sale Agreement pursuant to which PTSW agreed to purchase BSB's rights in the mezzanine floor of the S. Widjojo Centre in Jakarta, Indonesia. (Irwin Aff. ¶¶ 5, 6; Aubry Aff., Ex. 1). Subsequently, in February 1998, the parties entered into a series of agreements, including a Transfer Agreement, a Loan Agreement and a Deed of Security Rights over Land, in order to implement the Purchase and Sale Agreement. (Irwin Aff. ¶ 6). Pursuant to the Transfer Agreement, BSB agreed to transfer all of its rights and interest in the mezzanine floor to PTSW for a price of $2,915,040. (Aubry Aff., Ex. 2). The Transfer Agreement provides, inter alia, for the resolution of disputes by arbitration in Singapore under the rules of the SIAC, and states that "[t]he Arbitration award issued thereunder shall be final and binding upon the Parties hereof." (Id. at Art. 7).

Under the Loan Agreement, BSB agreed to lend PTSW $3,060,000, and PTSW agreed to use the money to maintain the S. Widjojo Centre and to pay the $2,915,040 purchase price for the rights to the mezzanine floor by making principal and interest payments to BSB. (Aubry Aff., Ex. 3). The Loan Agreement contains a set-off provision, which states:

> The Lender [BSB] may at any time set off any claims of the Borrower [PTSW] against the Lender in whatever currency and whether or not contingent and whether or not due and payable in or towards satisfaction of any sum whether or not contingent and whether or not due and payable to the Lender under or in connection with this Loan Agreement.

-4-

(Id. at ¶ 17).  The Loan Agreement also contains a choice of law provision stating  that

"[t]his Loan Agreement shall be governed by and construed in accordance with the laws

of the Republic of Indonesia."  (Id. ¶ 22).  Moreover, it also provides that "[a]ll disputes

arising out of this Loan Agreement shall be submitted to the District Court of South

Jakarta," but further states that "[n]othing . . . shall limit the right of [BSB] to bring

proceedings against [PTSW] in any other court of competent jurisdiction."  (Id.).  The

loan was secured by a Deed of Security Rights over Land, the equivalent of a mortgage.

(Irwin Aff. ¶ 6; Aubry Aff., Ex. 4).

Pursuant to the Loan Agreement, PTSW made approximately $250,000 in interest

payments to BSB over the course of several years.  (Irwin Aff. ¶ 9).  However, on

September 30, 2003, PTSW allegedly sent BSB a letter purporting to repudiate the Loan

Agreement.  (Id. ¶ 11).  PTSW also allegedly attempted to extinguish its obligations

under the Loan Agreement by including a payment of $168,809.42 with the letter.  (Id.).

PTSW now claims that BSB never made $2,915,040 available to PTSW as required by

the Loan Agreement, and that BSB had no valid interest in the property that it purported

to transfer to PTSW.  (Baerveldt Aff. ¶¶ 4-5).  The parties' rights and obligations under

the contracts are hotly contested.

In October 2003, PTSW, allegedly without notice to BSB and without BSB's

knowledge, obtained an ex parte order from the District Court of South Jakarta,

Indonesia.  (Irwin Aff., ¶ 12; Aubry Aff., Ex. 5).  The court ruled in its order that PTSW

had satisfied its debt obligation to BSB under the Loan Agreement and that PTSW's

mortgage should be released.  (Id.).

On January 15, 2004, after learning about the ex parte order from the Jakarta

District Court, BSB appealed the decision to the High Court of Jakarta.  (See Irwin Aff.

¶ 15).  In addition, BSB commenced an arbitration before the SIAC in Singapore claiming

that PTSW had breached the Transfer Agreement and the Loan Agreement and seeking

damages of $2,915,040 plus interest and other relief.  (Irwin Aff. ¶ 13; Aubry Aff., Ex.

6).  PTSW raised various procedural and jurisdictional objections to BSB's claims.

(Irwin Aff. ¶ 14; Baerveldt Aff. ¶ 10).

## The SIAC Award

The arbitration proceedings did not result in a resolution of the parties' contractual

dispute.  While the arbitration was pending, and before the arbitration tribunal was able

to render a decision on the merits of BSB's claims, the High Court of Jakarta, Indonesia

vacated the lower court's ex parte ruling.  (Irwin Aff. ¶ 15; Aubry Aff., Ex. 7).  As a

result, the local Jakarta land office reinstated the mortgage in favor of BSB.  (Irwin Aff.

¶ 15; Aubry Aff., Ex. 8).  Thereafter, on September 21, 2004, BSB filed an application to

withdraw its arbitration claims.  (Aubry Aff., Ex. 9; Baerveldt Aff. ¶ 11).  In its applica-

tion, BSB stated, among other things, that the reinstatement of its security rights by the

High Court of Jakarta had made it possible for BSB to seek foreclosure on its mortgage in

Indonesia and to obtain the payments that PTSW owed to BSB.  (Aubry Aff., Ex. 9 at

¶¶ 4.1, 5.1).  It also noted "that any award granted by the [SIAC] in favor of [BSB] would

ultimately require enforcement against [PTSW] by judicial action in Indonesia in any event." (Id. ¶ 1.5). PTSW objected to BSB's application, and alternatively requested that BSB only be allowed to withdraw on the condition that it reimburse PTSW's arbitration costs and that the arbitration tribunal issue an order barring BSB from recommencing its claims before the SIAC. (Nicholson Aff., Ex. 2).

On December 15, 2004, the arbitration tribunal issued a Final Award in which it allowed BSB to withdraw its claims and directed BSB to pay the arbitration costs, as well as the legal fees, expenses and disbursements that PTSW had incurred in connection with the arbitration. (Id., Ex. 1). The amount of PTSW's fees was "to be agreed between the parties and failing agreement to be taxed by the Registrar of SIAC . . . ." (Id. at ¶ 13(e)). The tribunal, in its Award, also precluded BSB from further arbitrating its claims against PTSW unless and until it paid PTSW's costs in full. (Id. at ¶ 13(f)).

## Proceedings Before This Court

On December 17, 2004, PTSW commenced this action to confirm and enforce the SIAC Award. Although the amount of its Final Award had not yet been fixed, PTSW also moved for an ex parte attachment in the amount of $388,000 against BSB's account at Citizens Bank. The District Court granted PTSW's motion in order to secure the applicant's ability to collect under the Final Award. The parties were unable to agree on the amount of PTSW's fees, and on March 11, 2005, the SIAC Registrar issued a

certificate taxing costs at approximately $287,000.[4]  (Nicholson Aff., Ex. 1).  This court,

in its Order dated April 12, 2005, directed that the attachment of BSB's Citizens Bank

account be reduced to $287,000.  (Docket No. 26).  PTSW has appealed that Order and

seeks to increase the attachment to take into account interest on the Final Award.

(Docket No. 31).

       Thereafter, BSB filed an Answer and Counterclaim in this action.  In its counter-

claim, BSB asserts a claim against PTSW for breach of the Loan Agreement, and seeks an

adjudication on the merits of its contract dispute with PTSW.  (See Counterclaim ¶¶ 41-

45).  In addition, BSB alleges that it is "contractually entitled to set off any amount due

to PTSW, including amounts due under the SIAC Award, against the amounts owed by

PTSW to BSB."  (Id. ¶ 46).  BSB is seeking to recover "all damages, including principal,

interest, costs and attorney's fees due to PTSW's breach of the Loan Agreement, less any

amount set off as an amount due to PTSW under the SIAC Award."  (Id. ¶ 47).  The

contract dispute raises numerous issues of Indonesian law.  (See generally Achtar Aff.).

## The Indonesian Litigation

       In response to BSB's counterclaim in this court, in April 2005, PTSW commenced

litigation against BSB in the South Jakarta District Court in Indonesia.  (Baerveldt Aff.

¶ 8).  In that action, PTSW claims that it never received the full amount due to it from

---

       [4]  The parties agree that the final amount of the SIAC award is about $287,000.  Because
the SIAC Registrar expressed certain portions of the final amount in Singapore dollars, which
have been converted to United States dollars, the $287,000 figure may not be exact.

BSB under the Loan Agreement, that it has repaid all of its debt to BSB, and that it is entitled to relief from any further obligations under the Loan Agreement. (PTSW Mem., Ex. 2). Accordingly, PTSW, in its Indonesian lawsuit, is seeking to resolve the parties' dispute under the Loan Agreement.

### III. ANALYSIS

BSB has moved to stay confirmation and enforcement of the SIAC Final Award pending adjudication of its counterclaims before this court. BSB maintains that this court has the authority to render a judgment on the merits of its contract suit for damages, as well as to apply a set off. In contrast, PTSW has moved to strike or dismiss the counterclaims on the grounds that a counterclaim is not authorized under the Convention. PTSW further argues that even if BSB may assert a counterclaim in this proceeding, this court has neither subject matter jurisdiction over the parties' contractual dispute nor personal jurisdiction over PTSW for purposes of resolving the contract dispute. Alternatively, PTSW requests that this court stay the litigation of BSB's counterclaims pending a decision from the Indonesian court in PTSW's lawsuit.

#### A.    Authority to Assert Counterclaims Pursuant to the Convention

"The Convention is a United Nations treaty to which the United States became a party in December 1970 . . . . Legislation implementing the Convention is codified in Chapter 2 of Title 9 of the United States Code." Fertilizer Corp. of India v. IDI Mgmt., Inc., 517 F. Supp. 948, 950 (S.D. Ohio 1981). It provides for the recognition and enforcement of foreign commercial arbitration awards that have been rendered by a

competent arbitration body in any country that is a party to the Convention.  <u>See</u> 9 U.S.C. §§ 201, 202, 207; <u>Jugometal v. Samincorp, Inc.</u>, 78 F.R.D. 504, 506 (S.D.N.Y. 1978). Singapore, the country in which the Final Award was issued in this case, is a party to the Convention.  <u>See</u> Convention set forth at 9 U.S.C. § 201.

Pursuant to 9 U.S.C. § 203, the district courts of the United States have original jurisdiction over actions and proceedings falling under the Convention, regardless of the amount in controversy.  Thus, "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to a [district court] for an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207. "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in said Convention."  <u>Id.</u> Accordingly, the court may refuse to recognize and enforce an arbitral award only if the party against whom the Convention is invoked proves one or more of seven enumerated defenses set forth in the Convention.  <u>See</u> Convention, Art. V.  In the instant case, BSB does not rely on any of the specific defenses to enforcement.  Consequently, it has not asked the court to refuse to confirm or enforce the SIAC award.  Rather, BSB requests that the court adjudicate the merits of its breach of contract claim against PTSW and apply a set-off.

There is a split of authority as to whether counterclaims may be asserted in response to an action to enforce an arbitration award under the Convention.  The dispute arises from the fact that "[a] central purpose of the Convention – an international agree-

ment to which the United States is only one of approximately one hundred signatories –
was to expedite the recognition of foreign arbitral awards with a minimum of judicial
interference." Hewlett-Packard Co., Inc. v. Berg, 61 F.3d 101, 106 (1st Cir. 1995).
Consequently, actions to confirm an arbitral award are "intended to be summary in
nature." Booth v. Hume Publ'g, Inc., 902 F.2d 925, 932 (11th Cir. 1990). As a result,
some courts have held that only the statutorily enumerated defenses may be asserted in
defense of an action to confirm an award. See, e.g., id. at 932-33 ("To allow a respon-
dent to assert counterclaims that are beyond the scope of the defenses enumerated in the
Act would change the nature of the confirmation proceedings and would defeat the
purpose of the Act.").

In addition to the policy reasons behind excluding counterclaims, some courts
point to the language of the Arbitration Act, which provides that "[a]ny application to the
court hereunder shall be made and heard in the manner provided by law for the making
and hearing of motions, except as otherwise herein expressly provided." 9 U.S.C. § 6.
See also Fed. R. Civ. P. 81(a)(3) (Federal Rules of Civil Procedure apply to arbitration
proceedings under 9 U.S.C. "only to the extent that matters of procedure are not provided
for in those statutes"). Thus, the argument goes, since matters of procedure are provided
for in 9 U.S.C. § 6, and the statute provides that a confirmation proceeding is to be
treated as a motion, no counterclaims are permitted because counterclaims may not be
interposed in response to a motion. See, e.g., Fertilizer Corp. of India, 517 F. Supp. at
963.

-11-

On the other hand, there are courts which allow counterclaims, finding them to be consistent with the policy behind the Act.  Thus, authorities have found that "[t]he Convention does not prevent this Court from entertaining set-offs or counterclaims in a proper case where authorized by Rule 13" of the Federal Rules of Civil Procedure. Jugometal, 78 F.R.D. at 507.  See also Thomas H. Oehmke, 1 Commercial Arbitration § 41.106 (2004) ("district courts enforcing foreign arbitral awards can entertain setoffs or counterclaims, even though these same claims may not have been considered by the arbitrator").  A counterclaim has been found to be appropriate where "the Court in its discretion could exercise under Rule 13, F.R.Civ.P., ancillary jurisdiction over the subject matter of the counterclaims" and "[t]he interests of justice require that the Court exercise its powers over the counterclaims . . . ."  Jugometal, 78 F.R.D. at 506.  Moreover, courts have allowed motions to dismiss and motions for summary judgment in response to proceedings to enforce arbitration awards brought under 9 U.S.C., despite the language of 9 U.S.C. § 6 providing that confirmation actions are to proceed like motions, by finding that such motions are not expressly excluded.  See Milwaukee Typographical Union No. 23 v. Newspapers, Inc., 639 F.2d 386, 390 (7th Cir. 1981) ("Courts have applied various sections of the Rules of Civil Procedure in actions under the Arbitration Act"), cert. denied, 454 U.S. 838, 102 S. Ct. 144, 70 L. Ed. 2d 119 (1981).  Under this analysis, counterclaims should be allowed as well.

In the instant case, this court does not need to reach the difficult issue whether a counterclaim raising the merits of BSB's contractual dispute with PTSW could be

asserted.  As detailed <u>infra</u>, this court lacks subject matter jurisdiction over such a claim.

This court does find persuasive, however, those cases which allow the assertion of a set-off to an action to enforce an arbitration award.  Allowing a set-off of a liquidated counterclaim would not require "a lengthy hearing on an unliquidated claim" or "frustrate the fair and speedy administration of justice as required by the Convention."  <u>Jugometal</u>, 78 F.R.D. at 507.  <u>See</u> <u>also</u> <u>Hewlett-Packard</u>, 61 F.3d at 105-06 (set-off appropriate in an action to enforce an arbitration award; equity requires enforcement action be stayed until other claim liquidated).  Here, BSB has established that there is a genuine dispute between the parties regarding their rights and obligations under the Loan Agreement.  It also has shown that it if it is able to obtain a favorable ruling on the merits of the contractual dispute, the amount of the set-off to which it would be entitled would be substantial.  Therefore, under the circumstances of this case, justice would best be served by allowing BSB to maintain its counterclaim to the extent that it seeks a set-off.

For these reasons, this court recommends that BSB be permitted to assert a set-off as a counterclaim to PTSW's enforcement action.

### B.    Subject Matter Jurisdiction

The next issue which must be addressed is whether this court has jurisdiction over the merits of BSB's dispute and/or a set-off.  As detailed herein, this court lacks subject matter jurisdiction over the merits of the contractual dispute.  In contrast, this court does have subject matter jurisdiction over BSB's claim for a set-off.

-13-

"Federal courts are courts of limited jurisdiction; a court may not address the merits until 'after . . . the court has assumed jurisdiction over the controversy.'"  Iglesias v. Mut. Life Ins. Co. of N.Y., 156 F.3d 237, 241 (1st Cir. 1998) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S. Ct. 773, 776, 90 L. Ed. 939 (1946)), cert. denied, 528 U.S. 812, 120 S. Ct. 45, 145 L. Ed. 2d 41 (1999).  "There are two ways for district courts to acquire jurisdiction over counterclaims: (1) pursuant to an independent basis for federal jurisdiction present in the counterclaim; or (2) pursuant to 28 U.S.C. § 1367 which provides supplemental jurisdiction over counterclaims that are part of the same case or controversy as the original claim."  Toste Farm Corp. v. Hadbury, Inc., 70 F.3d 640, 646 (1st Cir. 1995).  Because there is no independent basis for exercising jurisdiction over BSB's counterclaims,[5] this court may not hear the dispute unless it falls within this court's supplemental jurisdiction.

### 1.    Permissive vs. Compulsory Counterclaim

28 U.S.C. § 1367 provides in relevant part: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III

---

[5]  There is no federal question raised by BSB's counterclaim, and diversity jurisdiction is not available where the parties to the lawsuit consist of two foreign entities.  See 28 U.S.C. § 1332 (district courts have diversity jurisdiction over matters between citizens of different States or between citizens of a State and citizens of a foreign state, but not over matters between citizens of foreign states).

of the United States Constitution." 28 U.S.C. § 1367(a). "When considering supplemen-

tal jurisdiction, the nature of the counterclaim is crucial." Iglesias, 156 F.3d at 241.

Pursuant to Fed. R. Civ. P. 13, there are two types of counterclaims: compulsory and

permissive. A counterclaim is compulsory "if it arises out of the transaction or occur-

rence that is the subject matter of the opposing party's claim . . . ." Fed. R. Civ. P. 13(a).

All other counterclaims are permissive. See Fed. R. Civ. P. 13(b). "Only compulsory

counterclaims can rely upon supplemental jurisdiction; permissive counterclaims require

their own jurisdictional basis." Iglesias, 156 F.3d at 241. In the instant case, this court

has original jurisdiction over PTSW's claim to enforce its arbitration award. This court

finds that BSB's counterclaims are compulsory to PTSW's claim only to the extent that

BSB is seeking a set-off. The merits of BSB's breach of contract claim is a permissive

counterclaim and, therefore, is not within this court's supplemental jurisdiction.

　　　Under the law of this Circuit, "[t]here are at least four tests to determine whether a

counterclaim is compulsory or permissive . . . ." Id. They include:

　　(1)　Are the issues of fact and law raised by the claim and counterclaim
　　　　　largely the same?
　　(2)　Would res judicata bar a subsequent suit on defendant's claim absent
　　　　　the compulsory counterclaim rule?
　　(3)　Will substantially the same evidence support or refute plaintiff's
　　　　　claim as well as defendant's counterclaim?
　　(4)　Is there any logical relation between the claim and the counterclaim?

Id.

　　　BSB argues that substantially the same evidence will support or refute PTSW's

confirmation and enforcement action and the merits of BSB's contract dispute. This

court disagrees.  PTSW's claim is based on an arbitral award for costs incurred in

connection with an arbitration that was never determined on the merits.  There is no

reason for PTSW to introduce any evidence concerning the underlying contractual dispute

that brought the parties before the SIAC, and the Convention does not allow for the

respondent to refute the applicant's claim by litigating that dispute here.  Rather, pursuant

to the Convention, in order to obtain recognition and enforcement of an arbitral award,

the applicant need only submit "[t]he duly authenticated original award or a duly certified

copy thereof" and the parties' original agreement to submit to arbitration.  Convention,

Art. IV.  BSB is not challenging the award, and is not raising any of the specific defenses

to enforcement set forth in the Convention.  See Convention, Art. V.  Evidence

supporting BSB's claim that PTSW breached the terms of the Loan Agreement may

include facts relating to BSB's property rights and interest to the mezzanine floor of the

S. Widjojo Centre in Jakarta, its transfer of those rights to PTSW, the amounts that BSB

transferred to PTSW pursuant to the Loan Agreement, and any failure by PTSW to make

payments to BSB under the terms of the Loan Agreement.  This evidence is totally

distinct from the evidence needed to support or refute the present enforcement action.

Of the remaining tests, only the fourth "logical relation" test could possibly

encompass BSB's counterclaim.  Under this test, a counterclaim is compulsory if:

> it arises out of the same aggregate of operative facts as the original
> claim in two senses: (1) that the same aggregate of operative facts
> serves as the basis of both claims; or (2) that the aggregate core of
> facts upon which the original claim rests activates additional legal
> rights in a party defendant that would otherwise remain dormant.

Iglesias, 156 F.3d at 242.  The crucial facts upon which PTSW's action rests consist of the Final Award against BSB and the fact that it was rendered in a commercial dispute by a competent arbitration body in Singapore.  These facts may activate BSB's contractual right to set off PTSW's award by any amount that PTSW has been found to owe to BSB under the Loan Agreement.  However, they are unrelated to the merits of BSB's breach of contract claim and do not activate BSB's substantive right to damages under the Loan Agreement.  Moreover, BSB's ability to recover breach of contract damages does not depend upon the success or failure of PTSW's claim in this proceeding, and this action cannot be said to have "activate[ed] otherwise dormant claims" for damages under the Loan Agreement.  Id.  Accordingly, with the exception of its claim for a set-off, BSB's contract claims bear no logical relation to PTSW's enforcement proceeding.

## 2.     The Discretion to Decline Jurisdiction

Assuming, arguendo, the existence of supplemental jurisdiction over BSB's breach of contract claim, this court still would recommend that jurisdiction be declined.  "By statute, a district court may decline to exercise supplemental jurisdiction if, among other things, the state claim 'substantially predominates over the claim or claims over which the district court has original jurisdiction,' or 'in exceptional circumstances, [when] there are other compelling reasons for declining jurisdiction.'"  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 37 (1st Cir. 2003) (quoting 28 U.S.C. § 1367(c)(2), (c)(4)).  "In making these decisions, district courts must examine the totality of the circumstances" and "giv[e] consideration to such issues as 'comity, judicial economy, convenience, fairness and the

like.'" Id. (quoting <u>Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 257 (1st Cir. 1996)).

Here, litigation of BSB's breach of contract claim would easily predominate over the straightforward issues raised by PTSW's enforcement action. Because the Loan Agreement designates Indonesian law as the governing law, and the parties' positions raise numerous issues of Indonesian law, adjudication of the claim in this forum would be complex and require more of the court's and the parties' resources than an ordinary contract dispute. Furthermore, one of the parties to the dispute is an Indonesian entity, and the claim involves property located in Indonesia. Therefore, it is likely that at least some if not most of the witnesses and documentary evidence will be located in that country, and that litigation here would be especially burdensome for the parties. Finally, given the pending action before the Indonesian court, it appears that the dispute is likely to be resolved in a court of competent jurisdiction. Based on these circumstances, this court concludes that subject matter jurisdiction should be declined in any event. Accordingly, for these additional reasons, this court recommends that PTSW's motion to strike or dismiss the counterclaim be allowed to the extent that it seeks dismissal of the merits of the breach of contract claim, but denied insofar as it seeks dismissal of BSB's claim to a set-off for any amount that is found to be owing from PTSW to BSB.[6]

---

[6] Because this court concludes that there is no subject matter jurisdiction over BSB's contract claim for damages, there is no need to address PTSW's argument that this court has no personal jurisdiction over that entity, or that the court should dismiss BSB's claims under the doctrine of forum non conveniens. However, this court notes that in light of its jurisdiction to

### C.    A Stay of the Enforcement Proceeding

Because it would be fair to allow BSB to maintain its claim for a set-off, this court recommends that the enforcement action be stayed pending adjudication of the parties' contract dispute in Indonesia.  "Ordinarily there could be no doubt that a court, although obliged to decide a claim, would retain discretion to defer proceedings for prudential reasons.  Indeed, a typical reason is the pendency of a related proceeding in another tribunal."  Hewlett-Packard, 61 F.3d at 105.  In view of BSB's equitable and/or contractual claim to a set-off, and the likelihood that any set-off amount will be determined by the proceedings in Indonesia, this court concludes that equitable considerations support a stay of this action pending the outcome of the Indonesian lawsuit.  See id. at 105-06 (district court may stay confirmation of arbitral award pending outcome of underlying contractual dispute based on fairness considerations).  While that action is ongoing, PTSW's ability to collect the Final Award will remain secured by the attachment of BSB's bank account at Citizens Bank.  Accordingly, this court recommends that a stay be allowed, and that the parties file a report with the court every thirty days describing the status of the Indonesian litigation.

### IV.  CONCLUSION

---

hear PTSW's enforcement action, it does have jurisdiction to set-off other judgments.  See Jugometal, 78 F.R.D. at 506.  Furthermore, by submitting itself to this court's jurisdiction for purposes of its enforcement proceeding, PTSW has "surrendered any jurisdictional objections to claims that [BSB] wished to assert against it in consequence of the same transaction or arising out of the same nucleus of operative facts."  Gen. Contracting & Trading Co. v. Interpole, Inc., 940 F.2d 20, 23 (1st Cir. 1991).

For the reasons described herein, this court concludes that BSB is entitled to offset any amounts it may recover against PTSW, but that this court lacks jurisdiction to address the merits of BSB's contract dispute for damages. The action to confirm and enforce the SIAC award should be stayed pending the resolution of BSB's claims in an appropriate forum. Consequently, this court recommends to the District Judge to whom this case is assigned that BSB's motion to stay (Docket No. 29) be ALLOWED and that PTSW's motion to strike, dismiss or stay (Docket No. 36) be ALLOWED IN PART and DENIED IN PART. The parties should further be ordered to file a report with the court every thirty days describing the status of the Indonesian litigation.[7]

_____
Judith Gail Dein
United States Magistrate Judge

---

[7] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).